# IN THE UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

**ENDICOTT-QUINONES, et al.**

Plaintifs-Appellees,

v.

**GARZA, et al.**

Defendants-Appellants.

On Appeal from the United States District Court
for the District of New Mexico
The Honorable David H. Urias
United States District Judge
Case No. 21-cv-00368 DHU/JMR

## APPENDIX VOLUME 1

Respectfully Submitted,

JAMES J. GRUBEL
ALFRED A. PARK
Attorney for Defendants/Appellants
PARK & ASSOCIATES, LLC
3840 Masthead St. NE
Albuquerque, NM 87109
(505) 246-2805
jgrubel@parklawnm.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing APPENDIX was furnished by electronic means as more fully reflected in the CM/ECF certificate of delivery to the following on December 16, 2024.

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I further certify that all required privacy redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or Scanned PDF format is an exact copy of the written document filed with the Clerk, and that the digital submissions have been scanned for viruses with the most recent version of Microsoft Defender, updated December 16, 2024 and according to this program, they are free from viruses.

Respectfully submitted,

/s/ James J. Grubel
James J. Grubel
Alfred A. Park
Attorney for Defendants/Appellants
PARK & ASSOCIATES, LLC
3840 Masthead St. NE
Albuquerque, NM 87109
(505) 246-2805
jgrubel@parklawnm.com

# TABLE OF CONTENTS

Docket Report ........................................................................................................1

Doc. 53  Corrected Second Amended Complaint .....................................................13

Doc 55 Answer to Corrected Second Amended Complaint ......................................39

Doc 91 Renewed Motion for Summary Judgment ..................................................63

Doc 93 Order Setting Briefing Schedule .................................................................91

Doc 97 Plaintiffs' Response to Renewed Motion for Summary Judgment.............92

Doc 99 Plaintiffs' Notice of Lodging……………………………………………137

Doc 103 Reply in support of Motion for Summary Judgment ..............................139

Doc 115 Memorandum Opinion and Order Denying MSJ....................................180

Doc 117 Notice of Appeal ......................................................................................213

Doc 124 Transcript of hearing on Motion for Summary Judgment ......................215

# U.S. District Court
## United States District Court – District of New Mexico (Albuquerque)
### CIVIL DOCKET FOR CASE #: 1:21–cv–00368–DHU–JMR

Endicott–Quinones et al v. Garza et al
Assigned to: District Judge David H. Urias
Referred to: Magistrate Judge Jennifer M. Rozzoni
Case in other court:  First Judicial District Court, 21CV429
              Tenth Circuit, 24–02134
Cause: 28:1441 Petition for Removal– Civil Rights Act

Date Filed: 04/22/2021
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Alison Endicott–Quinones**
*guardian ad litem*
A.D., R.B., E.B., and M.B., minor
children

represented by **Benjamin Gubernick**
Gubernick Waldo Law Advocates LLP
717 Texas Ave
Suite 1200
77002
Houston, TX 77002
623–252–6961
Email: ben@wglawllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Bowles**
Bowles Law Firm
4811 Hardware Drive, N.E.
Bldg D, Suite 5
Albuquerque, NM 87109
505–217–2680
Fax: 505–217–2681
Email: jason@Bowles–Lawfirm.com
*TERMINATED: 05/29/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Gorence**
Gorence & Oliveros PC
300 Central Avenue SW
Suite 1000E
Albuquerque, NM 87102
505–244–0214
Fax: 505–244–0888
Email: gorence@golaw.us
*TERMINATED: 01/19/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd J. Bullion**
Law Office of Todd J. Bullion
4801 Lang Ave NE
Suite 110
Albuquerque, NM 87109
505–494–4656
Email: todd@bullionlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

represented by

**Patricia Garza**
*in her individual and official capacity*

**Alfred A Park**
Park & Associates, LLC
3840 Masthead St., N.E.
Albuquerque, NM 87109
505–246–2805
Fax: 505–246–2806
Email: apark@parklawnm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence M Marcus**
New Mexico Office of Superintendent of
Insurance
6200 Uptown Blvd. N.E.
Suite 400
NM
Albuquerque, NM 87110
505–709–8405
Email: lmarcus@nmdoj.gov
*TERMINATED: 08/07/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Grubel**
Park & Associates, LLC
3804 Masthead Street NE
Albuquerque, NM 87109
505–246–2805
Fax: 505–246–2806
Email: jgrubel@parklawnm.com
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**Rebecca Liggett**
*in her individual and official capacity*

represented by **Alfred A Park**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence M Marcus**
(See above for address)
*TERMINATED: 08/07/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Grubel**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**Brenda Saldana**
*in her individual and official capacity*

represented by **Alfred A Park**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence M Marcus**
(See above for address)
*TERMINATED: 08/07/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Grubel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**New Mexico Children Youth &**
**Families Department**
    represented by    **Alfred A Park**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence M Marcus**
(See above for address)
*TERMINATED: 08/07/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Grubel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does 1–50**

**Defendant**

**Jennifer De Los Santos**
    represented by    **Alfred A Park**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J Grubel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/22/2021 | 1 | NOTICE OF REMOVAL by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana from First Judicial District Court, case number D–101–CV–2021–00429. ( Filing Fee – Online Payment), filed by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Grubel, James) (Entered: 04/22/2021) |
| 04/22/2021 | 2 | NOTICE by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana *of Filing State Court Record* (Attachments: # 1 Exhibit) (Grubel, James) (Entered: 04/22/2021) |
| 04/22/2021 | | Filing and Administrative Fees Received: $ 402 receipt number BNMDC–7654553 re 1 Notice of Removal, filed by Rebecca Liggett, Brenda Saldana, New Mexico Children Youth & Families Department, Patricia Garza (Payment made via Pay.gov)(Grubel, James) (Entered: 04/22/2021) |
| 04/22/2021 | | United States Magistrate Judge Laura Fashing and United States Magistrate Judge Jerry H. Ritter assigned. (jg) (Entered: 04/22/2021) |
| 04/22/2021 | 3 | PLEASE TAKE NOTICE that this case has been randomly assigned to United States Magistrate Judge Laura Fashing to conduct dispositive proceedings in this matter, including motions and trial. Appeal from a judgment entered by a Magistrate Judge will be to the United States Court of Appeals for the Tenth Circuit. **It is the responsibility of the case filer to serve a copy of this Notice upon all parties with the summons and complaint.** *Consent is strictly voluntary, and a party is free to withhold consent without adverse consequences. Should a party choose to consent, notice should be made no later than 21 days after entry of the Order setting the Rule 16 Initial Scheduling Conference.* For e–filers, visit our Web site at www.nmd.uscourts.gov for more information and instructions. [THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jg) (Entered: 04/22/2021) |

| 04/29/2021 | 4 | ANSWER to Complaint (Notice of Removal) by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 04/29/2021) |
|---|---|---|
| 04/30/2021 | 5 | INITIAL SCHEDULING ORDER by Magistrate Judge Jerry H. Ritter setting a Rule 16 Initial Scheduling Conference for 6/29/2021 at 02:30 PM in Albuquerque − Telephonic Hearing/Conference before Magistrate Judge Jerry H. Ritter. Joint Status Report and Provisional Discovery Plan due by 6/22/2021. Unless otherwise notified by the Clerk or the Court a notice of consent or non−consent for this case to proceed before the trial Magistrate Judge should be submitted by each party no later than 6/9/2021. (mlt) (Entered: 04/30/2021) |
| 06/22/2021 | 6 | CERTIFICATE OF SERVICE by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana *Initial Disclosures* (Grubel, James) (Entered: 06/22/2021) |
| 06/22/2021 | 7 | Joint Status Report *and Provisional Discovery Plan* by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana (Grubel, James) (Entered: 06/22/2021) |
| 06/24/2021 | 8 | PLEASE TAKE NOTICE that this case has been reassigned to United States District Judge Kenneth J. Gonzales as the trial judge.<br><br>Under D.N.M.LR−Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges.<br><br>***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** Kindly reflect this change in your filings.<br><br>United States Magistrate Judge Laura Fashing no longer assigned to this case. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jg) (Entered: 06/24/2021) |
| 06/28/2021 | 9 | CERTIFICATE OF SERVICE by Alison Endicott−Quinones *re Plaintiffs' Initial Disclosures* (Gorence, Robert) (Entered: 06/28/2021) |
| 06/29/2021 | 10 | Clerk's Minutes for proceedings held before Magistrate Judge Jerry H. Ritter: Telephonic Rule 16 Scheduling Conference held on 6/29/2021. (mlt) (Entered: 06/29/2021) |
| 06/29/2021 | 11 | SCHEDULING ORDER by Magistrate Judge Jerry H. Ritter: Discovery due by 5/22/2022. Discovery Motions due by 5/29/2022. Pretrial Motions due by 7/7/2022. (mlt) (Entered: 06/29/2021) |
| 07/01/2021 | 12 | ORDER by Magistrate Judge Jerry H. Ritter setting a Settlement Conference on 5/10/2022 at 09:00 AM in Albuquerque − 440 Hondo Courtroom before Magistrate Judge Jerry H. Ritter. Settlement Statements are due to chambers on or before 4/26/2022. (mlt) (Entered: 07/01/2021) |
| 07/07/2021 | 13 | MOTION for Judgment on the Pleadings *For Rebcca Ligget Based on Absolute Immunity* by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 07/07/2021) |
| 07/13/2021 | 14 | Partial MOTION for Judgment on the Pleadings by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Marcus, Lawrence) (Entered: 07/13/2021) |
| 07/22/2021 | 15 | NOTICE by Alison Endicott−Quinones *of Agreed Upon Extension of Time for Plaintiffs to File Their Response to Defendant Rebecca Liggett's Motion for Judgment on the Pleadings Based on Absolute Immunity (Doc. 13)* (Gorence, Robert) (Entered: 07/22/2021) |
| 08/02/2021 | 16 | NOTICE by Alison Endicott−Quinones re 13 MOTION for Judgment on the Pleadings *For Rebcca Ligget Based on Absolute Immunity (of Agreed Upon Second Extension of Time for Plaintiffs to File Their Response)* (Gorence, Robert) (Entered: 08/02/2021) |

| | | |
|---|---|---|
| 08/02/2021 | 17 | Unopposed MOTION for Leave to File *a First Amended Complaint* by Alison Endicott–Quinones. (Attachments: # 1 Exhibit A) (Gorence, Robert) (Entered: 08/02/2021) |
| 08/03/2021 | 18 | ORDER by District Judge Kenneth J. Gonzales granting 17 Plaintiffs' Unopposed Motion for Leave to File a First Amended Complaint. [THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (tah) (Entered: 08/03/2021) |
| 08/04/2021 | 19 | ORDER by Magistrate Judge Jerry H. Ritter setting an Informal Discovery Conference for 8/9/2021 at 02:00 PM in Albuquerque – Telephonic Hearing/Conference before Magistrate Judge Jerry H. Ritter. Counsel shall call my toll–free AT&T conference line at (888) 278–0296, enter access code 9998216, and press # to be joined to the proceedings. [THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (mlt) (Entered: 08/04/2021) |
| 08/09/2021 | 20 | Clerk's Minutes for proceedings held before Magistrate Judge Jerry H. Ritter: Discovery Hearing held on 8/9/2021. Participants included Ben Gubernick and Todd Bullion for Plaintiff and James Grubel for Defendants. The Court noted that the matter involves an issue of New Mexico law. The parties may have a work–around for today, but either party may file a motion pertaining to NMSA 1978, Section 32A–4–33 and the attendant discovery issues raised today if they are unable to come to an agreement. [THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (mlt) (Entered: 08/09/2021) |
| 08/09/2021 | 21 | AMENDED COMPLAINT against All Defendants., filed by Alison Endicott–Quinones. (Gorence, Robert) (Entered: 08/09/2021) |
| 08/12/2021 | 22 | NOTICE OF WITHDRAWAL OF DOCUMENT as to document 13 Motion for Judgment on the Pleadings by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana (Grubel, James) (Entered: 08/12/2021) |
| 08/20/2021 | 23 | MOTION to Dismiss by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 08/20/2021) |
| 09/03/2021 | 24 | NOTICE OF AGREED UPON EXTENSION OF TIME FOR PLAINTIFFS TO FILE THEIR RESPONSE TO DEFENDANTS' MOTION TO DISMISS re 23 MOTION to Dismiss by Alison Endicott–Quinones. (Bullion, Todd) Modified text and termed motion on 9/8/2021 (bc). (Entered: 09/03/2021) |
| 09/23/2021 | 25 | NOTICE by Alison Endicott–Quinones re 23 MOTION to Dismiss *of Agreed Upon Extension of Time for Plaintiffs to File Their Response to Defendants' Motion to Dismiss [Doc. 23] (Second Notice)* (Gorence, Robert) (Entered: 09/23/2021) |
| 09/30/2021 | 26 | Unopposed MOTION for Leave to File Excess Pages *for Plaintiffs' Response to Defendants' Motion to Dismiss* by Alison Endicott–Quinones. (Gorence, Robert) (Entered: 09/30/2021) |
| 10/04/2021 | 27 | ORDER by District Judge Kenneth J. Gonzales granting 26 Unopposed Motion for Extension of the Page Limit. Plaintiffs' response to Defendants' Motion to Dismiss is extended to 30 pages. [THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (tah) (Entered: 10/04/2021) |
| 10/05/2021 | 28 | RESPONSE in Opposition re 23 MOTION to Dismiss filed by Alison Endicott–Quinones. (Bullion, Todd) (Entered: 10/05/2021) |
| 10/18/2021 | 29 | Unopposed MOTION to Extend (other) *Page Limits for Reply to Motion to Dismiss* by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 10/18/2021) |
| 10/19/2021 | 30 | ORDER by District Judge Kenneth J. Gonzales granting 29 Unopposed Motion for Extension of the Page Limit for Reply in Support of Defendants' Motion to Dismiss. (tah) (Entered: 10/19/2021) |
| 10/19/2021 | 31 | REPLY to Response to Motion re 23 MOTION to Dismiss filed by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 10/19/2021) |

| | | |
|---|---|---|
| 10/19/2021 | 32 | NOTICE of Briefing Complete by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana re 23 MOTION to Dismiss filed by Rebecca Liggett, Brenda Saldana, New Mexico Children Youth & Families Department, Patricia Garza (Grubel, James) (Entered: 10/19/2021) |
| 10/21/2021 | 33 | Unopposed MOTION to Stay *Discovery pending resolution of qualified immunity motion* by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 10/21/2021) |
| 10/26/2021 | 34 | ORDER by Magistrate Judge Jerry H. Ritter granting 33 Stipulated Motion to Stay (mlt) (Entered: 10/26/2021) |
| 12/08/2021 | 35 | ORDER FOR JOINT STATUS REPORT by District Judge Kenneth J. Gonzales. Status Report due by 12/13/2021. (tah) (Entered: 12/08/2021) |
| 12/10/2021 | 36 | NOTICE OF WITHDRAWAL OF DOCUMENT as to document 14 Motion for Judgment on the Pleadings by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department (Grubel, James) (Entered: 12/10/2021) |
| 01/31/2022 | 37 | PLEASE TAKE NOTICE that this case has been reassigned to District Judge David H. Urias as the trial judge.<br><br>Under D.N.M.LR−Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges.<br><br>***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** Kindly reflect this change in your filings.<br><br>District Judge Kenneth J. Gonzales no longer assigned to this case.<br>[THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jjs) (Entered: 01/31/2022) |
| 02/22/2022 | 38 | MINUTE ORDER re 34 Order on Motion to Stay, 12 Order Setting Settlement Conference by Magistrate Judge Jerry H. Ritter. The Court notes that the order staying the case was intended to vacate the settlement conference and all then−pending deadlines related to it until Defendant's Motion to Dismiss 23 was decided, which remains pending. The parties should jointly call Judge Ritter's judicial law clerk (Mike Timm at 505−348−2306) or send an email copying all counsel to michael_timm@nmd.uscourts.gov if they wish to proceed to a settlement conference before the Motion to Dismiss is decided and one will be set for an appropriate date. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (mlt) Modified on 2/22/2022 (jg). (Entered: 02/22/2022) |
| 08/17/2022 | 39 | MOTION for Leave to File *Second Amended Complaint* by Alison Endicott−Quinones. (Attachments: # 1 Exhibit Proposed Amended Complaint) (Bullion, Todd) (Entered: 08/17/2022) |
| 08/31/2022 | 40 | RESPONSE in Opposition re 39 MOTION for Leave to File *Second Amended Complaint* filed by Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 08/31/2022) |
| 09/19/2022 | 41 | NOTICE by Alison Endicott−Quinones re 40 Response in Opposition to Motion *for Leave to File Second Amended Complaint* (Bullion, Todd) (Entered: 09/19/2022) |
| 09/19/2022 | 42 | REPLY to Response to Motion re 39 MOTION for Leave to File *Second Amended Complaint* filed by Alison Endicott−Quinones. (Bullion, Todd) (Entered: 09/19/2022) |
| 09/19/2022 | 43 | NOTICE of Briefing Complete by Alison Endicott−Quinones re 39 MOTION for Leave to File *Second Amended Complaint* filed by Alison Endicott−Quinones (Bullion, Todd) (Entered: 09/19/2022) |
| 01/09/2023 | 44 | Unopposed MOTION to Withdraw as Attorney by Alison Endicott−Quinones. (Gubernick, Benjamin) (Entered: 01/09/2023) |
| 01/18/2023 | 45 | MOTION to Withdraw as Attorney by Alison Endicott−Quinones. (Gubernick, Benjamin) (Entered: 01/18/2023) |

| 01/19/2023 | 46 | ORDER by District Judge David H. Urias granting 45 Motion to Withdraw as Attorney. Attorney Robert J. Gorence terminated (arp) (Entered: 01/19/2023) |
|---|---|---|
| 02/10/2023 | 47 | NOTICE of Hearing on Motions: 23 MOTION to Dismiss and 39 MOTION for Leave to File *Second Amended Complaint* : Motions Hearing set for 3/7/2023 at 10:00 AM in Albuquerque − 420 Mimbres Courtroom before District Judge David H. Urias. (jmg) [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 02/10/2023) |
| 02/22/2023 | 48 | PLEASE TAKE NOTICE that this case has been reassigned to Magistrate Judge Jennifer M. Rozzoni as the pretrial judge.<br><br>Under D.N.M.LR−Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges.<br><br>***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** Kindly reflect this change in your filings.<br><br>Magistrate Judge Jerry H. Ritter no longer assigned to this case. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (bc) (Entered: 02/22/2023) |
| 03/02/2023 | 49 | MINUTE ORDER by District Judge David H. Urias VACATING the March 7, 2023 Motion Hearing.<br><br>[THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED] (jdf) (Entered: 03/02/2023) |
| 03/03/2023 | 50 | MEMORANDUM OPINION AND ORDER by District Judge David H. Urias denying as moot 23 MOTION to Dismiss , granting 39 MOTION for Leave to File *Second Amended Complaint*. Plaintiffs Second Amended Complaint must be filed on the docket within five working days of the entry of this Order. (arp) (Entered: 03/03/2023) |
| 03/06/2023 | 51 | SECOND AMENDED COMPLAINT against All Defendants. adding Jennifer De Los Santos., filed by Alison Endicott−Quinones. (Gubernick, Benjamin) Modified text to add "Second" on 3/7/2023 (bap). (Entered: 03/06/2023) |
| 03/14/2023 | 52 | ERRATA re 51 Amended Complaint by Alison Endicott−Quinones (Gubernick, Benjamin) (Entered: 03/14/2023) |
| 03/14/2023 | 53 | AMENDED COMPLAINT *CORRECTED* against All Defendants., filed by Alison Endicott−Quinones. (Gubernick, Benjamin) (Entered: 03/14/2023) |
| 03/14/2023 | 54 | WAIVER OF SERVICE Returned Executed by Jennifer De Los Santos as to Jennifer De Los Santos. (Grubel, James) (Entered: 03/14/2023) |
| 03/21/2023 | 55 | ANSWER to 53 Amended Complaint by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana.(Grubel, James) (Entered: 03/21/2023) |
| 03/22/2023 | 56 | INITIAL SCHEDULING ORDER: by Magistrate Judge Jennifer M. Rozzoni. Joint Status Report and Proposed Discovery Plan due by 4/26/2023. Scheduling Conference set for 5/3/2023 at 09:30 AM in Albuquerque − Telephonic Hearing/Conference before Magistrate Judge Jennifer M. Rozzoni. (kms) (Entered: 03/22/2023) |
| 04/14/2023 | 57 | MOTION for Judgment on the Pleadings *based on Absolute Immunity* by Rebecca Liggett. (Grubel, James) (Entered: 04/14/2023) |
| 04/25/2023 | 58 | Joint Status Report *and Provisional Discovery Plan* by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana (Grubel, James) (Entered: 04/25/2023) |
| 04/28/2023 | 59 | NOTICE by Alison Endicott−Quinones re 57 MOTION for Judgment on the Pleadings *based on Absolute Immunity of Agreed Upon Extension for Plaintiffs to Respond* (Bullion, Todd) (Entered: 04/28/2023) |

| | | |
|---|---|---|
| 05/03/2023 | 60 | Clerk's Minutes for proceedings held before Magistrate Judge Jennifer M. Rozzoni: Scheduling Conference held on 5/3/2023. (kms) (Entered: 05/03/2023) |
| 05/03/2023 | 61 | SCHEDULING ORDER and ORDER ADOPTING JOINT STATUS REPORT AND PROVISIONAL DISCOVERY PLAN by Magistrate Judge Jennifer M. Rozzoni. Discovery due by 1/19/2024. Motions due by 2/20/2024. Pretrial order deadline will be set by the presiding judge. (kms) (Entered: 05/03/2023) |
| 05/03/2023 | 62 | ORDER by Magistrate Judge Jennifer M. Rozzoni. Status Conference set for 8/16/2023 at 09:30 AM in Albuquerque − Telephonic Hearing/Conference before Magistrate Judge Jennifer M. Rozzoni. (kms) (Entered: 05/03/2023) |
| 05/04/2023 | 63 | TRIAL NOTICE: Call of the Calendar set for 7/26/2024 at 01:30 PM in Albuquerque − 420 Mimbres Courtroom before District Judge David H. Urias. Jury Selection/Trial set for 8/5/2024 at 09:00 AM in Albuquerque − 420 Mimbres Courtroom before District Judge David H. Urias. (Attachments: # 1 Trial Prep with JERS) (arp) (Entered: 05/04/2023) |
| 05/04/2023 | | Set Deadlines: Pretrial Order due by 7/15/2024. (arp) (Entered: 05/04/2023) |
| 05/12/2023 | 64 | NOTICE by Alison Endicott−Quinones re 57 MOTION for Judgment on the Pleadings *based on Absolute Immunity* (Gubernick, Benjamin) (Entered: 05/12/2023) |
| 05/17/2023 | 65 | Unopposed MOTION to Seal Document *exhibits to Defendants' motion for summary judgment* by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 05/17/2023) |
| 05/18/2023 | 66 | ORDER by District Judge David H. Urias GRANTING 65 Motion to Seal Document 65 Unopposed MOTION to Seal Document *exhibits to Defendants' motion for summary judgment* (arp) (Entered: 05/18/2023) |
| 05/19/2023 | 67 | NOTICE by Alison Endicott−Quinones re 57 MOTION for Judgment on the Pleadings *based on Absolute Immunity agreed upon extension for Plaintiff's Response* (Gubernick, Benjamin) (Entered: 05/19/2023) |
| 05/22/2023 | 68 | MOTION for Summary Judgment by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 05/22/2023) |
| 05/22/2023 | 69 | NOTICE by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana re 68 MOTION for Summary Judgment *Sealed Exhibits* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (Grubel, James) (Entered: 05/22/2023) |
| 05/22/2023 | 70 | "FILED IN ERROR" wrong document attached. MEMORANDUM in Opposition re 57 MOTION for Judgment on the Pleadings *based on Absolute Immunity* filed by Alison Endicott−Quinones. (Gubernick, Benjamin) Modified text on 5/23/2023 (bap). (Entered: 05/22/2023) |
| 05/23/2023 | 71 | NOTICE by Alison Endicott−Quinones re 70 Memorandum in Opposition, *Notice of Errata* (Gubernick, Benjamin) (Entered: 05/23/2023) |
| 05/23/2023 | 72 | RESPONSE in Opposition re 57 MOTION for Judgment on the Pleadings *based on Absolute Immunity* filed by Alison Endicott−Quinones. (Gubernick, Benjamin) (Entered: 05/23/2023) |
| 06/05/2023 | 73 | NOTICE by Alison Endicott−Quinones re 68 MOTION for Summary Judgment *agreed upon extension for Plaintiff's Response* (Gubernick, Benjamin) (Entered: 06/05/2023) |
| 06/05/2023 | 74 | NOTICE by Alison Endicott−Quinones re 68 MOTION for Summary Judgment (Bullion, Todd) (Entered: 06/05/2023) |
| 06/06/2023 | 75 | REPLY to Response to Motion re 57 MOTION for Judgment on the Pleadings *based on Absolute Immunity* filed by Rebecca Liggett. (Grubel, James) (Entered: 06/06/2023) |

| 06/06/2023 | 76 | NOTICE of Briefing Complete by Rebecca Liggett re 57 MOTION for Judgment on the Pleadings *based on Absolute Immunity* filed by Rebecca Liggett (Grubel, James) (Entered: 06/06/2023) |
|---|---|---|
| 06/17/2023 | 77 | NOTICE by Alison Endicott−Quinones re 68 MOTION for Summary Judgment *of Agreed Upon Extension for Plaintiffs to Respond* (Bullion, Todd) (Entered: 06/17/2023) |
| 07/03/2023 | 78 | NOTICE by Alison Endicott−Quinones re 68 MOTION for Summary Judgment *Agreed Upon Extension to Respond* (Bullion, Todd) (Entered: 07/03/2023) |
| 07/10/2023 | 79 | NOTICE by Alison Endicott−Quinones re 68 MOTION for Summary Judgment *Agreed Upon Extension of Time to Respond* (Bullion, Todd) (Entered: 07/10/2023) |
| 08/04/2023 | 80 | ORDER RE−SETTING TELEPHONIC STATUS CONFERENCE by Magistrate Judge Jennifer M. Rozzoni. Status Conference set for 8/28/2023 at 11:00 AM in Albuquerque − Telephonic Hearing/Conference before Magistrate Judge Jennifer M. Rozzoni. The Status Conference set for 8/16/2023 is hereby VACATED. (kms) (Entered: 08/04/2023) |
| 08/28/2023 | 81 | Clerk's Minutes for proceedings held before Magistrate Judge Jennifer M. Rozzoni: Status Conference held on 8/28/2023. (kms) (Entered: 08/28/2023) |
| 08/28/2023 | 82 | ORDER by Magistrate Judge Jennifer M. Rozzoni. Status Conference set for 12/1/2023 at 10:00 AM in Albuquerque − Telephonic Hearing/Conference before Magistrate Judge Jennifer M. Rozzoni. (kms) (Entered: 08/28/2023) |
| 08/28/2023 | 83 | Unopposed MOTION to Stay *Discovery due to pending motion on qualified immunity* by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 08/28/2023) |
| 08/29/2023 | 84 | ORDER granting 83 Motion to Stay Discovery by Magistrate Judge Jennifer M. Rozzoni (kms) (Entered: 08/29/2023) |
| 12/01/2023 | 85 | Clerk's Minutes for proceedings held before Magistrate Judge Jennifer M. Rozzoni: Status Conference held on 12/1/2023. (kms) (Entered: 12/01/2023) |
| 12/01/2023 | 86 | ORDER SETTING TELEPHONIC STATUS CONFERENCE by Magistrate Judge Jennifer M. Rozzoni. Status Conference set for 2/16/2024 at 10:00 AM in Albuquerque − Telephonic Hearing/Conference before Magistrate Judge Jennifer M. Rozzoni. (kms) (Entered: 12/01/2023) |
| 12/14/2023 | 87 | Joint MOTION for Protective Order by Alison Endicott−Quinones. (Attachments: # 1 Exhibit Exhibit A) (Gubernick, Benjamin) (Entered: 12/14/2023) |
| 12/15/2023 | 88 | ORDER granting 87 Motion for Protective Order by Magistrate Judge Jennifer M. Rozzoni (kms) (Entered: 12/15/2023) |
| 01/05/2024 | 89 | NOTICE by Alison Endicott−Quinones re 68 MOTION for Summary Judgment *of Agreed Upon Extension for Time to Respond* (Bullion, Todd) (Entered: 01/05/2024) |
| 02/09/2024 | 90 | ORDER by District Judge David H. Urias denying 68 Motion for Summary Judgment as moot for failure of the parties to abide by their briefing schedule. The Court grants Defendants leave to refile the motion once a briefing schedule has been determined. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (crg) (Entered: 02/09/2024) |
| 02/16/2024 | 91 | Second MOTION for Summary Judgment by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 02/16/2024) |
| 02/16/2024 | 92 | Clerk's Minutes for proceedings held before Magistrate Judge Jennifer M. Rozzoni: Status Conference held on 2/16/2024. (kms) (Entered: 02/16/2024) |
| 02/16/2024 | 93 | ORDER SETTING BRIEFING SCHEDULE re 91 Second MOTION for Summary Judgment filed by Rebecca Liggett, Brenda Saldana, Jennifer De Los Santos, New Mexico Children Youth & Families Department, Patricia Garza by Magistrate Judge Jennifer M. Rozzoni. Response due 3/8/2024. Reply due 3/22/2024. (kms) (Entered: |

| | | 02/16/2024) |
|---|---|---|
| 02/22/2024 | 94 | Unopposed MOTION to Stay *Discovery due to pending motion on qualified immunity* by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 02/22/2024) |
| 02/22/2024 | 95 | ORDER by Magistrate Judge Jennifer M. Rozzoni granting 94 Unopposed Motion to Stay Discovery. Discovery is stayed until Defendants' Renewed Motion for Summary Judgment (Doc. 91) has been decided. (ccp) (Entered: 02/22/2024) |
| 03/07/2024 | 96 | Unopposed MOTION for Leave to File Excess Pages , *File up to 250 Pages of Exhibits, and to File Exhibits Under Seal* by Alison Endicott–Quinones. (Bullion, Todd) (Entered: 03/07/2024) |
| 03/08/2024 | 97 | RESPONSE in Opposition re 91 Second MOTION for Summary Judgment filed by Alison Endicott–Quinones. (Bullion, Todd) (Entered: 03/08/2024) |
| 03/08/2024 | 98 | DECLARATION re 97 Response in Opposition to Motion *For Summary Judgment* by Alison Endicott–Quinones (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit) (Bullion, Todd) (Entered: 03/08/2024) |
| 03/09/2024 | 99 | NOTICE of Lodging by Alison Endicott–Quinones re 97 Response in Opposition to Motion, 98 Declaration, (Bullion, Todd) Modified on 3/11/2024 (cmm). (Entered: 03/09/2024) |
| 03/14/2024 | 100 | ORDER by District Judge David H. Urias GRANTING 96 Motion for Leave to File Excess Pages. [THIS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jdf) (Entered: 03/14/2024) |
| 03/20/2024 | 101 | Unopposed MOTION for Leave to File Excess Pages *for Defendants' Reply in support of Renewed Motion for Summary Judgment* by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 03/20/2024) |
| 03/21/2024 | 102 | ORDER by District Judge David H. Urias GRANTING 101 Motion for Leave to File Excess Pages for Defendants' Reply in support of Renewed Motion for Summary Judgment. (arp) (Entered: 03/21/2024) |
| 03/22/2024 | 103 | REPLY to Response to Motion re 91 Second MOTION for Summary Judgment filed by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Grubel, James) (Entered: 03/22/2024) |
| 03/22/2024 | 104 | NOTICE of Briefing Complete by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana re 91 Second MOTION for Summary Judgment filed by Rebecca Liggett, Brenda Saldana, Jennifer De Los Santos, New Mexico Children Youth & Families Department, Patricia Garza (Grubel, James) (Entered: 03/22/2024) |
| 03/27/2024 | 105 | MEMORANDUM OPINION AND ORDER by District Judge David H. Urias GRANTING IN PART AND DENYING IN PART 57 MOTION for Judgment on the Pleadings *based on Absolute Immunity.* (arp) (Entered: 03/27/2024) |
| 05/28/2024 | 106 | MOTION to Withdraw as Attorney by Alison Endicott–Quinones. (Gubernick, Benjamin) (Entered: 05/28/2024) |
| 05/29/2024 | 107 | Order granting 106 MOTION to Withdraw as Attorney by Magistrate Judge Jennifer M. Rozzoni. Noting that the motion is unopposed and plaintiff is still represented by other counsel, the motion is granted. Attorney Jason Bowles is withdrawn from the case. [THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS |

| | | |
|---|---|---|
| | | ATTACHED.] (kms) (Entered: 05/29/2024) |
| 06/18/2024 | 108 | NOTICE of Hearing on Motion 91 Second MOTION for Summary Judgment: Motion Hearing set for 7/16/2024 at 01:00 PM in Albuquerque − 420 Mimbres Courtroom before District Judge David H. Urias. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jdf) (Entered: 06/18/2024) |
| 07/16/2024 | 110 | Clerk's Minutes for proceedings held before District Judge David H. Urias: Motion Hearing held on 7/16/2024 re 91 Second MOTION for Summary Judgment filed by Rebecca Liggett, Brenda Saldana, Jennifer De Los Santos, New Mexico Children Youth & Families Department, Patricia Garza. (Court Reporter C. McAlister) (arp) (Entered: 07/17/2024) |
| 07/17/2024 | 109 | ORDER by District Judge David H. Urias VACATING the Call of the Calendar set for 7/26/2024, the Jury Selection/Trial set for 8/5/2024, and all other deadlines established in the 63 Trial Notice. These deadlines will be reset at a later date. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jdf) (Entered: 07/17/2024) |
| 07/26/2024 | 111 | DECLARATION re 97 Response in Opposition to Motion, 98 Declaration,, *in re replacement for Doc. 98−9* by Alison Endicott−Quinones (Attachments: # 1 Exhibit PDF) (Bullion, Todd) (Entered: 07/26/2024) |
| 08/07/2024 | 112 | Unopposed MOTION to Withdraw as Attorney *as to Lawrence Marcus for Defendants* by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Grubel, James) (Entered: 08/07/2024) |
| 08/07/2024 | 113 | ORDER by Magistrate Judge Jennifer M. Rozzoni granting 112 Unopposed Motion to Withdraw as Attorney. Attorney Lawrence M Marcus terminated. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (ccp) (Entered: 08/07/2024) |
| 08/07/2024 | 114 | ORDER by Magistrate Judge Jennifer M. Rozzoni. Settlement Conference set for 10/2/2024 at 09:00 AM in Albuquerque − 440 Hondo Courtroom before Magistrate Judge Jennifer M. Rozzoni. Settlement statements due to chambers no later than 9/25/2024. (ccp) (Entered: 08/07/2024) |
| 08/15/2024 | 115 | MEMORANDUM OPINION AND ORDER by District Judge David H. Urias DENYING 91 Second MOTION for Summary Judgment . (arp) (Entered: 08/15/2024) |
| 08/16/2024 | 116 | ORDER SETTING TELEPHONIC STATUS CONFERENCE by Magistrate Judge Jennifer M. Rozzoni. Status Conference set for 10/10/2024 at 09:30 AM in Albuquerque − Telephonic Hearing/Conference before Magistrate Judge Jennifer M. Rozzoni. (kms) (Entered: 08/16/2024) |
| 09/11/2024 | 117 | NOTICE OF APPEAL as to 115 Memorandum Opinion and Order by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana. (Filing Fee − Online Payment) (Grubel, James) (Entered: 09/11/2024) |
| 09/11/2024 | | Filing Fee Received: $ 605 receipt number ANMDC−9539798 re 117 Notice of Appeal filed by Rebecca Liggett, Brenda Saldana, Jennifer De Los Santos, New Mexico Children Youth & Families Department, Patricia Garza (Payment made via Pay.gov)(Grubel, James) (Entered: 09/11/2024) |
| 09/12/2024 | 118 | Transmission of Preliminary Record to US Court of Appeals re 117 Notice of Appeal. (Attachments: # 1 Preliminary Record) (cmm) (Entered: 09/12/2024) |
| 09/12/2024 | 119 | USCA Information Letter with Case Number 24−2134 for 117 Notice of Appeal filed by Rebecca Liggett, Brenda Saldana, Jennifer De Los Santos, New Mexico Children Youth & Families Department, Patricia Garza. (arp) (Entered: 09/12/2024) |

| 09/13/2024 | 120 | ORDER VACATING Conferences by Magistrate Judge Jennifer M. Rozzoni. Because this case is on appeal, the Court hereby VACATES the Settlement Conference set for 10/2/2024 at 9:00 a.m. and all deadlines set in the Order Setting Settlement Conference (Doc. 114). The Court also vacates the status conference set for 10/10/2024 at 9:30 a.m. (See Doc. 116). [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (ccp) (Entered: 09/13/2024) |
|---|---|---|
| 09/25/2024 | 121 | TRANSCRIPT ORDER FORM by Jennifer De Los Santos, Patricia Garza, Rebecca Liggett, New Mexico Children Youth & Families Department, Brenda Saldana requesting the proceedings held on 07/16/2024 be transcribed for the 117 Notice of Appeal (Grubel, James) (Entered: 09/25/2024) |
| 09/25/2024 | 122 | Minute order filed − Transcript order form due 10/09/2024 for Carmela McAlister (07/16/2024 proceedings) as to 117 Notice of Appeal filed by Rebecca Liggett, Brenda Saldana, Jennifer De Los Santos, New Mexico Children Youth & Families Department, Patricia Garza. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (arp) (Entered: 09/25/2024) |
| 10/02/2024 | 123 | Court Reporter's Transcript Order Form filed on 10/2/2024 re 117 Notice of Appeal Estimated Completion Date: 11/1/2024.(cm) (Entered: 10/02/2024) |
| 10/22/2024 | 124 | TRANSCRIPT of Proceedings held on July 16, 2024, before District Judge David H. Urias. Court Reporter/Transcriber Carmela McAlister, Telephone number 505−348−2094; email Carmela_McAlister@nmd.uscourts.gov. Transcript may be viewed at the Clerk's Office public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>**PLEASE TAKE NOTICE that each party now has seven (7) calendar days to file a Notice of Intent to Request Redaction of any personal identifiers from this transcript. If no notice is filed during this seven−day period, the court will assume that redaction of personal data is not necessary and will make the transcript electronically available, as is, to the public after 90 days. For additional guidance, PLEASE REVIEW the complete policy, located in the CM/ECF Administrative Procedures Manual at https://www.nmd.uscourts.gov.**<br><br>Notice of Intent to Request Redaction set for 10/29/2024. Redaction Request due 11/12/2024. Redacted Transcript Deadline set for 11/22/2024. Release of Transcript Restriction set for 1/21/2025.(cm) (Entered: 10/22/2024) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,

        Plaintiffs,

vs.                                                                       No. 21-cv-00368 DHU/JMR

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity;
BRENDA SALDANA, in her individual and
official capacity; JENNIFER DE LOS SANTOS,
in her individual and official capacity, the NEW
MEXICO CHILDREN, YOUTH & FAMILY
DEPARTMENT; and DOES 1-50,

        Defendants.

## CORRECTED SECOND AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND FOR DAMAGES AND INJUNCTIVE RELIEF

A. D., R. B., E. B. and M. B. (collectively, "Plaintiffs"), through their guardian ad litem Alison Endicott-Quiñones, complain against Patricia Garza ("Garza"), Rebecca Liggett ("Liggett"), Brenda Saldana ("Saldana"), Jennifer De Los Santos ("De Los Santos"), the New Mexico Children, Youth & Family Department ("CYFD") and Does 1-50 ("Doe Defendants") (collectively, "Defendants") as follows:

### INTRODUCTION

1.      This is an action to recover damages and injunctive relief under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act.

2.      The claims arise from the acts of Defendants, all of whom disregarded Plaintiffs' constitutional rights, safety and wellbeing in a cynical, concerted effort to get rid of their case.

3.      As alleged below, Defendants engineered a scheme to move Plaintiffs from an appropriate foster home to a "trial home visit" with their wholly unfit biological father. Defendants

1

App. Vol. 1: 013

acted with actual knowledge that the trial home visit created substantial risk to Plaintiffs' health, safety and wellbeing. Indeed, Garza's stated hope was that the children would be kidnapped during the trial home visit so the case would not go on for years. As a result, all four Plaintiffs were kidnapped by their biological parents, and the youngest, M.B., suffered catastrophic injuries.

4.      In furtherance of their scheme, Defendants: (1) concealed and misrepresented information about Plaintiffs' biological parents in New Mexico state family court; (2) threatened, coerced, and retaliated against CYFD employees who tried to alert third parties to the danger the trial home visit posed; (3) allowed the trial home visit to continue even when it had obviously failed and Defendants were legally obligated under their own regulations to end the trial home visit and remove the children from the trial home visit; and (4) actively hindered law enforcement's attempts to locate Plaintiffs after their biological parents kidnapped them during the trial home visit.

5.      Plaintiffs seek recovery from Defendants on all causes of action available under state and federal law.

## JURISDICTION

6.      Jurisdiction is proper in New Mexico as all, or substantially all, facts giving rise to Plaintiffs' claims occurred in New Mexico and all parties reside in New Mexico.

7.      This Court has original jurisdiction over this matter because Plaintiff's seek relief under 42 U.S.C. § 1983.

## PARTIES

8.      Plaintiff A. D. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

9.      Plaintiff R. B. is a minor child currently residing in Bernalillo County, New Mexico. His name is abbreviated in this Complaint to protect his privacy.

10.     Plaintiff E. B. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

App. Vol. 1: 014

11.     Plaintiff M. B. is a minor child currently residing in Bernalillo County, New Mexico. Her name is abbreviated in this Complaint to protect her privacy.

12.     Alison Endicott-Quiñones is a guardian ad litem appointed by a New Mexico state district court to represent Plaintiffs. She resides in Bernalillo County, New Mexico.

13.     Defendant Patricia Garza is a CYFD employee. She resides in Lea County, New Mexico. She is sued in her official and individual capacities.

14.     Defendant Brenda Saldana is a former CYFD employee. She resides in Texas. She is sued in her official and individual capacities.

15.     Defendant Rebecca Liggett is a retired CYFD employee. She resides in Santa Fe County, New Mexico. She is sued in her official and individual capacities.

16.     Defendant Jennifer De Los Santos was a CYFD employee at all material times. She resides in Lea County, New Mexico. She is sued in her official and individual capacities.

17.     Defendant CYFD is a subsidiary of the State of New Mexico. It is responsible for providing child protective services to children in New Mexico.

18.     Doe Defendants are CYFD employees or agents whose identities are not yet known. Through actions undertaken in their official and individual capacities, are legally responsible for the injuries to Plaintiffs complained of here. Plaintiffs will amend this complaint once their identities are ascertained.

## FACTUAL ALLEGATIONS

19.     June 3, 2019, started out as just another day panhandling outside the Walmart in Hobbs for Luiza Badea ("Badea") and Andrei C. Ducila ("Ducila"). For at least a month they had been living out of a van that would frequently stop in the Walmart parking lot. They would sleep in an old van at night and panhandle by the Walmart entrance during the day.

20.     The couple's four young children—Plaintiffs—were with them. All four were malnourished and had severe sunburns. The three older children had severe tooth decay. E.B. had tuberculosis. A doctor in Texas had given Ducila and Badea medication to treat E.B. The doctor

even told them E.B. could die if they did not stick to the treatment regimen. But the parents had left Texas months ago and had stopped giving E.B. her pills around the same time.

21.     In the weeks leading up to June 3, CYFD's abuse and neglect hotline had gotten numerous calls about the family. It made sense that people would call: CYFD's job was to protect kids, and it was plain to see that Plaintiffs needed help. No one came, though. That was because CYFD already knew about the family.

22.      Back in late April or early May of 2019, three workers from CYFD's Hobbs office had gone to the Walmart for lunch. They saw Plaintiffs wearing tattered clothes, walking barefoot on the hot asphalt, and they saw Badea and Ducila with a cardboard sign asking strangers for money. The case workers should have called in a report or personally addressed this situation. NMSA 32A-4-3 mandates reporting of child abuse for social workers who knows or has a reasonable suspicion that a child is being abused or neglected to immediately report the matter. Not to mention it was the right thing to do.

23.     Instead of addressing the abuse and neglect going on before their very eyes the case workers approached Plaintiffs' parents on their way into Walmart and told them to not be there when they came back because they would need to open an abuse and neglect case. When the workers left Walmart, the family was gone.

24.     After lunch the workers told Garza about the incident. They said CYFD had "dodged a bullet." After all, it was a lot of work to take abused children into custody. Garza was their boss—she managed the Hobbs office. She agreed with them completely about the family outside the Walmart. Hopefully they would just move on from Hobbs and make themselves someone else's problem.

25.     But within the next few days, the family was back at the Walmart. And as summer came and the weather got hotter, things only got harder for Plaintiffs. That, changed, though, on June 3, 2019, when someone called the police.

26.     When officers from the Hobbs Police Department arrived, they did not tell the family to leave. Instead, they arrested Badea and Ducila, and charged them with felony child abuse.

App. Vol. 1: 016

27.     Ivy Woodward ("Woodward"), one of CYFD's permanency planning supervisors, was dispatched to the parking lot to assess the situation. When she arrived, she saw an open-and-shut case of medical neglect. Plus, the parents had been arrested. She figured CYFD had no choice but to take Plaintiffs into custody.

28.     But Garza and CYFD's chief children's court attorney, Liggett, saw things differently. From their perspective, the problem was that Badea and Ducila were in the country illegally—if they were deported, CYFD could be stuck taking care of Plaintiffs until they found someone to adopt them.

29.     Liggett was a high-level administrator stationed at CYFD's headquarters in Santa Fe. She rarely appeared on cases and did not work in the Hobbs office at all. She was one of Brian Blalock's ("Blalock") top lieutenants. Blalock, CYFD's cabinet secretary, pushed an unwritten policy of reducing caseloads by reuniting parents with their children whenever possible. During the first two years of his administration, CYFD's case load had plummeted.

30.     At the parking lot that June evening, Liggett and Garza laid down the law for Woodward: the high-ups had spoken. CYFD would not take the children into custody.

31.     To Woodward, the edict made no sense. The children had nowhere else to go. Liggett had also initially supported taking the children into CYFD's custody, until she learned that the parents were not in the country legally. Woodward continued to argue with Liggett and Garza, while the police and Plaintiffs waited nearby.

32.     The stalemate was broken after several hours when someone called a state district court judge. The judge then contacted CYFD and asked when the filings from CYFD to initiate an abuse and neglect case would arrive. After that, Garza and Liggett backed down. The papers were filed and the children were placed in CYFD's custody on June 3, 2019.

33.     Intake at CYFD confirmed what was apparent in the Walmart parking lot: Plaintiffs and been abused, and Ducila and Badea were unfit parents. Medical personnel diagnosed Plaintiffs with a litany of medical conditions. E.B., R.B., and A.D. had such advanced tooth decay they needed soft food diets. R.B. required surgery to treat his tooth decay. All four children were

severely malnourished and sunburned. M.B. was suffering from severe diaper rash and dehydration. Something had caused abrasions on A.D.'s face. To make matters worse, Ducila and Badea told a CYFD investigator that they were unconcerned about Plaintiffs' medical conditions. The parents then offered the investigator and the police a cash bride to be on their way.

34.     Garza and Liggett wanted to find a way to dismiss the abuse and neglect case and return Plaintiffs to their biological parents. However, that became impossible when the Fifth Judicial District Attorney's Office filed felony child abuse charges against Ducila and Badea. As the parents' conditions of release prohibited them from residing with Plaintiffs, CYFD no longer had anyone it could return the children to.

35.     Unable to jettison Plaintiffs' case for the time being, CYFD assigned Plaintiffs to a foster home and enrolled E.B. and A.D. in daycare. CYFD also assigned Woodward to formulate a permanency plan.

36.     Shortly after being assigned to the case, Woodward learned that the police had found an empty bottle of tuberculosis medicine in the parents' van. Further investigation revealed that E.B. and A.D. were positive for tuberculosis. Woodward immediately notified Garza, and stated that the children needed to be removed from daycare before they infected other students. Woodward was also worried that they posed a threat to the foster family's children, one of whom was immunocompromised.

37.     Garza ordered Woodward to withhold the tuberculosis diagnosis from the daycare and the foster family. Garza said she was worried about finding other foster parents who would house E.B. and A.D. For her, the nightmare scenario was that CYFD would have to devote time and resources to taking care of the children itself. Garza was unconcerned with getting E.B. and A.D. treatment for their tuberculosis.

38.     Woodward disobeyed Garza by notifying the foster family, who then drove E.B. and A.D. to Lubbock, Texas to obtain treatment. The doctors discovered that E.B.'s tuberculosis had caused meningitis of the brain, and immediately hospitalized her for several days. Eventually E.B. recovered and went back into foster care with her siblings.

App. Vol. 1: 018

39.     Over the next few weeks, Woodward undertook the daunting task, assigned to her by Garza, of crafting a "treatment plan" to transform Badea and Ducila into fit parents.

40.     In October 2019, CYFD scheduled a psychological diagnostic appointment for Ducila and Badea. The appointment was scheduled to occur in Roswell, New Mexico. Woodward was tasked with transporting Ducila and Badea to the appointment.

41.     Prior to leaving for Roswell from Hobbs, Woodward was told by Megan Finno-Velazquez, CYFD's director of Immigration Affairs, to conceal the parents' identities from law enforcement if she was pulled over. Ducila and Badea were Romanian nationals in the United States illegally, and subject to deportation. Believing that the request was unethical and likely illegal, Woodward reported the event to Garza. Garza also ordered Woodward not to disclose the parents' identities.

42.     An email was sent by Megan Velasquez on October 8, 2019, stating that an immigration attorney had consulted with Ducila on his asylum claim. The immigration attorney assessed in her opinion that there was no hope of obtaining asylum or other relief that would allow Ducila to stay in the United States legally.

43.     Over the following months, Ducila and Badea made no progress on CYFD's treatment plan. These repeated failures were reported by Woodward to Garza and other CYFD employees. However, on every occasion Garza and other CYFD employees waived the treatment plan's requirements.

44.     The treatment plan required Ducila and Badea to address issues pertaining to their immigration status. However, neither Ducila nor Badea ever addressed their immigration status issues and are still deportable from the United States.

45.     The treatment plan required Badea and Ducila to address all issues pertaining to the felony criminal child abuse charges filed by the Fifth Judicial District Attorney. At the time Badea and Ducila kidnapped their children and at the time of the trial home visit, the criminal cases were still pending.

App. Vol. 1: 019

46.     The treatment plan required Badea and Ducila to undergo psychological evaluations and follow all subsequent recommendations. The psychological evaluation was never completed.

47.     The parents were ordered to engage in therapy and follow all therapist recommendations. This portion of the treatment plan was not completed.

48.     The plan required Ducila and Badea to attend all Plaintiffs' medical, dental and vision appointments. Ducila and Badea failed to do that.

49.     During Ducila's visits at CYFD's office in Hobbs, he could not interact with or supervise the children. E.B. and A.D. would frequently run up and down the hall and flash the lights on and off, while M.B., an infant, would scream.

50.     Woodward mentioned Ducila's profound inability to supervise or meaningfully interact with his children to Garza and the guardian ad litem on numerous occasions.

51.     Garza instructed Saldana to begin having the visitations in a room that did not have a recording device installed so that the abuse and neglect court would not have access to them.

52.     Garza also directed a temp, Rebecca Gaston, to be Saldana's assistant and to provide a counter narrative to anything that Woodward might say about the case.

53.     Gascon's directive was for her story to always match Saldana's regardless of what Woodward reported.

54.     On one occasion, during a supervised visit at CYFD, Ducila and Badea tried to leave the office with the children. The police were called and Ducila and Badea barricaded themselves in a room with Plaintiffs. Eventually, Hobbs Police Department officers had to make a forced entry to the room.

55.     Garza gave the directive that no charges would be pressed against Ducila and Badea for the incident and that visitation would continue as scheduled.

56.     During one supervised visit at CYFD, Ducila offered Woodward a cash bribe to look the other way while the parents absconded with the children. Ducila stated he had a lot of

App. Vol. 1: 020

money and asked how much of it he would need to pay to make all of this go away. Woodward refused and reported the incident to her superiors at CYFD, including Garza.

57.     Garza replied to the report of attempted bribery to obtain the children in CYFD's care by laughing and asking how much Ducila had offered.

58.     Ducila also offered a cash bribe on one occasion to Kelly Mazy ("Mazy"), a CYFD investigator. She did not accept the bribe.

59.     A.D. struggled while at school due to difficulty hearing. Woodward told Garza that CYFD should schedule an audiology appointment for A.D., and to order tests to determine whether A.D.'s hearing troubles stemmed from a traumatic brain injury. Garza refused this request.

60.     In early March 2020, Garza held a meeting on Plaintiffs' case. By that time, Badea had been incarcerated by ICE. Garza stated, "If we don't send these kids home, it will be another Everhart case." The Everhart case was a CYFD case that had gone on for over ten years.

61.     Woodward stated that the plan for the children should be shifted towards adoption because Badea was incarcerated and Ducila had done nothing to demonstrate that he could care for the children on his own.

62.     Saldana claimed that Ducila had complied with everything that the department had asked of him. Woodward reminded everyone of the multiple failures to comply with their treatment plan.

63.     Saldana stated that the visits with Ducila were going very well. Woodward replied that one week before this meeting, E.B. and A.B. tried to bolt from a visitation room to get away from Ducila, and that Ducila had nearly dropped M.B.

64.     Garza and Saldana then agreed amongst themselves that, rather than the visitation taking place at the office, where in Garza's words, "everybody could stick their nose in the case," they should start visiting with Ducila in the home. Garza was looking at Woodward when she made the comment about people sticking their nose into the case.

65.     Garza then stated, "Maybe they'll take the kids and run and we won't have to deal with them." Realizing that Woodward had heard that, Garza and Saldana locked eyes and then Garza stated, "just kidding, sorry, that wasn't funny."

66.     In February and March of 2020 A.D. and R.B. began making disturbing disclosures during play therapy.

67.     Play therapy is a structured activity designed to build on the normal communicative and learning processes of children. Therapists strategically utilize play therapy to help children explain what is troubling them when they lack the verbal language to express their thoughts and feelings. Play therapy is an evidence-based practice endorsed by the American Counseling Association.

68.     A.D. disclosed witnessing domestic violence by Ducila.

69.     A.D. also disclosed that Ducila had made her and R.B.  kiss each other on the lips.

70.     A.D. also arranged a family in the living room of the play therapy area and had the father doll come in and hit and kick everyone until they hid. The father then killed the family dog.

71.     A.D. disclosed that she had witnessed Ducila strike R.B. in the head.

72.     R.B. described his father to his therapist as being mean and during a play therapy session locked a doll representing his father outside of a room, stating if they let him in that he would hurt them.

73.     R.B. also disclosed to his therapist unequivocally that his father had hit him in the head "a lot."

74.     The therapist compiled this information and made a CYFD SCI report.

75.     Garza dismissed the play therapy disclosures regarding the dog being killed by speculating that A.D. was reenacting things she had seen on the news. No explanation or excuse was ever given to explain away the reports of physical abuse from both A.D. and R.B..

76.     Following the SCI report by the therapist, Garza and other CYFD employees contacted the therapist's supervisor. The organization that employed the therapist is separate from CYFD. However, much of its workload comes from clients referred to it by CYFD. Garza

10

threatened to stop sending clients to the therapist if she continued to report in a way that was counter to CYFD's objectives.

77.     The SCI report regarding Ducila striking R.B. in the head and sexual activity with A.D was investigated by Mazy.

78.     Within two days of being assigned as the investigator for the SCI report referrals, Mazy faced pressure from both Garza and Mazy's direct supervisor, De Los Santos, to close the case by finding that the disclosures could not be substantiated.

79.     Mazy informed De Los Santos and Garza that there were additional people she wanted to interview, including the children's therapist.

80.     Mazy also informed Garza and De Los Santos that she wanted to have the children participate in additional therapy and that she planned to interview the children again after they had discussed the abuse at greater length with their therapist.

81.     Mazy also informed Garza and De Los Santos that it was difficult interviewing A.D. because of her hearing issue and she wanted to speak with A.D. again after that issue was addressed.

82.     Defendant De Los Santos replied to Mazy's requests for additional time to investigate and perform additional interviews as follows, "you're probably right but Trish [Garza] really wants this closed."

83.     Mazy told De Los Santos that there was sufficient evidence to substantiate that physical abuse had occurred based on the initial statements made by R.B. and A.D. in therapy. De Los Santos and Garza ignored these disclosures and continued to pressure Mazy to close the investigation.

84.     De Los Santos ultimately ordered Mazy to unsubstantiate the abuse allegations.

85.     Patricia Garza gave this direction to De Los Santos that the report needed to be unsubstantiated.

86.     Mazy, acting under fear of losing her job, followed the directive from De Los Santos and issued a report saying the disclosures were unsubstantiated and closed the investigation.

App. Vol. 1: 023

87.     Garza, Saldana, and Liggett communicated to the abuse and neglect court that the allegations underlying the SCI report had been fully investigated and had been unsubstantiated.

88.     Defendants did not disclose to the abuse and neglect court that Garza and De Los Santos had ordered Mazy to unsubstantiate the report.

89.     Had the abuse and neglect court been provided with accurate information about therapist's SCI report and CYFD's investigation of the report, the court would not have allowed a trial home visit with the children's biological parents to take place.

90.     Defendants suppressed the circumstance surrounding CYFD's investigation of the SCI report even though they knew a significant risk existed that Ducila would continue to abuse his children and strike one or more of them in the head.

91.     In March 2020, Woodward reported Plaintiff's guardian ad litem in the abuse and neglect case at the time, Laura Castillo ("Castillo"), that Garza had made a "joke" about wanting Plaintiffs to be kidnapped. Woodward also informed Castillo that CYFD's decision to start a trial home visit would endanger the children.

92.     Based on Woodward's concerns, Castillo motioned the abuse and neglect court for a hearing, where Woodward would be the sole witness she would call. The purpose of the hearing was to stop the trial home visit from going forward based on Woodward's concerns, the play therapy disclosures, and Garza's "joke" about the parental kidnapping.

93.     Garza attempted to dissuade Woodward from telling the court about the danger the trial home visit posed to Plaintiffs. Garza wanted Woodward to omit information including the play therapy disclosures, Woodward's observations that Ducila had on at least one occasion looked like he was going to throw M.B. or drop her due to being enraged by his children's chaotic misbehavior, concerns about sexual abuse from the parents, Garza's stated desire to have Ducila and Badea kidnap the children, and other facts that would impede CYFD's plan to start  a trial home visit.

94.     When Woodward indicated that she would testify truthfully, Garza told Woodward that Woodward would be receiving a call from Liggett.

App. Vol. 1: 024

95.     Upon information and belief, Garza conveyed the anticipated substance of Woodward's testimony in its entirety to Liggett.

96.     On March 13, 2020, Woodward received a phone call from Liggett.

97.     Liggett was not an attorney of record on the case and the matter was being handled by a CYFD line attorney. Liggett was the chief children's court attorney for CYFD and did not handle individual cases or a docket as part of her normal job duties.

98.     Liggett asked Woodward what she planned to testify to at the hearing. Woodward stated she would testify truthfully about Ducila's inability to control the children, that the children would not be safe from abuse or neglect with Ducila, the children's troubling disclosures, the anger Ducila demonstrated during visits with the children, and that the investigation into the disclosures the children made in therapy was rushed by Garza and De Los Santos and was closed before an adequate investigation could be done.

99.     Liggett told Woodward that her testimony would make it look like CYFD was misleading the court about Ducila's readiness for a trial home visit.

100.    Liggett instructed Woodward that she was to refrain from testifying to her own personal or professional opinions and was to instead parrot CYFD's institutional position.

101.    Liggett directed Woodward to conceal her professional opinion that placing the children into a trial home visit would be dangerous contrary to the children's interests, even if directly asked to provide her professional opinion in court. Liggett instructed Woodward to respond to any question seeking her professional opinion as follows: CYFD's decision was to engage in a trial home visit.

102.    When Woodward said that she would not omit the truth and would answer questions honestly Liggett told Woodward that she would object to Woodward providing her opinion in court.

103.    Liggett then stated, "Let me remind you that you are an employee of the State of New Mexico and as such it is your obligation to align and censure yourself with the needs of the organization that employs you." Woodward replied, "No, ma'am, it is not. Especially when this

App. Vol. 1: 025

organization is asking me to lie for them." Liggett became agitated and stated, "nobody told you to lie, I just told you to censure yourself so that we are all on the same page." Liggett then stated that she was going to do everything in her power to keep Woodward from taking the stand and that there would be, "no limits" to what she would do to keep her from testifying.

104.     Liggett threatened Ms. Woodward on this phone call and intimated that Woodward would lose her job if she testified truthfully in the hearing.

105.     Woodward also received a phone call from Brian Blalock. Mr. Blalock told Ms. Woodward that she "needed to remember who her employer was" and also told her that she could lose her job if she was insubordinate. Ms. Woodward told Mr. Blalock that she felt her job was being threatened because she was doing her job, to protect children, and refused to go along with a coverup of CYFD's malfeasance in the Badea case. Mr. Blalock then hung up on her.

106.     Liggett and Garza told Woodward that due to Coronavirus and the fact that Woodward lived just over the state line in Texas that they would use coronavirus protocols to bar her from entering the courthouse and providing testimony.

107.     Neither Liggett nor Garza were concerned about Woodward travelling to testify in court until after Woodward indicated she would testify truthfully and would refuse to omit material facts and withhold professional opinions that undercut CYFD's goal of moving forward with a trial home visit.

108.     Woodward reported the conversation with Liggett to Castillo. Castillo decided that she would not be able to prevail at the hearing without Woodward's testimony, because Woodward was her sole witness. Castillo was also concerned that CYFD would fire Woodward if she testified at the hearing. Castillo called off the hearing, and the hearing was never reset.

109.     Woodward was removed from the Badea case by Garza shortly after her conversation with Liggett. Following Woodwards efforts to keep the Badea children safe CYFD engaged in a pattern of retaliation against Woodward that forced her to resign her position.

110.     In March of 2020 a no contact order was in place between Ducila and his children in his felony child abuse case, D-506-CR-2019-00391.To accomplish its plan of starting a trial

14

home visit, the criminal court overseeing Ducila's case had to be convinced to amend his conditions of release to remove the no contact order.

111.    On March 23, 2020 Ducila's attorney filed a motion to review conditions of release to permit the trial home visit to take place. The motion stated, "CYFD is prepared to allow the children to reside with the Defendant since he has kept up with his parenting plan through their office". This information was false and came from CYFD. On information and belief, Liggett directed the children's court attorney assigned to the case to misrepresent to Ducila's attorney how much progress Ducila had made.

112.    The motion itself states, "Defendant, by and through his attorney of record, respectfully requests this Court lift the "no contact" order in this matter and allow the Defendant's children to reside with him per request of CYFD."

113.    Liggett induced Ducila's criminal defense attorney to make false statements to the District Court judge overseeing Ducila's child abuse case. At the time Liggett induced the criminal defense attorney to make this false statement Liggett, De Los Santos, and Garza each had actual knowledge of the disclosures of physical abuse that were made in play therapy by the children that Ducila struck R.B. in the head "a lot".

114.    In April 2020, Garza, Saldana, and Doe Defendants sent Plaintiffs to live at Ducila's home on a trial home visit.

115.    Saldana and Garza actively worked to facilitate the trial home visit by manufacturing evidence to contradict the credible and objective evidence that the parents were unfit and that future abuse was likely. This included ordering Mazy to unsubstantiate credible disclosures that Ducila had physically abused R.B. by striking him in the head on multiple occasions.

116.    Garza, Liggett, Saldana, and other CYFD employees worked together to alter the status quo for Plaintiffs through formal legal process to compel Plaintiffs into the trial home visit. They did this with the knowledge that Plaintiffs would be subject to abuse and neglect by Ducila. Plaintiffs were entirely dependent on Defendants to provide for their basic needs.

App. Vol. 1: 027

117.   When the trial home visit started, Defendants repeatedly breached their own policies and procedures to mislead the abuse and neglect court about its progress. The purpose of a trial home visit is to see, in a supervised setting, whether the parents can provide for the child's essential needs. Yet Saldana personally provided for Plaintiffs' essential needs during the trial home visit. This included, but was not limited to, bathing Plaintiffs, preparing their meals, making the children brush their teeth, and transporting them to school. Saldana performed these tasks specifically because it was known to the Defendants that Ducila was unfit and incapable of adequately caring for the children.

118.   Saldana also assisted Ducila in staging the apartment he was living it, to make it appear that it was suitable for Plaintiffs. Saldana also provided Ducila with advanced notice over the phone that she would be visiting, even though such visits were supposed to be unannounced.

119.   In April 2020, Badea was released from jail. Within days of her release from jail the parents kidnapped Plaintiffs and disappeared.

120.   On information and belief, Badea and Ducila kidnapped Plaintiffs in April of 2020.

121.   On information and belief, Saldana was aware that Plaintiffs were missing during April 2020, but waited until May 2, 2020, to inform Hobbs Police that the children could not be found. For the next twelve days, Garza, Saldana, and other CYFD employees refused to tell the Hobbs Police Department that CYFD's custodial rights were being interfered with, and claimed that Plaintiffs were not in danger.

122.   As a direct result of CYFD's refusal to state that they wanted the children returned and their refusal to say the children were in danger, the police were unable to issue an Amber Alert.

123.   Garza and Saldana actively hindered law enforcement's efforts to locate Plaintiffs. Garza and Saldana sabotaged the Hobbs Police Department's efforts to issue an Amber Alert. Garza and Saldana refused to report Plaintiffs missing, and initially blocked the District Attorney from pressing custodial interference charges by claiming that CYFD's custodial rights were not being interfered with. Garza and Saldana also withheld documents from Hobbs Police Department investigators who executed a search warrant on CYFD's office. These documents contained

App. Vol. 1: 028

information on the family collected by CYFD and would have assisted police in ascertaining the family's whereabouts.

124.    Liggett later learned that Garza had concealed documents from Hobbs PD. No action was taken by her to arrange for the documents to be provided.

125.    The Hobbs Police Department told CYFD officials in a meeting in May of 2020 that they could not take action to locate the children, issue warrants, or issue an amber alert due to CYFD's refusal to state that it wished to enforce its custodial rights. This meeting included CYFD officials Karla Young, Mary McQueency, Defendants Garza, Saldana, Liggett, and two officers with the Hobbs Police Department.

126.    Liggett stated that she did not know why the department needed to state that they actually wanted the children returned to CYFD. At the time Liggett made this statement CYFD regulation required the children to be removed from the trial home visit.

127.    CYFD Officials Young and McQueeny indicated that depending on the situation the children were found in that CYFD may not actually want the children returned to them.

128.    At all relevant times, CYFD had custody Plaintiffs. As such, CYFD had the right and obligation to decide where and with whom Plaintiffs would reside. See N.M. Admin. Code 8.10.7.7(X) (granting CYFD the "right and duty to protect, train and discipline the child[ren] and to provide the child[ren] with food, shelter, personal care, education and ordinary and emergency medical care.")

129.    Defendants subjected Plaintiffs to a manifestly dangerous situation by forcing them to live with Ducila on a trial home visit.

130.    After Plaintiffs were kidnapped, Defendants cut them off from private and public aid by refusing to enforce CYFD's parental rights and by actively hindering the Hobbs Police Department's attempts to locate Plaintiffs.

131.    In November 2020, M. B. was dumped at a North Carolina hospital by Badea. M. B. had suffered a fractured skull and brain damage due to her suffering abusive head trauma during the extended trial home visit in which CYFD and Defendants knowingly left plaintiffs in a danger.

Her injuries have left her permanently blind. Ducila and Badea, along with M. B.'s siblings, were later found in Houston, Texas. Shortly afterwards, CYFD's spokesperson issued a statement to an Albuquerque television station falsely claiming that CYFD had promptly reported Plaintiffs missing and had cooperated with law enforcement's efforts to locate them.

132.    After M.B. was left by her parents at the hospital, she was also observed to have circular shaped burns on her skin. These burns were likely caused by persons pressing the lit end of cigarettes against M.B.'s skin. Both Ducila and Badea face felony child abuse charges in North Carolina for causing M.B.'s life-altering injuries.

133.    In 2021, CYFD ordered tests to determine the cause of A.D.'s hearing loss. These tests, which are the ones Woodward recommended, revealed brain injuries consistent with physical abuse.

134.    CYFD maintains legal custody of Plaintiffs and has had legal custody of Plaintiffs from June 3, 2019 to the present.

135.    CYFD employees colluded together and engaged in a conspiracy to make false statements to the abuse and neglect court, the criminal court handling Ducila's criminal case, to threaten and coerce individuals who tried to help Plaintiffs, and other conscience shocking activity described in the foregoing paragraphs all for the common purpose of getting the children out of CYFD's legal custody as soon as possible despite the knowledge of each individual Defendant that they would be placing the children into an extremly dangerous situation.

136.    There is manifest evidence of this conspiracy which include numerous emails exchanged by the individual Defendants and other high ranking CYFD employees discussing their desire to end this case. The case was handled in CYFD's words as a team which included the individual defendants as well as Brian Blalcok and other high ranking CYFD officials.

137.    The trial home visit was always intended to be a farce as evidenced by an email sent by Megan Velasquez to Patricia Garza, Brenda Saldana, CYFD Secretary Brian Blalock and others on March 5, 2020, where the following was stated, "I understand that we are trying to move towards a trial home visit with dad (and hopefully mom at some point). And that we are facing

App. Vol. 1: 030

resistance from foster parents, GAL and possibly the judge. Hopefully for our call on Tuesday we can cover: making sure we pull together a strong legal argument for the home visit, and how we can make it a short trial visit before we close the case…"

138.    Each of the individual Defendants acts should be imputed to each of the other individual Defendants by virtue of their conspiracy to violate the law and Plaintiffs constitutional right to be free from harm while in foster care.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of the Fourteenth Amendment – Special Relationship
### (Against Defendants Saldana, Garza, De Los Santos, and Liggett in their individual and official capacities)

139.    Plaintiffs incorporate and reassert the allegations as set forth in the foregoing paragraphs as though fully stated herein.

140.    Plaintiffs and Defendants are all persons for purposes of 42 U.S.C. § 1983.

141.    The Fourteenth Amendment of the United States Constitution vested Plaintiffs with a clearly established procedural and substantive due process right to be protected by Defendants while in State custody.

142.    Defendants violated the duties created by the special relationship they had with Plaintiffs by, among other things, removing Plaintiffs from safe and appropriate foster homes and providing Ducila and Badea with access to Plaintiffs and the opportunity to kidnap Plaintiffs while Plaintiffs were still in CYFD's custody.

143.    While CYFD facilitated a trial home visit, no custodial rights had been transferred to Ducila or Badea. CYFD maintained custodial rights over Plaintiffs including the ability to determine who they lived with and where. CYFD possessed the ability to immediately end the trial home visit at their discretion without engaging in any legal process. CYFD also had the ability and obligation to terminate the trial home visit if the visit was not a success.

App. Vol. 1: 031

144.     CYFD utilized their legal custody to determine where the Badea children would live, who would care for them, and who would have access to them from June 3, 2019 to the present.

145.     Plaintiffs did not have a choice about who they lived with once they came into CYFD's legal custody. The nature of the relationship between Plaintiffs and CYFD was involuntary and the children were completely dependent upon CYFD to satisfy their basic human needs.

146.     CYFD policy defines "legal custody" as:

[A] legal status created by order of the children's court or other court of competent jurisdiction or by operation of the New Mexico Children's Code, Section 32A-4-1 et seq or 32A-3B-1 et seq, NMSA 1978, that vests in a person, department or agency the: (1) right to determine where and with whom a child shall live; (2) **right and duty to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care**; (3) right to consent to major medical, psychiatric, psychological and surgical treatment and to the administration of legally prescribed psychotropic medications pursuant to the Children's Mental Health and Developmental Disabilities Act; and (4) right to consent to the child's enlistment in the armed forces of the United States.

N.M. Admin. Code 8.10.7.7(X)(emphasis added). This policy, which imposes affirmative duties on CYFD employees to protect Plaintiffs, was continuously in force and effect from June 3, 2019 to the present.

147.     Defendants undertook affirmative acts in furtherance of their scheme, including creating a false narrative that Plaintiffs' biological parents were fit for a trial home visit, suborning perjury, and withholding material information from the abuse and neglect court. Each Defendant's individual actions shock the conscience.

148.     Defendants owed Plaintiffs a continuing legal duty because of the special relationship. Saldana and Garza breached that continuing duty after the children went missing by refusing to report the children missing and permit the issuance of an Amber Alert. Saldana and Garza breached that duty again by hindering police efforts to locate the family.

149.     Defendants had actual knowledge that the children would be endangered by a trial home visit. Defendants failed to exercise professional judgment regarding that danger. To the

contrary, Defendants worked to create the danger in the first place and also took affirmative acts to cut Plaintiffs off from aid and assist the parents in the kidnapping.

150.    As a proximate result of Defendants' actions, M. B. suffered a catastrophic brain injury as well as other physical injuries. All Plaintiffs have suffered extreme emotional distress. Upon information and belief, all Plaintiffs suffered from further abuse and neglect similar to what the Hobbs Police Department observed on June 3, 2019.

151.    Plaintiffs are entitled to damages, injunctive relief barring Defendants from committing further violations of their constitutional rights, punitive damages, reasonable attorneys' fees, and costs of suit.

152.    Garza's refusal to provide medical care to E.B. for her tuberculosis was also a breach of their special relationship with E.B. As a result of Garza's refusal, E.B. suffered damages the full extent of her damages are still being discovered.

153.    CYFD's refusal to immediately treat E.B., A.B, and R.B. for severe tooth decay is a separate breach of their special relationship with the children. Garza and Saldana knew that immediate medical treatment was needed.  A.D. in particular was especially harmed by this breach because A.D. had been on a soft food diet since June 2019. A dentist appointment was eventually scheduled by Saldana for A.D. in January 2020.

154.    CYFD engaged in other discrete breaches of their special relationship to keep the children safe and affirmatively protect them from harm as described in the preceding paragraphs.

155.    The Defendants' conduct shocks the conscience.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Violation of the Fourth and Fourteenth Amendments –
State Created Danger
(Against Defendants Saldana, Garza, De Los Santos, and Liggett in their individual and
official capacities)**

156.    Plaintiffs incorporate and reassert the allegations as set forth in the foregoing paragraphs as though fully stated herein.

157.    Plaintiffs and Defendants are all persons for purposes of 42 U.S.C. § 1983.

App. Vol. 1: 033

158.    The Fourteenth Amendment of the United States Constitution vested Plaintiffs with a clearly established procedural and substantive due process right to be protected by Defendants while in their care. Plaintiffs also possessed a constitutional right to not be harmed by private persons as a result of a state created danger.

159.    Defendants created a dangerous situation for Plaintiffs. They removed Plaintiffs from both parents' custody, placed them in a foster home, and then placed them in a trial home visit with just their father.

160.    The status quo for the children preceding the trial home visit was safe. The children were in a good foster home and their essential needs were being met.

161.    Defendants modified this status quo by removing the Plaintiffs from a place of safety, foster care, and starting a trial home visit with a person they knew was dangerous. Defendants each knew Ducila was dangerous because of the disclosures made in therapy by A.D. and R.B..

162.    Defendants could reasonably foresee that they were removing the Plaintiffs from a safe foster home placement and subjecting them to dangerous conditions which included being physically struck by Ducila. In play therapy, one of the children indicated that Ducila would come home, hit, kick and strike all members of the family, and on one occasion killed a family pet. On another occasion, Woodward observed Ducila holding M.B. like a basketball and demonstrating an appearance which suggested strongly that he was going to drop her, shake her or throw her.

163.    Defendants could also reasonably foresee that the children would be subject to neglect – including neglect that could lead to death or serious injury.

164.    Defendants could also reasonably foresee that Ducila would attempt to kidnap the children if given the opportunity due to the multiple instances of attempted bribery of CYFD employees and the occasion in which he tried to take the children from CYFD's office. Defendants Garza and Saldana in fact hoped that Ducila would abscond with the children.

165.     Defendants took affirmative acts to create this danger, including creating a false narrative that Ducila and Badea were fit parents and retaliating against and removing people who

22

were acting in the children's best interest from the children's case and denying the children the ability to receive care from them.

166.     Plaintiffs are members of a limited and specifically definable group as they are the biological children of the two private actors who abused them.

167.     Defendants' conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm. This risk was obvious and known.

168.     Defendants acted recklessly and in conscious disregard of the known risks the trial home visit posed for Plaintiffs.

169.     Even after the risk came to pass, Plaintiffs were kidnapped, Defendants continued to act recklessly by refusing to timely report the children missing and refusing to tell the Hobbs Police Department that their custodial rights were being interfered with. Each Defendant's conduct was conscience shocking.

170.     As a proximate result of Defendants' actions, M. B. suffered a catastrophic brain injury. All Plaintiffs have suffered extreme emotional distress.

171.     Plaintiffs are entitled to damages, injunctive relief barring Defendants from committing further violations of their constitutional rights, punitive damages, reasonable attorneys' fees, and costs of suit.

**THIRD CLAIM FOR RELIEF**
**New Mexico Tort Claims Act**
**(Against Defendants CYFD, Saldana, Garza in their individual and official capacities)**

172.     Plaintiffs incorporate and reassert the allegations as set forth in the foregoing paragraphs as though fully stated herein.

173.     At all times CYFD, Saldana, and Garza were responsible for providing Plaintiffs a safe living place.

174.     Defendants decided to house Plaintiffs with biological parents who had pending felony child abuse charges, and who Defendants knew or should have known were unfit.

App. Vol. 1: 035

175.     Saldana provided material assistance in operating Ducila's home by bathing Plaintiffs, providing further assistance at mealtimes, and transporting Plaintiffs to school. Upon information and belief, Saldana acted under Garza's direction and supervision.

176.     Saldana and Garza breached their duty to maintain a reasonably safe living place for the children while the children were in CYFD's legal custody.

177.     As a proximate result of Defendants' actions, M. B. suffered a catastrophic brain injury. All Plaintiffs have suffered extreme emotional distress.

178.     Plaintiffs are entitled to damages, injunctive relief barring Defendants from committing further violations of their constitutional rights, punitive damages, reasonable attorneys' fees, and costs of suit.

## PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendants as follows:

1.      For general and special damages according to proof;

2.      For punitive damages according to proof;

3.      For costs of suit;

4.      For attorneys' fees;

5.      For pre-judgment interest; and

6.      For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

GUBERNICK LAW P.L.L.C.

/s/ Benjamin Gubernick
Benjamin Gubernick
New Mexico Bar No. 145006
Ben@gubernicklaw.com
734-678-5169
10720 W. Indian School Rd.
Ste. 19 PMB 12
Phoenix, AZ 85037

---and---

24

*/s/ Todd J. Bullion*
Todd J. Bullion
**Law Office of Todd J. Bullion**
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM  87109
(505) 452-7674
todd@bullionlaw.com

---and---

*/s/ Jason Bowles*
Jason Bowles
**Bowles Law Firm**
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM  87109
(505) 217-2680
jason@bowles-lawfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of March, 2023, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

**Alfred A Park**
Park & Associates, LLC
3840 Masthead St., N.E.
Albuquerque, NM 87109
505-246-2805
Fax: 505-246-2806
Email: apark@parklawnm.com

**James J Grubel**
Park & Associates, LLC
3804 Masthead Street NE
Albuquerque, NM 87109
505-246-2805
Fax: 505-246-2806
Email: jgrubel@parklawnm.com

25

App. Vol. 1: 037

_/s/ Benjamin Gubernick_
Benjamin Gubernick

App. Vol. 1: 038

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,**

        **Plaintiffs,**

**vs.**                                              **No: 21-cv-00368 DHU/JMR**

**PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity; BRENDA
SALDANA, in her individual and official capacity;
JENNIFER DE LOS SANTOS in her individual and
official capacity; NEW MEXICO CHILDREN YOUTH
 &  FAMILIES DEPARTMENT; and DOES 1-50,**

        **Defendants.**

<u>**ANSWER TO COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND FOR DAMAGES
AND INJUNCTIVE RELIEF**</u>

      COME NOW New Mexico Children, Youth and Families Department ("CYFD"), Patricia

Garza, Rebecca Liggett, Brenda Saldana, and Jennifer De Los Santos (collectively "Defendants")

by and through their attorneys, Park & Associates, LLC (Alfred A. Park and James J. Grubel), and

for their Answer to Plaintiffs' Corrected Second Amended Complaint for Civil Rights Violations

and For Damages and Injunctive Relief (hereinafter "Complaint") state as follows:

**INTRODUCTION**

1.  Defendants state that no response is necessary to the  allegations in Paragraph 1 of the

    Complaint.  To the extent that the allegation can be construed against Defendants, they

    deny the same and demand strict proof thereof.

2.  Defendants deny the allegations contained in Paragraph 2 of the Complaint and demand

    strict proof thereof.

1

3.  Defendants deny the allegations contained in Paragraph 3 of the Complaint and demand strict proof thereof.

4.  Defendants deny the allegations contained in Paragraph 4 of the Complaint and demand strict proof thereof.

5.  . Defendants state that no response is necessary to the  allegations in Paragraph 5 of the Complaint.  To the extent that the allegation can be construed against Defendants, they deny the same and demand strict proof thereof.

## JURISDICTION

6.  Defendants state that the allegations in Paragraph 6 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 6 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

7.  Defendants Admit the allegations contained in Paragraph 7 of the Complaint.

## PARTIES

8.  Defendants admit the allegations as contained in Paragraph 8 of the Complaint.

9.  Defendants admit the allegations as contained in Paragraph 9 of the Complaint.

10. Defendants admit the allegations as contained in Paragraph 10 of the Complaint.

11. Defendants admit the allegations as contained in Paragraph 11 of the Complaint.

12. Defendants admit that Alison Endicott-Quinones was appointed to represent Plaintiffs in another matter but deny that she has been appointed to represent Plaintiffs in this matter. Defendants admit that Alison Endicott-Quinones resides in Bernalillo County.

App. Vol. 1: 040

13. Defendants admit that Patricia Garza is a CYFD employee who manages CYFD's Lea County Office.  Defendants state that the remaining allegations in 13 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 13 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

14. Defendants admit that Brenda Saldana is a former CYFD employee who resides in Texas. Defendants state that the remaining allegations in 14 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 14 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

15. Defendants admit that Rebecca Liggett was a CYFD employee who resides in Santa Fe County but deny the reaming allegations contained in Paragraph 15 of the Complaint and Demand strict proof thereof.

16. Defendants admit Jennifer de los Santos was a CYFD employee and that she resides in Lea County, but deny the reaming allegations contained in Paragraph 16 of the Complaint and Demand strict proof thereof.

17. Defendants admit that CYFD is a department of the New Mexico state government. Defendants state that the remaining allegations in 17 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph

App. Vol. 1: 041

17 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

18. Defendants state that the allegations in Paragraph 18 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 18 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

**FACTUAL ALLEGATIONS**

19. Defendants admit that Badea and Duclia were panhandling at Walmart in Hobbs on June 3, 2019, but are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 19 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

20. Defendants admit there were four young children and that E.B. had tuberculosis,  but deny the remaining allegations contained in Paragraph 20 of the Complaint and demand strict proof thereof.

21. Paragraph 21 of the Complaint is a statement or argument of counsel, and not a factual allegation to which a response might be deemed required.  To the extent a response is necessary, Defendants deny the same and demand strict proof thereof.

22. Defendants state that the allegations in 22 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 22 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

23. Defendants deny the allegations contained in Paragraph 23 of the Complaint and demand strict proof thereof.

24. Defendants deny the allegations contained in Paragraph 24 of the Complaint and demand strict proof thereof.

25. Paragraph 25 of the Complaint is a statement or argument of counsel, and not a factual allegation to which a response might be deemed required.  To the extent a response is necessary, Defendants deny the same and demand strict proof thereof.

26. Defendants admit that Badea and Duclia were charged with child abuse and deny the remaining allegations contained in Paragraph 26 of the Complaint.

27. Defendants state that the allegations in 22 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 22 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

28. Defendants deny the allegations contained in Paragraph 28 of the Complaint and demand strict proof thereof.

29. Defendants deny the allegations contained in Paragraph 29 of the Complaint and demand strict proof thereof.

30. Defendants deny the allegations contained in Paragraph 30 of the Complaint and demand strict proof thereof.

31. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 31 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof

App. Vol. 1: 043

32. Defendants deny the allegations contained in Paragraph 32 of the Complaint and demand strict proof thereof.

33. Defendants deny the allegations contained in Paragraph 33 of the Complaint and demand strict proof thereof.

34. Defendants deny the allegations contained in Paragraph 34 of the Complaint and demand strict proof thereof.

35. Defendants admit that Plaintiffs were placed in a foster home and that EB and AD were enrolled in daycare.  Defendants deny the remaining allegations contained in Paragraph 35 of the Complaint and demand strict proof thereof.

36. Defendants admit that AD and EB were diagnosed with tuberculosis, but are without sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 36  the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

37. Defendants deny the allegations contained in Paragraph 37 of the Complaint and demand strict proof thereof.

38. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 38 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

39. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 39 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

App. Vol. 1: 044

40. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 40 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof

41. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 41 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof

42. Defendants admit the allegations in Paragraph 42 of the Complaint.

43. Defendants deny the allegations contained in Paragraph 43 of the Complaint and demand strict proof thereof.

44. Defendants state that the allegations in 44 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 44 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

45. Defendants state that the allegations in 45 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 45 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

46. Defendants state that the allegations 46 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph

App. Vol. 1: 045

46 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

47. Defendants state that the allegations in 47 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 47 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

48. Defendants deny the allegations as contained in Paragraph 48 of the Complaint and demand strict proof thereof.

49. Defendants deny the allegations as contained in Paragraph 49 of the Complaint and demand strict proof thereof.

50. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 50 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof

51. Defendants deny the allegations as contained in Paragraph 51 of the Complaint and demand strict proof thereof.

52. Defendants deny the allegations as contained in Paragraph 52 of the Complaint and demand strict proof thereof.

53. Defendants deny the allegations as contained in Paragraph 53 of the Complaint and demand strict proof thereof.

54. Defendants deny that Police had to make forced entry into a room but admit the remaining allegations as asserted in Paragraph 54 of the Complaint.

App. Vol. 1: 046

55. Defendants deny the allegations as contained in Paragraph 55 of the Complaint and demand strict proof thereof.

56. Defendants deny the allegations as contained in Paragraph 56 of the Complaint and demand strict proof thereof.

57. Defendants deny the allegations as contained in Paragraph 57 of the Complaint and demand strict proof thereof.

58. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 58 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

59. Defendants deny the allegations as contained in Paragraph 59 of the Complaint and demand strict proof thereof.

60. Defendants deny the allegations as contained in Paragraph 60 of the Complaint and demand strict proof thereof.

61. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 61 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

62. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 62 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

63. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 63 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

App. Vol. 1: 047

64. Defendants deny the allegations as contained in Paragraph 64 of the Complaint and demand strict proof thereof.

65. Defendants deny the allegations as contained in Paragraph 65 of the Complaint and demand strict proof thereof.

66. Paragraph 66 of the Complaint is a statement or argument of counsel, and not a factual allegation to which a response might be deemed required.  To the extent a response is necessary, Defendants deny the same and demand strict proof thereof.

67. Defendants state that the allegations in 67 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 67 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

68. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 68 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

69. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 69 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

70. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 70 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

App. Vol. 1: 048

71. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 71 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

72. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 72 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

73. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 73 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

74. Defendants admit that a SCI report was filed by a therapist but deny the remaining allegations as contained in Paragraph 74 of the Complaint and demand strict proof thereof.

75. Defendants deny the allegations contained in Paragraph 75 of the Complaint and demand strict proof thereof.

76. Defendants deny the allegations contained in Paragraph 76 of the Complaint and demand strict proof thereof.

77. Defendants state the SCI report speaks for itself and to the extent the allegations contained in Paragraph 77 of the Complaint differ, those allegations are denied and Defendants demand strict proof thereof.

78.   Defendants deny the allegations contained in Paragraph 78 of the Complaint and demand strict proof thereof.

79. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 79 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

App. Vol. 1: 049

80. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 80 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

81. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 81 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

82. Defendants deny the allegations contained in Paragraph 82 of the Complaint and demand strict proof thereof.

83. Defendants deny the allegations contained in Paragraph 83 of the Complaint and demand strict proof thereof.

84. Defendants deny the allegations contained in Paragraph 84 of the Complaint and demand strict proof thereof.

85. Defendants deny the allegations contained in Paragraph 85 of the Complaint and demand strict proof thereof.

86. Defendants deny the allegations contained in Paragraph 86 of the Complaint and demand strict proof thereof.

87. Defendants state that the allegations of abuse and neglect in the SCI report was unsubstantiated but deny the remaining allegations contained in Paragraph 87 of the Complaint and demand strict proof thereof.

88. Defendants deny the allegations contained in Paragraph 88 of the Complaint and demand strict proof thereof.

App. Vol. 1: 050

89. Paragraph 89 of the Complaint is a statement or argument of counsel, and not a factual allegation to which a response might be deemed required.  To the extent a response is necessary, Defendants deny the same and demand strict proof thereof.

90. Defendants deny the allegations contained in Paragraph 90 of the Complaint and demand strict proof thereof.

91. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 91 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

92. Defendants deny the allegations contained in Paragraph 92 of the Complaint and demand strict proof thereof.

93. Defendants deny the allegations contained in Paragraph 93 of the Complaint and demand strict proof thereof.

94. Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 94 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

95. Defendants deny the allegations contained in Paragraph 95 of the Complaint and demand strict proof thereof.

96. Defendants admit the allegations as contained in Paragraph 96 of the Complaint.

97. Defendants admit that Rebecca Liggett did not enter an appearance in the abuse and neglect proceeding and that Kristen Dickey had primary responsibilities representing CYFD in that case. CYFD denies the remaining allegations contained in Paragraph 97 in the Complaint to the extent they imply Ms. Liggett had no role in the abuse and neglect proceeding.

App. Vol. 1: 051

98. Defendants admit that the allegations contained in Paragraph 98 of the Complaint summarize Ivy Woodward's statements, but deny the accuracy of those statements.

99.   Defendants deny the allegations contained in Paragraph 99 of the Complaint and demand strict proof thereof.

100.     Defendants deny the allegations contained in Paragraph 100 of the Complaint and demand strict proof thereof.

101.     Defendants deny the allegations contained in Paragraph 101 of the Complaint and demand strict proof thereof.

102.     Defendants admit to the allegations contained in Paragraph 102 of the Complaint.

103.     Defendants deny the allegations contained in Paragraph 103 of the Complaint and demand strict proof thereof.

104.     Defendants deny the allegations contained in Paragraph 104 of the Complaint and demand strict proof thereof.

105.     Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 105 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

106.     Defendants deny the allegations contained in Paragraph 106 of the Complaint and demand strict proof thereof.

107.     Defendants deny the allegations contained in Paragraph 107 of the Complaint and demand strict proof thereof.

108.     Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 108 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

App. Vol. 1: 052

109.     Defendants admit that Woodward was removed from the abuse and neglect case but deny the remaining allegations contained in Paragraph 109 of the Complaint and demand strict proof thereof.

110.     Defendants state that the allegations in 110 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 110 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

111.     Defendants deny the allegations contained in Paragraph 111 of the Complaint and demand strict proof thereof.

112.     Defendants state the referenced  motion report speaks for itself and to the extent the allegations contained in Paragraph 112 of the Complaint differ, those allegations are denied and Defendants demand strict proof thereof.

113.     Defendants deny the allegations contained in Paragraph 113 of the Complaint and demand strict proof thereof.

114.     Defendants admit that Plaintiffs were placed on a trial home visit in April 2020 but deny the remaining allegations in Paragraph 114 of the Complaint and demand strict proof thereof.

115.     Defendants deny the allegations contained in Paragraph 115 of the Complaint and demand strict proof thereof.

116.     Defendants deny the allegations contained in Paragraph 116 of the Complaint and demand strict proof thereof.

App. Vol. 1: 053

117.     Defendants deny the allegations contained in Paragraph 117 of the Complaint and demand strict proof thereof.

118.     Defendants deny the allegations contained in Paragraph 118 of the Complaint and demand strict proof thereof.

119.     Defendants admit the allegations contained in Paragraph 119 of the Complaint.

120.     Defendants deny the allegations contained in Paragraph 120 of the Complaint and demand strict proof thereof.

121.     Defendants deny the allegations contained in Paragraph 121 of the Complaint and demand strict proof thereof.

122.     Defendants deny the allegations contained in Paragraph 122 of the Complaint and demand strict proof thereof.

123.     Defendants deny the allegations contained in Paragraph 123 of the Complaint and demand strict proof thereof.

124.     Defendants deny the allegations contained in Paragraph 124 of the Complaint and demand strict proof thereof.

125.     Defendants deny the allegations contained in Paragraph 125 of the Complaint and demand strict proof thereof.

126.     Defendants deny the allegations contained in Paragraph 126 of the Complaint and demand strict proof thereof.

127.     Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 127 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

App. Vol. 1: 054

128.     Defendants state that the allegations in 128 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 128 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

129.     Defendants deny the allegations contained in Paragraph 129 of the Complaint and demand strict proof thereof.

130.     Defendants deny the allegations contained in Paragraph 130 of the Complaint and demand strict proof thereof.

131.     Defendants admit that MB was left at a North Carolina Hospital in November 2020 with injuries, but deny the remaining allegations contained in Paragraph 131 of the Complaint and demand strict proof thereof.

132.     Defendants are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 132 the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

133.     Defendants state that the allegations in 133 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 133 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

134.     Defendants admit the allegations contained in Paragraph 134 of the Complaint.

135.     Defendants deny the allegations contained in Paragraph 135 of the Complaint and demand strict proof thereof.

App. Vol. 1: 055

136.     Defendants deny the allegations contained in Paragraph 136 of the Complaint and demand strict proof thereof.

137.     Defendants deny the allegations contained in Paragraph 137 of the Complaint and demand strict proof thereof.

138.     Defendants deny the allegations contained in Paragraph 138 of the Complaint and demand strict proof thereof.

## FIRST CLAIM FOR RELIEF
### 42 USC §1983- Violation of the Fourteenth Amendment – Special Relationship
### (Against Defendants Saldana, Garza, De Los Santos, and Liggett in their individual and official capacities)

139.     Defendants re-allege and incorporate their answers to the previous paragraphs of the Complaint as though fully set forth.

140.     Defendants state that the allegations in 140 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 140 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

141.     Defendants state that the allegations in Paragraph 141 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 141 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

142.     Defendants deny the allegations as contained in Paragraph 142 of the Complaint and demand strict proof thereof.

18

143.     Defendants state that the allegations in Paragraph 143 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 143 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

144.     Defendants deny the allegations as contained in Paragraph 144 of the Complaint and demand strict proof thereof.

145.     Defendants deny the allegations as contained in Paragraph 145 of the Complaint and demand strict proof thereof.

146.     Defendants state that the allegations in Paragraph 146 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 146 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

147.     Defendants deny the allegations as contained in Paragraph 147 of the Complaint and demand strict proof thereof.

148.     Defendants deny the allegations as contained in Paragraph 148 of the Complaint and demand strict proof thereof.

149.     Defendants deny the allegations as contained in Paragraph 149 of the Complaint and demand strict proof thereof.

150.     Defendants deny the allegations as contained in Paragraph 150 of the Complaint and demand strict proof thereof.

App. Vol. 1: 057

151.     Defendants deny the allegations as contained in Paragraph 151 of the Complaint and demand strict proof thereof.

152.     Defendants deny the allegations as contained in Paragraph 152 of the Complaint and demand strict proof thereof.

153.     Defendants deny the allegations as contained in Paragraph 153 of the Complaint and demand strict proof thereof.

154.     Defendants deny the allegations as contained in Paragraph 154 of the Complaint and demand strict proof thereof.

155.     Defendants deny the allegations as contained in Paragraph 155 of the Complaint and demand strict proof thereof.

**SECOND CLAIM FOR RELIEF**
**42 USC §1983- Violation of the Fourth and Fourteenth Amendments**
**State Created Danger**
**(Against Defendants Saldana, Garza, De Los Santos, and Liggett in their individual and official capacities)**

156.     Defendants re-allege and incorporate their answers to the previous paragraphs of the Complaint as though fully set forth.

157.     Defendants state that the allegations in 157 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 157 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

158.     Defendants state that the allegations in 158 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or

20

knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 158 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

159.     Defendants deny the allegations as contained in Paragraph 159 of the Complaint and demand strict proof thereof.

160.     Defendants state that the allegations in 160 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 160 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

161.     Defendants deny the allegations as contained in Paragraph 161 of the Complaint and demand strict proof thereof.

162.     Defendants deny the allegations as contained in Paragraph 162 of the Complaint and demand strict proof thereof.

163.     Defendants deny the allegations as contained in Paragraph 163 of the Complaint and demand strict proof thereof.

164.     Defendants deny the allegations as contained in Paragraph 164 of the Complaint and demand strict proof thereof.

165.     Defendants deny the allegations as contained in Paragraph 165 of the Complaint and demand strict proof thereof.

166.     Defendants state that the allegations in 166 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph

App. Vol. 1: 059

166 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

167.     Defendants deny the allegations as contained in Paragraph 167 of the Complaint and demand strict proof thereof.

168.     Defendants deny the allegations as contained in Paragraph 168 of the Complaint and demand strict proof thereof.

169.     Defendants deny the allegations as contained in Paragraph 169 of the Complaint and demand strict proof thereof.

170.     Defendants deny the allegations as contained in Paragraph 170 of the Complaint and demand strict proof thereof.

171.     Defendants deny the allegations as contained in Paragraph 171 of the Complaint and demand strict proof thereof.

**THIRD CLAIM FOR RELIEF**
**NMSA 1978 §41-4-6 – New Mexico Tort Claims Act, Negligent Operation and Maintenance of a Building**
**(Against CYFD, Saldana, and Garza in their individual and official capacities)**

172.     Defendants re-allege and incorporate their answers to the previous paragraphs of the Complaint as though fully set forth.

173.     Defendants state that the allegations in 173 of the Complaint contain overly broad legal conclusions rather than factual allegations and are without sufficient information or knowledge to form a belief as to the truth or falsity of the allegations contained in Paragraph 173 of the Complaint. Placing their denial on that basis, Defendants deny the same and demand strict proof thereof.

App. Vol. 1: 060

174.     Defendants deny the allegations as contained in Paragraph 174 of the Complaint and demand strict proof thereof.

175.     Defendants deny the allegations as contained in Paragraph 175 of the Complaint and demand strict proof thereof.

176.     Defendants deny the allegations as contained in Paragraph 176 of the Complaint and demand strict proof thereof.

177.     Defendants deny the allegations as contained in Paragraph 177 of the Complaint and demand strict proof thereof.

178.     Defendants deny the allegations as contained in Paragraph 178 of the Complaint and demand strict proof thereof.


## PRAYER FOR RELIEF

Defendants deny the relief requested in Plaintiffs' Prayer for Relief, including in all subparagraphs 1 through 6.

Defendants deny any allegation not specifically admitted.

## AFFIRMATIVE DEFENSES

Defendants assert the following separate and affirmative defenses in order to preserve them. Any affirmative defense for which no evidence has been adduced by the time of trial will be withdrawn:

1.  Plaintiffs fail to state a claim for which relief can be granted.

2.  Even if the subject incidents occurred as described in the Complaint, and even if Plaintiffs suffered some injury, none of Defendants' actions were the proximate or sole cause of the injuries and damages alleged

App. Vol. 1: 061

3.  Defendants are entitled to the defense of qualified immunity.

4.  Defendants are entitled to the defense of absolute immunity.

5.  Punitive damages are not appropriate in this case.

6.  Plaintiffs' claims of punitive damages is barred by law.

7.  Defendants did not have a sufficiently culpable state of mind to allow for punitive damages.

8.  Defendants did not have a sufficiently culpable state of mind for liability under 42 U.S.C. § 1983.

9.  State claims are barred by the Tort Claims Act.

10. Some claims may be barred by the applicable statute of limitations.

11. Defendants reserve their right to assert additional affirmative defenses as these defenses become known.

Respectfully Submitted:

PARK & ASSOCIATES, LLC


By _/s/ James J. Grubel_____
Alfred A. Park
James J. Grubel
3840 Masthead Street, N.E.
Albuquerque, NM 87109
505-246-2805 ext. 104
jgrubel@parklawnm.com
*Counsel for Defendants*

I hereby certify that a true and correct
copy of the foregoing was served via
CM/ECF filing system to all counsel
of record on this 20th day of March 2023.


_/s/ James J. Grubel_____
James J Grubel

App. Vol. 1: 062

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,

        **Plaintiffs,**

vs.                             **No: 21-cv-00368 DHU/JMR**

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity; BRENDA
SALDANA, in her individual and official capacity;
JENNIFER DE LOS SANTOS in her individual and
official capacity; NEW MEXICO CHILDREN YOUTH
 & FAMILIES DEPARTMENT; and DOES 1-50,

        **Defendants.**

### DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

COME NOW New Mexico Children, Youth and Families Department ("CYFD"), Patricia

Garza, Rebecca Liggett, Jennifer De Los Santos, and Brenda Saldana (collectively "Defendants"), by

and through their attorneys, Park & Associates, LLC (Alfred A. Park and James J. Grubel), and for

their Motion for Summary Judgment state as follows[1]:

### I.    SUMMARY

Plaintiff are four minors who became enmeshed in abuse and neglect proceedings when their

parents were found panhandling in a Walmart Parking lot in Hobbs New Mexico on June 3, 2019.

The parents were itinerant and were apparently passing through New Mexico.  The Children were

taken into CYFD custody based on concerns that the parents were failing to provide for the Children's

basic needs including shelter, clothing, and medical treatment.  The Children were deemed neglected

by a state district court judge, placed into foster care, and their parents were ordered to complete a

---

[1] Pursuant to Rule 7.1, Plaintiffs' counsel was contacted and indicated that this Motion is opposed.

App. Vol. 1: 063

treatment plant, the goal of which was to remedy the conditions that led to the Children being placed into state custody.

In late March 2020, CYFD placed the three oldest children on a trial home visit with their biological parents. The youngest child was placed in her parents' home in April of 2020. About that time, the Children's mother was released from incarceration. Shortly thereafter, the parents fled New Mexico and took the Children with them, even though CYFD retained legal custody of the Children. More than six months after the family disappeared, in October 2020, the youngest child was left in a North Carolina hospital with serious injuries.

Plaintiffs' filed suit alleging that Defendants disregarded the constitutional rights and well-being of the Plaintiff children in "a concerted effort to get rid of their case." Doc 53 at ¶ 2. Plaintiffs generally assert that returning the Children to the physical care of their parents violated their rights because CYFD knew or should have known that the parents intended to "kidnap" them. The first claim of relief set forth in the Complaint asserts that, by placing the children back in the care of their biological parents, CYFD violated the special relationship it had with Plaintiffs, thus violating their Fourteenth Amendment rights. Count Two of the Complaint alleges that the Defendants created a dangerous situation by removing the Children from the safety of a foster parent home and returning them to the home of their biological parents. Count Three asserts that Defendants violated the New Mexico Tort Claims Act because Defendants decided to house Plaintiffs with their parents who they allegedly should have known were unfit.

In the First Claim of Relief, Plaintiffs assert that Defendants "violated the duties created by the special relationship they had with Plaintiffs by, among other things, removing Plaintiffs from safe and appropriate foster homes and providing [the parents] with unsupervised access to Plaintiffs while Plaintiffs were still in CYFD's custody." Doc 53 at ¶142. However, at set forth below, the Children were not in the physical custody of CYFD, so there was no special relationship as a matter of law.

Accordingly, Plaintiffs have not stated a claim upon which relief can be granted under 42 U.S.C. § 1983. Moreover, even assuming, *arguendo*, that a special relationship existed between Defendants and the Children, it was not clearly established, during any time relevant to the instant case, that such a relationship existed. As such, Defendants are entitled to qualified immunity.

In their Second Claim for Relief, Plaintiffs assert that Defendants "created a dangerous situation for Plaintiffs. They removed Plaintiffs from both parents' custody, placed them in a foster home, and then placed them in a trial home visit with just their father." Doc 53 at ¶159. Plaintiffs also allege that in "[i]n April 2020, [Mother] was released from jail. Within days of her release from jail the parents kidnapped Plaintiffs and disappeared." Id. at ¶119. However, because CYFD returned the Children to their biological parents and, the *status quo ante*, CYFD cannot be found to have created the danger. Again, even assuming, *arguendo*, that these actions could constitute creation of a danger, it was not clearly established, during any time relevant to the instant case, that such actions would be considered danger creation. As such, Defendants are entitled to qualified immunity.

In their Third Claim for Relief, Plaintiffs assert that Defendants violated the New Mexico Tort Claims Act. However, Plaintiffs fail to identify any waiver of immunity as the basis for tort liability against the state. Accordingly, Plaintiffs fail to state a claim as their assertion under the Tort Claims Act are barred by sovereign immunity.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

1. On June 3, 2019, Plaintiff minors A.D., R.B., E.B., and M.B ("Children" or "Plaintiffs") were observed by the Hobbs Police sitting outside a Walmart in 91-degree weather as their parents held signs asking for rent, money, gas, food, and formula. See Affidavit for Ex Parte Custody Order, ¶ 2, Doc 69-1.; Corrected 2nd Amend. Complt at ¶19 (Doc 53).

App. Vol. 1: 065

2.  The parents of the Children, A. D. and L.B. were from Romania and claimed they were seeking political asylum in the United States.  Doc 69-1 at ¶¶ 6, 7.[2]

3.  CYFD requested the state court grant it custody based on allegations that "Mr. Ducila and Ms. Badea are failing to provide for the children's basic needs including shelter, clothing, and medical/mental treatment for the children.  Mr. Ducila and Ms. Badea are going to be arrested for felony credit card fraud leaving no care taker for the children."  Doc 69-1 at p. 5.

4.  In an order filed on August 20, 2019, the Children were adjudicated as "neglected" by a judge in the New Mexico Fifth Judicial District Court. *See* Stipulated Adjudicatory Judgment and Dispositional Order, Doc. 69-2 at ¶2 p. 5.

5.  The Children were ordered to remain in foster care.  Doc 69-2 at p. 4  ¶10

6.  Additionally, the parents were ordered to complete a Family Treatment Plan and Predispositional Study.  Doc. 69-2, p. 3, ¶8; p. 5  ¶5.

7.  The Children were represented by a Guardian Ad Litem ("GAL"), Laura Castillo, throughout the abuse and neglect proceedings. See Doc. 69-2. at p. 1.

8.  The Childrens GAL filed an "Emergency Motion to Suspend Visitations" on January 28, 2020. See Motion, Doc 69-3.

9.  The GAL's motion asserted "minor child, [AD] who is only five years old made certain disclosures to her therapist related to emotional trauma caused by father's direct actions; she has further exhibited sexualized behaviors in her foster home with other children in the home." Do.69-3 at ¶3.

10. The state court found in its order following a hearing on March 16, 2020, that "The emergency motion to suspend visits filed by the Guardian ad Litem is withdrawn, following CYFD

---

[2] The Exhibits referenced herein are filed separately under seal. *See* Doc 69.

App. Vol. 1: 066

hosting and filming special visit & investigating concerns raised by therapist." See Initial

Permanency Order, Doc. 69-4 at p. 5.

11. The state court judge also found that the Children were to be transitioned home within a

reasonable period depending on the facts and circumstances of the case not to exceed six

months. Doc. 69-4 at ¶11

12. On April 16, 2020 notices were filed indicating that "the three older children were placed

back with their parents on a trial home visit" on March 31, 2020. A similar notice indicated

that MB "will be placed with her parents on a trial home visit" on or after April 20, 2020. *See*

Notice of Change of Placement, Doc. 69-5. *See also* Corrected Second Amended Complaint

(Doc. 53) at ¶114.

13. In April 2020, Luiza Badea, mother of Plaintiffs, was released from detention. Doc. 53 at

¶119.

14. In late April or early May 2020, the parents fled New Mexico with the Children. Doc 53. At

¶119; *See also*, Status Conference Order, Doc 69-6

15. In October 2020, MB was left at a hospital in North Carolina with serious injuries. Doc. 53

at ¶13; See also, Emergency Notice of Change of Placement, Doc. 69-7.

## III.    **STANDARD OF REVIEW**

### A. **SUMMARY JUDGMENT STANDARD**

When a defendant asserts qualified immunity at the summary judgment stage, it is the

plaintiff's burden to prove (1) the defendant violated his constitutional rights; and (2) the law was

clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct.

2151, 150 L.Ed.2d 272 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223,

236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The court has discretion to decide the order in which

these two prongs should be addressed, and, when appropriate, does not need to address both. Pearson,

App. Vol. 1: 067

555 U.S. at 236–37, 129 S.Ct. 808 (2009). Only when a plaintiff satisfies this heavy burden must the defendant then satisfy the traditional summary judgment standard. Estate of Ceballos v. Husk, 919 F.3d 1204, 1212 (10th Cir. 2019); Soza v. Demsich, 13 F.4th 1094, 1099 (10th Cir. 2021)

Summary judgment is appropriate where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Such a finding is mandated when, after adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an element essential to that party's case and upon which that party will bear the burden of proof at trial. Breen v. Black, 709 Fed. Appx. 512, 513 (10th Cir. 2017) (unpublished); Johnson v. Mullin, 422 F. 3d 1184, 1187 (10th Cir. 2005). An issue is "genuine" if sufficient evidence exists on each side of an issue that a rational trier of fact could resolve the issue either way. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. Id. While disposal of a case by summary judgment prior to trial can be considered a drastic means of disposing of litigation, it is appropriate when the no material issue of fact exists such that no jury could reasonably conclude in favor of the non-movant. Bones v. Honeywell Intern., Inc., 366 F. 3d 869, 876 (10th Cir. 2004); Jones v. Nelson, 484 F. 2d 1165, 1168 (10th Cir. 1973).

In order to avoid summary judgment, the party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Indeed, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. Although a plaintiff need not prove his entire claim at summary judgment, he is still required to present "specific facts showing that there is a genuine issue of trial." Celotex Corp., v. Catrett, 477 U.S. 317, 325 (1986).

6

App. Vol. 1: 068

The nonmovant's facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. Fed. R. Civ. P. 56(c)(1)(A). See Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992). "[M]ere speculation, conjecture, or surmise" is insufficient to defeat a properly supported motion for summary judgment. Bones, 366 F.3d at 876.

## B. Standard of Review for Qualified Immunity

Government officials who perform discretionary functions are entitled to the defense of qualified immunity from claims brought pursuant to 42 U.S.C. § 1983 when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citing Procunier v. Navarette, 434 U.S. 555, 565, 98 S.Ct. 855, 861(1978); Wood v. Strickland, 420 U.S.308, 322, 95 S.Ct.992, 1001 (1975)). If the law at the time of the alleged conduct is not clearly established, "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Harlow, 457 at 818, 102 S.Ct. at 2738.

Upon the filing of a motion to dismiss on the basis of qualified immunity, a plaintiff's response must meet a "heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10thCir. 2001). Specifically, "[o]nce a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff ... [to] show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred." Baumeister v. N.M. Comm'n for the Blind, 425 F.Supp.2d 1250, 1268 (D.N.M. 2006) (quoting Verdecia v. Adams, 327 F.3d 1171, 1174 (10thCir. 2003)).

The first prong of the qualified immunity analysis requires a determination of whether the facts as alleged state a claim for a constitutional violation. Gomes v. Wood, 451 F.3d 1122, 1134

7

(10th Cir. 2006); Perez v. Elington, 421 F.3d 1128, 1131 (10th Cir. 2005)(quoting Mitchell v. Forsyth, 472 U.S. 511, 528, 105S.Ct. 2806, 2817 n.9 (1985)). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10thCir. 1994). Sufficiency of a complaint is a question of law for this Court to decide, accepting as true all well-pleaded factual allegations, viewing those allegations in the light most favorable to the non-moving party, and drawing all reasonable inferences in Plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10thCir. 2006); Housing Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10thCir. 1991).

The second prong of the qualified immunity analysis requires a determination of whether the right allegedly violated was clearly established at the time of the alleged unlawful conduct. Smith v. Cochran, 339 F.3d 1205 (10th Cir. 2003). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S.Ct. 305, 308 (2015) (quoting Reichle v. Howards, 566 U.S.658, 664, 132 S.Ct. 2008, 2093 (2012)) (the constitutional rule applied must be "beyond debate").

"The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." Roska v. Peterson, 328 F.3d 1230, 1248 (10th Cir. 2003) (citing Farmer v. Perrill, 288 F.3d 1254, 1259 (10thCir.2002)). "[T]he contours of the right must be sufficiently clear such that an objectively reasonable officer would understand that what she is doing violates that right." Id,328 F.3d at 1247 (citing Anderson v. Creighton, 483 U.S. 635, 639-40, 107 S.Ct. 3034,3039 (1987)).

In determining whether a defendant's conduct violated clearly established rights, the Court may consider only those decisions decided prior to the allegedly unlawful conduct in question. Stewart v. Donges, 915 F.2d 572, 581 (10th Cir.1990); Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131

S.Ct. 2074, 2083 (2011) (precedent existing at the time of the challenged conduct must have placed the constitutional question beyond debate). "The plaintiff carries the burden of convincing the court that the law was clearly established." Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir.1988).

In meeting this burden "a plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995). In fact, while a right to some process may be clearly established, "the clearly established law must be 'particularized' to the facts of the case." Lee. V. Univ. of N.M., 2020 WL 1515381 at *42 (D.N.M. Slip Copy, March 30, 2020) (Browning, J.) citing White v. Pauly, 137 S. Ct. 548, 552 (2017).

"Because the doctrine of qualified immunity represents a balance that has been struck between competing values, 'the trial judge is burdened with a responsibility at an early stage, to make determinations of law based upon what the clearly established law governing the case was at the time of the challenged acts.'" Id., 847 F.2d at 646 (quoting Dominque v. Telb, 831 F.2d 673, 677 (6th Cir.1987)).

This Court has the discretion to decide which of the two prongs of the qualified immunity analysis to address first, "in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009).

## C. Legal Standard for Special Relationship

The Due Process Clause "generally confer[s] no affirmative right to governmental aid, even when such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196 (1989). Similarly, "state actors are liable only for their own acts, and not the violent acts of third parties." Liebson v. New Mexico Corrections Dep't, 73 F.3d 274, 276 (10th Cir.1996).

9

There are, however, two relevant exceptions to this general rule. First, "state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996) (quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995)). Second, "if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1261 (10th Cir. 1998).   Absent involuntary restraint, however, no duty to protect arises under the special-relationship theory. Armijo, 159 F.3d at 1261.

### D.  Legal Standard for Danger Creation

As stated above, "state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996) (quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995)). This "danger creation" exception to the general rule applies only when a state actor "affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence." Currier v. Doran, 242 F.3d 905, 923 (10th Cir.2001). To state a *prima facie* case, the plaintiff must show that (1) state actors created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience. Ruiz v. McDonnell, 299 F.3d 1173, 1182–83 (10th Cir.2002); Robbins v. Oklahoma, 519 F.3d 1242, 1251 (10th Cir. 2008).   The danger creation theory focuses on the affirmative actions of the state in placing [an individual] in harm's way.   Currier v. Doran, 242 F.3d 905, 919 (10th Cir.2001).

10

App. Vol. 1: 072

Under a danger creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[ ] 'affirmative conduct on the part of the state in placing the plaintiff in danger.' " Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d at 916). In determining whether the danger creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm. See Christiansen v. City of Tulsa, 332 F.3d at 1281. The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cty. of Denver, 960 F.2d 1493, 1496 (10th Cir.1992), overruled on other grounds by Morris v. Noe, 672 F.3d 1185 (10th Cir.2012). The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cty. of Denver, 960 F.2d at 1496.

### E.  Legal Standard for Conscience Shocking

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir.2006) (quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir.2006)) (internal quotation marks omitted). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly

App. Vol. 1: 073

conscience shocking." Camuglia at 1222–23 (quoting Uhlrig v. Harder, 64 F.3d at 574) (internal

quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme
> Court in evaluating substantive due process claims: (1) the need for restraint in
> defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the
> need for deference to local policymaking bodies in making decisions impacting upon
> public safety."

> Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at

574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances,

rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922

F.Supp.2d at 1227 (citing James v. Chavez, 830 F.Supp.2d 1208, 1276 (D.N.M.2011) (Browning, J.)

(finding that the use of deadly force did not shock the conscience even if the suspect did not have an

intent to harm the officer, because the officer "had sufficient facts before him to conclude that there

was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct

objectively"), aff'd, 511 Fed.Appx. 742 (10th Cir.2013)).

## F.  **Legal Standard Claims Pursuant to the New Mexico Tort Claims Act**

The New Mexico Legislature has declared that the "public policy of New Mexico that

governmental entities and public employees shall only be liable within the limitations of the Tort

Claims Act and in accordance with the principles established in that Act." TCA at §41-4-2A. New

Mexico courts have held that the TCA is the exclusive remedy against a governmental entity or public

employee for any tort for which immunity has been waived under the TCA and no other claim, civil

action or proceeding for damages, by reason of the same occurrence, may be brought against a

governmental entity or against the public employee or his estate whose act or omission gave rise to

the suit or claim. Id. at §41-4-17A. In other words, a plaintiff may not sue a governmental entity of

New Mexico, or its employees or agents, unless the plaintiff's cause of action fits within one of the

12

App. Vol. 1: 074

exceptions to immunity granted in the TCA. See Begay v. State, 1985-NMCA-117, 104 N.M. 483, 486, 723 P.2d 252, 255 (Ct. App. 1985) ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 1986-NMCA-049, 104 N.M. 375, 721 P.2d 1306 (1986). A plaintiff also may not sue a governmental entity or its employees for damages arising out of violations of rights under the New Mexico Constitution, unless the TCA contains a waiver of immunity.[3] See Barreras v. N.M. Corr. Dep't, 2003-NMCA-027, ¶24, 133 N.M. 313, 62 P.3d 770 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act.")

It is Plaintiff's burden to identify which of the specific statutory sections allegedly waive immunity. See Rubio v. Carlsbad Municipal School District, 1987-NMCA-127, 106 N.M. 446, 448, 744 P.2d 919, 921 (Ct. App. 1987).

## IV.   ARGUMENT

### A. Plaintiffs cannot maintain a cause of action for violation of the Fourteenth Amendment because there was no special relationship.

Plaintiffs cannot meet their heavy burden of demonstrating that CYFD's conduct violated their Fourteenth Amendment rights.  More specifically, courts have found that there is no special relationship when children in the legal custody of the state are placed in the physical custody of their biological parents, as CYFD would lack the necessary ability to physically restrain the children. Accordingly, Plaintiffs fail to sufficiently state a §1983 claim for a constitutional deprivation and the first claim for relief must be dismissed for failing to state a claim based upon qualified immunity. Holland, 268 F.3d at 1186; Baumeister, 425 F.Supp.2d at 1268.

---

[3] While the Legislature has now created a cause of action for claims brought under the New Mexico Constitution against public bodies, it does not apply retroactively and thus, cannot apply to this case. NMSA 1978 § 41-4A-12.

App. Vol. 1: 075

1. There is no evidence of the requisite restraint

Plaintiffs' focus on CYFD retaining legal custody to support the creation of a special relationship is misplaced. The fundamental element that establishes a special relationship is whether the state restrains an individual's freedom to protect himself. In Armijo, the Tenth Circuit explained that, if a state restrains an individual's freedom to protect himself, "the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." 159 F.3d at 1261 (emphasis added). Here, placing the children on a trial home visit with their parents does not constitute a restraint on the Children, but rather a lack of restraint on their biological parents. Moreover, the alleged harm occurred nearly six months after the parents fled New Mexico when was injured in North Carolina. **SMF 15**. Because Defendants had no control over the location of the Plaintiffs after April 2020, Defendants could not exercise any restraint over Plaintiffs and, therefore, there can be no special relationship.

The undisputed facts do not support a claim for the creation or breach of a special relationship. Plaintiffs argue that "Defendants violated the duties created by the special relationship they had with Plaintiffs by, among other things, removing Plaintiffs from safe and appropriate foster homes and providing [Father] and [Mother] with access to Plaintiffs and the opportunity to kidnap Plaintiffs while Plaintiffs were still in CYFD's custody. Doc 53. at ¶142. Plaintiffs also assert that Defendants had not formally transferred physical or legal custody of the Plaintiffs back to the parents. Id. at ¶143. Plaintiffs' allegation is a futile attempt to avoid the implications between legal and physical custody. Even read in a light most favorable to Plaintiffs, they were transferred to the home of their parents. There is no legally sustainable argument that they were not in the physical control of their parents once placed on the trial home visit. Indeed, if they were not under the parents' control, the Children could not have been removed from the state.

App. Vol. 1: 076

Plaintiffs also assert that Defendants took affirmative actions in furtherance of their scheme [to return the Plaintiffs to their parents]. Id. at ¶147.   Quite simply, despite asserting multiple facts that are immaterial to their claims, Plaintiffs contend that CYFD failed to exercise control over the Children's location.[4]

None of the undisputed facts Complaint support the conclusion that Plaintiffs were restrained or that any restraint rose "to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual." Armijo at 1261.   Defendants did not have day-to-day physical control of the Children's ability to satisfy their basic needs; that was the role of the biological parents. Bathing and transporting a child on occasions does not rise to the requisite level of restraint. Moreover, these allegations are precluded by the fact that the Children were injured when they were outside New Mexico.   There are no allegations supporting CYFD provided care in any form to the Children outside of the state and the injuries did not occur during a time of restraint.

2. CYFD's legal custody of Plaintiffs does not create a special relationship.

The fact that Defendants did not have physical custody of the children resulting in the lack of physical control and restraint, is dispositive.   Indeed, Judge Armijo of the Federal District of New Mexico, in a factually similar but more egregious case, found there was no special relationship when CYFD, who retained legal custody, placed children in the physical custody of their biological father. Hernandez v. Rapp, No. CV 00-1456 MCA/WDS, 2003 WL 27385396, at *1 (D.N.M. Mar. 31, 2003).

---

[4] The Corrected Second Amended Complaint cites to examples of state law that Plaintiffs assert create a duty for Defendants to protect Plaintiffs.   See, e.g. Doc. 53 . at ¶¶ 128. 146   However, a violation of state law does not, in itself, give rise to a § 1983 claim. See, e.g., Robison v. Via, 821 F.2d 913, 922 (2d Cir.1987) (violation of state law neither gives plaintiff a § 1983 claim, nor deprives defendants of the defense of qualified immunity); see also Davis v. Scherer, 468 U.S. 183, 197 & n. 11, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

App. Vol. 1: 077

In <u>Hernandez</u>, the children's father, Ralph Hernandez, beat and shot at their mother, Dora Hernandez, in the presence of the children. Ralph Hernandez was subsequently arrested, convicted of aggravated assault with a deadly weapon, and given a four-year prison sentence. <u>Id</u>. at *2. CYFD thereafter took physical and legal custody of the children. While the father was incarcerated, no action was taken to terminate the parental rights of Ralph and Dora Hernandez or to ensure that the Hernandez children would be adopted during this period. Eventually, the father was released from prison. While the Hernandez children remained in the legal and physical custody of CYFD, CYFD employees began receiving information that the father had started drinking alcohol again, and they knew this information meant that the children would be in imminent danger of serious harm if placed in his custody. Nevertheless, CYFD employees approved and facilitated the delivery of all six Hernandez children to the physical custody of Ralph Hernandez. <u>Id</u>. at *3.

Later, a CYFD employee conducted a cursory investigation of the Hernandez family, which resulted in a memorandum that vouched for Ralph Hernandez's parenting abilities and discounted or omitted information from other sources indicating that the children were in jeopardy. CYFD then used the report to justify relinquishing CYFD's legal and physical custody of the children to their father. <u>Id</u>. The Children's Court granted the father both legal and physical custody of the children. The children would eventually be again removed because of sexual abuse perpetrated by the father on them. <u>Id</u>.

In <u>Hernandez</u>, the plaintiffs asserted that CYFD retained legal custody of the Hernandez children during part of the time they were abused by their biological father. <u>Id</u>. at *10. Judge Armijo found that these allegations were insufficient to maintain a cause of action under the special relationship theory and found dispositive the fact that the children were placed with a biological parent, as opposed to a foster parent. <u>Id</u>. Specifically, <u>Hernandez</u> found:

> A different situation is presented by relinquishing the physical custody of a child to a parent whose biological relationship and legal rights with respect to that child precede

App. Vol. 1: 078

any intervention by the State on the child's behalf. In this situation, the fact that the State retains legal custody of the child is not sufficient to establish a "special relationship" for purposes of asserting a claim under the substantive component of the Due Process Clause. Legal custody without day-to-day physical control of a child's ability to satisfy his or her basic needs is more akin to the mere undertaking or proclamation of intent to protect a child, which the Supreme Court found insufficient to establish such a special relationship in DeShaney, 489 U.S. at 197-98, or to the limited custodial responsibilities imposed by state compulsory school-attendance statutes, which the Tenth Circuit found insufficient to establish such a relationship in Maldonado v. Josey, 975 F.2d 727, 732-33 (10th Cir. 1992), Seamons, 84 F.3d at 1235-36, and Armijo, 159 F.3d at 1261-62.

Hernandez at * 10-11.

In Hernandez, the defendants failed to investigate the father's alleged alcohol abuse, as well as allegations that the father was physically abusing the children. The court in Hernandez found that, "[l]egal custody without day-to-day physical control of a child's ability to satisfy his or her basic needs is more akin to the mere undertaking or proclamation of intent to protect a child, which the Supreme Court found insufficient to establish such a special relationship in DeShaney, 489 U.S. at 197-98." Hernandez at *10.

The same reasoning applies here, where the crux of Plaintiffs' argument is that CYFD failed to ensure that the children were kept safe from their parents. Plaintiffs allege that CYFD retained legal custody of them, but that they were placed in the physical custody of their biological parents, or at least initially with just the Father. Pursuant to the reasoning of Hernandez, legal custody is insufficient to establish that a special relationship existed. The dispositive factor is the physical control and restraint exercised by CYFD. At its essence, Plaintiffs assert that the failure to restrain the parents was the cause of injuries to the Children. That failure to restrain does not support a claim for a breach of a special relationship.

The Eleventh Circuit employed similar reasoning when it dismissed a substantive due-process claim under circumstances "where a public agency is awarded legal custody of a child, but does not control that child's physical custody except to arrange court-ordered visitation with the non-

17

App. Vol. 1: 079

custodial parent." Wooten v. Campbell, 49 F.3d 696, 699 (11th Cir. 1995). In particular, the Eleventh Circuit rejected the analogy to a foster care situation and instead analogized the situation of private physical custody and state legal custody to the circumstances presented in DeShaney and Maldonado. See Wooten, 49 F.3d at 699-701.

Further, this matter is likewise distinguishable from a case in which CYFD placed a child with a foster parent and that child is subsequently harmed. The foster parent is licensed and controlled by CYFD. The child, whether placed voluntarily or involuntarily, is dependent on the state, by means of its agent foster parent, for basic needs. When a child is placed with a biological parent, state control is lacking. Hernandez specifically distinguished biological and foster parents. Moreover, DeShaney noted that the Supreme Court might have ruled differently had the issue at bar been abuse by a foster parent rather than a failure to remove a child from an abuse biological parent. The Supreme Court reasoned:

> Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to Estelle and Youngberg, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.

DeShanney, 489 U.S. 189, 201, n. 9, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249 (1989)

Lastly, to the extent that the Complaint alleges facts claiming CYFD had knowledge that the biological parents posed a danger to Plaintiffs, this is irrelevant. The Tenth Circuit has held that the defendants' knowledge of a risk of harm to the plaintiff was "not relevant to the determination of whether a special relationship existed." Armijo By & Through Chavez v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1262 n.5 (10th Cir. 1998). Likewise, the allegations that Defendants knew the parents would flee or otherwise posed a danger, even if assumed to be true, is a red-herring and does not establish there was a special relationship.

App. Vol. 1: 080

**B. Plaintiffs' allegation of danger creation fails because they were placed back in the custody of their biological parents.**

Plaintiffs cannot meet their heavy burden of demonstrating that CYFD's conduct violated their Fourteenth Amendment rights and fail to allege facts that would support all of the required elements of danger creation. Plaintiffs allege that "Defendants acted recklessly and in conscious disregard of the known risks the trial home visit posed for Plaintiffs. Even after the risk came to pass, Plaintiffs were kidnapped, Defendants continued to act recklessly by refusing to timely report the children missing and refusing to tell the Hobbs Police Department that their custodial rights were being interfered with." Doc 53 at ¶¶ 168, 169. This allegation, even assumed true, is insufficient to rise to the level of being conscience shocking. Plaintiffs allege that the alleged actions of Defendants were done recklessly and in disregard. At most, this might meet the fourth element of establishing danger creation. However, this alone is simply does not rise to the level of conscious shocking and is foreclosed by Camuglia.

Moreover, the facts here are similar to those of DeShanney, where the United States Supreme Court found there was no due process violation when the state took a child from an abusive father and later returned the child to that abusive parent. The United States Supreme Court held that because "the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the child]." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 201, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249 (1989). "While the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201, 109 S.Ct. 998. The Court noted that "[t]he most that

can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." Id. at 203, 109 S.Ct. 998.

At its core, the Plaintiffs asserts that they were removed from their parents and then later returned to the parents. **SMF 4, 5 , 14** While the Complaint asserts other facts in an apparent attempt to show conscience shocking behavior, that is all irrelevant to whether Defendants created a danger for the Children. The law is clear that Defendants did not create a danger by returning the Children to their parents, even if they knew the parents posed a threat to the safety of the Children. To hold otherwise would be turning Defendants into the guarantors of the Children's safety. This theory of liability is explicitly rejected by DeShaney. Accordingly, because the Children were returned to their parents and the *status quo ante*, Defendants cannot be liable for damages suffered by the Children because new or enhanced dangers were not created as a matter of law.

Plaintiffs' attempt to distinguish the facts from DeShaney by focusing on the wrong time period to define the status quo. Of note, before Defendants intervened, Plaintiffs were with their biological parents. But for the actions of the state, Plaintiffs would not have been in foster care. If the Defendants had done nothing, they would have always been in the custody of their parents. The but for action is not the removal from foster care but placement in foster care

This conclusion is supported by case authority. In Currier, two young children were removed from their mother's home and a court granted legal custody to the state. 242 F.3d at 909. The court then gave the father physical custody, and later legal custody, despite knowledge on the part of social workers that the father regularly failed to pay child support and was likely to be an inadequate caregiver. Id. During the father's custody of the children, social workers received repeated reports of abuse from the children's mother, but no steps were taken to end the father's custody. Id. at 909–10. Ultimately, one of the children died of burns after his father poured boiling water over him. Id. at 910.

20

App. Vol. 1: 082

The plaintiffs brought claims against three social workers who had been assigned to the case; each asserted qualified immunity. Id. at 908.

The Tenth Circuit held that a social worker had not committed a constitutional violation because the social worker's failures occurred only after the children were in the father's legal custody. Id. at 920. Thus, he had not created any danger and he had "no constitutional duty to rescue the children," even assuming that he knew that other actors had created a danger to the children and he had "a clear opportunity to rescue [them]." Id. at 921.

A second social worker, Doran, was sued because he was responsible for the state court's award of custody to the father and because of "various allegations as to [his] involvement after legal custody was awarded to [the father.]" Currier, 242 F.3d at 919. The Tenth Circuit rejected qualified immunity for Doran with respect to his role in placing the children with the father because his assistance in their placement did create a danger to the children. Id. at 919–20. The Tenth Circuit distinguished DeShaney because *the state had not returned the children to the same person (the children's mother) from whom it had taken custody*. Here, the Children were returned to the parents from whom they were removed. Accordingly, Defendants did not create the danger.

Plaintiffs attempt to avoid the application of DeShaney by asserting that CYFD did not simply return the Children to the *status quo ante*. Plaintiffs assert that the Children were placed in the home of just their father as opposed to both parents. However, this assertion is immaterial, because Plaintiffs also aver that the mother was released from jail and within days of the release the parents kidnapped Plaintiffs and disappeared. **SMF 13, 14.**. First, Plaintiffs admit that the kidnapping did not take place until the mother came home, and also admit that the mother participated in the kidnapping. Thus, the kidnapping was not proximately caused by the fact that the Children were returned to the father alone. Further, Plaintiffs admit the mother was in jail at the time the Children were initially placed with the father. Even if CYFD had not taken custody of the Children in the first place, the fact

21

that the mother was incarcerated meant that the father would have been the only parent having physical custody regardless of CYFD's intervention.

Moreover, Plaintiffs appear to be asserting that the damage they suffered was that they were placed in the control of their biological parents rather than foster parents, who provided a more stable and better environment. But Defendants did not create the danger. Plaintiffs were born to their parents and lived with their parents until CYFD took custody. The trial home visit did not expose Plaintiffs to any greater danger than they would have been exposed but for the interactions of Defendants. Rather, Plaintiffs would have been in their biological parents' care and control. They were only in the care of foster parents but for the actions of Defendants.

Lastly, Plaintiff MB was injured in October of 2020, approximately six months after she was taken from New Mexico. **SMF 15**. A six-month gap between an alleged act and the harm caused by that act cannot reasonably be considered "an immediate, and proximate harm,' as required by Currier Defendants' actions did not place the Plaintiffs in danger as a matter of law and ewre not the cause of her injuries in North Carolina.

**C. Defendants are entitled to qualified immunity, as it was not evident that placing children back with their biological parents violated a clearly established statutory or constitutional right when the alleged violation occurred.**

Even assuming that Plaintiffs have stated a plausible claim that Defendants committed any constitutional violations within the pleadings, Defendants are still entitled to qualified immunity. When targeted by an action brought under 42 U.S.C. § 1983, a government official can assert the defense of qualified immunity. When acting in the scope of their duties, "officials 'are shielded from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Davis v. Scherer, 468 U.S. 183, 191, 104 S. Ct. 3012, 3017 (1984), citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2739 (1982).

22

App. Vol. 1: 084

The second prong of the qualified immunity analysis requires a determination of whether the right allegedly violated was clearly established at the time of the alleged unlawful conduct. Smith v. Cochran, 339 F.3d 1205 (10th Cir. 2003). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S.Ct. 305, 308 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664, 132 S.Ct. 2008, 2093 (2012)) (the constitutional rule applied must be "beyond debate"). The pleaded facts simply fail to show that Defendants' conduct violated a clearly established law of which a reasonable person would have known. See Pueblo Neighborhood Health Ctrs. v. Losavio, 847 F.2d 642, 646 (10th Cir. 1988).

1. There was no clearly established right that placing the Children back with their parents violated duties created by a special relationship.

Plaintiffs cannot establish that their actions violated a clearly established right because case authority does not support a finding that CYFD's retention of legal custody is sufficient to establish a special relationship. In Hernandez, the court found that the defendants were entitled to qualified immunity because it was not clear that the children plaintiffs' rights were violated by virtue of a breach of the special relationship. Hernandez at *10. Other courts have similarly held that "legal custody without physical custody is insufficient to create a 'special relationship." Briggs v. Oklahoma ex rel. Oklahoma Department of Human Services, 472 F.Supp.2d 1294 (W.D.Okla.2007); A.M. ex rel. Youngers v. New Mexico Dep't of Health, 65 F. Supp. 3d 1206, 1232 (D.N.M. 2014); A.S. v. Tellus, 22 F.Supp.2d 1217, 1221 (D.Kan.1998); e.g., Wooten v. Campbell, 49 F.3d 696 (11th Cir.1995) (no special relationship where state has legal custody, mother has physical custody, and child injured by natural father); Clark v. City of Philadelphia, 2006 WL 2321574 (E.D.Pa. Aug. 8, 2006) (absent physical custody, no special relationship exists).

Multiple courts have held that legal custody without physical custody is insufficient to create a special relationship. Therefore, Plaintiffs cannot cite to any decision or authority that would have

put Defendants on notice that any of the conduct alleged to have occurred violated the Fourteenth Amendment. Pueblo Neighborhood, 847 F2d at 645 (plaintiff bears burden of convincing court that the law was clearly established). Accordingly, all of the Defendants named in their individual capacities are entitled to qualified immunity and to dismissal of the first claim for relief.

2. There was no clearly established right that placing the Children back with their parents created a danger.

Plaintiffs cannot demonstrate that Defendants' actions violated a clearly established right because case authority does not support a finding that CYFD's return of the Children to their biological parents for a trial home visit is sufficient to establish that Defendants created a danger that harmed the Children. Indeed, as noted above, case authority, including DeShanney and Currier, require a finding that Defendants did not create a danger to the Children by returning them to the parents from whom they were removed.

Tenth Circuit case law clearly establishes that "reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional." Currier, 242 F.3d at 924. Denying qualified immunity requires more, however. It requires that every reasonable official in the Defendants' shoes would have known that the actions in question violated clearly established law. See Currier at 925 (granting qualified immunity, because the "particular theory of danger creation on which Plaintiffs have stated a claim ... is substantially less established in the case law"). In Currier, the state formally removed a child from a mother's custody and legally placed the child with the father. See 242 F.3d at 918–19 ("When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, DeShaney does not foreclose constitutional liability.")(emphasis added). The Tenth Circuit's opinion is predicated on the fact that the state placed the child with a new parent. See 242 F.3d at 918–19. No case in the Tenth Circuit or elsewhere establishes that returning children to their biological parents affirmatively creates a danger and violates a child's constitutional rights. The closest case is Currier,

but there: (i) the State had formal, legal custody over the child; and (ii) the State placed a child with a different parent. See Kerns v. Bader, 663 F.3d at 1188 (stating that the law is not clearly established where "a distinction might make a constitutional difference")(emphasis in original).

Accordingly, even if the Court were to find that placing the Children back with their parents could constitute danger creation, there is no analogous binding case authority that would provide Defendants notice that such an action constituted a constitutional violation. Therefore, Defendants are entitled to qualified immunity.

**D. There is no applicable Tort Claims waiver for the acts alleged**

There are no provisions within the TCA that impose a duty on CYFD or its employees to obtain or retain custody of children from biological parents. Additionally, there is no waiver of immunity pursuant to the TCA that would allow for a claim to move forward when the claim is based on injuries to a child over whom CYFD does not have physical custody.

At no point within the four corners of the Complaint does Plaintiff even cite to an applicable waiver of the TCA. Rather, Plaintiffs merely states that, "CYFD, Saldana, and Garza were responsible for providing Plaintiffs a safe living place. Defendants decided to house Plaintiffs with biological parents who had pending felony child abuse charges, and who Defendants knew or should have known were unfit." See Doc. 53 at ¶ 173-174. Plaintiffs further allege "Saldana and Garza breached their duty to maintain a reasonably safe living place for the children while the children were in CYFD's legal custody." Doc. 53 at ¶176

Assuming *arguendo,* given the reference to a safe living space, that Plaintiffs are relying on the operation of a public building waiver NMSA §41-4-6, such an argument fails. This statutory provision does not provide for a cause of action against Defendants. In reviewing a similar argument, the New Mexico Court of Appeals reasoned:

App. Vol. 1: 087

> We borrow from Judge Black's introduction in <u>M.D.R. v. State ex rel.</u> <u>Human Servs. Dep't</u>, 114 N.M. 187, 188, 836 P.2d 106, 107 (Ct.App.1992), to the interplay between CYFD action and immunity:
>
> It is true that employees of the Department have a responsibility to oversee and supervise the safety and well-being of children entrusted to [the Department]. But it does not necessarily follow that the Department may be held liable under the [Tort Claims] Act for a breach of that duty. The Act declares that governmental entities and public employees shall only be liable within the limitations of its provisions. Governmental entities and public employees, while acting within the scope of their duties, are immune from tort liability except as waived by the Act. The right to sue and recover is therefore specifically limited to the rights, procedures, limitations, and conditions of the Act.

<u>Young v. Van Duyne</u>, 2004-NMCA-074, ¶ 12, 135 N.M. 695, 699, 92 P.3d 1269, 1273 (first alteration in original) (internal quotation marks and citations omitted.)

Plaintiffs set forth an inconsistent argument that conflates two diametrically opposed fact patterns. Plaintiff contends that Defendants failed to protect the Plaintiffs by placing them in the custody of their biological parents. However, Plaintiffs also assert that the "parents kidnapped Plaintiffs and disappeared." Doc. 53 at ¶119. Accordingly, the harm that allegedly occurred did not happen in a building controlled or operated by Defendants, but necessarily occurred somewhere other than a place in CYFD control. <u>See</u> Doc. 53 at ¶131. Moreover, the Complaint admits that CYFD lost control over the Plaintiffs. Doc. 53, ¶¶ 119-120.

Plaintiffs further muddle the issue by asserting "Saldana provided material assistance in operating Ducila's home by bathing Plaintiffs, providing further assistance at mealtimes, and transporting Plaintiffs to school. Upon information and belief, Saldana acted under Garza's direction and supervision." Doc. 53 at ¶175. This allegation has no bearing on whether the waiver for operation of a building is applicable because, even assuming that CYFD operated the parents' home, which is denied, the harm did not take place in the home. The harm was not caused directly by any CYFD employee and occurred months after the Plaintiffs left New Mexico.

App. Vol. 1: 088

As a matter of law, there is no applicable waiver of immunity pursuant to the TCA that would support the allegations against Defendants. See Young, 2004-NMCA-074, ¶ 30. In Young, the Court of Appeals determined that there was no authority for interpreting § 41-4-6 so broadly as to intend the building waiver to apply to a private home. Id. at ¶ 29. Young addressed the issue of CYFD's duty in connection with supervision, oversight, operation, or maintenance of a home into which a child is placed for adoption. The court's analysis was predicated on the fact the legal relationship of the adopted child to the adoptive parents was the same as if he were a biological child. Young, ¶ 25. Accordingly, the same analysis is appropriate here, where the Plaintiffs were in the physical custody of their biological parents. Plaintiffs cite to no authority or allege any facts supporting their novel claim that the home of the biological parent was somehow a foster home.

Plaintiff's Complaint fails to include any other waiver provision of the TCA. Because there is no applicable waiver of sovereign immunity for the negligence alleged in the SAC, the causes of action pursuant to the TCA are futile and leave to file the SAC should be denied.

WHEREFORE, Defendants respectfully request that the Court enter summary judgment in Defendants' favor as to all claims asserted in Plaintiff's Corrected Second Amended Complaint for failure to identify a constitutional violation, or alternatively, based on qualified immunity; to dismiss the state tort claims based on sovereign immunity and for such further relief as the Court deems appropriate.

Respectfully Submitted:

PARK & ASSOCIATES, LLC

By  /s/ James J. Grubel
Alfred A. Park
Lawrence M. Marcus
James J. Grubel
3840 Masthead Street, N.E.
Albuquerque, NM 87109
505-246-2805 ext. 104

App. Vol. 1: 089

jgrubel@parklawnm.com
*Counsel for Defendants*

I hereby certify that a true and correct

copy of the foregoing was served via
CM/ECF filing system to all counsel
of record on this  16th day of February, 2024.


*/s/ James J. Grubel*
James J Grubel

App. Vol. 1: 090

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUINONES,
Guardian ad Litem, on behalf of
A.D., R.B., E.B., and M.B.,
minor children,

        Plaintiffs,

v.                                       1:21-cv-00368-DHU-JMR

PATRICIA GARZA, in her individual and official
Capacity; REBECCA LIGGETT, in her individual
and official capacity; BRENDA SALDANA, in her
individual and official capacity; JENNIFER DE LOS
SANTOS, in her individual and official capacity;
NEW MEXICO CHILDREN YOUTH & FAMILIES
DEPARTMENT; and DOES 1-50,

        Defendants.

## ORDER SETTING BRIEFING SCHEDULE

THIS MATTER comes before the Court on the February 16, 2024, status conference. At

the status conference, the Court set the following briefing schedule for defendants' renewed

second Motion for Summary Judgment (Doc. 91).

      Plaintiffs' response:      March 8, 2024.

      Defendants' reply:       March 22, 2024

Theses deadlines may only be extended via written motion. The Court will not grant any

further extensions absent extraordinary circumstances.

                                         JENNIFER M. ROZZONI
                                         United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,

        Plaintiffs,

vs.                              No: 1:21-cv-00368 DHU/JMR

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity; BRENDA
SALDANA, in her individual and official capacity;
JENNIFER DE LOS SANTOS, in her individual
and official capacity; NEW MEXICO CHILDREN
YOUTH & FAMILIES DEPARTMENT;
and DOES 1-50,

        Defendants.

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Alison Endicott-Quiñones, as representative of A. D., R. B., E. B., and M. B. (collectively "Plaintiffs"), through undersigned counsel, responds as follows to the New Mexico Children, Youth and Families Department ("CYFD"), Patricia Garza ("Garza"), Rebecca Liggett ("Liggett"), Jennifer De Los Santos ("De Los Santos"), and Brenda Saldana's ("Saldana") (collectively, "Defendants") Renewed Motion for Summary Judgment (Dkt. No. 91, "Def. Mot." or "Motion"). As explained below, the Motion lacks merit and should be denied in its entirety.

## I.    OVERVIEW

Plaintiffs' biological parents were arrested by the Hobbs Police Department in June of 2019 for felony child abuse. They would later have release conditions that barred them from contact with Plaintiffs. As the Motion acknowledges, when Defendants ultimately decided to take Plaintiffs into their custody, there was "no care taker [sic] for the children." Def. Mot. at 4 (citing Def. Ex. A at p. 5). The status quo was hardly ideal—Plaintiffs were homeless in a Walmart parking lot, in the functional custody of the Hobbs Police Department ("HPD"). However, there was one

threat from which they were safe and would have remained safe had Defendants done nothing: the threat posed by their biological parents.

Once the state took custody of Plaintiffs, the law required Defendants to protect them. That was a burden Defendants did not want to shoulder. But the only way to free themselves from it was to get the state abuse and neglect court (the "State Civil Court") to transfer custody of Plaintiffs to someone else. So, in the months that followed, Defendants acted in concert to deceive the State Civil Court into reunifying Plaintiffs with their biological parents. Garza, the scheme's ringleader, was by her own admission indifferent to Plaintiffs' wellbeing—she just wanted to get rid of their case as quickly as possible. Garza even joked that she hoped the biological parents would abduct Plaintiffs and disappear.

As part of the scheme, Defendants sent Plaintiffs to live in an apartment with their biological father, Cristin Andrei Ducila ("Ducila"), on a "trial home visit." Officially, the visit would showcase Ducila's improved parenting skills to the court. Unofficially, the visit was a farce. Defendants surreptitiously continued to perform the household functions they claimed to have delegated to Ducila. Defendants' hope was that once the trial home visit ended, the State Civil Court would believe Ducila had morphed into a fit parent and sign off on reunification.

Even starting the trial home visit required Defendants to commit egregious misconduct. Saldana fed false information to a state criminal court judge (the "State Criminal Court") so Ducila's no-contact order would be lifted. Garza and Saldana withheld evidence of physical abuse by Ducila from the State Civil Court. Garza and De Los Santos forced a CYFD investigator to "unsubstantiate" credible abuse allegations. And Garza and Liggett barred Plaintiffs' guardian ad litem from presenting evidence to the State Civil Court that showed Ducila was unfit and dangerous.

Several weeks into the trial home visit, Plaintiffs were kidnapped by their biological parents and disappeared. But even that did not shake Defendants' resolve. Saldana used her custodial rights to block HPD from issuing an Amber Alert. And then, when HPD served a search warrant on CYFD in hopes of obtaining information about Plaintiffs' location, Defendants withheld

2

documents. As CYFD administrators—including Liggett—explained in a Zoom meeting with HPD after the kidnapping, Defendants did not want Plaintiffs found.

The result of Defendants' actions was foreseeable and appalling. The scheme ended in November of 2020 when the youngest child, M. B., was dumped at a North Carolina hospital with catastrophic brain damage.

Now, Defendants contend they are entitled to summary judgment. But none of their arguments have merit.

*First*, Defendants claim generally that they had no special relationship with Plaintiffs. But that is plainly wrong: Defendants took Plaintiffs into involuntary custody at the Walmart parking lot. Once that happened, Defendants became constitutionally responsible for their safety. The event that would have ended the special relationship—reunification—never occurred. Thus, the special relationship has continued uninterrupted to the present day. No custodial rights *of any kind* were ever transferred to Plaintiffs' biological parents. Defendants' attempt to distinguish between "physical" and "legal" custody is a red herring—under New Mexico law, Defendants maintained full control over where and with whom Plaintiffs would live. Although Defendants' reckless misuse of that control breached the special relationship, it did not end it. And while the special relationship existed, Defendants were obligated to protect Plaintiffs from all third parties.

*Second*, even if the special relationship was extinguished at some point, Defendants' Motion would still fail on a "danger creation" theory for multiple reasons. To start with, the trial home visit did not restore the status quo. The status que was safe foster care, which Defendants disrupted by moving Plaintiffs to the home of a known abuser. Moreover, Plaintiffs were not in their biological parents' custody when the state intervened. Rather, they were in the custody of HPD. And even if the trial home visit or kidnapping could somehow be characterized as a return to the status quo ante, Defendants' state created danger arguments would still fail. That is because Defendants prevented the issuance of an Amber Alert and obstructed an HPD search warrant. In short, Defendants were not passive observers, but rather aiders and abettors who cut off avenues for aid.

3

***Third***, Defendants' actions were conscience shocking. Defendants intentionally put Plaintiffs into the path of danger and prevented evidence of violent child abuse by Ducila from reaching the State Civil Court. Defendants knew severe injury or death would likely result, and when third parties attempted to protect Plaintiffs from that danger, Defendants took affirmative steps to thwart those efforts.

***Fourth***, the constitutional rights Defendants violated were clearly established. The exception Defendants ask the Court to craft to 10th Circuit precedent, namely harm inflicted by biological parents, is unsupported.

***Fifth***, whether Defendants' misconduct was the proximate cause of Plaintiffs' injuries is a triable fact question. Defendants' contrary arguments conflate the *immediate risk* of harm (which is required) with the *immediate occurrence* of harm (which is not).

***Sixth and finally***, Defendants used the apartment of a known child abuser as *ad hoc* housing for children in their custody and care. That is worse than negligent. Accordingly, the Tort Claims Act exception applies.

The goal of Defendants' scheme was to trick the State Civil Court into ending their special relationship with Plaintiffs. The method of the scheme was to provide a known abuser with unsupervised access to Plaintiffs. The result of the scheme was catastrophic brain damage for M.B. The Motion should be denied.

## II.   STATEMENT OF FACTS

### A. Disputed Material Facts.

Pursuant to L.R. 56.1(b), Plaintiffs do not dispute Defendant's material facts ("DMF").

### B. Plaintiffs' Additional Material Facts.

Pursuant to L.R. 56.1(b), Plaintiffs identify the following additional material facts ("PMF" or "PAF") as relevant to the Motion's resolution:

**<u>CYFD reluctantly takes Plaintiffs into CYFD custody from HPD on a 48 hour hold,</u>**
**<u>and then files an abuse and neglect petition</u>**

4

App. Vol. 1: 095

**A.** CYFD employees first encountered Plaintiffs and their parents in May of 2019 while at Walmart during their lunch break. The employees, including De Los Santos, told the parents to go somewhere else so that they would not have to take Plaintiffs into custody. Garza applauded the employees for refusing to assist Plaintiffs, approving a subordinate's claim that "the office had dodged a bullet". [Ivy Woodward Declaration at ¶ 6, Exhibit A][Yvette Lucero Affidavit at pages 1-3, Exhibit B][June 3, 2019 Referral Report at pages 1-2, Exhibit C].

**B.** In May of 2019 CYFD's Hobbs office prioritized keeping the number of their cases down. [Ivy Woodward Deposition, 22:2-23:25 and 24:24-25:24, Exhibit D] (stating that CYFD is "not trying to get cases right now").

**C.** On June 3, 2019, once HPD had detained Plaintiffs' parents, Liggett refused to take Plaintiffs into CYFD custody on a 48 hour hold for approximately two hours. [Woodward Decl. ¶¶ 8-12, EX A] [June 3, 2019 Referral Report at pages 1-2, Exhibit C]. [Garza Dep. 31:16-32:14, EX E][Initial Assessment Plan at page 2, EX K]. Liggett refused even after learning Plaintiffs' biological parents were going to be arrested for felony child abuse. [Woodward Decl. ¶¶ 8-12, EX A].

**D.** CYFD eventually filed an abuse and neglect petition to extend its custody beyond the 48 hour hold. [Woodward Decl. ¶¶ 7-12, EX A][Lucero Affidavit at page 5, EX B].

### Defendants decide to pursue reunification despite numerous red flags about Ducila

**E.** When Plaintiffs were eventually taken into CYFD custody, Ivy Woodward was assigned to their case. [Woodward Decl. ¶¶ 3 and 13, EX A].

**F.** From the time Plaintiffs were taken into CYFD's custody, Garza pushed Woodward to find somewhere to send them. Garza said her priority was making sure that Plaintiffs' case did not turn into "another Everhart case," referring to a case where children had been in CYFD's custody for at least ten years [Woodward Dep. 66:9-16, EX D].

**G.** Garza wanted Plaintiffs to leave CYFD custody as soon as possible because to please her supervisors in Santa Fe saying "We need to remember who signs our checks" and "I have bills to

App. Vol. 1: 096

pay and the State signs my checks, so I'm going to go with [the State]". [Woodward Dep. 66:15-67:3 and 67:10-68:7].

**H.** Ducila was wholly unable to manage Plaintiffs during supervised visitation. He often became angry, and Plaintiffs were afraid of him. [Woodward Decl. at ¶¶ 32-34, EX A].

**I.** Woodward warned coworkers that that Ducila was "a ticking time bomb" and was holding his penchant for violence inside because he knew CYFD employees were watching. [Woodward Dep at 85:6-86:2, EX D].

**J.** On two occasions, Ducila attempted to bribe CYFD workers to allow him to abscond with Plaintiffs. [Woodward Decl. ¶ 13, EX A][Lucero Affidavit at page 4, EX B][Garza Dep. 111:17-21, EX E][Saldana Dep. 103:3-7, EX F].

**K.** Plaintiffs' biological parents attempted to abscond with Plaintiffs during a supervised visit at CYFD's office. During the visit, they barricaded themselves in a room with Plaintiffs, requiring HPD officers to come and break down the door. [Woodward Decl at ¶ 33, EX A][Garza Dep. 112:23-113:25 and 142:20-144:14, EX E][Saldana Dep. 39:25-40:4 and 41:1-42:20, EX F][Initial Assessment Plan at page 2, EX K].

**L.** To prevent additional evidence of Ducila's unfitness from being collected, Garza ordered that supervised visits take place in rooms with nonfunctional surveillance equipment. [Woodward Decl. ¶ 34, EX A].

**M.** While Woodward was assigned to Ducila's case, he made no progress on his treatment plan. [Woodward Decl. ¶ 32-35 and 44].

**N.** Woodward objected to Garza's plan to start a trial home visit. [Woodward Decl at ¶ 36, EX A]. Woodward was concerned that Ducila was abusive and was likely to abscond with Plaintiffs. [*Id.*, EX A] Garza replied "maybe we'll luck out and they will disappear." [*Id.*, EX A][Garza Dep. 107:16-108:25, EX E]. Garza then placed her hand over her mouth, laughed, and said "I didn't say that." [*Id.*, EX A].

**O.** Saldana represented to CYFD's Children's Court Attorney that Ducila had complied with his treatment plan so that the State Criminal Court to lift Ducila's no contact order. [Saldana Dep.

App. Vol. 1: 097

33:17- 36:16, EX F][Motions to Modify No Contact Orders and Orders Granting Motions, EX L][Woodward Decl. at ¶ 43, EX A].

**P.** Saldana's representations about Ducila's treatment plan compliance were made with the express purpose of convincing the State Criminal Court to lift Ducila's no contact order. [Woodward Decl. at ¶ 43, EX A][Saldana Dep. 33:17-36:16][Motions to Modify No Contact Orders and Orders Granting Motions, EX L].

<u>Defendants suppress disclosures of abuse by Ducila</u>

**Q.** Liggett and Garza directed Woodward to withhold her professional opinion at a hearing in the abuse and neglect case, and then acted in concert to prevent Woodward's testimony from reaching the State Civil Court. [Woodward Decl. ¶¶ 37-42, EX A][Woodward Dep. 86:24-87:24, EX D][Liggett Dep. 138:7-16, 141:16-142:8, 143:4-15, 143:22-144:24, 146:4-147:1, 147:4-17, 148:24-149:15, 149:18-150:7, 153:16-154:18, 154:25-156:20, 161:23-162:7, 171:12-15, 173:6-17, 175:11-23, 176:16-177:10, EX G].

**R.** The Guardian ad Litem withdrew her emergency motion to suspend visitation when she learned that Woodward would not be permitted to testify and because Saldana and Garza had represented to her that the concerns raised in her January 28, 2020, motion to suspend visits had been addressed by the investigation conducted by Mazy and that the investigation would be unsubstantiated. [Woodward Decl. ¶¶ 41-42, EX A][Woodward Dep. 88:1-16, EX D][March 16, 2020 Permanency Hearing Transcript 32:10-33:23 and 40:13-41:12, EX T]. Following the withdrawal of the motion Garza ordered Woodward to cease communication with the Plaintiffs' Guardian ad Litem about the Plaintiffs' case. [Woodward Decl. ¶¶ 37-42, EX A].

**S.** On February 3, 2020, Plaintiffs' therapist, Salena Evans ("Evans"), wrote a letter to CYFD concerning statements made by Plaintiffs during therapy sessions up to February 3, 2020. [Evans Feb 3, 2020 Letter, EX M]. The letter described disclosures made in play therapy that gave the therapist concerns for the Plaintiffs' safety. [*Id.*, EX M][Evans Dep. 48:7-16, 81:23-83:15, EX H].

**T.** On February 4, 2020, R.B. told Evans that Ducila "yells and hits me" and that this happens "alot [sic]." [February 4, 2020 Therapy Note, EX N][Liggett Dep. 178:24-180:18, EX G][Evans Dep. 50:3-4, EX H].

**U.** On February 11, 2020, R.B. disclosed to Evans that his "grumpy daddy" gets mad frequently and hits him. [February 4, 2020 Therapy Note, EX O].

**V.** On February 18, 2020, R.B. displayed "fear of his father" during a therapy session; Evans described R.B.'s play therapy on this date as follows, "[R.B.] began by grabbing the foam locks and the large black keys on the shelves. He placed both foam locks on the doors and explained his "grumpy daddy" cannot enter this room. Therapist tracked accordingly and validated his rule. He then explained if we let him in, he will "hurt you!" [February 4, 2020 Therapy Note, EX P].

**W.** On February 24, 2020, A.D. disclosed in therapy that Ducila hits her mother "really hard," hits R.D. in the head a lot, hurts animals, and scares her. [February 4, 2020 Therapy Note, EX Q]. A.D. and R.B. were living in different foster homes. [Woodward Decl. ¶ 18].

**X.** On February 24, 2020, Evans submitted a Statewide Central Intake ("SCI") child abuse referral based on R.D. and A.D.'s disclosures of violence by Ducila. [S. Evans Dep. 53:12-54:4, EX H][Evans February 2020 SCI Report, EX R].

**Y.** Evans directly confronted Garza, Saldana, and Woodward about her concerns that Ducila was physically abusive. [S. Evans Dep. 50:17-19, 51:25-52:12, 53:12-54:4, and 119:24-120:3, EX H].

**Z.** Garza and Saldana were aware of the disclosures of abuse made to Evans. [*Id.*, EX H][Woodward Decl. at ¶¶ 20-21, EX A].

**AA.**     Garza warned Evans' employer that CYFD might stop referring cases to it because Evans was expressing concerns about Ducila. [Evans Dep. 81:23-83:15].

**BB.**     The Hobbs CYFD office opened an investigation into A.D. and R.B.'s physical abuse disclosures on February 25, 2020. Kelly Mazy ("Mazy") was assigned to investigate, with De Los Santos supervising her. [Woodward Decl. at ¶¶ 14-22 and 26, EX A].

8

**CC.**     On March 30, 2020, Mazy was coerced by Garza and De Los Santos into unsubstantiating A.D. and R.B.'s abuse disclosures. [March 30, 2020 Disposition of Investigation, EX S][Woodward Decl. at ¶¶ 23-30, EX A][Kelly Mazy Deposition, 40:5-41:1, 41:16-42:1 and 45:1-46:4, EX J]. The stated reason to unsubstantiate the investigation was lack of credible evidence. [*Id.*, EX S].

**DD.**     Mazy believed A.D. and R.B.'s abuse disclosures should have been substantiated. [Woodward Decl. at ¶¶ 23-24, EX A][Mazy Deposition, 40:5-41:1, 41:16-42:1 and 45:1-46:4, EX J].

**EE.**     Under CYFD guidelines, A.D. and R.B.'s abuse disclosures should have been substantiated. [Woodward Decl. ¶¶ 14-31, EX A][NMAC 8.10.3.17(A)(1)] (identifying disclosures by children as credible evidence) [CYFD Legal Manual on Child Abuse and Neglect, EX Y] at page 8 (identifying disclosures made by children as credible evidence and stating "substantiated means that CYFD determines that there is credible evidence to support the conclusion that the child has been abused or neglected)[Mazy Deposition, 40:5-41:1, 41:16-42:1 and 45:1-46:4, EX J].

## Defendants dupe the State Civil Court into approving a permanency plan that included a trial home visit

**FF.** Prior to Plaintiffs' kidnapping, Defendants did not alert the State Civil Court to the physical abuse disclosures made after February 3, 2020, or the February 24, 2020 SCI report. During the March 16, 2020 Saldana was asked if a plan of reunification was safe and appropriate and she responded, "Yes". [March 16, 2020 Hearing, 43:16-24, EX T]. When Saldana was asked about concerns held by Evans she did not mention any of the disclosures that had occurred after Evans February 3, 2020 letter and never mentioned that Ducila had previously hit R.B. [March 16, 2020 Hearing, 32:10-33:23, EX T][Evans Feb 3, 2020 Letter, EX M].

**GG.**     On March 13, 2020, Garza and Saldana filed a "Judicial Review And/Or Permanency Hearing Report" and a "Family Treatment Plan" (collectively referred to as the

App. Vol. 1: 100

"Report") in the State Civil Court. [March 13, 2020 JQ Filing, EX U]. The Report identifies Saldana as the responsible CYFD Party for the case participants. [*Id.* at page 5, EX U].

**HH.**     The Report falsely claimed that "[supervised] visits go well and the children are excited to see their father." [March 13, 2020 JQ Filing at pages 3 and 6, EX U].  Woodward Decl. Ex. A at ¶¶ 32-35.

**II.** The Report falsely claimed that "Ducila has been compliant with his treatment plan and has done everything the Department ha[d] asked of him." [March 13, 2020 JQ Filing at page 4, EX U]. [Woodward Decl. ¶ 32-35 and 44].

**JJ.** The Report claimed that CYFD "assessed there are no risks to the children if they are returned home," and that "the Department does not have any safety concerns with the visitation." [March 13, 2020 JQ Filing at page 3, EX U].

**KK.**     Defendants were aware that a trial home visit would likely lead to Plaintiffs being abducted by their biological parents, and that a trial home visit should not occur under such circumstances. [Garza Dep. 114:3-115:5, 115:17-116:18, 117:10-24] (admitting trial home visit should not occur if risk exists that parents will abscond with children); "There were concerns for the family fleeing once the children were back in the home as the family is transient". [Saldana May 2, 2020 SCI Report, EX V][Woodward Decl. at ¶ 36, EX A][Garza Dep. 107:23-108:13 and 110:3-6, EX E]. Ms. Lucero stated in her June 5, 2019 affidavit to bring the Plaintiffs into CYFD custody, "The family is highly transient and have stated that they are leaving as soon as they get their children back". [Lucero Affidavit at page 5, EX B].

**LL.**     The Report omitted any mention of the physical abuse disclosures, the February 24, 2020 SCI report, and CYFD's internal assessment which evaluated Plaintiffs as "unsafe." [March 16, 2020 Hearing, 43:16-24, EX T][Summary of NCCD Safety and Risk Assessments in FACTs, EX W].

**MM.**     Garza and Saldana knowingly concealed facts known to them that the children would be in danger during a trial home visit because they wished to close the case as quickly as possible. [Trial Home Visit Email, EX X][Woodward decl. ¶ 36, EX A][Garza Dep. 107:16-108:25,

EX E][Liggett Dep. 70:16-71:11, 132:23-133:6, 133:25-134:14, 136:11-137:1, 178:24-180:18, 203:11-205:24, EX G][R. Gaston Dep. 37:1-42:13, EX I]. At the close of the March 16, 2020 hearing the Judge asked that Ducila keep up the good work. [March 16, 2020 Hearing, 43:16-24, EX T].

### Defendants start a sham trial home visit and continue to ignore red flags

**NN.**     Plaintiffs were in CYFD's custody during the trial home visit, and at all other relevant times. [Saldana Dep. 99:3-100:3 and 100:17-101:9, 108:9-109:5, 115:17-117:5, 117:16-118:15, EX F][March 13, 2020 JQ Filing at page 6, EX U][CYFD Legal Manual on Child Abuse and Neglect pages 5 and 7, EX Y at page 7 (Stating there is no distinction between physical and legal custody under New Mexico law and that the term "physical custody" can cause confusion and is no longer used) at pages 2-4  (Crediting Liggett as a contributor to the Legal Manual)[Garza Depo 118:5-17, 118:24-119:22, 128:3-5, EX E][Woodward Decl., ¶¶ 45-49, EX A][R. Liggett Dep. 28:17-31:22, 33:22-35:3, 36:4-37:24, 43:16-19, 60:14-61:25, 62:17-23, EX G] at 43:16-19 (CYFD has duty to protect children from their biological parents when a child is in CYFD's legal custody) [Saldana May 2, 2020 SCI Report, EX V] (stating Child in CYFD custody currently on Trial Home Visit with Parent)[May 7, 2020 Status Conference Order, EX Z][October 28, 2020 SCI Report, EX AA] at page 2 ("The children and in CYFD custody")[May 13, 2020 Letter to DA, EX AB] page 1 (stating Saldana gave a police officer "confirmation the children were in CYFD custody")[Garza November 6, 2020 Report, EX AC] page 3 (stating Plaintiffs are currently in CYFD custody and that M.B. is currently at a hospital in North Carolina)[Hobbs Police Dept. Reports, EX AD] pages 1 and 2 (Saldana tells two different police officers that Plaintiffs were in CYFD custody at the time they went missing) [Declaration of Clifford Gilmore at paragraphs 4-6 and 11-17, EX AF].

**OO.**     During the trial home visit, Saldana improperly provided household services to Plaintiffs, gave their biological father advanced warning of "unannounced" visits, and assisted him in staging the apartment to make him look like a fit parent. [Gaston Dep. 25:24-29:15, 30:4-14, and 31:25-32:18, EX I][Garza Dep. 122:24-123:4, 124:21-125:10, 126:12-24, 127:19-129:25, EX E].

App. Vol. 1: 102

**PP.**        A disclosure of sexual abuse was made on April 27, 2020, days before Plaintiffs disappeared. [Selena April 29, 2020 email, EX AE]. CASA advocate Megan Gallegos believed that this report may have prompted Ducila and Badea to flea with Plaintiffs. [Hobbs Police Dept. Reports, EX AD] at page 4 (Megan advised she was concerned for the safety and well being of the children based on statements the children made during therapy sessions the week prior…Megan claimed the concerns were forwarded to CYFD to suggest the children be removed from the home).

**QQ.**        Defendants were obligated, without exception, to protect children in their legal custody, including during a trial home visit. [R. Liggett Dep. 34:2-35:3, 36:4-37:24, 43:16-19, and 59:9-61:25, EX G][Woodward Decl., ¶ 45-49, EX A][Gilmore Decl. ¶ 12-13, EX AF].

**RR.**        Garza, Liggett and Saldana knew that CYFD had a legal obligation to terminate a trial home visit if children are in danger. [Garza Dep. 118:24-119:22, 122:25-126:4, 124:21-125:10] [Woodward Decl., Ex. A at ¶¶ 45-49, Ex. A].

### Plaintiffs' biological parents abscond, Defendants assist their escape, and M.B. suffers horrific injuries

**SS.**        Saldana and Liggett prevented HPD from issuing an Amber Alert by claiming Plaintiffs were not in danger and prevented custodial interference charges from being issued against the parents. [Woodward Decl. at ¶¶ 50-52, EX A][Garza Dep. 134:4-135:11 and 136:4-137:5, EX E][Saldana Dep. 94:7-23, 96:19-97:10, 97:21-101:9, 104:11-105:23, 106:4-108:4, 109:19-110:14, 112:20-113:13, 113:22-24, 117:7-118:15, 120:4-121:9, EX F][Liggett Dep. 70:16-71:11, EX G][Gaston Deposition 38:13-42:13, EX I][ [Mazy Dep., 47:12-48:19 and 68:20-25, EX J].

**TT.**        Saldana did not report Plaintiffs as missing in NCIC until after M.B.'s catastrophic injuries. [Saldana Dep. 122:25-125:15 and 125:24-126:7, EX F] Saldana and Garza knew the children had not been listed as missing with the National Center for Missing and Exploited Children before October of 2020. [*Id.*, EX F][November 3, 2020 CASA Report and attached email at pages 3-5, EX AG].

**UU.**     Saldana, De Los Santos, Garza, and Liggett had actual knowledge that credible reports of physical abuse had been made by the children. [Liggett Dep. 178:24-180:18, EX G][Mazy Dep. 40:5-41:1, 41:16-42:1, EX J][Evans February 2020 SCI Report, EX R][Woodward Decl. at ¶¶ 14-31, EX A].

**VV.**     Once Plaintiffs went missing, Garza ordered Saldana and Gaston to not discuss the case with anyone, including the police. [R. Gaston Dep. 50:12-51:7]

**WW.**     Garza, De Los Santos, and Liggett withheld documents responsive to a search warrant served on CYFD by the Hobbs Police Department. [Garza Dep 152:16-158:22, EX E][Liggett Dep. 114:23-117:24, EX G][Woodward Dec. at ¶¶ 54-57, EX A][K. Mazy Dep. 85:7-87:23, EX J].

**XX.**     The withheld documents may have assisted the Hobbs Police Department in locating Plaintiffs. [Woodward Decl. at ¶¶ 54-57, EX A].

**YY.**     After Plaintiffs disappeared, Garza, Liggett and Saldana held in a Zoom meeting with HPD and CASA. [Meeting Excerpt, EX AH 1]. In the meeting, Liggett, Karla Young and Marie McQueeney stated they may not actually want Plaintiffs back and may be content to leave Plaintiffs with their biological parents. [Meeting Excerpts, EXs AH 2 and AH 3]. During the meeting, Liggett said to HPD officers, "You need CYFD to say we want to enforce our custodial rights… it's not enough to say that the children are in CYFD custody?" [Meeting Excerpt, EX AH 4]. When a CASA advocate asked if CYFD would say that they actually wanted to find Plaintiffs, Karla Young responded that she was not prepared to say CYFD actually wanted the Plaintiffs back and that she wanted to attend an internal CYFD staffing to determine whether CYFD would actually state that they wanted the Plaintiffs back. [Meeting Excerpt, EX AH 5]. CASA worker Megan Gallegos found it shocking that CYFD was content not knowing where the Plaintiffs were [M. Gallegos Dep. 62:14-17, EX AI].

**ZZ.**     After M.B. suffered catastrophic brain damage, CYFD filed change of placement notices in the State Civil Court switching M.B.'s placement status from "unknown" to Novant Hospital in North Carolina. [Change of Placement Notice at page 1, EX AJ]. A change of

13

placement notice was filed for A.D., E.B., and R.B. from "Trial Home Visit" to non-relative foster care after they were found in Houston, Texas in November of 2020. [*Id.* at page 2, EX AJ].

**AAA.**     Change of placement notices are only filed for children who are in child protective services custody within CYFD. [R. Liggett Dep. 59:9-61:25 and 62:4-23, EX G].

**BBB.**     Liggett claimed that the trial home visit was a success despite Plaintiffs' kidnapping and M.B. life-altering injuries. [Liggett Dep. 51:2-52:24, EX G].

### III.     LEGAL STANDARD

Summary judgment may only be granted if no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020); Fed. R. Civ. P. 56(a). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only if the movant meets that burden is the nonmovant required to put in the record facts showing that a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). Factual allegations must be supported by evidence, such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A). In resolving a motion for summary judgment, all evidence is viewed in the light most favorable to the nonmovant, and reasonable inferences are drawn in the nonmovant's favor.

Individual defendants in a 42 U.S.C. § 1983 action may raise qualified immunity as a defense. *Irizarry v. Yehia*, 38 F.4th 1282, 1287 (10th Cir. 2022). A qualified immunity defense must be rejected, however, if the plaintiff can show (1) that "the defendant's actions violated a constitutional or statutory right" and (2) that the "right was clearly established at the time of the defendant's complained-of conduct." *Id.* To show that a right was clearly established, "the plaintiff does not have to show that the specific action at issue had been held unlawful, but the alleged unlawfulness of the defendant's conduct must be apparent in light of preexisting law." *Armijo By & Through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998). Although it is the plaintiff's burden to satisfy the two-part test for defeating a qualified immunity defense, the

14

Court must still "review the evidence in the light most favorable to the nonmoving party[.]" *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

## IV.   ARGUMENT

### A. Special Relationship.

Defendants first contend they cannot be held responsible for their actions because they did not have a special relationship with Plaintiffs. Defendants argue they "lack[ed] the necessary ability to physically restrain the children" because Plaintiffs were "placed in the custody of their biological parents[.]" Def. Mot. at 13. That is wrong for several reasons.

To start with, Defendants' blanket assertion that "there was no special relationship," (*id.*), is obviously incorrect. CYFD (reluctantly) took Plaintiffs into foster care in June of 2019. Once that happened, Defendants became constitutionally responsible for Plaintiffs' "safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). So, Defendants really mean their special relationship with Plaintiffs ended *at some point*. But the Motion fails to specify when Defendants contend the special relationship ceased. That failure is the canary in the coal mine, alerting the Court that something is amiss.

As explained below, Defendants' special relationship with Plaintiffs has continued, uninterrupted, from the day they were taken into foster care to the present. PMFs NN-RR, YY, ZZ, AAA, BBB. The trial home visit did not break the chain. *Id.* And "an affirmative link" exists between Defendants' betrayal of that special relationship and "the injuries plaintiffs suffered." *Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs.*, 959 F.2d 883, 890 (10th Cir. 1992). Accordingly, Plaintiffs have established a prima facie case that Defendants are liable for Plaintiffs' injuries.

### 1. Plaintiffs satisfy all elements of a Section 1983 claim under a special relationship theory.

To prevail on their substantive due process claim, Plaintiffs will have to prove four elements:

App. Vol. 1: 106

First, the plaintiff must demonstrate the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs. ... Second, the plaintiff must show that the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger. ... Third, the plaintiff must show that the defendant's conduct caused the plaintiff's injuries. ... And finally, fourth, the defendant's actions must shock the conscience.

*Dahn v. Amedei*, 867 F.3d 1178, 1185–86 (10th Cir. 2017) (citations omitted). Here, the record contains sufficient evidence for a jury to find in Plaintiffs' favor on all elements.

### a. Defendants have had a special relationship with Plaintiffs since June 2019.

Although state governments have no general duty to protect people from third parties, "if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." *Armijo*, 159 F.3d at 1261. Thus, "children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm[.]" *Yvonne L.,* 959 F.2d at 893. The special relationship "extends to children in the state's legal custody." *Johnson ex rel. Cano v. Homes*, 377 F. Supp. 2d 1039, 1046 (D.N.M. 2004) ("*Cano I*"), *aff'd sub nom. Johnson ex rel. Est. of Cano v. Holmes*, 455 F.3d 1133 (10th Cir. 2006) ("*Cano II*").

In the foster child context, the duty of protection from harm includes the exercise of professional judgment in placement decisions. "Failure to exercise professional judgment ... does not require actual knowledge children will be harmed[.]" *Id.* Rather, "it implies abdication of the duty to act professionally in making the placements." *Id.*

In the 10th Circuit, the special relationship continues so long as a party "retain[s] *ultimate responsibility* for [the] child's food, shelter, clothing, medical care, and reasonable safety." *Maldonado v. Josey*, 975 F.2d 727, 733 (10th Cir. 1992) (emphasis added). That is why, for example, "[a]lthough a child may well be in the 'custody' of ... school authorities during school hours, th[at] custody does not amount to a [special relationship]." *Id.* at 732 (10th Cir. 1992). Because "parents decide where their children will be educated," they "retain ultimate responsibility for their child's food, shelter, clothing, medical care, and reasonable safety." *Id.* at 732-33.

16

The "ultimate responsibility" test also determines if the special relationship between the state and a foster child has ended. For that reason, courts "focus on which individual or agency society deems most responsible for a child or individual's well-being," *not* "physical presence []or day-to-day control." *A.M. ex rel. Youngers v. New Mexico Dep't of Health*, 65 F. Supp. 3d 1206, 1259 (D.N.M. 2014).

In *Cano I*, Judge Browning held that CYFD had a special relationship with a child in its legal custody, even though the child lived with a prospective adoptive parent:

> Until the adoption was finalized … Grace remained in CYFD's legal custody. … As such, state law charged CYFD with the duties to "determine where and with whom [Grace] shall live;" and to "provide [Grace] with food, shelter, education, and ordinary and emergency medical care." NMSA 1978, § 32A–1–4N.

> In furtherance of their legal obligations to Grace, state law required the CYFD Defendants to conduct a home visit, to interview in Bogey's home, and to determine the capacity of Bogey to shelter, to feed, and to clothe Grace. *See id*. at §§ 32A–5–12, 32A–5–13, 32A–5–14; NMAC 8.26.3.18 (requiring pre-placement study to include study of physical and social home environment). Before the adoption could go through, the CYFD Defendants were under a duty to conduct a post-placement investigation to include a number of home visits so that they could make the required post-placement statement to the state court regarding the prospective adoptive home. *See* NMSA 1978 §§ 32A–5–31; NMAC 8.26.3.32B. The CYFD Defendants were also under a duty to provide post placement services to Grace until the adoption's finalization. *See* NMAC 8.26.2.20.

> If any of the individual CYFD Defendants suspected child abuse or neglect in the adoptive home, she was under a duty to investigate; if the investigation substantiated the suspicion, the worker had a duty to determine the family was no longer eligible to adopt children in CYFD's custody. *See* NMAC 8.26.2.21. The relationship between the State and Grace was therefore the "special relationship" that, under *Yvonne L.*, gives rise to a duty of protection from harm.

377 F.Supp.2d 1039, 1046-47 (modifications original). The statutory provision cited by the court is the definition of "legal custody" found in the New Mexico Children's Code. *See* NMSA 1978, § 32A–1–4(T).[1]

In affirming *Cano I*, the 10th Circuit found that a special relationship existed even though prospective adoptive parents "are not considered public employees nor is their day-to-day conduct as parents regulated and controlled by the State." *Cano II*, 455 F.3d at 1140. The test is not *where*

---

[1] Since 2004, Section 32A–1–4's subsections have been re-lettered several times. As none of the alterations are relevant here, this Opposition cites to the version currently in effect.

a foster child lives, but rather who is ultimately responsible for *deciding* where the child lives. Until that responsibility is transferred to someone else, the legal duties imposed by the special relationship remain. *Id*. at 1145 (qualified immunity denied on special relationship theory where a social worker "did not investigate … and, over a two-month span, did not make a single visit to [the adoptive parent's] house"); *Smith v. D.C.*, 413 F.3d 86, 94 (D.C. Cir. 2005) ("the District's control over Tron restrained his liberty against his will. … Tron had to live at Queenstown Apartments. He had no choice.") *See also*, *Yvonne L.*, 959 F.2d at 892 ("a state … [can]not avoid … responsibilities … by delegating custodial responsibility to irresponsible private persons" (citing *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990)).

Conversely, the special relationship terminates once another party becomes ultimately responsible for a child's wellbeing:

> [A] child alleged to be adopted … [or] living with an adult pursuant to a guardianship … is not in the custody of the State and, unlike a foster child, does not have a special relationship with the State. An adopted child is in the custody of his or her adoptive parents. Similarly, a child living in Oklahoma pursuant to a court-ordered guardianship is in the custody of his or her guardian.

*Matthews v. Bergdorf*, 889 F.3d 1136, 1146 (10th Cir. 2018). *See also*, *Dahn*, 867 F.3d at 1186 fn. 7 ("We note the importance of Dahn's adoption date. On December 11, 2008, Oklahoma, Colorado, and Adoption Alliance finalized Lovato's adoption of Dahn. This meant that after December 11, no state … had custody of Dahn."); *Smith*, 413 F.3d at 96 ("Courts have typically … treat[ed] the custody analysis as an all-or-nothing inquiry").

In the present matter, a special relationship was created on June 3, 2019, when Defendants took custody of Plaintiffs. From that point forward, Defendants were the parties ultimately responsible for Plaintiffs' care. PAFs NN-RR, YY, ZZ, AAA, BBB. That responsibility never shifted to Plaintiffs' biological parents or anyone else. *Id*. Defendants now claim they "returned the Children to their biological parents," (Def. Mot. at 3), but that is incorrect. A trial home visit is exactly what it sounds like: visitation. During a trial home visit, a child "resides with the parent or guardian while services are provided to the child and family [by CYFD] *to ensure safety of the child*." N.M. Admin. Code 8.10.7.7(KK) (emphasis added). Moreover, a trial home visit begins

18

and ends at CYFD's discretion. *State of N.M. ex rel. CYFD v. Lisa A.*, 2008-NMCA-087, ¶ 9, 144 N.M. 324, 327 ("Despite the trial home visit, there was no guarantee that Child would remain in Mother's care or that Mother would ultimately receive custody of Child at the conclusion of the proceedings.")

Also, the trial home visit did not relieve Defendants from their "right to determine where and with whom a child shall live" or their "duty to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care[.]" NMSA 1978, § 32A–1–4(T). *See also*, N.M. Admin. Code 8.10.7.7(X)(2) (same). And in its order approving CYFD's proposed permanency plan, the state court made no mention of any responsibility for Plaintiffs' care being transferred to the biological parents. Indeed, the only mention of custody in the order is that "legal custody would remain with CYFD."

Just as finalization of the adoption in *Cano I* would have ended the special relationship, so too would reunification in the present matter. But reunification never happened. PAFs NN-RR, YY, ZZ, AAA, BBB. Prior to June 3, 2019, Plaintiffs' biological parents were ultimately responsible for Plaintiffs' wellbeing. Once Plaintiffs' biological parents were detained, the baton was transferred to HPD. *See, e.g., White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (section 1983 liability where police arrested the guardian of three children but left the children on the side of the road); PAFs A-D. And then several hours later, when CYFD took Plaintiffs into custody, the special relationship with HPD ended and CYFD assumed ultimate responsibility. *Id*. It bears emphasis: no further handoffs occurred. PAFs A-D, NN-RR, YY, ZZ, AAA, BBB.

### b.  Defendants breached the duties imposed by the special relationship.

The existence of a special relationship "triggers a continuing duty which is subsequently violated if a state official knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto[.]" *Schwartz*, 702 F.3d at 580 (quoting *Yvonne L.*, 959 F.2d at 890 (alterations in original) (quotations omitted). The record provides ample support for a finding that Defendants subjected Plaintiffs to known dangers and failed to exercise professional judgment.

19

### i.  Defendants knew their actions would endanger Plaintiffs.

Each Defendant knew that a trial home visit would put Plaintiffs' lives at risk, yet still chose to go ahead with the scheme. PAFs E-I, N, Q-Z, BB-EE, JJ-MM. Defendants also knew that by impeding HPD's efforts to locate Plaintiffs, that risk was exacerbated further. Defendants' actions were also manifestly unreasonable. PAFs SS-UU. Thus, they are liable for the harm that resulted. *See M.D. ex rel. Stukenberg v. Perry*, 294 F.R.D. 7, 34 (S.D. Tex. 2013) ("[T]he fourteenth amendment right upon which plaintiffs base their claim can be characterized as a right to be free from an unreasonable risk of harm while in the state's custody.")

Prior to the trial home visit, all Defendants were aware of the circumstances that led to the arrest of Plaintiffs' biological parents on felony child abuse charges. All Defendants were also aware of A.D. and R.B.'s disclosures of physical abuse by Ducila. PAFs S-MM. That includes A.D.'s disclosure that her father hit R.B. in the head a lot. PAF T. Defendants were also aware that Plaintiffs' biological parents were likely to abscond with Plaintiffs if given the opportunity—in fact, Garza hoped they would. PAFs Q-R and KK. Defendants also went to great lengths to keep information about these risks from the State Civil Court. *T.D. v. Patton*, 868 F.3d 1209, 1230 (10th Cir. 2017) ("Ms. Patton's intentional exclusion of her knowledge and concerns from her hearing reports showed she acted recklessly and in conscious disregard of an obvious or known risk that Mr. Duerson posed to T.D."); PAFs Q-EE.

Along the same lines, during the trial home visit started, Saldana was aware that Ducila was unable to care for Plaintiffs. PAF OO. There is no other reason to provide him with advance notice of unannounced visits. *Id*. And finally, once Plaintiffs were kidnapped, Saldana, Garza, De Los Santos, and Liggett all knew that Plaintiffs were in danger, yet took steps to prevent law enforcement from locating them. PAFs PP, SS-YY.

### ii.  Defendants failed to exercise professional judgment.

The just-described conduct also amounts to a total abdication of professional judgment. PAFs N-ZZ.

Under *Schwartz v. Booker*, 829 F. Supp. 2d 1080, 1087 (D. Colo. 2011), aff'd, 702 F.3d 573 (10th Cir. 2012), "fail[ure] to conduct any investigation" into abuse allegations is an abdication of professional judgment. *See also, Cano I*, 377 F. Supp. 2d at 1047 ("If any of the individual CYFD Defendants suspected child abuse or neglect in the adoptive home, she was under a duty to investigate; if the investigation substantiated the suspicion, the worker had a duty to determine the family was no longer eligible to adopt children in CYFD's custody").

Here, Defendants' conduct was even worse: Garza and Saldana withheld A.D. and R.B.'s abuse disclosures from the abuse and neglect court and dictated the investigation's outcome to suit their goals. PAFs S-EE. Similarly, Liggett and Garza prevented Woodward's professional judgment from reaching the abuse and neglect court. PAFs Q-R.

Viewed in the light most favorable to Plaintiffs, Defendants' actions were not motivated by professional judgment *at all*. Rather, they just wanted to dispose of Plaintiffs' case as quickly as they could. *Youngberg v. Romero*, 457 U.S. 307, 323 (1982) (failure to exercise professional judgment where "the person responsible actually did not base the decision on such judgment.")

### c.  Defendants' actions caused Plaintiffs' injuries.

The causation element is satisfied where a defendant breaches the special relationship and "an affirmative link to the injuries plaintiffs suffered can be shown[.]" *Yvonne L.*, 959 F.2d at 890.

As discussed above, Defendants knew that Plaintiffs' biological parents were unfit. They were also aware that Ducila frequently struck R.B. in the head. PAFs T-Y. Moreover, Defendants were aware that Plaintiffs were likely to be kidnapped if left alone with their biological parents. PAF KK.

Thus, Plaintiffs' "representative[] allege[s] a host of risk factors ignored by [Defendants] … all of which were exacerbated by their failure to adequately monitor [Plaintiffs' biological parents]." *Hunt v. Montano*, 39 F.4th 1270, 1281 (10th Cir. 2022). "When the children were placed in [the trial home visit], these risks became real." *Id*. "That is an affirmative link under the special relationship doctrine[.]" *Id*.

### d.  Defendants' actions shock the conscience.

"To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (internal quotation marks & citation omitted) (alteration omitted). That requirement is satisfied where a plaintiff "demonstrate[s] a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Armijo*, 159 F.3d at 1262 (quotations omitted). Whether the state actor's conduct shocks the conscience depends on the facts of the specific case. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("Rules of due process are not, however, subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another"). The court must view the defendant's "conduct as a whole." *Uhlrig v. Harder*, 64 F.3d 567, 576 (10th Cir. 1995). Here, each Defendant's conduct, when viewed as a whole, shocks the conscience.

**Patricia Garza**. As the manager of CYFD's Hobbs office, Garza was everyone's boss except Liggett's. Unsurprisingly, she was involved in almost every bad act committed in this case. She used a room with broken surveillance equipment for visitation, so that evidence of Ducila's unfitness would not collected. PAF L. She also prevented Woodward's professional opinion from reaching the State Civil Court. PAF Q. She threatened Evans' employer in an attempt to stop the trickle of troubling therapy disclosures. PAF Y. She also forced Mazy to unsubstantiate credible allegations of abuse by Ducila, including allegations that he frequently struck one of his children in the head. PAFs Z, CC, S-X. *Patton*, 868 F.3d at 1230. ("awareness of and failure to investigate evidence of potential abuse, including T.D.'s report that Mr. Duerson had hit him with a wooden mop," shocked the conscience); *Schwartz*, 702 F.3d at 587 (conscience shocking behavior where a social working "ignored known or likely injuries and abuse to Chandler, chose not to further investigate such possible abuse, and ignored the danger posed by his continued residence in Jon Phillips's home.") She also signed off on the Report—a document that contained numerous false statements and omitted any mention of the post-February 3rd, 2020 abuse disclosures. PAFs GG-JJ, LL, MM. Garza was also responsible for withholding documents from HPD that could have

App. Vol. 1: 113

helped locate Plaintiffs. PAFs SS, UU-XX. She also ordered Woodward not to talk to the Guardian ad Litem and told other subordinates not to talk to the police. PAFs R, VV. Garza's actions are especially outrageous given that she seemingly had no concern for Plaintiffs at all. Instead, she was motivated solely by her desire to keep the office's caseload down. PAFs A, B, F, G, N.

**Brenda Saldana**. Saldana's role in the scheme was nearly as expansive as Garza's. First, Saldana convinced the State Criminal Court to remove Ducila's no-contact order by falsely claiming he had complied with his treatment plan. PAF M, O. She did that because the protection provided by the no-contact order had to be removed before Defendants could leave Plaintiffs alone with Ducila. PAF P. Next, the Report identifies Saldana as the responsible social worker. PAF GG. And as the person on the ground with regular contact with the family, the State Civil Court trusted her to be its eyes and ears. Once the trial home visit started, Saldana betrayed that trust by staging Ducila's apartment to make him look like a fit parent, and by providing him with advanced notice of unannounced visits. *See, e.g.*, *Matthews*, 889 F.3d at 1152 ("We see little distinction between the affirmative act of instructing an individual to cease reporting evidence of abuse as occurred in *Currier* and the affirmative act of warning an individual so that the latter might cover up evidence of abuse as alleged here.") Those actions were not just a fraud upon the court, they were also tantamount to aiding and abetting abuse. And finally, once Plaintiffs disappeared, Saldana refused to list them as missing in NCIC, and prevented HPD from issuing an Amber Alert or pursuing custodial interference charges. PAF SS, TT.

**Jennifer De Los Santos**. De Los Santos was Mazy's direct supervisor, an authority she abused by ordering Mazy to unsubstantiate A.D. and R.B.'s abuse disclosures as not supported by credible evidence. PAFs BB, CC. De Los Santos' order was contrary to CYFD's guidelines, which specifically identify disclosures by children as credible evidence. PAF EE. Moreover, the disclosures were especially credible given that they described the same events (Ducila striking R.B.) and were made by children living in different foster homes. PAF W. De Los Santos' actions likely doomed M.B. De Los Santos closed the investigation on March 30, 2020, approximately a month before Plaintiffs were abducted. PAFs CC, PP. Up to that point, Defendants had painted

Ducila as a changed man and caring father who had done everything asked of him. PAF II, MM. Had that illusion been dispelled, it is doubtful the State Civil Court would have allowed Ducila anywhere near Plaintiffs. Additionally, De Los Santos, along with Garza and Liggett, withheld documents that fell within the scope of HPD's search warrant, and that could have assisted the police in locating Plaintiffs. PAFs WW, XX.

**Rebecca Liggett**. Liggett directed subordinates to keep documents from HPD. PAF WW. Like Garza, Liggett instructed Woodward to withhold her professional opinion from the State Civil Court, and then kept Woodward from being called as a witness when she refused to do so. PAF Q. And also like Garza, Liggett acted with bad motives. She first refused to take Plaintiffs into custody from HPD. PAF C. To be clear, Plaintiffs do not allege that her initial indifference to Plaintiffs' wellbeing was constitutionally impermissible. The problem for Liggett, though, is her indifference persisted *even after* Plaintiffs came into CYFD custody, and she knew better. *See* PTF NN (crediting Liggett as a contributor to CYFD's policy manual); PTF QQ (admitting that Defendants are always obligated to protect children in CYFD's legal custody, including during trial home visits).

Finally, all Defendants played a part in sending Plaintiffs to live with Ducila on the trial home visit, and all bear responsibility for the harm that resulted. *Patton*, 868 F.3d at 1230 (defendant's conduct shocked the conscience due to "her responsibility for T.D. being placed and remaining in Mr. Duerson's home"); *Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001) (allegations sufficient to survive dismissal where social working failed to investigate signs of abuse and was responsible for court order granting custody to caretaker).

Viewing the record in the light most favorable to Plaintiffs, as the Court must at this juncture, each Defendant knowingly disregarded Plaintiffs' safety. Defendants' actions were likely criminal. Regardless, they shock the conscience.

**2. Defendants' special relationship arguments lack merit.**

The crux of Defendants' special relationship arguments is that although they created an opportunity for Plaintiffs' biological parents to cause Plaintiffs harm, Defendants did not directly harm Plaintiffs. That argument takes two forms, neither of which have merit.

*First*, Defendants claim they "had no control over the location of the Plaintiffs" after the trial home visit started, and thus "could not exercise any restraint over Plaintiffs." Def. Mot. at 14. But that argument relies on an incorrect understanding of the term "restraint."

*Second*, Defendants argue that although they had legal custody of Plaintiffs, they "were placed in the physical custody of their biological parents." Def. Mot. at 17. Defendants' argument fails, however, because Plaintiffs' parents had no custodial rights whatsoever.

### a. Defendants' "Restraint" Argument Misunderstands and Misapplies the Law.

Defendants first insist that Plaintiffs were "in the physical control of their parents once placed on the trial home visit." Def. Mot at 14. Defendants reason that "if they were not under the parents' control, the Children could not have been removed from the state." *Id.* But that is pure equivocation—for sure, a person exercises "control" over someone whenever they cause them physical harm. That is not, however, how terms like "custody," "control," and "restraint" are used in 10th Circuit special relationship case law. The whole point of the special relationship doctrine is to identify the circumstances where state actors are liable for the violent acts of third parties. *Armijo*, 159 F.3d at 1260.

Once CYFD takes children into custody, it assumes complete control over their lives. CYFD "determines where and with whom" the children live. NMSA 1978, § 32A–1–4(T). Consequently, Plaintiffs were deprived of any ability to protect themselves. *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002) ("liability may attach to a state actor for the violence of a third party if the state restrained the plaintiff's personal liberty and that restraint hindered the plaintiff's freedom to act to protect himself from the third party."); *Cf. Liebson v. New Mexico Corr. Dep't*, 73 F.3d 274, 276 (10th Cir. 1996) (no special relationship because an inmate's

25

"presence in the prison library … was completely voluntary. …  [S]he was free to come and go each day of her employment. Through this employment relationship, she was not taken into state custody and held against her will."); *Smith*, 413 F.3d at 95 ("Like [foster] children, Tron not only looked to the government as primary guardian of his needs, but, absent District approval, also lacked freedom to seek alternate arrangements—precisely the two circumstances courts have found create *DeShaney* custody in the foster care situation."); *R. F. J. v. Fla. Dep't of Child. & Fams.*, 398 F. Supp. 3d 1268, 1276 (M.D. Fla. 2019) ("a closer look at the cases reveals that the decisive factor is not who has custody of the children, but the state's action (or lack thereof) in placing them there.")

Notably, Defendants make no attempt to harmonize their position with NMSA 1978, § 32A–1–4(T), which vested Defendants with exclusive authority over "where and with whom" Plaintiffs lived and imposed on them a "duty to protect" Plaintiffs. *Id*. Instead, Defendants merely drop a footnote to remind the Court that "a violation of state law does not, in itself, give rise to a § 1983 claim." Def. Mot. at 15, fn. 4. What Defendants ignore, though, is that state law is highly relevant in determining who society deems ultimately responsible for a person's wellbeing. *See Cano I*, 377 F.Supp.2d 1039, 1046-47 (finding special relationship based on NMSA 1978, § 32A–1–4(T); Smith, 413 F.3d at 94 ("the District's legal custody over Tron is a good indicator that it had a duty to look after him. Because the District, rather than Tron's family, had primary legal control over him, the District had legal responsibility for his daily care."); *Matthews*, 889 F.3d at 1146 (special relationship where an Oklahoma state statute "impos[es] on [child protective services] the duty to provide for the care and treatment of a child placed in [child protective services] custody").

Consider the absurdity of Defendants' claim that no special relationship existed because "placing the children on a trial home visit with their parents does not constitute a restraint on the Children, but rather a lack of restraint on their biological parents." Def. Mot. at 14. If accepted, Defendant's argument would create a truck-sized loophole in the special relationship doctrine. By Defendants' logic, CYFD could simply leave a foster child on the side of the road in a dangerous

neighborhood and drive off. From that point on, CYFD would "ha[ve] no control over the [child's] location[.]" Def. Mot. at 14.

Equally distressing, the way Defendants define "restraint" would essentially pause the special relationship whenever a third party has access to a child in the state's custody. For example, consider the supervised visit in late 2019 at CYFD's Hobbs office, when Plaintiffs' biological parents barricaded themselves and the children in a visitation room. PAF K. By Defendants' logic, the special relationship was paused until the police arrived and broke down the door.

But there is nothing in 10th Circuit precedent—or anywhere else—that would lead a reasonable social worker to believe that the special relationship flicks on and off like a light depending on who happens to be in the room. To the contrary, the "focus [is] on which individual or agency society deems most responsible for a child or individual's well-being." *Youngers*, 65 F. Supp. 3d at 1259. Plaintiffs were restrained because they "could not have gone elsewhere even if, for example, [they] felt threatened by [a] roommate or [a] neighbor[]. For *DeShaney* purposes, [they were] thus in the [state's] custody[.]" *Smith*, 413 F.3d at 95. *See also*, *Camp v. Gregory*, 67 F.3d 1286, 1295 (7th Cir. 1995) ("to the extent Gregory and the DCFS bore a duty for Anthony's safety when it was appointed guardian, that duty did not terminate when Anthony was placed again with Camp.")

### b. Defendants' legal custody/physical custody dichotomy is a red herring.

Defendants next contend that there was no special relationship because once the trial home visit started, they lost "physical custody" of Plaintiffs. Def. Mot. at 15. But close inspection reveals that Defendants' argument is built on a foundation of equivocation and lacks merit.

The first red flag is Defendants' failure to explain what they mean by "physical custody." Defendants contend that "CYFD retained legal custody of [Plaintiffs], but ... they were placed in the physical custody of their biological parents[.]" Def. Mot. at 17. In the same paragraph, Defendants claim "[t]he dispositive factor is the *physical control* and restraint exercised by CYFD." *Id.* (emphasis added). But Judge Browning rejected Defendants' "physical control" test

27

in distinguishing *Briggs v. Oklahoma ex rel. Oklahoma Dep't of Hum. Servs.*, 472 F. Supp. 2d 1294

(W.D. Okla. 2007), another case relied on by Defendants:

> Notably, Judge Miles–Lagrange did not define "physical custody." By noting that foster children are in the state's legal and physical custody, however, Judge Miles–Lagrange indicated that *physical custody neither turns on physical presence nor day-to-day control.* Foster parents certainly have the ability to tell children where to go and what to do. Instead, her standard follows the Supreme Court's analyses in *Youngberg v. Romeo* and *DeShaney*, and the United States Courts of Appeals decisions interpreting those cases. As explained previously, *those cases focus on which individual or agency society deems most responsible for a child or individual's well-being.*

*Youngers*, 65 F. Supp. 3d at 1259 (emphasis added).

Defendants' argument fails because Plaintiffs' biological parents were never granted

ultimate responsibility (or any responsibility) for Plaintiffs' safety and wellbeing. Rather,

Defendants merely allowed them unsupervised access. Plaintiffs were still in Defendants' care and

custody; the only thing that changed was where and with whom Defendants decided Plaintiffs

would live. *Maldonado*, 975 F.2d at 733 (special relationship exists where a party "retain[s]

ultimate responsibility for [the] child's food, shelter, clothing, medical care, and reasonable

safety.") As discussed earlier, New Mexico's statutory definition of "legal custody" is expansive.

It vests CYFD with exclusive authority over every aspect of a child's life:

> Additionally, legal custody is a legal status created by court order that vests in a person or agency the right to determine where and with whom a child will live. ... Thus, we conclude that, once legal custody was in the Department, the children's court had no authority to prohibit the Department from placing physical custody of the child with any particular person. Although granting such authority to the children's court might serve a useful purpose, the present statute does not do so.

*State ex rel. Hum. Servs. Dep't*, 1988-NMCA-100, ¶ 9, 107 N.M. 769, 771. Tellingly, CYFD's own

employee handbook, which has been in place since 2018 and lists Liggett as a contributor, states

that the term "physical custody" is meaningless given New Mexico state law:

> The term "legal custody" is defined in the Children's Code. It should be read in harmony with the definitions of "guardian" and "parent." Whoever has legal custody of a child is empowered to make decisions regarding, among other things, where and with whom the child shall live, that is, the physical placement of that child. If legal custody is given to CYFD, placement is in the discretion of CYFD and not the court; CYFD's placement decisions are reviewable by the courts under the abuse of discretion standard. *The term "physical custody" can confuse the two concepts and is no longer used.*

*See* Bullion Decl. Ex. Y at section 3.5 (emphasis added); PAF NN.

In an attempt to salvage their claim that physical control is dispositive (or even relevant), Defendants point out that a "foster parent is licensed and controlled by CYFD. The child, whether placed voluntarily or involuntarily, is dependent on the state, by means of its agent foster parent, for basic needs." Def. Mot. at 18. But that argument is crossways with *Cano II*, where a special relationship existed even though "[a]doptive parents are … not considered public employees nor is their day-to-day conduct as parents regulated and controlled by the State." 455 F.3d at 1140. *See also*, *Currier*, 242 F.3d at 918 ("just because 'the child is placed with a parent as opposed to a foster parent should not change the standards by which social agencies and their employees conduct their investigations.'" (Citing *Ford v. Johnson*, 899 F.Supp. 227, 233 (E.D. Pa. 1995)).

The case law Defendants cite is unpersuasive. Defendants rely on *Hernandez v. Rapp*, No. CV 00-1456 MCA/WDS, 2003 WL 27385396 (D.N.M. Mar. 31, 2003), an unpublished case that no courts appear to have followed, or even cited. Although the circumstances of the underlying children's court case are murky, *Hernandez* describes a court order "awarding legal and physical custody" to CYFD, "subject to review every six months." *Id.* at *2. The opinion later says the state "relinquish[ed] the physical custody of a child to a parent[.]" *Id.* at 10. *Hernandez* makes no mention of Section 32A–1–4(T)'s definition of legal custody. Indeed, the court characterized CYFD's duties as "more akin" to the "limited custodial responsibilities imposed by state compulsory school-attendance statutes[.]" *Id.* at 10. And like *Briggs*, the *Hernandez* court did not define physical custody.

In contrast to *Hernandez*, the permanency plan approved by the State Civil Court does not mention physical custody or any responsibilities being transferred to Plaintiffs' parents. That is a far cry from the "relinquishing [of] physical custody" in *Hernandez*. And even after the trial home visit started, CYFD continued to surreptitiously provide basic household services to Plaintiffs.

Along the same lines, in *Wooten v. Campbell*, 49 F.3d 696 (11th Cir. 1995), "[b]oth of [a child's] parents consented to [a] custody arrangement" where child protective services would have legal custody, while the child would live with his mother, and would have visits with his father. *Id.*

29

at 698. The court made clear that the "public agency [was] awarded legal custody of a child, but *d[id] not control that child's physical custody except to arrange court-ordered visitation with the non-custodial parent.*" *Id.* at 699 (emphasis added). That is plainly distinguishable from the present matter, where Defendants retained full control over Plaintiffs.[2]

## B. State Created Danger.

Even if the special relationship between Defendants and Plaintiffs terminated at some point, the Motion would still warrant denial under the state created danger exception.

### 1. Plaintiffs can satisfy all requirements for a state created danger claim.

To establish a substantive due process claim under a state created danger theory, a plaintiff must first show that two "preconditions" are satisfied: "first, the state actor took an affirmative action, and, second, that action led to private violence injuring the plaintiff." *Est. of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016), as amended on reh'g in part (Aug. 12, 2016). Assuming those preconditions are met, a state created danger claim has six elements:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014). In the present matter, the two preconditions and all six elements are satisfied.

#### a. Defendants engaged in affirmative conduct.

The affirmative conduct prerequisite is satisfied where the "defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way[.]" *Armijo*, 159 F.3d at

---

[2] Defendants suggest at several points in their brief that Plaintiffs' kidnapping somehow terminated the special relationship. *See, e.g.*, Def. Mot. at 14 ("Defendants had no control over the location of the Plaintiffs after April 2020… and, therefore, there can be no special relationship.") Defendants cite no legal authority to support that proposition, and Plaintiffs cannot find any. Plaintiffs note, however, that even after the kidnapping, Defendants used the custodial rights they now disclaim to block an Amber Alert. Moreover, the kidnapping and injuries to M.B. were the foreseeable result of Defendants' actions. Allowing dangerous adults access to vulnerable children breaches the special relationship; it does not end the special relationship.

1263. "Post-placement conduct may be considered for a danger-creation claim provided it is 'affirmative.'" *Patton*, 868 F.3d at 1226.

Here, Defendants' misconduct was almost entirely affirmative. For example, prior to the trial home visit De Los Santos and Garza ordered Mazy to unsubstantiate credible disclosures of physical abuse. PAFs S-EE. Garza and Liggett also prevented Woodward from providing the children's court with her professional opinion and suborned perjury. PAF Q. Garza barred Woodward from communicating with the Guardian ad Litem. PAF R. Saldana repeatedly misled the State Criminal Court and State Criminal Court. PAFs FF-MM. All these actions were taken with the express purpose of providing Ducila with unsupervised access to Plaintiffs. And after the trial home visit started, Saldana staged Ducila's apartment and provided him with advance notice of unannounced visits so that the State Civil Court would incorrectly believe Plaintiffs were not in danger. Finally, after Plaintiffs were kidnapped, Defendants worked together to hinder HPD's search efforts.

Defendants claim the present matter is akin to *DeShaney*, where a child protective services officer observed abuse and did nothing. But while *DeShaney* is a case about inaction, this case is about action. "This is not a 'positive liberties' case, like *DeShaney*, where the question was whether the Constitution entitles a child to governmental protection[.]" *K.H.*, 914 F.2d at 848. Rather, the evidence obtained to this point shows an unmistakable and damning pattern. Time and again, third parties attempted to protect Plaintiffs from their biological parents. And time and again, Defendants took affirmative steps to thwart those efforts.

**b. Defendants' actions led to private violence against Plaintiffs.**

The second prerequisite, private violence, is satisfied for the same reasons as the causation element is met in Plaintiffs' special relationship claim. Plaintiffs were traumatized, and M.B. suffered catastrophic brain damage. These injuries were likely inflicted by Plaintiffs' biological parents and were imminently foreseeable. Thus, the private violence prerequisite is satisfied.

**c. The six elements of a state created danger claim are satisfied.**

**i. Defendants created or increased the danger posed to Plaintiffs.**

31

The central thesis of Defendants' state created danger arguments is that "[t]he trial home visit did not expose Plaintiffs to any greater danger than they would have been exposed but for the interactions of Defendants." Def. Mot. at 22. In other words, Defendants contend that they are constitutionally privileged to expose children to the risk of grievous harm, so long as they faced that risk prior to the state's intervention. That argument fails for at least three reasons.

### a. Defendants knowingly placed Plaintiffs at great risk of harm.

More than 30 years ago Judge Posner wrote that "[i]f the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department." *K.H.,* 914 F.2d at 849.

Now, though, Defendants claim to have discovered a loophole that *does* allow the fire department to kill you. According to Defendants, the fire department must use the right instrumentality: while the Constitution bars the fire department from shooting you or running you over, it may pick you up and toss you into the *same fire it rescued you from.* As Defendants see it, liability in that situation is "explicitly rejected by *DeShaney.*" Def. Mot. at 20.

Not so. To continue the fire rescue analogy, a *DeShaney* situation occurs where the fire department pulls you out of a fire and then later finds you trapped, again, in a fire. The fire department is under no constitutional obligation to rescue you the second time because "the State does not become the permanent guarantor of [your] safety by having once offered [you] shelter." 489 U.S. at 201. That is, plainly, distinguishable from tossing someone into a fire. *K.H.,* 914 F.2d at 848 ("One of the less controversial aspects of the due process clause is its implicit prohibition against a public officer's intentionally killing a person, or seriously impairing the person's health, without any justification.")

Unsurprisingly then, case law establishes that social workers may not place children back with their parents when they know that doing so will expose the children to great risk of injury. In *Ford*, 899 F. Supp. at 227, the court held that a viable danger creation claim existed where child protective services returned a child to his father's custody. The social workers withheld

32

disqualifying information about the father to get the placement approved. *Id.* at 232. The court stated that "[i]t is important to remember that in the case at bar, Shawntee had not been in the custody of her father, but, rather, had been in the custody of CYS and was placed with her father by the court after a CYS investigation and recommendation." *Id.* at 233.

     Likewise, in *Tazioly v. City of Philadelphia*, No. CIV.A. 97-CV-1219, 1998 WL 633747 (E.D. Pa. Sept. 10, 1998), as amended (Sept. 10, 1998), the court held that a "state-created danger theory may apply in cases where a state actor has rendered a minor more vulnerable to injury at the hands of the minor's biological parent." *Id.* at *11. Key to the court's ruling was that "the evidence, viewed in a light most favorable to the Plaintiffs, indicates that the decision to return Michael to his biological mother was made with *actual knowledge* that she was unfit and dangerous." *Id.* at 12 (emphasis original). *See also, Camp,* 67 F.3d at 1295 ("Gregory shouldered a responsibility to provide Anthony with a safe environment. When he returned Anthony to an environment he allegedly knew to be inadequate, Gregory might be said to have resurrected the danger that had motivated Camp to surrender guardianship in the first place."); *Cox v. Dep't of Soc. & Health Servs.,* 913 F.3d 831, 838 (9th Cir. 2019) ("entitlement to qualified immunity turns on whether the facts known at the time reasonably revealed this terrible risk.")

     The 10th Circuit in *Currier* cited favorably to *Ford* and *Tazioly. Currier,* 242 F.3d at 918. *See also, id* at 920 (agreeing with the dissent in *S.S. v. McMullen,* 225 F.3d 960, 968 (8th Cir. 2000) that "distinctions ... between foster parents and natural parents … are arbitrary"); *Bank of Ill. v. Over,* 65 F.3d 76, 78 (7th Cir.1995) ("[i]f the [social workers] knowingly placed [plaintiff] in a position of danger, they would not be shielded from liability by the decision in *DeShaney*.") (cited by *Currier,* 242 F.3d at 918).

     The result is the same when children are placed back with their biological parents. In *Hubbard v. Oklahoma ex rel. Oklahoma Dep't of Hum. Servs.,* the 10th Circuit flatly stated that "[s]tate-created danger claims can apply to placement with a biological parent as well as a foster parent." 759 F. App'x 693, 709 at fn. 9 (10th Cir. 2018). The *Hubbard* court further suggested that *Tazioly* applies if the child "experience[s] an immediate increase of vulnerability to private danger

when placed with his biological [parent]" and the social worker "ha[s] significant pre-placement warning signs of the [parent's] behavior." *Id.*

Here, Defendants had actual knowledge that Plaintiffs' biological parents were unfit and dangerous. Defendants also knew they would likely abscond with Plaintiffs if given the opportunity. Nonetheless, Defendants went to great lengths to "resurrect[] the danger" they posed. *Camp*, 67 F.3d at 1295.

### b. Defendants did not restore the status quo ante.

The Motion asserts that "[i]f the Defendants had done nothing, [Plaintiffs] would have always been in the custody of their parents." Def. Mot. at 20. But that is revisionist history. Defendants took custody of Plaintiffs from HPD, two hours after HPD detained Plaintiffs' parents and informed Liggett that felony child abuse charges were being filed. Plaintiffs lived at foster homes for months after that. The status quo ante was either Plaintiffs standing around in a parking lot while Liggett refused to take them into custody, or Plaintiffs in foster homes. Either way, Plaintiffs "would not have been exposed to the dangers from their [biological parents] but for the affirmative acts of the state[.]" *Currier*, 242 F.3d at 918. Defendants did not restore the status quo ante by working to remove the no-contact order and then leaving Plaintiffs unattended at the apartment of their abusive father.

Additionally, prior to the state's intervention, Plaintiffs' biological parents were not faced with the possibility of losing their children. The pending abuse and neglect proceeding gave them motivation to abscond and evade law enforcement, a departure from the status quo ante:

> Although ... Will ... [was] placed in the care of his mother, the significance of the distinction between a brief visit and a permanent return of custody is illustrated by the facts alleged in the complaint. The complaint alleges that Arkisha was despondent and hopeless because she feared she would never regain custody of Will and expressed the view that if she could not have Will, then no one could. Based upon these alleged facts, it is reasonable to infer that a temporary visit posed a particular heightened danger to Will that was distinct from any danger Will would have faced had he been permanently returned to Arkisha.

App. Vol. 1: 125

*Est. of Johnson v. La Causa Inc.*, No. 10-C-953, 2011 WL 5319909, at *9 (E.D. Wis. June 24, 2011) (citations omitted). That reasoning applies equally well here, so Defendant's Motion should be denied.

**Third**, Defendants do not even attempt to justify blocking the Amber Alert, withholding documents from HPD, or telling people not talk to the police. Those actions "increased [Plaintiffs'] vulnerability to … danger in some way[.]" *Currier*, 242 F.3d at 918 (10th Cir. 2001). The same is true for providing Ducila with advance notice of unannounced visits after the trial home visit started and barring Woodward from speaking to the Guardian ad Litem. All these actions cut Plaintiffs off from potential sources of aid. *Armijo*, 159 F.3d at 1263 (state created danger claim where a state actor "cut[s] off potential sources of private aid."); *Currier*, 242 F.3d at 921 ("Medina can be liable for danger creation because she instructed Juarez to stop making allegations of abuse."); *Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990) ("constitutional wrong" where the state "cut[] off private sources of rescue").

Defendants' actions "significantly changed the nature of [Plaintiffs'] custody." *Horton v. Flenory*, 889 F.2d 454, 458 (3d Cir. 1989). And as "participant[s] in the custody which led to [Plaintiffs' injuries]," *id.*, Defendants may not escape liability.

### ii.   Plaintiffs were members of a limited and identifiable group.

Here, Plaintiffs plainly satisfy the second element of the state created danger test, in that they are the four children the state took into custody at the Walmart parking lot in Hobbs on June 3, 2019. *See, e.g., Armijo*, 159 F.3d at 1264 ("Armijo was a member of a limited and specifically definable group—special education students who have expressed threats of suicide.")

### iii.   Defendants' conduct put Plaintiffs at substantial risk of imminent harm.

According to Defendants, "[a] six-month gap between an alleged act and the harm caused by that act cannot reasonably be considered 'an immediate, and proximate harm[.]'" Def. Mot. at 22, citing *Currier*, 242 F.3d at 918. But Defendants' quote omits key language. *Currier* held that this element is satisfied if "defendants' conduct put plaintiff at *substantial risk* of serious,

35

immediate, and proximate harm[.]" 242 F.3d at 918 (emphasis added). Defendants granted Ducila unsupervised access to Plaintiffs knowing that he was unfit and likely to physically abuse Plaintiffs. More specifically, Defendants "contributed to putting [Plaintiffs] at risk of serious, immediate, and proximate harm by withholding relevant information and recommending [they] be placed with [their] father." *Patton*, 868 F.3d at 1229. The harm Plaintiffs suffered could have materialized at any time. That six months passed before M.B. suffered catastrophic brain damage is irrelevant. *See, e.g., Est. of Hebert by & through Bourgeois v. Marinelli*, No. 122CV02582CNSSTV, 2023 WL 4744927, at *7 (D. Colo. July 25, 2023) ("Defendants' argument that their alleged conduct did not place Mr. Hebert at a risk of serious, immediate, and proximate cause simply because he died *after* he encountered them … fails to persuade" (Emphasis original)).

### iv.    The risk was obvious or known.

As already discussed, numerous warning signs were obvious or known to Defendants. Indeed, most of the actions Defendants took were designed to hide damaging information about Ducila from the State Civil Court. For example, Saldana "warn[ed] [Plaintiffs' father] when an investigator was scheduled to arrive at the home to inspect the property and speak with the children[.]" *Matthews*, 889 F.3d 1151–52. That "conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm, the risk was obvious or known (otherwise why the warnings?)" *Id.* Similarly, Defendants were aware of the physical abuse disclosures made by A.D. and R.B.

### v.    Defendants acted recklessly in conscious disregard of that risk.

As just discussed, Defendants consciously disregarded the risks their plan posed to Plaintiffs. *See, e.g., Patton*, 868 F.3d at 1230 (element satisfied where a social worker "intentionally withheld her concerns that she feared for T.D.'s safety and her professional judgment that T.D. should be removed from his father's home.")

### vi.    Defendants' actions shock the conscience.

App. Vol. 1: 127

As already discussed, Defendants' actions were conscience shocking. Many of them standing alone would be sufficient to satisfy this element. Taken together, this final element of a state created danger claim is easily met.

### C. Clearly Established Law.

In addition to establishing a violation of constitutional rights, to defeat a qualified immunity defense a plaintiff must also show that the right "was clearly established at the time of the conduct in question[.]" *Dahn*, 867 F.3d at 1185. "[T]o show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (citations omitted).

However, "a plaintiff need not show the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (citations omitted). That is because "general statements of the law are not inherently incapable of giving fair and clear warning[.]" *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Rather, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful[.]" *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227, 137 L. Ed. 2d 432 (1997) (quotations omitted) (modification original). *See also, Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.") So, for example, although "[t]here has never been a section 1983 case accusing welfare officials of selling foster children into slavery … it does not follow that if such a case arose, the officials would be immune from damages liability[.]" *K.H.*, 914 F.2d at 851. *See also, Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (qualified immunity unavailable where conduct "was unreasonable in light of clearly established law.")

Here, the rights Defendants violated were clearly established under a special relationship theory or a danger creation theory.

37

**1. Special Relationship.**

Starting with special relationship:

> As of 1999, Supreme Court and Tenth Circuit authority clearly alerted persons in the positions held by Defendants that a child in state custody had a constitutional right to be reasonably safe from harm and that if Defendants placed such a child in known danger, or failed to exercise professional judgment by abdicating their duty to act professionally, thereby causing injury to the child, they would violate the child's constitutional rights.

*Whitley v. New Mexico Child., Youth & Fams. Dep't*, 184 F. Supp. 2d 1146, 1157 (D.N.M. 2001).

*See also*, *Yvonne L.*, 959 F.2d at 893 ("children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm; and … if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs."); *Schwartz*, 702 F.3d at 581 ("As our case law makes clear, the special relationship exists between the State and foster child, which triggers an accompanying, continuing duty imposed on state custodial officials thereafter."); *Cano I*, 377 F. Supp. 2d 1039, 1046 ("children in the state's legal custody have a clearly established constitutional right to be reasonably safe from harm").

As outlined in section IV(A)(1)(b) *supra*, each Defendant intentionally and unreasonably endangered Plaintiffs. Likewise, each Defendant failed to exercise professional judgment. In the Motion, Defendants argue the rights they violated were not clearly established because "case authority does not support a finding that CYFD's retention of legal custody is sufficient to establish a special relationship." Def. Mot. at 23. But legal custody and physical custody are synonymous under New Mexico law and CYFD's own employee manual. Defendants' "singular argument regarding the construction of the special relationship doctrine does not negate that the contours of foster children's constitutional rights were clearly delineated in this circuit as well as other circuits[.]" *Schwartz*, 702 F.3d at 588.

Defendants cite *Hernandez* for the claim that "it was not clear that the children plaintiffs' rights were violated by virtue of a breach of the special relationship." Def. Mot. at 23. But Defendants' reliance on *Hernandez* is misplaced. The court held only that the plaintiff's special

relationship theory "was not sufficiently well-established *in the 1989-1992 time frame*[.]" 2003 WL 27385396 at *11 (emphasis added). By its own terms, *Hernandez* does not consider subsequent 10th Circuit precedent. *See also*, *Brosseau v. Haugen*, 543 U.S. at 200 n.4 (2004) ("The parties point us to a number of other cases … that postdate the conduct in question. … These decisions, of course, could not have given fair notice to Brosseau and are of no use in the clearly established inquiry."); *Bishop v. Szuba*, 739 F. App'x 941, 945 (10th Cir. 2018) (holding that *Schwartz* could not be used to "establish the contours of the constitutional right at issue" because it was "decided more than 13 years after [the social worker's] investigation.")

**2. State Created Danger.**

Defendants also breached clearly established rights under a state created danger theory. "[T]he law [is] established that 'a reasonable state official would … [know] that reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm [is] unconstitutional.'" *T.D. v. Patton*, 868 F.3d 1209, 1225 (10th Cir. 2017) (citing *Currier* at 924).

As discussed in IV(B)(1)(c)(i) *supra*, those requirements are satisfied by Defendants' placement of Plaintiffs on a trial home visit. And that is true regardless of how the Court defines the status quo ante. Defendants also broke clearly established law by taking affirmative actions that "cut[] off potential sources of private aid[.]" *Armijo*, 159 F.3d at 1263. For example, Defendants withheld documents from HPD and blocked an Amber Alert. Saldana provided Ducila with advanced warning of unannounced visits. Garza ordered multiple employees not to talk to the police. These actions have only one discernable purpose: to prevent third parties from assisting Plaintiffs. Any reasonable social worker would understand that at "actions allegedly designed to shield and protect [an abuser] … could give rise to constitutional liability under the state-created danger exception." In *Matthews*, 889 F.3d at 1152. That is exactly what happened here. *Cf. DeShaney*, 489 U.S. at 201 at 192-193 ("the caseworker … observed a number of suspicious injuries … but she did nothing more.") Defendants have failed to cite, and Plaintiffs cannot find,

any authority that would even suggest to a reasonable social worker that it is permissible to help biological parents harm their children.

**3. This is an Obvious Case.**

Even if the facts in the present matter were distinguishable from existing precedent, this would still be an "obvious case, where the unlawfulness of the officer's conduct is sufficiently clear" to deny Defendants' qualified immunity claim. *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (quotations omitted).

"Cases featuring obvious constitutional violations typically involve unlawful conduct that is obviously egregious." *Rosales v. Bradshaw*, 72 F.4th 1145, 1157 (10th Cir. 2023) (quotations omitted). Hallmarks of obvious constitutional violations include a "mental state of conscious wrongdoing" and "malicious criminal behavior." *Id.* at 1158. That is because "[q]ualified immunity exists to protect mistaken but reasonable decisions, not purposeful criminal conduct." *Id. See also, Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1120 (9th Cir. 2017) ("Try as we might, we cannot conceive of circumstances in which social workers would not know and understand that they could not use criminal behavior in *any* court setting to interfere with a person's fundamental constitutional liberty interest" (emphasis original)). Courts are also more likely to find a case is obvious when the defendants "were not asked to make any split-second decisions[.]" *Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1175 (D.N.M. 2021).

Multiple indicia of an obvious case are present here. Liggett and Garza suborned perjury by ordering Woodward to present inaccurate testimony to the State Civil Court. Saldana presented false information to multiple courts. Defendants also obstructed justice by withholding documents that were responsive to the HPD search warrant. Garza prohibited CYFD employees from talking to the cops. That is criminal activity, made worse by the fact that it endangered children that Defendants were constitutionally obligated to protect. Moreover, essentially all the misconduct underlying this action was intentional—this is not a case where reasonable mistakes were made. That is underscored by the complete lack of split-second decisions at issue. Every Defendant had ample time to realize what they were doing was wrong, and ample time to stop. The misconduct

here occurred over months, not minutes. "Confronted with the particularly egregious facts of this case," any reasonable social worker would have realized their actions "offended the Constitution." *Taylor v. Riojas*, 592 U.S. 7, 9 (2020)

### 4. Defendants' proposed exceptions to constitutional principles either do not clearly exist or do not exist at all.

Defendants argue that the law is not clearly established for essentially one reason: the hypothetical possibility that exceptions exist to the general principles underlying Plaintiffs' claims. As explained below, Defendants misunderstand and misapply the law.

To illustrate the mistake, start with Defendants' state created danger arguments. Defendants point to *Currier*, which they contend "require[s] a finding that Defendants did not create a danger to the Children by returning them to the parents from whom they were removed." Def. Mot. at 24. Defendant extrapolates that rule from the case's facts—the child in *Currier* was removed from one parent and placed with another. But that is not how *Currier* arrived at its holding. Rather, the court started with the general principle of law, "reckless, conscience shocking conduct that alter[s] the status quo and place[s] a child at substantial risk of serious, immediate, and proximate harm [is] unconstitutional," 242 F.3d at 924, and applied it to the narrow facts of the case. Defendants, by starting with the rule's narrow application, have the analysis backwards. The 10th Circuit recently rejected an analogous argument in a qualified immunity case:

> Nor is such a finding precluded by the fact that Rosales is not a child. To be sure, we noted in *Holland* that "[p]ointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances." *But* Holland's *overall discussion was not limited to children; it discussed general principles about the pointing of firearms and then applied those general principles to the pointing of firearms at children.*

*Rosales*, 72 F.4th at 1155–56 (citations omitted).

Indeed, if the individual facts are subsumed by a sufficiently clear general principle of law, the defendant is only entitled to qualified immunity if "an *exception* to bedrock constitutional principles *clearly exists*." *Mascorro v. Billings*, 656 F.3d 1198, 1209 (10th Cir. 2011) (emphasis added). And the "clearly exists" test for exceptions is strict. Unreported opinions and dicta do not

App. Vol. 1: 132

suffice. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. at 747 (2002) ("The unreported District Court opinions cited by the officers are distinguishable on their own terms. But regardless, they would be no match for the Circuit precedents."); *Taylor*, 592 U.S. at 13 (Alito, J. concurring) ("Although this Court stated in *Hutto* that holding a prisoner in a 'filthy' cell for 'a few days' 'might be tolerable,' that equivocal and unspecific dictum does not justify what petitioner alleges." (citations omitted)) And *Currier* itself cautions social workers *against* assuming exceptions exist to the state created danger rule's general principles as they relate to injuries caused by biological parents:

> Our conclusion that danger creation law was clearly established at the time of the events underlying this suit is not undermined by the Seventh Circuit's dicta in *K.H. v. Morgan* suggesting that placing a child with a family member might insulate the state from all constitutional liability. Never before has this court indicated that state employees would be justified in relying on the isolated dicta of another circuit court to create an exception to a general theory of liability established by Tenth Circuit and Supreme Court cases, and it will not do so now. Such a rule would make state employees immune from constitutional obligations determined to exist by this court or the Supreme Court, based on the non-binding musings of other circuit courts."

242 F.3d at 924 (citations omitted).

Defendants' special relationship arguments are equally deficient. As discussed, it is undisputed that Plaintiffs were taken into Defendants' custody on June 3, 2019. So, Defendant is either arguing that there is ambiguity about when the special relationship ends, or what the special relationship obligates social workers to do. But no 10th Circuit precedent supports any relevant exceptions to the general rule that "children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm[.]" *Yvonne L.*, 959 F.2d at 893. The 10th Circuit has never suggested that social workers are obligated to protect children from everyone *except* their biological parents. Likewise, no precedent exists to support the belief that the duty to protect always applies *except* during a trial home visit. *See Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1173 (D.N.M. 2021) (qualified immunity rejected where a defendant's proposed distinction "has no basis in the Tenth Circuit's caselaw.") Defendant Liggett admitted that CYFD must protect children even from their biological parents when children are in the custody of the State. PAF QQ at R. Liggett Dep. 43:16-19.

App. Vol. 1: 133

The Court's "focus must be on whether an exception to bedrock constitutional principles clearly exists." *Mascorro*, 656 F.3d at 1209. As "[t]here appears to be no relevant precedent announcing such an exception in cases such as this," *id.*, Defendants' clearly established law arguments fail.

### D. Tort Claims Act.

In *Quevedo v. New Mexico Child. Youth & Fams. Dep't* the New Mexico Court of Appeals "conclude[d] that the waiver of immunity in Section 41–4–6(A) permits suit against CYFD" under the Tort Claims Act because "CYFD has an obligation to house children in its care in homes or facilities that meet certain minimum health and safety standards. This obligation may create a relationship between CYFD, the homes or facilities in which children are placed, and the children." 2016-NMCA-101, ¶ 17. That is especially true where CYFD is "in some respects, 'driving the bus[.]'" *Young v. Van Duyne*, 2004-NMCA-074, ¶ 21 (citing *Cobos v. Dona Ana County Housing Authority*, 1998–NMSC–049, ¶¶ 7, 9).

Applying *Quevedo* and *Young*, CYFD was obligated to provide safe housing to Plaintiffs. CYFD failed to do that when it decided to house Plaintiffs, often unsupervised, in the home of their biological father, a person they knew to be abusive and unfit. That conclusion is further warranted because CYFD's can fairly be said to have "driv[en] the bus" during the trial home visit. Saldana, CYFD's employee, performed basic household functions, and staged the apartment to make Plaintiff's biological father appear competent.

None of CYFD's counterarguments succeed. First, CYFD points out that as Plaintiffs were kidnapped and subsequently injured, "the harm that allegedly occurred did not happen in a building controlled or operated by Defendants, but necessarily occurred somewhere other than a place in CYFD control." Def. Mot. at 26. What CYFD overlooks, though, is that Defendants' failure to provide safe housing is what allowed the kidnapping to occur in the first place. The resulting harm proximately resulted from CYFD's Tort Claims Act violation. Second, CYFD's claim that the Tort Claims Waiver does not apply because "Plaintiffs were in the physical custody of their biological parents," (*id.* at 27), is wholly without merit. As mentioned earlier, CYFD's own employee

handbook acknowledges that the concept of "physical custody" is meaningless given the broad definition of legal custody under the Children's Code. And Liggett, CYFD's chief children's court attorney, admitted in deposition that the trial home visit had no impact whatsoever on CYFD's obligation to protect Plaintiffs.

## V.     CONCLUSION

For the foregoing reasons, Defendants' summary judgment motion should be denied.


Respectfully submitted,

GUBERNICK LAW P.L.L.C.

*/s/ Benjamin Gubernick*
Benjamin Gubernick
 New Mexico Bar No. 145006
Ben@gubernicklaw.com
623-252-6961
10720 W. Indian School Rd.
Ste.19 PMB 12
Phoenix, AZ 85037


-and-


Todd J. Bullion
Law Office of Todd J. Bullion
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM 87109
(505) 494-4656

todd@bullionlaw.com


*-and-*

Jason Bowles
Bowles Law Firm
4811 Hardware Dr NE

App. Vol. 1: 135

Bldg D, Suite 5
Albuquerque, NM 87109
505-217-2680
jason@bowles-lawfirm.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 8th day of March 2023, I filed the foregoing electronically through the Court's CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alfred Park
James Grubel
apark@parklawnm.com
jgrubel@parklawnm.com

*Counsel for Defendants*

*/s/ Todd J. Bullion*
Todd J. Bullion

App. Vol. 1: 136

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ALISON ENDICOTT-QUIÑONES,**
**Guardian ad Litem, on behalf of**
**A. D., R. B., E. B., and M. B.,**
**minor children,**

        **Plaintiffs,**

vs.

                               **No: 1:21-cv-00368 DHU/JMR**

**PATRICIA GARZA, in her individual**
**and official capacity; REBECCA LIGGETT,**
**in her individual and official capacity; BRENDA**
**SALDANA, in her individual and official capacity;**
**JENNIFER DE LOS SANTOS, in her individual**
**and official capacity; NEW MEXICO CHILDREN**
**YOUTH & FAMILIES DEPARTMENT;**
**and DOES 1-50,**

        **Defendants.**

## PLAINTIFFS' NOTICE OF LODGING

Alison Endicott-Quiñones, as representative of A. D., R. B., E. B., and M. B. (collectively

"Plaintiffs"), through undersigned counsel, gives notice of lodging of Exhibits AH 1, AH 2, AH 3,

AH 4, and AH 5 which are video clips that could not be filed through ECF. These exhibits are

offered in support of Plaintiffs Opposition (Doc 97.) to Defendants' Motion for Summary

Judgment (Doc 91.).

                        Respectfully submitted,

                        GUBERNICK LAW P.L.L.C.

                        */s/ Benjamin Gubernick*
                        Benjamin Gubernick
                        New Mexico Bar No. 145006
                        Ben@gubernicklaw.com
                        623-252-6961
                        10720 W. Indian School Rd.
                        Ste.19 PMB 12
                        Phoenix, AZ 85037

1

-and-


Todd J. Bullion
Law Office of Todd J. Bullion
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM 87109
(505) 494-4656

todd@bullionlaw.com


*-and-*

Jason Bowles
Bowles Law Firm
4811 Hardware Dr NE
Bldg D, Suite 5
Albuquerque, NM 87109
505-217-2680
jason@bowles-lawfirm.com
*Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE


I HEREBY CERTIFY that on the 8th day of March 2023, I filed the foregoing electronically through the Court's CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Alfred Park
James Grubel
apark@parklawnm.com
jgrubel@parklawnm.com

*Counsel for Defendants*


*/s/ Todd J. Bullion*
Todd J. Bullion

App. Vol. 1: 138

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
Guardian ad Litem, on behalf of
A. D., R. B., E. B., and M. B.,
minor children,

       Plaintiffs,

vs.                            No: 21-cv-00368 DHU/JMR

PATRICIA GARZA, in her individual
and official capacity; REBECCA LIGGETT,
in her individual and official capacity; BRENDA
SALDANA, in her individual and official capacity;
JENNIFER DE LOS SANTOS in her individual and
official capacity; NEW MEXICO CHILDREN YOUTH
 & FAMILIES DEPARTMENT; and DOES 1-50,

       Defendants.

## DEFENDANT'S REPLY IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT

COME NOW New Mexico Children, Youth and Families Department ("CYFD"), Patricia

Garza, Rebecca Liggett, Jennifer De Los Santos, and Brenda Saldana (collectively "Defendants"),

by and through their attorneys, Park & Associates, LLC (Alfred A. Park and James J. Grubel), and

for their Reply in Support of Motion for Summary Judgment (Doc. 91) and in opposition to

Plaintiffs' Response (Doc. 97)  state as follows:

### I.    INTRODUCTION

Plaintiffs' Response adds fifty-four additional facts, none of which are relevant to the core

and dispositive  issue of whether placing Plaintiffs in the care and control of their parents for a

trial home visit can constitute a violation of their constitutional rights pursuant to the doctrines of

danger creation or special relationship. Rather, Plaintiff attempts to confuse the record with

inuendo, unsupported argument, and immaterial facts.

Once the Plaintiffs were back in the home of their parents, Defendants no longer exercised control over Plaintiffs' daily lives.  Case authority is clear, a special relationship only exists <u>while</u> an individual is <u>wholly</u> dependent on the state for all of his or her needs.  When Plaintiffs were retuned to their parents, it was the parents' responsibility to provide, food, shelter, healthcare, and other necessities of life, not withstanding any supported offered by CYFD.  Accordingly, as a matter of law, there was no special relationship between Plaintiffs and Defendants.  Therefore, there can be no finding of a constitutional violation based on this doctrine.

In addition, because Plaintiffs were removed from the home of their parents, and then returned to those same parents, claims of danger creation also fail as a matter of law.  Binding authority, including <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) and its progeny, hold that a state is not responsible for injuries sustained by a child unless the state actors did something to create or increase the danger to that child.  Unless a Plaintiff can show "but for" causation, returning a child to the *status quo ante* places a child in no greater danger than if the state actors had never intervened in the first place.  Here, Plaintiffs were with their parents in June of 2019 and were in their parents' care again in April of 2020.  They were in no worse of a position than if Defendants have never acted.  Plaintiffs' claims, therefore, fail.

Moreover, even if Plaintiffs could demonstrate that the actions of Defendants constituted a violation of their constitutional rights, which they cannot, they have failed to identify that those rights were clearly established.  Rather, the authority cited by Plaintiffs is distinguishable as either a situation dealing with a foster parent, moving a child from one parent to a non-custodial parent, or placing a child who was born addicted to drugs with a mother with whom he never resided.  It is Plaintiffs' burden to establish their rights were clearly established, otherwise Defendants are

2

entitled to qualified immunity.  Plaintiffs have failed to identify any authority that would clearly establish the rights they claim to have been violated.

Moreover, Plaintiffs fail to identify that the actions of Defendants were the proximate cause of a constitutional injury.  Instead, the rely on the presumption that an injury sustained by the youngest Plaintiff nearly six months later in North Carolina, was caused by the parents and was foreseeable.  Plaintiff have offered no evidence of the cause of the injury to the child, let alone proof that it was an immediate consequence of any identifiable actions by the Defendants.  As a result, summary judgment in Defendants' favor is appropriate because they did not violate Plaintiffs' constitutional rights or because those rights were not clearly established, thus entitling Defendants to qualified immunity.

## II.   RESPONSE TO PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS

Plaintiffs do not dispute Defendants material facts.  They are accordingly Undisputed Material Facts.  Plaintiffs' Response contains a counterstatement of facts that lists 54 additional factual paragraphs.  Defendants respond to each of Plaintiffs' additional facts ("PAFS")as follows:

A. Immaterial.  Whether staff within CYFD was initially reluctant to take Plaintiffs into custody is not relevant to whether Defendants breached duties to Plaintiffs when they were eventually taken into CYFD custody and placed on a trial home visit with their parents.

B. Immaterial.  Whether staff within CYFD was initially reluctant to take Plaintiffs into custody is not relevant to whether Defendants breached duties to Plaintiff when they were eventually taken into CYFD custody and placed on a trial home visit with their parents.

App. Vol. 1: 141

C.   Immaterial.   Whether staff within CYFD was initially reluctant to take Plaintiffs into custody is not relevant to whether Defendants breached duties to Plaintiff when they were eventually taken into CYFD custody and placed on a trial home visit with their parents.

D.   Undisputed, but immaterial.

E.   Undisputed, but immaterial.

F.   Immaterial.   Whether some staff within CYFD wanted to resolve Plaintiffs' custody quickly is not relevant to whether Defendants breached duties to Plaintiffs when they placed on a trial home visit with their parents.

G.   Disputed as unsupported by the evidence cited, but immaterial to this motion.

H.   Disputed and immaterial. Ivy Woodward was removed as supervisor of Plaintiffs' case no later than November 2019.   See Ex. A. Dep. of Brenda Saldana, 133:14-17. Accordingly, Woodward's opinions and observations regarding the father related to visits in 2019 were not pertinent to a decision to return the Plaintiffs to their parents for a trial home visit in April of 2020.

I.   Immaterial.  Ivy Woodward testified that she believed the father was a "ticking time bomb" and that she would advocate against reunification if asked to testify.  (Doc. 98-4 at 5).  However, Ms. Woodward also admitted that she "sees things according to humanity and feelings, its not all black and white for me."  Id.  Woodward's conclusions on whether reunification was appropriate are not relevant to whether placing the children on a trial home visit with their parents can constitute a constitutional violation.

App. Vol. 1: 142

J.  Immaterial.  The father's actions to regain his children, particularly at the beginning of the abuse and neglect proceedings, were not unknown.  However, it is not material to whether Defendants breached their duty to Plaintiffs pursuant to a theory of danger creation or special relationship.

K.  Immaterial.  The father's actions to regain his children, particularly at the beginning of the abuse and neglect proceedings, were known.  However, it is not material to whether Defendants breached their duty to Plaintiffs pursuant to a theory of danger creation or special relationship, when Plaintiffs were returned to their parents for a trial home visit.

L.  Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

M.  Immaterial and disputed.  Ivy Woodward was removed as a supervisor of Plaintiffs' case prior to the decision to place Plaintiffs on a trial home visit. *See* H above. Whether Ivy Woodward later disagreed with the decision by CYFD to proceed with a trial home visit is immaterial to whether Plaintiffs' constitutional rights were violated by being returned to their parents.

N.  Immaterial and disputed.  Ivy Woodward was removed as a supervisor of Plaintiffs' case prior to the decision to place Plaintiffs on a trial home visit. *See* H above. Whether Ivy Woodward disagreed with the decision to place Plaintiffs on a trial home visit is immaterial to whether Plaintiffs' constitutional rights were violated by being returned to their parents.

O.  Immaterial and disputed as not supported by the cited evidence.  The cited motions and orders speak for themselves.  Ivy Woodward had no direct knowledge of the parents'

5

compliance with parenting plans because she had been removed from the case. Her opinions regarding the suitability of the parents were known to CYFD. It was the court presiding over the abuse and neglect proceeding that had the responsibility to monitor the parents progress with parenting plans and, therefore, the state criminal judge, to the extent the no-contact order was based on safety concerns for the children, should and did defer to the court and agency overseeing the children. It is also immaterial to whether returning Plaintiffs to their parents for a trial home visit violated their constitutional rights.

P. Immaterial. It was the court presiding over the abuse and neglect proceeding that had the responsibility to monitor the parents progress with parenting plans and, therefore, the state criminal judge, to the extent the no-contact order was based on safety concerns for the children, should and did defer to the court and agency overseeing the children. It is also immaterial to whether returning Plaintiffs to their parents for a trial home visit violated their constitutional rights.

Q. Disputed and immaterial. Liggett prepared Ms. Woodward as a witness to refrain from offering her individual opinions if called to testify and instead testify as to the collective decision of CYFD. *See* Ex. B. Dep of Liggett, 146:4-147:15 However, Ms. Woodward never testified. Moreover, this witness preparation is not relevant to whether a trial home visit with parents from whom the Plaintiffs were removed, as a matter of law, constitutes a violation of their constitutional rights.

R. Disputed, immaterial, and unsupported by the cited evidence. The Guardian ad Litem ("GAL") withdrew the relevant motion and stated that "the Department addressed my concerns within my motion, by launching an investigation. My understanding that an

6

App. Vol. 1: 144

Unsbstantited Letter is soon to be issued." Doc. 98-20 at 4. Ms. Woodward's assertion that the motion was withdrawn because she was not permitted to testify is unsupported. Indeed, Woodward testified that she did not know why the relative motion was withdrawn. She stated, "[t]o my knowledge the motion had been withdrawn prior to that [day of hearing] and it was all done electronically, so I wasn't privy to that. The only thing the judge said was it had been taken off the docket." See Ex. D., Dep. of Woodward, 89:2-8.

S.   Immaterial.  Moreover, the issues asserted in Ms. Evans' letter were addressed in the questioning by Plaintiffs' GAL Laura Castillo during the hearing of March 16, 2020. Doc. 98-20 at 3.

T.   Immaterial.  Moreover, the issues asserted in Ms. Evans' letter were addressed in the questioning by Plaintiffs' GAL Laura Castillo during the hearing of March 16, 2020. Doc. 98-20 at 3.

U.  Immaterial.  Moreover, the issues regarding potential violence were addressed in the questioning by Plaintiffs' GAL Laura Castillo during the hearing of March 16, 2020. Doc. 98-20 at 3.

V.   Immaterial.  Issues regarding the fitness of the father were available to the GAL Laura Castillo prior to the hearing of March 16, 2020 and the GAL asked questions regarding alleged domestic violence. Doc. 98-20 at 3.

W.  Immaterial.  Issues regarding the fitness of the father were available to the GAL Laura Castillo prior to the hearing of March 16, 2020 and the GAL asked questions regarding alleged domestic violence. Doc. 98-20 at 3.

X. Immaterial. Issues regarding the fitness of the father were available to the GAL Laura Castillo prior to the hearing of March 16, 2020 and the GAL asked questions regarding alleged domestic violence. Doc. 98-20 at 3.

Y. Immaterial. Issues regarding the fitness of the father were available to the GAL Laura Castillo prior to the hearing of March 16, 2020 and the GAL asked questions regarding alleged domestic violence. Doc. 98-20 at 3.

Z. Immaterial. Issues regarding the fitness of the father were considered at the hearing of March 16, 2020.

AA.   Immaterial. Issues regarding the allegations of potential physical abuse were considered at the hearing of March 16, 2020.   See Doc 98-20.

BB.   Immaterial. Issues regarding the fitness of the father were considered at the hearing of March 16, 2020.

CC.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

DD.   Immaterial. Mazy made a finding that the allegations were unsubstantiated. The document making that finding speaks for itself. See Doc 98-19. It is also not material to whether placing Plaintiffs back in the physical custody of their parents violated their constitutional rights as they were returned to the *status quo ante*. .

EE.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

FF.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence. Ms. Saldana specifically testified in response to a question whether concerns raised by the therapist were addressed that "Yes they have been." She was asked if the

8

concerns regarding a kissing game and the killing of a puppy were addressed and she clarified, "yes, and also regarding domestic violence."   Doc. 98-20 at 3.

GG.   Undisputed, but immaterial.

HH.   Disputed and immaterial.  Ivy Woodward was removed from the abuse and neglect case in October or November 2019.  See Ex. A. Dep. of Brenda Saldana, 133:14-17.  Woodward's opinions are not based in concurrent firsthand knowledge.

II.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.  Ivy Woodward's statements are based on observations made prior to her being removed in November 2019. *See* H above.

JJ. Undisputed.

KK.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

LL. Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

MM.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

NN.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

OO.   Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

PP. Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence. The referenced letter addresses allegations that one of the Plaintiffs was

9

kissing another.  Plaintiffs' classification of this email as a report of sexual abuse is wholly without support and is hyperbole intended to distract.

QQ.    Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence. It is for the Court to determine whether, as a matter of law, Plaintiffs can sustain a claim that their constitutional rights were violated when they were returned to the parents from whom they were removed.

RR.    Immaterial and disputed as lawyer argument.

SS.    Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.  Megan Gallegos testified that "We were pushing, pushing for an Amber Alert.  But even—we did find out that even if CYFD had reported the way that HPD and the DA needed them to, that they could not do an Amber Alert." *See* Ex. C, Dep. of Meghan Gallegos 68:4-17.

TT.    Disputed and immaterial.  Saldana reported the Plaintiff's Missing on May 2, 2020 per the Police Report cited by Plaintiffs.  Doc 98-30 at 1.

UU.    Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

VV.    Undisputed, but immaterial.

WW.    Disputed and immaterial.  The Plaintiffs were already missing by the time the search warrant was served and compliance with a state search warrant is not relevant to whether placing Plaintiffs in the physical custody of their parents violated Plaintiffs' constitutional rights.

XX.    Immaterial and disputed as lawyer argument and not a recitation of facts supported by evidence.

App. Vol. 1: 148

YY.   Disputed as Plaintiff take statements out of  context.  The allegations are also
immaterial to whether the trial home visit violated Plaintiffs rights.  Plaintiffs were
brought into CYFD custody because of allegations of medical neglect. The Plaintiffs
were determined to be safe in the home and the parents leaving with the Plaintiffs did
not necessarily lead to the conclusion that the children were unsafe.  *See* Ex. B, Dep of
Ligget, 205:9-24.

ZZ. Undisputed.

AAA.   Immaterial and disputed as lawyer argument and not a recitation of facts supported
by evidence.

BBB.   Immaterial and disputed as lawyer argument.

## III.   ARGUMENT

### 1.   There was no special relationship between the Plaintiffs and Defendants once they were placed under the physical control of their biological parents.

Significantly, Plaintiff's Response fails to fully address the relevant and binding Tenth
Circuit precedent on the elements of a special relationship, as articulated in Armijo v. Wagon
Mound Pub. Schs., 159 F.3d 1253, (10th Cir. 1998).  Instead, Plaintiffs cite to authority that are
based upon easily distinguishable facts.

The fundamental element that establishes a special relationship is whether the state
restrains an individual's freedom to protect himself.  Armijo held that "if the state restrains an
individual's freedom to act to protect himself or herself through a restraint on that individual's
personal liberty, the state may thereby enter into a 'special relationship' during such restraint to
protect that individual from violent acts inflicted by others." Armijo at 1261.  Of note, none of the
undisputed facts support the conclusion that Plaintiffs were restrained  by Defendants or that any

App. Vol. 1: 149

restraint rose "to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual." Armijo at 1261.

Here, it is undisputed that during the trial home visit, Defendants did not have day-to-day physical control of the Children's ability to satisfy their basic needs; that was the role of the biological parents.   It is undisputed that once they were placed in the trial home visit, which is undisputably at the home of the biological parents, that CYFD was not monitoring Plaintiffs twenty-four hours a day.  Pursuant to Armijo,  the relevant question is the restraint at the time of the alleged injury.  Here, Plaintiffs are asserting that the parents were allowed to flee, that the state did not exercise restraint.

Armijo involved a special education student who, after being suspended and driven home without parental notification, committed suicide. The Tenth Circuit found no special relationship existed. The tenth Circuit reasoned

> At most, Armijo was a student in a public school confined in Herrera's car during the drive home from school. Even if such circumstances constituted a custodial relationship, that relationship ended once Armijo exited the car and ran to his house because at that point he was no longer under any involuntary restraint by a school official. Armijo at 1261. "The only 'restraint' imposed upon Armijo after his removal from school was Schutz' directive that he not return to school that day. Otherwise, Armijo was free to do whatever he wanted, including voluntarily leaving his house. Banning a student from the school grounds does not rise to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual. The fact that Armijo ended his life after he was "released" by Herrera bars any liability under the special relationship doctrine. Thus, the district court erred as a matter of law by denying qualified immunity to the Individual Defendants on the special relationship claim.

Armijo at 1262-1263.

Similarly, Plaintiffs' assertions do not constitute a restraint on the children, but rather a lack of restraint on their biological parents.  It is undisputed that one of the Plaintiffs was harmed in North Carolina by unknown means.  Because Defendants had no control over the location of

App. Vol. 1: 150

the Plaintiffs after April 2020, Defendants could not exercise any restraint over Plaintiffs and, therefore, there no special relationship could exist.

Plaintiffs' allegation is a futile attempt to avoid the implications between legal and physical custody. Even read in a light most favorable to Plaintiffs, they were transferred to the home of their parents. There is no legally sustainable argument that they were not in the physical control of their parents once placed on the trial home visit. Indeed, if they were not under the parents' control, the Children could not have been removed from the state.

In Wooten v. Campbell, 49 F.3d 696, 699 (11th Cir. 1995), a child was in the physical custody of a mother as a result of actions of the Georgia Department of Human Resources ("DHR"). In addition, DHR initially monitored visitation with the non-custodial father. During an unsupervised visit, the father murdered the child and then killed himself. The mother sued DHR. The key inquiry, according the Eleventh Circuit, was whether the county caseworkers controlled the child's life to such an extent that the mother could not be expected to protect him. Wooten at 701.

The Eleventh Circuit rejected the district court's comparison of the situation to one involving foster care. Id. at 699. The Circuit found the distinction that the child was in his mother's physical custody, and not a third-party foster home, to be dispositive. In foster care, the state chooses to place a child into the care of someone of the state's choosing. The Eleventh Circuit found that the facts were more analogous to DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Wooten emphasized that "[t]he purpose of the Due Process Clause is to protect the people from the state, not to ensure that the state protect the people from each other." Wooten at 700 (quoting DeShaney at 196).

App. Vol. 1: 151

Wooten specifically found "[t]here is no special relationship here: Daniel was in the physical custody of his natural mother when his natural father took him; Daniel did not rely solely upon the state for his physical needs and safety; Wooten had access to the courts if she was displeased with the unsupervised visitation; Wooten could have intervened to stop the unsupervised visitation; and Wooten was able to protect Daniel because she had physical custody of Daniel." Wooten at 700.

Here, the facts are more akin to Wooten and DeShanney. Plaintiffs were not solely reliant on Defendants for their physical needs and safety. For example, if there had been a fire in the home in which Plaintiffs resided with their parents, it would not have been the role of Defendants to remove the children from the burning home. Rather, it would be the responsibility of the parents to immediately act. The parents had the same responsibility to provide food and other immediate needs to Plaintiffs during the trial home visit. Significantly, the children were not in a home owned or operated by Defendants, but one that was operated, and presumably leased, by the parents.

Plaintiffs assert in their Response that Defendants are creating a false distinction between physical and legal custody. However, that distinction is recognized by multiple courts. Plaintiffs assert that Wooten is distinguishable because the state actors' only role was to monitor visitation of the father and CYFD had a greater role in this case. Plaintiffs claim that in Wooten "[t]he court made clear that the 'public agency [was] awarded legal custody of a child, but d[id] not control that child's physical custody except to arrange court-ordered visitation with the non-custodial parent.' Id. at 699 (emphasis added). That is plainly distinguishable from the present matter, where Defendants retained full control over Plaintiffs." Doc. 97 at 30.

14

Plaintiffs recognize that control is the key to the analysis in determining whether a special relationship exists.   Nonetheless, Plaintiffs misapply the facts to the analysis to come to their faulty conclusion that there was a continuing special relationship while the children resided in the home of their parents.   Plaintiffs assert that Defendants contend that the kidnapping ended the special relationship.  Id. at n. 2   However, the kidnapping just emphasizes the lack of control the state had over the Plaintiff.  Once the children were placed in the home of their parents, the special relationship ended as a matter of law.

 In DeShanney there was no violation of due process because the child was harmed by his father in the father's home.  In Armijo, the special relationship terminated the moment the child left the automobile of the school official driving him home, and in Wooten, there was no special relationship because the child was in the physical custody of his mother.   The key in all of these cases is control and physical custody.   Plaintiffs are simply incorrect when they assert that there is no distinction between physical and legal custody.

A.S. By & Through Blalock v. Tellus, 22 F. Supp. 2d 1217, 1221 (D. Kan. 1998) is analogous to the facts here.   There, a court order provided in part, that the Kansas Social and Rehabilitation Services ("SRS") was "granted permission to continue placement of said children in the home of Brenda Summers, mother, if such action is deemed to be appropriate." A.S. remained in the temporary custody of SRS until June 12, 1989." A.S at 1219.   The child was abused by her father and subsequently by the boyfriend of her mother while residing with the mother.

The court in A.S reasoned that "[t]his case lies somewhere between DeShaney and Yvonne L. In this case, the state had legal custody of the plaintiff, but physical custody remained with her mother. The questions before the court, then, are whether this situation constitutes a special

15

App. Vol. 1: 153

relationship entitling A.S. to state protection from harm by third parties and, if so, whether this right was clearly established in 1988 and 1989, when the alleged abuse occurred, so as to defeat the defense of qualified immunity." Id. at 1221. The court held that "legal custody without physical custody is insufficient to create a special relationship." Id. It further stated that the Tenth Circuit has stressed that it is the state's taking and holding a person against her will which creates a special relationship. Id.

Of note, the Plaintiffs here were represented by a GAL during the state court proceedings. The GAL for the Plaintiffs agreed to the permanency plan proposed by CYFD, which included a trial home visit. See state court's order of March 23, 2020 Doc 69-4 at 5. Moreover, CYFD filed a change in placement notice prior to the beginning of the trial home visit. See Doc. 69-5 Pursuant to NMSA 32A-4-14, the Plaintiffs, through their GAL, could have objected to such a placement. Accordingly, Plaintiffs were not involuntarily returned back in the physical custody of their parents. They accepted this change in placement through an affirmative approval of the permanency plan, via their GAL, and the failure to object to the notice in change in placement.

Plaintiffs' reliance on Judge Browning's opinion in A.M. ex rel. Youngers v. New Mexico Dep't of Health, 65 F. Supp. 3d 1206, 1259 (D.N.M. 2014), to reject the "physical control test," is misplaced.[1] Notably, Judge Browning recognized that "although the state has no substantive due-process obligations to protect children from their biological parents, such obligations arise when the state assumes the role of guardian—as with children in foster care, prisoners, and developmentally disabled individuals." A.M. at 1599 (emphasis supplied). A.M. specifically recognizes that placement with biological parents is legally distinct from foster children or, as in

---

[1] Plaintiffs' citation omits the specific language that contradicts their position. "This reading is reinforced by the fact that all of the cases that Judge Miles–Lagrange cites—A.S. v. Tellus; Wooten v. Campbell; and Clark v. City of Philadelphia—involved state actors failing to intervene when children suffered abuse in their biological parents' homes. Accordingly, Briggs is also inapposite."

16

the case of A.M., placement of individuals with developmental disabilities.   Accordingly,

Plaintiffs have failed to offer any contrary authority to the proposition that a special relationship

requires that the state actor have <u>both</u> physical and legal custody. Once Plaintiffs were placed on

the trial home visit in the home of their parents, Defendants lost physical custody/control.   As a

matter of law, the special relationship ceased.  In addition, Plaintiffs were not involuntarily placed

in the home of their parents.

Moreover, to the extent that Plaintiffs assert that Defendants knew that the parents would

abscond with the children, that is not relevant to whether a special relationship existed.  The Tenth

Circuit has held that the defendants' knowledge of a risk of harm to the plaintiff was "not relevant

to the determination of whether a special relationship existed." <u>Armijo</u>, 159 F.3d 1253, 1262 n.5.

Plaintiffs cannot sustain a claim for violation of Due Process because there was no special

relationship as a matter of law.

### 2. <u>Defendants did not create or enhance the danger to Plaintiffs, as they were returned to their parents and Plaintiff cite to no authority that would require a different conclusion.</u>

Plaintiffs cannot meet at least two elements required to prove danger creation. In order for

the state created danger exception to apply, the Plaintiffs must show:

> (1) [T]he charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscious shocking.

<u>Currier v. Doran</u>, 242 F.3d 905, 915–20 (10th Cir. 2001), 242 F.3d at 918.

First, and most importantly, there can be no danger creation because the Defendants did

not create the danger.  The children were returned to the *status quo ante*.  <u>DeShaney</u> specifically

forecloses Plaintiffs' claims. Indeed, while the Tenth Circuit has found that removing a child from

App. Vol. 1: 155

one parent and placing that child with a non-custodial parent who injures that child can sustain a claim for danger creation, returning a child to the custody to the parent(s) from whom the child was removed will not support a claim of danger creation. In T.D. v. Patton, 868 F.3d 1209, 1238–39 (10th Cir. 2017), Judge Briscoe in a concurrence found, "We attempted to avoid the controlling precedent in DeShaney by drawing a distinction that returning a child to the same parent did not increase the child's vulnerability to danger from violence at the hands of that parent, but returning a child to a different parent did." The facts here are similar to DeShanney and not Patton or Currier v. Doran, 242 F.3d 905, 915–20 (10th Cir. 2001) as Plaintiffs were not removed from a custodial parent and returned to a non-custodial parent.

Plaintiffs attempt to distinguish the facts here from DeShanney by focusing on the affirmative action requirement under Currier and Patton. Plaintiffs claim that in DeShanney, a child protective services officer observed and did nothing. Doc. 97 at 31. In contrast, Plaintiffs argue that Defendants here engaged in the affirmative action of ignoring warning signs that the parents posed a danger and actively sought to return the children to the parents. This allegation fails to create danger creation on multiple levels. Because the children were returned to the parents from whom they were taken, the *status quo ante* was restored. The United States Supreme Court held that because "the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the child]." DeShaney 489 U.S. 189, 201, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249 (1989).

Plaintiffs assert that in <u>Hubbard v Oklahoma ex rel. Oklahoma Dep't of Hum. Servs</u>. 759 Fed.Appx, 693, that the Tenth Circuit "flatly stated that "[s]tate created danger theory can apply to placement with a biological parent as well as a foster parent." Doc. 97 at 33.    However, Plaintiffs fail to include the parenthetical citation to <u>Currier</u>, which states, "When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, <u>DeShaney</u> does not foreclose constitutional liability."   Plaintiffs conveniently ignore this clarifying statement because it precludes recovery under a theory of danger creation, as the Plaintiffs were not taken from one parent and placed with another non-custodial parent.

Plaintiffs aver that the Tenth Circuit in <u>Currier</u> cited favorably to <u>Tazioly v. City of Philadelphia</u>, No. CIV.A. 97-CV-1219, 1998 WL 633747(E.D. Pa. Sept. 10, 1998), as amended (Sept. 10, 1998).  However, the Tenth Circuit in <u>Hubbard,</u> which was decided nearly two decades later, distinguished the relevance of <u>Tazioly</u>.  <u>Hubbard</u> found that "[t]his case is not binding and is readily distinguishable. In <u>Tazioly</u>, the child was born addicted to cocaine. At birth, the child was taken from his mother (who herself remained addicted to cocaine) and placed with another caretaker. <u>Id</u>. at *3-*4. The mother appeared 'hostile, abusive, ... paranoid' and 'bizarre' to social workers." <u>Hubbard</u> at 709. Critically, the Tenth Circuit found the "child in <u>Tazioly</u> experienced an immediate increase of vulnerability to private danger when placed with his biological mother (<u>with whom he had never previously lived</u>)." <u>Id</u>. (emphasis supplied).

Plaintiff cite to no authority standing for the proposition that state actors can be liable for danger creation when those state actors return a child to the parent from whom that child was initially removed.  Plaintiffs' focus on what Defendants knew and when they knew it is simply not relevant.  There can be no danger creation under the circumstances here. Plaintiffs were taken

19

from their parents in June of 2019 and returned in April of 2020. They were in no worse position in 2020 than they were in 2019.

3.  **Plaintiffs' assertion that they were not returned to the *status quo ante* is unsupported.**

Plaintiffs unsuccessfully attempt to establish that the *status quo ante* was state custody, but their position is patently contradictory. Plaintiffs assert that "the status quo ante was either Plaintiffs standing around in a parking lot waiting while Liggett refused to take them into custody or Plaintiffs in foster homes." Doc 97 at 34. Plaintiffs' assertion is inflammatory, yet, meaningless. It is undisputed that Plaintiffs were in the custody of their parents while in the Wal-Mart parking lot on June 3, 2019. Undisputed Material Fact "UMF" 1. It is also undisputed that Plaintiffs were placed into foster care because of the actions of CYFD. UMF 4, 5.

Accordingly, before they were taken into CYFD custody, Plaintiffs were under the physical control of their parents. Once they were placed on a trial home visit, Plaintiffs were again in the physical control of their parents. Plaintiffs insinuate that there is difference between being in the control of CYFD or the Hobbs Police Department. Plaintiffs offer no support for this novel claim.

Plaintiffs also assert that prior to the state's intervention, "Plaintiffs' biological parents were not faced with the possibility of losing their children."[2] Doc. 97 at 34. Plaintiffs claim that "the pending abuse and neglect proceeding gave them motivation to abscond and evade law enforcement, a departure from the status quo ante." Doc 97 at 34. Plaintiffs' position is contradictory. Plaintiffs are simultaneously claiming that CYFD resisted taking Plaintiffs into custody, while also complaining that, by taking them into custody, they provided a reason for the

---

[2] It is ironic that Plaintiffs are claiming that Defendants created incentives for their parents to flee New Mexico while relying on the testimony and opinions of individuals such as Ivy Woodward. Multiple individuals helped to create an environment within Hobbs, including a media frenzy, that was openly hostile to the parents. The parents and the Plaintiffs were essentially used as pawns for political purposes because of their immigration status.

parents to flee. This is also not relevant to the danger creation based on the facts here. It is undisputed that on June 3, 2019 the Plaintiffs were in the physical control of their parents traveling through, as there is no evidence they resided in, Hobbs, New Mexico. There is no evidence that that parents ever intended to stay in New Mexico. They had no apparent ties to this state and were facing federal immigration issues. See Complaint, Doc. 53 at ¶44. Indeed, the mother was in federal custody for the majority of the time between June 2019 until April 2020. Doc 53. Plaintiffs cannot point to any actions that Defendants took that increased the risk that their parents posed to their safety.

Plaintiffs rely on Est. of Johnson v. La Causa Inc., No. 10-C-953, 2011 WL 5319909, at *9 (E.D. Wis. June 24, 2011) for the proposition that there is a distinction between a short visit and a permanent return to custody. However, this authority is not helpful to Plaintiffs. First, Est. of Johnson was a decision on a motion to dismiss and, therefore, it only addressed whether the claim was properly pled – not whether it was successful. Second, there were private entities involved. Third, the issue of qualified immunity was not addressed.

Est. of Johnson involved arranging a visit with a mentally ill mother and her infant child. A case worker spent a half hour with both in the mother's home and then left. The mother placed the child in a bathtub, left the child un unattended, and returned to find the child unresponsive. The child apparently drowned. The facts here are readily distinguishable. First, in Est of Johnson, the child was only to visit with the mother for a short time. That case found "the complaint indicates that Will resided with a person chosen by the state under circumstances akin to a foster care arrangement. Will was with his mother only for the limited purpose of a visit that was scheduled to last only a few hours." Id. at C.I.A. *7.

App. Vol. 1: 159

Therefore, because the state was still responsible for meeting the daily needs of the child, such as food, shelter, medical care, etc., a special relationship could exist.  Here, as discussed above, there was no special relationship because the parents were responsible for providing the necessities of life to the Plaintiffs.

Est. of Johnson also addressed the issue of danger creation.  However, the facts are again distinguishable.  Est. of Johnson held that it was legally significant that the complaint in that case did not allege that the state actors returned the child to his mother full-time, thus restoring the *status quo ante. Id.* at *9.  Rather, she only was permitted to have a brief visit with her son.  Here, Plaintiffs were placed with their parents for more than just a brief visit.  They were fully responsible for their children during a trial home visit during which Plaintiffs resided with their parents.

Moreover, from the outset, the visit was  not intended to be brief.  Per New Mexico regulations, a "'Trial home visit' is the period of time, not to exceed six months, in which a child with a plan of reunification resides with their parent or guardian while services are provided to the child and family to address risk factors and ensure safety of the child." 8.10.8.7 HH NMAC.

### 4.  **Plaintiffs' focus on an Amber Alert is immaterial and unfounded.**

Plaintiffs make assertions that Defendants interfered with issuing an Amber Alert.  This is not only irrelevant to danger creation; it is not supported by the evidence.  Megan Gallegos[3] testified that "We were pushing, pushing for an Amber Alert.  But even—we did find out that even if CYFD had reported the way that HPD and the DA needed them to, that they could not do an Amber Alert."  Response to Plaintiffs' additional Fact SS *supra*.  This is an allegation that

---

[3] Ms. Gallegos served as the CASA, Court Appointed Special Advocate.  She was not aligned with CYFD or with the parents in the abuse and neglect proceedings.  *See* NMSA 1978, 32A-1-4 F, ""court-appointed special advocate" means a person appointed pursuant to the provisions of the Children's Court Rules to assist the court in determining the best interests of the child by investigating the case and submitting a report to the court

Defendants failed to act. This assertion is demonstrably inaccurate and does not form the basis for danger creation. Multiple cases have found that a refusal to act is not affirmative conduct to support a state created danger claim. See, e.g., Est. of B.I.C. v. Gillen, 761 F.3d 1099, 1107 (10th Cir. 2014) (finding allegations regarding refusals to act were only "failures to act," including refusal by the defendant-social worker to accept a CD with pictures of abuse, refusal to return phone calls from the police, and refusal to substantiate allegations of abuse); see also Price-Cornelison v. Garvin Cnty., Oklahoma, No. CIV-04-241-W, 2004 WL 7338331, at *3 (W.D. Okla. Apr. 27, 2004) ("A failure to act by refusing to enforce an order is not affirmative conduct").

In addition, the Response asserts that there were other examples of cutting off Plaintiffs from sources of aid, including alleged advance notice of visits or barring Woodward from speaking with the GAL. Of note, these are unsupported allegations that took place before the family fled and do not connect the actions to any injuries sustained by Plaintiffs. Moreover, this is mere argument of counsel and does not defeat summary judgment.

## 5. **Plaintiffs' alleged injuries were not immediate and proximately caused by Defendants.**

As a preliminary matter, Plaintiffs fail to clearly define the injury they sustained. It is not disputed that ML suffered a serious brain injury, but that was almost six months after she was placed in the physical custody of her parents and that injury occurred in North Carolina. Moreover, Plaintiffs do not provide any information about the cause of those injuries. All Plaintiffs can muster are conclusory statements when they assert that the "injuries were likely inflicted by Plaintiffs' biological parents and were immediately foreseeable." Doc. 97 at 31. The injuries to ML could have been caused by an intentional act by one of the parents, a failure to monitor, or an unavoidable accident. At its base, Plaintiffs' argument fails to establish that the parents, let alone

App. Vol. 1: 161

the Defendants, caused harm.  They also fails to explain how the time span of six months could qualify as "immediate"

Plaintiffs also appear to be alleging that simply placing the children in the custody of their parents created a danger in and of itself.  Returning the children to their parents resulted in a return to the *status quo ante* and, therefore, could not be considered an injury as a matter of law. Moreover, Plaintiffs have failed to show how they were injured by being removed from New Mexico.  Rather, they seek to tie injuries sustained by ML to the Defendants because the Defendants failed to stop them leaving.

Plaintiffs cite to Est. of Hebert by & through Bourgeois v. Marinelli, No. 122CV02582CNSSTV, 2023 WL 4744927, at *2 (D. Colo. July 25, 2023) for the proposition that an injured party was placed at risk of serious, immediate, and proximate harm because he died after he encountered the defendants and they affirmatively acted to dissuade him from getting necessary medical care. In that case the decedent was a mentally disabled individual who lived at Berry House, a brain injury assisted living residence.  The decedent experienced a psychiatric emergency was seen by two law enforcement officers after he had left Berry House and wandered to a lake. Id. at *1.  The officers allegedly discouraged the decedent from going to a hospital and instead encouraged him to return to Berry House.  "In crisis, Mr. Hebert [decedent] left Berry House later that afternoon. At approximately 2:17 p.m., he walked onto the partially frozen reservoir at Blue Heron Park, fell into the reservoir, and drowned.  Id. at *2 (internal citations omitted).

Here, in contrast, the alleged injuries did not occur the same day, the same week, or even the same month.  Rather, the injuries to ML occurred many months later.  Est. of Herbert does not stand for the proposition that there is no temporal link to the alleged injuries and the alleged actions

App. Vol. 1: 162

of a defendant. That case does not contemplate a nearly sixth month gap between the alleged acts and the alleged injuries as occurred here. Accordingly, it is unhelpful to Plaintiffs' position.[4]

### 6. **The actions of Defendants were not conscience shocking**.

Despite the tragic outcome for one of the Plaintiffs, the allegations asserted against the Defendants, even when viewed in a light most favorable to Plaintiffs, do not rise to the level of conscience shocking. Under either the special relationship or danger creation exceptions to the DeShaney rule, the plaintiff must show that the defendant's conduct "shocks the conscience." Hubbard at 708. "Conduct that shocks the judicial conscience ... is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.' " Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employ[ed] it as an instrument of oppression. The behavior complained of must be egregious and outrageous." Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013) (alteration in original) (quotations omitted). A defendant's "conduct as a whole"—including "both action and inaction"—are relevant in evaluating whether it "shocks the conscience." Estate of B.I.C., 710 F.3d at 1174. The Tenth Circuit considers the following principles when evaluating substantive due process claims in this context: "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." Currier, 242 F.3d at 920.

"Conscience-shocking" is often defined by what it is not, or what it exceeds. See, e.g., County of Sacramento v. Lewis, 523 U.S. at 849, 118 S.Ct. 1708 ("[L]iability for negligently

---

[4] Of note, Est. of Herbert was decided at the 12(b)(6) stage and is not directly applicable here.

inflicted harm is categorically beneath the threshold of constitutional due process."); Gutteridge v. Oklahoma, 878 F.3d 1233,1238-43 (10th Cir. 2018) ("[A] social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983." (quoting to Schwartz v Booker, 702 F.3d at 583)); DeAnzona v. City & Cty. of Denver, 222 F.3d 1229, 1235 (10th Cir. 2000) ("Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking."); Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 528 (10th Cir. 1998) ("[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." (quotations omitted)).

In Hubbard, the Tenth Circuit found that the allegations against various social workers, while very likely negligent, were not so egregious to violate constitutional requirements. The allegations against the defendants included vague assertions such as employees "took no action to protect or safeguard the children." Hubbard at 710. More specifically, the state defendants allegedly failed to ensure that foster parents ensured that the children were taken to therapy. The Tenth Circuit found that the failure to confirm therapy attendance was poor job performance, but not conscience shocking. Id. at 711. Further, the Tenth Circuit concluded that a social worker was not informed that the foster parents spanked the children. This lack of information, and perhaps even if the worker had known, did not lead to the conclusion that one of the children would be killed months later. Id.

In Hubbard, the facts included indications of drug abuse, inappropriate sexual interaction among the children, mental health issues, a filthy home, and corporal punishment. Corporal punishment can be more easily extrapolated to lead to physical child abuse than failing to provide dental services and living a transient lifestyle. Plaintiffs in this case have the benefit of hindsight.

App. Vol. 1: 164

However, at the time, the decision to allow a trial home visit was made, Defendants did not have knowledge of what would occur in North Carolina, assuming that is causally linked, which Defendants assert it is not. The circumstances here are tragic, but they do not shock the judicial conscience as a matter of law.

Here, the allegations are that "Defendants engineered a scheme to remove Plaintiffs from an appropriate foster home and leave them with their wholly unfit biological parents on a trial home visit..." Doc. 53 at ¶ 3. Of note, CYFD requested the state court grant it custody based on allegations that, "Mr. Ducila and Ms. Badea are failing to provide for the children's basic needs including shelter, clothing, and medical/mental treatment for the children. Mr. Ducila and Ms. Badea are going to be arrested for felony credit card fraud leaving no care taker for the children." SMF 3. Importantly, there were no allegations of physical abuse. Moreover, investigations into subsequent allegations of potential abuse were not substantiated. Doc. 98-19 at 2. Contrary to Plaintiffs' conclusory statements, there was simply no evidence that the children were subjected to physical abuse by their parents. See Johnson ex rel. Est. of Cano v. Holmes, 455 F.3d 1133, 1145 (10th Cir. 2006)(When a state agent relied upon a determination that the abuse allegation was unsubstantiated, and where there was no proof of the existence of a "obvious or known" risk, such as the uninvestigated abuse allegation in Currier, a danger creation claim cannot survive.) It is simply not conscience shocking to rely on a determination that a claim of abuse was unsubstantiated.

Specifically, in June of 2019, Plaintiffs were suffering from tooth decay, urinary tract infection, a first-degree sunburn, malnourishment, and tuberculosis. The fact that the parents fled and that one of the children suffered a skull fracture months later, does not flow from allegations of medical neglect. There is no evidence that while Plaintiffs were in New Mexico, there was any

27

evidence that they were being physically abused.  At worst, Defendants simply made a mistake of judgment under what are admittedly complex and difficult conditions. See Schwartz v Booker.

### 7. **Defendants are entitled to qualified immunity.**

Plaintiffs misapprehend their burden in responding to a motion for summary judgment asserting qualified immunity.  When a defendant asserts qualified immunity at the summary judgment stage, it is the plaintiff's burden to prove (1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled on other grounds* by Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)(emphasis supplied).

"The dispositive question is 'whether the violative nature of particular conduct is 'clearly established,' " which means courts may not "'define clearly established law at a high level of generality.'" Mullenix v. Luna, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (quoting al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074). "The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law." Thomas v. Durastanti, 607 F.3d 655, 669 (10th Cir. 2010).

Plaintiffs are trying to flip the burden of proof.  Plaintiffs assert that "if the individual facts are subsumed by a sufficiently clear general principle of law, the defendant is only entitled to qualified immunity if 'an *exception* to bedrock constitutional principles *clearly exists*.'" relying on Mascorrow v Billings, 656 F.3d 1198 (10th Cir. 2011). Doc. 97 at 41(emphasis is original).

Plaintiffs' reliance on Mascorrow is misplaced.  That case involved determining whether an officer had made an unlawful warrantless entry based on a traffic offense coupled with the exigent circumstances necessarily attending the pursuit of a fleeing suspect. Mascorro at 1204

28

(10th Cir. 2011). There, the Tenth Circuit held that "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Id. at 1204–05. If, however, police have probable cause for an arrest, the existence of certain exigent circumstances may "overcome the presumption of unreasonableness that attaches to all warrantless home entries." Id. at 1205.

Contrary to Plaintiffs' assertions, Moscorrow does not stand for the proposition that Defendants have the burden of proof of establishing an exception. In Mascorrow, it was undisputed that officers were seeking to enter a home as the result of a traffic offense and that it was clearly established that such entry was not permitted. The issue was whether there was a clear exception based on exigency that could apply. Here, Plaintiffs cannot meet the threshold issue of whether the act of returning the Plaintiffs to their parents, and when one of the Plaintiffs was somehow injured six months later, can support a constitutional violation. Accordingly, Plaintiffs have the burden of establishing that such actions were violative of their constitutional rights and that those rights are clearly established.

Plaintiffs assert that it is a bedrock principle that "children in the custody of the state have a constitutional right to be reasonably safe from harm." Doc. 97 at 42. That however, is an overly broad general principle that is insufficient upon which to find that the principle is clearly established pursuant to Mullenix.

Plaintiffs misunderstand Defendants' argument. Defendants assert that the case authority cited by Defendants, including DeShaney v. Winnebago County Department of Social Services,, Wooten v. Campbell, and Hernandez v. Rapp, No. CV 00-1456 MCA/WDS, 2003 WL 27385396, at *1 (D.N.M. Mar. 31, 2003), establishes that returning the children to their biological parents terminated any special relationship and returned the Plaintiffs to the *status quo ante,* thereby

App. Vol. 1: 167

precluding claims pursuant to danger creation.  Accordingly, as a matter of law there was no constitutional violation.

Plaintiffs fail to cite to any contrary authority.  Indeed, none of the authority cited by Plaintiffs is analogous to the issues here.  Plaintiffs' cited authority concerns foster parents (Schwartz v Booker), placing a child with a non-custodial parent (T.D. v Patton and Currier v Dornan), or unique circumstances (Tazioly v. City of Philadelphia).

In contrast, as discussed *supra*, Defendants have cited to multiple cases that hold, as a matter of law, returning a child to a previously custodial parent cannot support claims pursuant to the doctrines of danger creation or special relationship.  Plaintiffs have failed to provide any authority that the actions of Defendants, based on the undisputed facts, can support viable claims for constitutional violations.  The failure to identify well-established authority providing that placing children in the physical custody of their parents on a trial home visit, or something remotely similar, and where one child is injured six months later, constitutes a constitutional violation is fatal to Plaintiffs' claims.  Accordingly, summary judgment is appropriate.

### 8.  Plaintiffs' Tort Claims fail

Plaintiffs cite to Quevedo v. New Mexico Child. Youth & Fams. Dep't, 2016-NMCA-101, 385 P.3d 657 for the proposition that CYFD may be sued under the Tort Claims Act waiver of immunity for operation and maintenance of a building.  Plaintiffs rely on the portion of Quevado that provides "CYFD has an obligation to house children in its care in homes or facilities that meet certain minimum health and safety standards. This obligation may create a relationship between CYFD, the homes or facilities in which children are placed, and the children."  Id. at ¶17. However, that finding does not apply to the facts here.  In Quevado, the focus was on the regulation of facilities in which children were placed.  Quevado noted that:

App. Vol. 1: 168

CYFD has promulgated extensive licensing requirements and regulations governing residential shelter-care facilities for children, including crisis shelters, multi-service homes, community homes, and "[n]ew or [i]nnovative programs" that provide children's services, as well as foster homes. 7.8.3.2 NMAC7.8.3.2 NMAC (09/15/1975, as amended through 08/15/2011) (licensing requirements for shelter-care homes); 8.26.4 NMAC8.26.4 NMAC (licensing requirements for foster and adoptive homes)

Id. at ¶15

However, here the undisputed facts are that the Plaintiffs were not harmed in the home of their parents while in New Mexico. Moreover, and critically, the parents' home was not subject to any regulations, unlike the building in Quevado. Quevado found "that the building waiver may apply when an agency undertakes to provide housing for clients when permitted or required to do so under specific statutory authority. Id. at ¶13. Here, CYFD did not undertake to provide housing to the Plaintiffs when they were put on a trial home visit. At that time, they were not placed in the home of shelter care facility, foster home, or non-custodial relative. Plaintiffs have not asserted that they were harmed while in foster homes.

Despite the Plaintiffs' claims, the injury is not that the parents fled or that Defendants somehow allowed them to flee. If there was no physical injury to ML there is no question that this lawsuit would not have been filed. Plaintiffs were not harmed by the fact that CYFD allowed them to return to their parents for a trial home visit. Moreover, there is no demonstrable injury simply because the parents fled New Mexico. Plaintiff had no constitutional right to stay in state care indefinitely. The only conceivable harm is when the youngest child suffered a brain injury.

However, Plaintiffs cannot connect that injury to any specific action, let alone one that flows from the actions of the Defendants. While the building operation waiver may apply more broadly than its plain text would suggest, it is a bridge too far to assert that CYFD is responsible for injuries that occurred six months later and on the other side of the country.

31

App. Vol. 1: 169

The same reasoning applies to the constitutional claims.  "[E]ven though it rarely is mentioned in reported decisions, causation is an essential element of a section 1983 cause of action." <u>Morton v. Becker</u>, 793 F.2d 185, 187 (8th Cir.1986). "A plaintiff must prove his or her damages, or basis for entitlement to equitable relief. Monetary damages are governed by the same basic principles that prevail in tort law generally, and normally will be satisfied by showing that a defendant's conduct caused some actual harm." <u>Greffey v. State of Ala. Dept. of Corrections</u>, 996 F. Supp. 1368, 1377 (N.D. Ala. 1998) Plaintiffs provide no contrary authority for this position. Accordingly, summary judgment is appropriate on the Plaintiffs' state law claims.

WHEREFORE, Defendants respectfully request that the Court enter summary judgment in Defendants' favor as to all claims asserted in  Plaintiff's Corrected Second Amended Complaint for failure to identify a constitutional violation, or alternatively, based on qualified immunity; to dismiss the state tort claims based on sovereign immunity and for such further relief as the Court deems appropriate.

Respectfully Submitted:

PARK & ASSOCIATES, LLC

By _/s/ James J. Grubel_____
Alfred A. Park
James J. Grubel
3840 Masthead Street, N.E.
Albuquerque, NM 87109
505-246-2805 ext. 104
jgrubel@parklawnm.com
*Counsel for Defendants*

I hereby certify that a true and correct
copy of the foregoing was served via
CM/ECF filing system to all counsel
of record on this 22nd day of March, 2024.
*/s/ James J. Grubel*_____
James J Grubel

App. Vol. 1: 170

FIFTH JUDICIAL DISTRICT COURT
COUNTY OF LEA
STATE OF NEW MEXICO

No. D-506-CV-2020-01344

IVY WOODWARD and KELLY
MAZY,

                   Plaintiffs,

        vs.

STATE OF NEW MEXICO
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,

                   Defendant.


                DEPOSITION OF BRENDA SALDANA
                    February 11, 2022
                       9:02 a.m.
                    Zoom Deposition
                 Paul Baca Court Reporters
                  Albuquerque, New Mexico



        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  TODD J. BULLION, ESQ.
           Attorney for Plaintiffs



REPORTED BY:  Beverly Ann Schleimer, RDR, NM CCR #66
              Paul Baca Court Reporters
              500 Fourth Street, NW - Suite 105
              Albuquerque, New Mexico  87102

Page 130

1    So, I knew that they were -- they attended
2  that therapy session, but I'm trying to think of when
3  it was.
4    **Q.   Okay.  Have you seen this policy before,**
5  **children or youth missing from care or on runaway**
6  **status?**
7    A.  I did.  I have seen it.
8    **Q.   Okay.  In your experience, does that policy**
9  **apply to this situation, when the children are taken**
10 **from a trial home visit?**
11   A.  I'm really not -- I'm not sure.  I saw
12 this -- I remember dealing with this more after,
13 like, maybe, like my last year.
14   **Q.   Okay.  So, at the time --**
15   A.  At the time I wouldn't -- yeah, I don't
16 think that I would have linked the situation to the
17 policy, to the runaway policy.
18   **Q.   Okay.  So it's fair to say when you dealt**
19 **with the issue, this policy wasn't on your mind?**
20   A.  I would say that.  Yeah, I don't think I
21 would have linked it, I don't think.
22   **Q.   Okay.  So, Ms. Mazy submitted this ERB**
23 **report.  Did anything ever come of this, did ERB ever**
24 **contact you about this?**
25   A.  Not that I can remember.  I don't -- I know

Page 131

1  there was a lot of -- I mean, this whole case, that
2  situation when the kids ran -- or not the kids ran,
3  but when the kids were taken, or went with the
4  family, they left the state, there was a lot of
5  meetings going back and forth that I don't recall an
6  ERB meeting, ever being in one of those.  I just
7  think there was a lot of meetings going on, and not
8  one that comes to mind specifically on that.
9    **Q.   Before the trial home visit commenced, do**
10 **you recall the GAL, Laura Castillo, requesting a**
11 **hearing to talk about the -- I guess, appropriateness**
12 **of doing the trial home visit?**
13   A.  I don't recall one regarding the
14 appropriateness.  I recall one regarding wanting to
15 stop visitation.
16   **Q.   Okay.  When was that taking place?**
17   A.  I think that was this -- that was the same
18 time that we proposed a trial home visit.  It was
19 that same hearing.  I believe it was to look at
20 visitation, but we proposed a trial home visit
21 calendar.  This happened the same day it was ordered.
22   **Q.   And in discussing the trial home visit, who**
23 **all was involved in making that -- in that**
24 **discussion, aside from you?**
25   A.  Me, Patricia.  I want to say Kristen

Page 132

1  Dickey, or -- I'm trying to remember if she was there
2  or if it was, like, her supervisor.  But there was a
3  lot of higher-ups.  I can't think of all of their
4  names.
5    **Q.   Was Secretary Blalock involved?**
6    A.  Not that I remember.
7    **Q.   Was Mr. Terry Locke involved?**
8    A.  I don't recall if he was in that one, if he
9  was in that staffing.
10   **Q.   All right.  So, you mentioned higher-ups.**
11 **So, I started with the highest people I could think**
12 **of.**
13   A.  Yes.
14   **Q.   Flesh that out for me.  Who all is there?**
15   A.  So, when I think of higher-ups, I'm
16 thinking more -- not just, like, our -- people, like,
17 outside of our office, our county manager -- well,
18 not -- sorry, regional manager.  And then we have --
19 I think Anna Marie.  Her last name?  Yeah, I can't
20 think, like, of all the names.  But I think of, like,
21 the people who are running things, like, in Santa Fe
22 and Albuquerque, and I can't -- it's been such a long
23 time that I can't remember, like, all of their names.
24   **Q.   Okay.  And it was atypical for higher-ups**
25 **to be involved in decisions like this, in your other**

Page 133

1  cases; right?
2    A.  Yeah.  I would say that.  It's not
3  something that happens often.
4    **Q.   Was Ivy involved in discussing the trial**
5  **home visit in any way?**
6    A.  I don't believe so.
7    **Q.   You and Garza -- did you talk about it in**
8  **her presence?**
9    A.  I don't know.
10   **Q.   Was she -- she was still your supervisor at**
11 **this time; right?**
12   A.  Yeah, so she was my supervisor, but wasn't
13 supervising me in this case.
14   **Q.   Okay.  When did that change?  When did she**
15 **stop supervising you in this particular case?**
16   A.  That would have been -- it was in 2019, as
17 well, maybe November, October, November, I think.
18   **Q.   All right.  And why did that happen?**
19   A.  I'm really not sure that -- Trish did tell
20 me that she was going to be supervising me in this
21 case, with it being, like, a high -- kind of, like,
22 what we would call, like, a high-profile case.
23 Again, like it was very public.  Everyone knew about
24 this case.  The circumstances were different, as far
25 as, like, the population that we usually work with,

34 (Pages 130 to 133)

STATE OF NEW MEXICO
COUNTY OF LEA
FIFTH JUDICIAL DISTRICT


 IVY WOODWARD and KELLY
MAZY,

              Plaintiffs,

vs.                                    Case No.
                                       D-506-CV-2020-01344
STATE OF NEW MEXICO
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,

              Defendant.
_____/


     VIDEOTAPED ZOOM DEPOSITION OF REBECCA LIGGETT



              Monday, February 28, 2022



              Albuquerque, New Mexico


     PURSUANT TO THE NEW MEXICO RULES OF CIVIL

PROCEDURE, this deposition was:



TAKEN BY:    TODD J. BULLION, ESQ.
             ATTORNEY FOR PLAINTIFFS


REPORTED BY: TERI WARD, RPR, CCR #549
             PAUL BACA COURT REPORTERS
             500 4th Street, Suite 105
             Albuquerque, New Mexico 87102

Exhibit B

Page 146

1    different course of action, that we have -- that the
2    attorney will have those discussions with them about
3    what they're role as a CYFD employee is.
4        Q.    And what -- what is their role as a CYFD
5    employee in that circumstance where they don't agree
6    with CYFD's decision when they're called to testify?
7        A.    So their role is to testify, as I said
8    here. It's not about a personal opinion, about an
9    individual opinion, but about CYFD's decision.
10       Q.    Okay. So you -- you said personal
11   opinion. What about a social worker's professional
12   opinion? If their professional opinion diverges
13   from CYFD's decision on a case, are they instructed
14   not to testify about their professional opinion as
15   well as their personal opinion?
16       A.    Well, it's an individual -- so -- so
17   they don't -- like, I wouldn't -- so normally it
18   would be --
19       Q.    Is there -- is there a difference in
20   your --
21       A.    What?
22       Q.    Sorry. Is there a difference in your
23   mind between personal and professional opinion in
24   this circumstance?
25       A.    I don't -- I don't think so. I probably

Page 147

1    should have said individual opinion.
2        Q.    Okay.
3        A.    Would be more accurate.
4        Q.    Okay. So I'm sorry to have interrupted.
5    I wanted to figure that out. So you say it's not
6    their role to testify to their individual opinion,
7    which encompasses both personal opinion and
8    professional opinion. Why is that?
9        A.    Because they're an employee of the -- of
10   CYFD, and CYFD overall has come up with a course of
11   action, and so it's not up to the worker to testify
12   about like I would have done it differently or I was
13   in part of the discussion, this was my
14   recommendation. It's their -- their role is to
15   testify about the department's decision --
16       Q.    Okay. So --
17       A.    -- and recommendation.
18       Q.    -- is that -- and that's not something
19   that's just limited to Ms. -- sorry, to Ivy's case
20   or this situation here. This is an overarching
21   policy that CYFD has?
22       A.    I don't know if I would call it a
23   policy. I think --
24       Q.    I mean, it's a guideline that social
25   workers --

Page 148

1        A.    -- it doesn't -- like it doesn't make
2    sense to me --
3        Q.    -- need to follow. It sounds like a
4    policy to me.
5        A.    Well, I'm saying it's not a -- I don't
6    think there's like a written policy.
7        Q.    Okay. It's not --
8        A.    A policy --
9        Q.    It's not written down, but it is --
10       A.    Right.
11       Q.    -- a -- a guideline which you have
12   testified that social workers are actually trained
13   to follow during what used to be called legal week,
14   but now it's a single day of training, right?
15       A.    Yeah. I mean, I don't know that -- I
16   mean, a lot of it is just when you're talking about
17   -- I don't know that it was specifically in legal
18   week. Although, when I taught it, I did -- I talked
19   about it.
20              I -- I really in all my years never had
21   this kind of discussion with a -- with a caseworker.
22   I just -- it doesn't -- it didn't make sense to me.
23   It still doesn't make sense to me. I -- it's not --
24   CYFD makes team decisions based on input from a
25   number of different people.

Page 149

1              But ultimately, CYFD, that's -- like,
2    that's the client, and that's the position that
3    we're representing. And so you're not going to
4    have, like, five different caseworkers who gave
5    input into the ultimate decision, each of them
6    testify about what their individual decision is or
7    their individual opinion is that -- that we go
8    forward.
9              Like, my job is to -- as the -- you
10   know, as an attorney was to put on testimony about
11   the department's decision. I mean, I don't think
12   any organization could have just anybody who might
13   disagree with a decision go and testify in court
14   about their disagreement. I -- I don't -- that
15   doesn't make sense to me.
16       Q.    So why -- why is it that you can't have
17   -- or I guess let me rephrase.
18              Why is it that CYFD does not want to
19   have individual social workers testifying about
20   their personal and professional opinions when it
21   deviates from CYFD's stated decision?
22       A.    I mean, those opinions were already
23   considered and discussed in CYFD -- in meetings and
24   CYFD reaching its decision, which is what we are
25   presenting to the court.

Page 202

1    A.     -- that was presented to the court after
2  that, so I don't know.
3    Q.     So if I -- if I pull the hearing tapes,
4  I'll be able to figure out definitively if -- if
5  this was mentioned or not to the court?
6    A.     Yeah, the hearing tapes or the court
7  report.
8    Q.     And what do you mean by court report?  I
9  want to make sure I understand what you're saying.
10   A.     So before every hearing, the caseworker
11 -- well, before most hearings, like judicial reviews
12 in permanency hearings, the caseworker will file a
13 report with the -- a report with the court, and so
14 it has many different -- it should be part of that.
15   Q.     Which would be part of this Exhibit 7
16 that we looked at?
17   A.     Yes.
18   Q.     Okay.  And I'll look through here again.
19 Children back with their parents and trial home
20 visit, family has been on the run for over a month.
21 It says department continues to collaborate with law
22 enforcement by providing them info, pictures of
23 children, and documents.
24        I don't see anything mentioned in here
25 about this concern from the therapist either.  Would

Page 203

1  you agree that that concern is not noted in that
2  report?
3    A.     Well, it doesn't appear to be.
4    Q.     Okay.  And so I think there's one more
5  exhibit I forgot to go over.  Yes.
6        MR. BULLION:  I'm going to publish
7  Exhibit 8.
8        (Exhibit 8 will be marked for
9        identification.)
10 BY MR. BULLION:
11   Q.     This is a letter to Dianna Luce,
12 District Attorney, dated May 13, 2020.  And it -- it
13 says that they are writing to follow-up on
14 discussions about the Badea family in yesterday's
15 meeting, and it says on May 2, the permanency
16 worker, in this case, Brenda, reported the situation
17 to law enforcement.  Three officers met with her to
18 take a report.
19        The worker gave Officer Espinoza all of
20 the available info, including confirmation the
21 children were in CYFD custody.  A copy of the last
22 order is provided, and it goes on to say in addition
23 to reporting, CYFD has made extensive efforts to
24 locate the family.
25        And this last paragraph here, criminal

Page 204

1  charging decisions and criminal investigations are
2  the purview of your office and the police
3  department, respectively.
4        Okay.  And that's submitted by Karla
5  Young.  So there was a phone meeting or a Zoom
6  meeting, which is alluded to here in the first
7  sentence on May the 12th, 2020, where Dianna Luce
8  and Ricky Guerrero of the Hobbs Police Department
9  said in very black and white terms that to pursue
10 custodial interference charges, they needed to hear
11 from CYFD that their custodial rights were being
12 interfered with.
13        And there was discussion at that
14 meeting, and they said, well, we'll staff it and get
15 back to you.  And the result of that staffing is
16 it's your decision, police, whether you pursue
17 charges.
18        Were you part of this May 12th meeting?
19   A.     Yes.
20   Q.     What was discussed --
21        MR. GRUBEL:  Form.
22 BY MR. BULLION:
23   Q.     -- at this May 12th meeting?  What's
24 your recollection of that meeting?
25   A.     Like steps to take -- steps to take next

Page 205

1  to locate the family, CYFD's cooperation.
2  Basically, what's set out in that letter and what
3  you said Ms. Luce said.
4    Q.     And do you -- do you agree that the DA
5  and Hobbs Police Department were requesting CYFD to
6  actually say that their custodial rights being
7  interfered with?
8    A.     Yes, I think they did say that.
9    Q.     Okay.  And at that meeting, did CYFD
10 express to the police and the DA's Office that CYFD
11 did not believe the children were in danger?
12   A.     Yeah.  Something about that we had
13 assessed that the children were safe in the home
14 with the parents.
15   Q.     And that assessment continued even
16 though the children were no longer in the home,
17 right?
18   A.     Well, with their parents, with their --
19 under their parents' care.
20   Q.     All right.
21   A.     I think, CYFD did not consider the fact
22 of the parents leaving with the children as
23 necessarily leading to a conclusion that the
24 children were unsafe.
25   Q.     And this exhibit, Exhibit 8, this

52 (Pages 202 to 205)

Page 1

STATE OF NEW MEXICO
COUNTY OF LEA
FIFTH JUDICIAL DISTRICT COURT

IVY WOODWARD and
KELLY MAZY,

        Plaintiffs,

vs.                D-506-CV-2020-01344

STATE OF NEW MEXICO CHILDREN,
YOUTH & FAMILIES DEPARTMENT,

        Defendant.


MEGAN GALLEGOS
MARCH 7, 2022
9:00 A.M.
Zoom Deposition
Paul Baca Court Reporters
Albuquerque, New Mexico



    PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  TODD J. BULLION, ESQ.
          Attorney for Plaintiffs



REPORTED BY:  Shawnie Archuleta, CRR, NM CCR #298
            Paul Baca Court Reporters
            500 Fourth Street, NW - Suite 105
            Albuquerque, New Mexico  87102

Exhibit C

Page 66

1    if you could help with that.
2    A.  Yes.
3    Q.  And we -- I had a -- a summer job in high
4    school in a doctor's office scanning paper medical
5    records into electronic medical records, some of
6    these files were like this thick.  I -- I understand
7    that that may take some time.
8    A.  And this file, we actually had to transfer it
9    because the case was transferred.  So we had to
10   transfer it to another CASA.  So maybe the program
11   manager already has it all copied and ready to go.
12   I will check with her.
13        MR. BULLION:  Okay.  Well, Ms. Gallegos, I
14   don't have any further questions for you.  Thank you
15   very much for talking with us today.
16        Mr. Grubel may have some follow-up
17   questions for you.
18        EXAMINATION
19   BY MR. GRUBEL:
20   Q.  Ms. Gallegos, thank you.  I do have a few
21   questions.  My name is James Grubel, and I represent
22   CYFD in this case.
23      So you had mentioned you had reported to a
24   number of people your concerns over safety.  How
25   did -- do you -- are you aware if CASA reported any

Page 67

1    concerns of safety of the children to the Court in
2    this case.
3    A.  I am not aware.  I would have to refer to the
4    file and look at the notes.
5        I guess, can I have some clarification on
6    safety concerns prior to the children being missing?
7    Q.  Both prior and after.  But, specifically, I
8    would say prior.  Prior to the trial home visit,
9    were you a -- were you part of this case?  My
10   understanding is you were not.
11   A.  No, I was not.
12   Q.  As a general practice, how does CASA report its
13   concerns to the Court?  Is there a primary method?
14   A.  Yes, via the Court report.  They are reporting
15   concerns there, as well as the judge gives the CASA
16   the ability to speak in court regarding their
17   concerns.
18   Q.  And you've reviewed the file generally,
19   correct, in this case?
20   A.  Yes.  Yes.
21   Q.  Did CASA file reports in this case?
22   A.  Yes.
23   Q.  Okay.  Do you have any knowledge now that
24   anything that CASA reported was inaccurate?
25   A.  Not that I'm aware of, other than what I stated

Page 68

1    earlier about what Mary McQueeney told me.  But not
2    that I'm aware of that there was any inaccuracies,
3    no.
4    Q.  Okay.  Just to the interview that we all just
5    looked at, the conversation you had with Hobbs and
6    the video we were reviewing over the break.  There's
7    a comment in there that you said you understood the
8    criteria for an Amber alert was not there.
9        Do you recall what you mean by that?  Can you
10   explain that to me, please?
11   A.  I don't remember the Amber alert criteria.  So
12   I did have some clarification after watching the
13   video again.
14      We were pushing, pushing, pushing for Amber
15   alert.  But even -- we did find out that even if
16   CYFD had reported the way HPD and the DA needed them
17   to, that they could not do an Amber alert.  So we
18   kept pushing for what else is there we can we do.
19   And that was custodial interference and issue
20   warrants out for the parents.  And then it could be
21   put out on a broader -- a broader area, as far as
22   people looking for these families.
23      So we did have to understand that we weren't
24   going to get an Amber alert, but we were willing to
25   get whatever we could in order to protect those

Page 69

1    children.
2    Q.  Understood.
3        Do you know Ivy Woodward, also known as Ivy
4    Ortiz?
5    A.  I don't know her.  I -- she previously worked
6    at CYFD.
7    Q.  Did you speak to her about this case?
8    A.  We probably did, because I believe -- I don't
9    know if she was Brenda's supervisor or how she was
10   originally -- she was originally on the case, and
11   they took her off the case, if I remember correctly.
12   So she would have been, in the beginning, the
13   original contact for the case.
14   Q.  And do you remember any specifics of any of
15   conversation with Ms. Woodward about this case?
16   A.  No; not about this case, no.
17   Q.  Do you know Kelly Mazy?
18   A.  She works -- or I think she still works at
19   CYFD.  I haven't seen her in a while.
20   Q.  Did -- did you have any conversations with
21   Ms. Mazy regarding this case?
22   A.  No, I did not.
23        MR. GRUBEL:  Okay.  I have no further
24   questions.
25        MR. BULLION:  I just have a brief

18  (Pages 66 to 69)

Page 1

STATE OF NEW MEXICO
COUNTY OF LEA
FIFTH JUDICIAL DISTRICT COURT

IVY WOODWARD, and
KELLY MAZY,

      Plaintiffs,

vs.         Case No. D-506-cv-2020-01344

STATE OF NEW MEXICO CHILDREN,
YOUTH & FAMILIES DEPARTMENT,
      Defendant.


VIDEOCONFERENCE DEPOSITION OF
IVY WOODWARD
Conducted via Zoom
All Parties Appearing Remotely
May 13, 2022
9:01 a.m. MDT


    PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this deposition was:
TAKEN BY:  JAMES J. GRUBEL, ESQ.
    Attorney for Defendants


REPORTED BY:  CHRISTINE N. CASIMIRA, RMR, NM CCR #529
    Trattel Court Reporting & Videography
    609 12th Street Northwest
    Albuquerque, New Mexico 87102

Exhibit D
App. Vol. 1: 178

Ivy Woodward, et al.  v. State of New Mexico Children, Youth & Families
Ivy Woodward

May 13, 2022
D-506-cv-2020-01344

---

Page 86

1  the door, run out of the room.  They were running up and
2  down the hall screaming.  Those were not quality visits.
3       I also told her that ▮▮▮▮▮ had no bond
4  with her mom, and that they needed to work on
5  reestablishing that parent-child bond, because it's
6  scary for a baby when you don't -- like, you don't know
7  this person anymore, and all of a sudden they're your
8  primary caretaker again, and the person that you've
9  bonded to as your mother is not there anymore.
10       It's double trauma, because she went through
11  the trauma of being taken away from her mom, and bonding
12  with another person, and now we're subjecting her to
13  this trauma again.  And she said -- she was like, "Well,
14  I mean, well, what can you say?"
15       I say, "I'm going to tell the truth.  I am
16  not going to lie.  I'm not going to manipulate the facts
17  because Rebecca Liggett wants me to."
18       And she just kind of like -- she changed the
19  subject, glazed over it, and the conversation was over.
20       Q.  So wait a minute.  This conversation with
21  Ms. Dickey, did this take place before or after your
22  conversation with Ms. Liggett?
23       A.  It was after.
24       Q.  Okay.  So you had a conversation with
25  Ms. Liggett.  What was that conversation about?

---

Page 87

1       A.  To my understanding, it was supposed to be a
2  conversation, a court prep conversation on the ▮▮▮▮
3  case.  There was going to be a hearing that Laura
4  Castillo had called based on whether or not to allow
5  unsupervised visits as part of the trial home visit.
6       Laura had reached out to me and asked if,
7  because I had supervised so many visits, what I thought.
8  I then gave her pretty much the exact same spiel that I
9  had told Ms. Dickey.  She called the hearing.  And
10  Ms. Liggett told me that I needed to modify what I was
11  saying, and that I needed to recall who my employer was
12  before I spoke.
13       I told her that my job under oath was to tell
14  the truth.  It wasn't to align my testimony to what my
15  employer wanted to hear.  I said, "We're not all
16  perfect.  We all make mistakes.  And in this case, I
17  believe that the department is mistaken.  That's the
18  truth as I see it.  That's the truth as to what I have
19  witnessed in the interactions between the parents and
20  the children.  And that's what I'm going to say because
21  I'm under oath.  And I believe you're asking me to lie,
22  which is -- would make me guilty of a petty misdemeanor,
23  and I'm not willing to do that for you because then I
24  wouldn't lose my job.  I would lose my career."
25       Q.  Did you end up testifying at the hearing?

---

Page 88

1       A.  No.  Directly -- as soon as I got off the
2  phone with Ms. Liggett, I text Laura Castillo, and I
3  told her, "Rebecca Liggett basically told me that I
4  could lie or lose my job if I testify in this hearing."
5       And then Laura was -- Laura, I believe her
6  only reply was "LOL."  But then I got an email just a
7  couple hours later saying that Laura had withdrawn her
8  motion.
9       Q.  Did you have any conversation with Laura
10  about why she withdrew the motion?
11       A.  I did.
12       Q.  And what did you learn from that
13  conversation?
14       A.  She said, "You would have been my only
15  witness.  And if you're going to get fired for
16  testifying, then I don't have a case."
17       Q.  When did that conversation happen?
18       A.  I believe it happened that following Monday.
19  It did, because my conversation with Rebecca Liggett was
20  on a Friday, and court was that Monday.  So I was
21  preparing for my court hearings, and I got the email
22  that Laura had withdrawn her motion, and she had told me
23  that that was why she had withdrawn it.
24       Q.  Did you go to court that Monday?
25       A.  I did go to court that Monday.  I just did

---

Page 89

1  not have to testify.
2       Q.  Do you recall what reason was presented to
3  the judge why the motion was withdrawn?
4       A.  To my knowledge, the motion had been
5  withdrawn prior to that, and it was all done
6  electronically, so I wasn't privy to that.  The only
7  thing the judge said was it had been taken off the
8  docket.
9       Q.  Okay.
10       A.  And the only reason I remember is because all
11  I had that day was a status conference on an unrelated
12  case, and she asked me if I minded if she called my
13  matter out of order just to fill that time slot, so...
14       Q.  Did you speak with Ed McCorkindale at ERB?
15       A.  I may have.  I spoke with a lot of people
16  from ERB over my years at CYFD.  I don't recall exactly
17  who did that interview.
18       Q.  I'm going to try to refresh your memory.  Can
19  you read this?  You may be able to --
20       A.  Oh, I suppose I did.
21       Q.  Okay.
22       A.  I don't recall.  But, yes, if I received that
23  email, then I must have.
24       Q.  And my question, did you also send -- do you
25  remember sending Mr. McCorkindale a list of points?

---

23 (Pages 86 to 89)

App. Vol. 1: 179

Electronically signed by Christine Casimira (401-116-951-5014)

d9916149-3e32-4e7c-a275-562f47214d61

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ALISON ENDICOTT-QUIÑONES,
*guardian ad litem* on behalf of
A.D., R.B., E.B., and M.B., minor children,

      Plaintiff,

vs.                                                                No. 1:21-cv-00368-DHU-JMR

PATRICIA GARZA, *in her individual and*
*official capacity,* REBECCA LIGGETT
*in her individual and official capacity*,
BRENDA SALDANA, *in her individual and*
*official capacity* NEW MEXICO CHILDREN
YOUTH & FAMILIES DEPARTMENT,
Does 1-50 and JENNIFER DE LOS SANTOS,

      Defendants.

### MEMORANDUM OPINION AND ORDER

Alison Endicott-Quiñones ("Plaintiff") is the guardian *ad litem* on behalf of four minor

children, A.D., R.B., E.B., and M.B. ("the Children"). Plaintiff has sued numerous employees of

the New Mexico Children Youth & Families Department ("CYFD") under 42 U.S.C. § 1983 for

violations of the Children's substantive due process rights under the Fourteenth Amendment. In

addition, she brings claims under the New Mexico Tort Claims Act ("NMTCA") N.M. Stat. Ann.

§§ 41–4–1 to –30 against CYFD and individual CYFD employees. Defendants filed their Renewed

Motion for Summary Judgment that is now before the Court. Doc. 91. After carefully considering

Defendants' motion, the attendant briefs, the parties' oral arguments, and being fully advised of

the premises, the Court concludes that the motion will be **DENIED**.

## I. BACKGROUND

The Court considers the evidence in the light most favorable to Plaintiff. *See Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023). Children and their parents, A. D. ("Mother") and L.B. ("Father") are nationals of Romania who were seeking political asylum in the United States during the events in question. Defs.' UMF ¶ 2, Doc. 91. In the summer of 2019, Children and their parents had been sleeping in a van at night and panhandling by day at the Hobbs, New Mexico Walmart, prompting numerous calls to CYFD's abuse and neglect hotline. Compl. ¶¶ 19, 21 Doc. 53.

CYFD employees first encountered the family at the Walmart in May 2019. Pl.'s AMF ¶ A, Doc. 97. They approached the parents and informally warned them to go somewhere else or the Children would be taken into custody. *Id*. The employees then reported back to Defendant Patricia Garza, the Hobbs CYFD manager, about the incident. Compl. ¶¶ 13, 24. One employee told Garza that CYFD had "dodged a bullet" by telling the family to leave. Pl.'s AMF ¶ A. Garza "applauded the employees for refusing to assist [the Children]" and she approved the employee's "dodged a bullet" remark. *Id*.; Compl. ¶ 24.

However, on June 3, 2019, Hobbs Police Department ("HPD") officers spotted the family back at the Walmart. Defs.' UMF ¶ 1. The Children were observed outside sitting in 91-degree weather as their parents held signs asking for rent, money, gas, food, and formula. *Id*. At this point police officers arrested the parents and charged them with felony child abuse. Compl. ¶ 26. Even though the parents had been arrested, Defendant Rebecca Liggett, a high-ranking CYFD employee, "refused to take [the Children] into CYFD custody." Pl.'s AMF ¶ C. Liggett "only relented and agreed to take the children into custody when a state court judge called and asked when CYFD would be filing an abuse and neglect petition." Woodward Decl. ¶ 12, Doc. 98-1.

App. Vol. 1: 181

CYFD did eventually file an abuse and neglect petition and the Children were taken into custody in June 2019. Pl.'s AMF ¶ D. On August 20, 2019, the Children were adjudicated as "neglected" by a state court and the Children were ordered to remain in foster care. Defs.' UMF ¶¶ 4, 5.

Ivy Woodward was assigned to the Children's case. Pl.'s AMF ¶ E. According to Woodward, Garza "pushed Woodward to find somewhere to send" the Children quickly. *Id.* ¶ F. Garza's "priority was making sure that [the Children's] case did not turn into 'another Everhart case,' referring to a case where children had been in CYFD's custody for at least ten years." *Id.*[1]

Plaintiff alleges numerous "red flags" arose about the parents, and especially the Father. Doc. 97 at 5. For example, during supervised visitations, he often became angry, and the Children were afraid of him. Pl.'s AMF ¶ H. Woodward believed he was "a ticking time bomb." *Id.* ¶ I. While she was assigned to the case, he made no progress on his treatment plan. *Id.* ¶ M. On two occasions, Father "attempted to bribe CYFD workers to allow him to abscond" with the Children. *Id.* ¶ J. On another occasion both parents "attempted to abscond with [the Children] during a supervised visit" and "barricaded themselves in a room with [the Children], requiring HPD officers to come and break down the door." *Id.* ¶ K.

Despite the alleged red flags, Garza wanted to start a trial home visit. *Id.* ¶ N. Woodward objected to Garza's plan, and in a meeting Woodward "voiced her concern that, were [Father] given unsupervised access to the [C]hildren, he would likely abscond with them, and that the [C]hildren would be in danger." Woodward Decl. ¶ 36. Garza responded, "maybe we'll luck out

---

[1] Defendants object that Woodward lacks personal knowledge about many of her statements because she no longer worked on Children's case after November 2019. However, there is a genuine dispute of material fact concerning Woodward's personal knowledge because she expressly stated in her declaration that she has "personal knowledge of the facts contained" therein. Woodward Decl. ¶ 3. Viewing the evidence in Plaintiff's favor, the Court assumes that Woodward had personal knowledge of the events she described. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986) (in determining whether a genuine issue of material fact exists, "[t]he evidence of a non-movant is to be believed").

and they will disappear." *Id.* Garza then put her hand over her mouth, laughed, and said, "I didn't say that." *Id.*

In addition to the alleged red flags, Plaintiff also alleges that CYFD "suppressed disclosures of abuse" by Father so that a home trial visit would go forward. Doc. 97 at 7. For example, CYFD inaccurately represented that Father "had been compliant with his treatment plan." Woodward Decl. ¶ 44. However, Father "had never complied with his treatment plan: he did not obtain and maintain employment, he had missed several of his immigration hearings, he did not attend parenting classes, [he] no-showed for his psychological evaluation on two occasions, and refused to attend required therapy sessions." *Id.* Because of the inaccurate representation that Father was complying with the treatment plan, a motion "was filed in [Father's] criminal case in March of 2020 to remove the no contact order [between Father and the Children] to facilitate a trial home visit." *Id.* ¶ 43.

On January 28, 2020, the Children's guardian *ad litem* ("GAL") filed an emergency motion to suspend supervised visitations between the Children and Father. Defs.' Ex. C. The GAL wrote in her motion that A.D, then five-years old, disclosed "emotional trauma caused by [F]ather's direct actions," and that A.D. had "exhibited sexualized behaviors in [A.D.'s] foster home with other children in the home." *Id.* The GAL asked Ivy Woodward to be a witness at the motion hearing. Woodward Decl. ¶ 37.

However, "Liggett and Garza … prevent[ed]" Woodward from testifying. Pl.'s AMF ¶ E. Garza and Liggett "instructed [Woodward] to lie" at the hearing by providing false testimony about the appropriateness of unsupervised visits. Woodward Decl. ¶ 39. When Woodward refused, Liggett said that Garza would testify in Woodward's place in order to represent CYFD's position. *Id.* ¶ 40. "Had the hearing gone forward [Woodward] would have testified that in [her] professional

4

opinion that the father was unfit and likely to be neglectful and physically abusive if he were to gain unsupervised access to the children." *Id.* ¶ 38. Woodward feared that her job would be in jeopardy if she testified truthfully. *Id.* ¶ 39.

The GAL did not want to put Woodward's job at risk, so the GAL withdrew the motion. *Id.* ¶ 41.[2] Garza then ordered Woodward to stop communicating with the GAL about the case, even though Woodward's job was to provide the GAL case information. *Id.* ¶ 42. Woodward "understood that [she] would be subject to discipline or termination if [she] disobeyed this directive." *Id.*

Throughout February 2020, A.D. and R.B. made several disclosures of Father's alleged violence to therapist Salena Evans. Pl.'s AMF ¶¶ S, T, U, V, W. Several of Evans' notes from the therapy sessions are in the summary judgment record. In a February 3, 2020, letter, Evans wrote that A.D. had described Father as "mean daddy" and that A.D. had "exhibited sexual play therapy themes." Pl.'s Ex. M, Doc. 98-13. On February 4, 2020, R.B. disclosed to Evans that Father "yells and hits" him "alot [sic]." Pl.'s Ex. N, Doc. 98-14. In entries from February 11 and 18, 2020, Evans reported that R.B. "has displayed some fear of his father." Pl.'s Exs. O, P, Docs. 98-15, 98-16. And on February 24, 2020, A.D. disclosed to Evans that Father would hit her mother "really hard," hit her brother R.D. in the head a lot, hurt animals, and that Father scared her. Pl.'s Ex. Q, Doc, 98-17.

On February 24, 2020, Evans submitted a child abuse referral based on R.D. and A.D.'s disclosures of violence by Father. Pl.'s AMF ¶ X. Evans also "directly confronted Garza, Saldana, and Woodward about her concerns that [Father] was physically abusive." *Id.* ¶ Y. Garza and

---

[2] There is a genuine dispute of material fact concerning the GAL's reason for withdrawing the motion. However, the Court views the evidence in the light most favorable to Plaintiff and therefore assumes that the GAL withdrew the motion because Woodward was prevented from testifying.

Saldana were aware of R.D. and A.D.'s disclosures to Evans. *Id.* ¶ Z. Evans testified in a later deposition that she was concerned about the Children being alone with their parents and she believed the Children were in danger. Evans Depo. 80:14-21, Doc. 98-8. She also testified that after she wrote the February 3, 2020, letter, she "felt pressure" from CYFD. *Id.* 82:2-5. CYFD officials apparently told Evans' superiors "that [CYFD] would have to limit or decrease therapy referrals" to Evans. *Id.* at 82:10-25–83:1-3.

On February 25, 2020, the Hobbs CYFD office opened an investigation into A.D. and R.B.'s disclosures. Pl.'s AMF ¶ BB. The investigation was assigned to Kelly Mazy. *Id.* After concluding the investigation, Mazy wrote in a March 30, 2020, report that "no credible evidence" supported A.D. and R.D's allegations. Pl.'s Ex. S, Doc. 98-19. However, in a later deposition Mazy indicated that she wanted to substantiate the allegations, but that Garza and De Los Santos ultimately decided to find the allegations unsubstantiated. Mazy Depo. 40:23-25–41:1, Doc. 98-10. Woodward also indicated that Mazy believed "the abuse disclosures were credible and should be deemed substantiated." Woodward Decl. ¶¶ 23, 24. But Mazy was ultimately "coerced by Garza and De Los Santos into unsubstantiating A.D. and R.B.'s abuse disclosures." Pl.'s AMF ¶ CC.

On March 13, 2020, Garza and Saldana filed a "Judicial Review And/Or Permanency Hearing Report" and a "Family Treatment Plan" (collectively referred to as the "Report") in state court. *Id.* ¶ GG. According to Plaintiff, the Report contained misleading statements or omissions. For example, the Report claimed that "the [supervised] visits [between Father and Children] [went] well" and the [C]hildren [were] excited to see their dad" Report, 3, Doc. 98-21, even though Ivy Woodward claimed the visits were a "disaster." Woodward Decl. ¶ 32. The Report also claimed that "[Father] ha[d] been compliant with his treatment plan and has done everything the Department ha[d] asked of him." Report at 3. However, the Report did not mention the fact that

6

Evans had submitted a child abuse referral. Nor did it contain any mention of A.D. and R.B.'s numerous disclosures made to Evans during the February 2020 therapy sessions. CYFD ultimately concluded in the Report that "there are no risks to the [C]hildren if they are returned home," and stated, "the Department does not have any safety concerns with the visitation." *Id.*

On March 16, 2020, a state court held an initial permanency hearing. Defs.' Ex. D, Doc. 69-4. During the hearing, Saldana represented that reunification was safe and appropriate. Pl.'s AMF ¶ FF. She testified that CYFD had "addressed via an investigation" the "concerns raised by the therapist and [R.B.'s] foster mother as to whether the kids are afraid of their father" and allegations "regarding domestic violence." Mar. 16, 2020, Hr'g. Tr. 33:1-8, Doc. 19-20. However, according to Plaintiff, Defendants did not alert the court to the details of A.D. and R.B.'s disclosures to the therapist. Pl.'s AMF ¶ FF. Nor did they inform the court that Evans made a child abuse referral based on those disclosures or that Father had previously hit R.B. *Id.* The court stated that "it sounds like [Father] has made great progress … in his treatment plant." Mar. 16, 2020, Hr'g. Tr. 27:17-19.

On March 23, 2020, the court issued an "Initial Permanency Order" that placed the Children at home with Father. Doc. 69-4. About a week later, the three older children were placed back with Father for the trial home visit, while the youngest child was to be placed with the parents on or after April 20, 2020. Defs.' UMF ¶ 12. According to Plaintiff, during the trial home visit, Saldana provided household services to the Children, gave Father advanced warning of "unannounced" visits, and assisted him in "staging" the apartment to make him look like a fit parent. Pl.'s AMF ¶ OO. Mother was released from detention during this same period. Defs.' UMF ¶ 13.

App. Vol. 1: 186

In late April or early May 2020, the parents fled New Mexico with the Children during the trial home visit. *Id.* ¶ 14. "Saldana and Liggett prevented HPD from issuing an Amber Alert by claiming Plaintiffs were not in danger and prevented custodial interference charges from being issued against the parents." Pl.'s AMF ¶¶ SS.[3] Once the Children went missing, "Garza ordered Saldana and [another employee] to not discuss the case with anyone, including the police." *Id.* ¶¶ VV. And "Garza, De Los Santos, and Liggett withheld documents responsive to a search warrant served on CYFD by the Hobbs Police Department" that could have helped HPD locate the Children. *Id.* ¶¶ WW, XX.

In October 2020, one of the children, M.B., was abandoned at a hospital in North Carolina with serious injuries. Defs.' UMF ¶ 15. M.B. had skull fractures, healing skull fractures, an orbital fracture, subdural hematomas, blood pooling on the brain, and several burns on her legs. Pl.'s Ex. AG, 2 Doc. 98-33. The child is now blind. *Id.* After the injuries, CYFD filed change of placement notices in state court switching the Children's placement statuses. Pl.'s AMF ¶¶ ZZ. According to Plaintiff, "[c]hange of placement notices are only filed for children who are in child protective services custody within CYFD," suggesting the agency believed the Children were its custodial responsibility. *Id.* ¶¶ AAA.

On March 14, 2023, the Children's Guardian *ad litem* filed this action against CYFD, Garza, Liggett, Saldana De Los Santos, in their individual and official capacities, and "Does 1-50." Compl. at 1. She asserts two 42 U.S.C. § 1983 claims against the individual Defendants for violations of the Children's substantive due process rights, and one state law claim against CYFD, Garza and Saldana. *Id.* at 19-26. Liggett, by separate motion, sought absolute immunity, which the

---

[3] There is a genuine dispute over whether CYFD officials prevented HPD from issuing an Amber Alert. For purposes of deciding the motion for summary judgment, however, the Court views the evidence in the light most favorable to the Plaintiff, and therefore assumes that officials prevented the issuing of an Amber Alert.

Court denied. Doc. 105. In the motion now before the Court, Defendants move for summary judgment on Plaintiff's § 1983 claims based on qualified immunity. They also argue that Plaintiff's state law claim fails as a matter of law.

## II. LEGAL STANDARD

42 U.S.C. § 1983 "allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 459 (10th Cir. 2013). "Section 1983 creates no substantive civil rights, only a procedural mechanism for enforcing them." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "In defending against § 1983 claims like the ones at issue here, an official may plead an affirmative defense of qualified immunity." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1307 (10th Cir. 2015).

In reviewing a summary judgment motion based on qualified immunity, the court views the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam) (citation omitted). "Because of the underlying purposes of qualified immunity, [courts] review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). That burden requires a plaintiff to show that the state official "(1) [] violated a federal statutory or constitutional right, and (2) the unlawfulness of [the official's] conduct was clearly established at the time." *D.C.*

App. Vol. 1: 188

*v. Wesby*, 583 U.S. 48, 62–63, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (citation and quotation marks omitted).

"[The court] may decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016) (citing *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.") (internal quotation marks and citation omitted).

## III. DISCUSSION

### Substantive Due Process Claims (Counts 1 and 2)

The Due Process Clause of the Fourteenth Amendment provides, "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As the Supreme Court has explained, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Thus, "[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *see also Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995) ("[S]tate actors are generally only liable under the Due Process Clause for their own acts and not for private violence.").

App. Vol. 1: 189

"However, there are two exceptions to this general rule"—the "special relationship" and "danger creation" exceptions. *Armijo By & Through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998). Plaintiff relies on both exceptions to the general rule. The Court first addresses the state-created danger exception before turning to the special relationship exception.

### A. <u>State-Created Danger Analysis</u>

#### 1) Constitutional Violation

The Court begins with the first prong of the qualified immunity defense, whether the Defendants' actions violated a federal constitutional or statutory right. *See Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). Under the state-created danger exception "a state official may be liable when a state actor affirmatively acts to create, or increase[ ] a plaintiff's vulnerability to, danger from private violence." *T.D. v. Patton*, 868 F.3d 1209, 1221 (10th Cir. 2017) (alterations in original) (citation and quotation marks omitted). "The state-created danger exception is a means by which a state actor, *absent a special or custodial relationship between the victim and the State*, might be held liable for an act of private violence." *Matthews v. Bergdorf*, 889 F.3d 1136, 1150 (10th Cir. 2018) (emphases in original).

"To invoke the danger-creation theory, a plaintiff must show a state actor affirmatively act[ed] to create or increases a plaintiff's vulnerability to, danger from private violence." *Patton*, 868 F.3d at 1222; *see also Est. of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016) (describing a state actor's "affirmative action … that action led to private violence" as "[t]wo preconditions" to state a claim). If a plaintiff meets those two preconditions, a plaintiff must next show:

> (1) the state actor created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) plaintiff was a member of a limited and specifically definable group, (3) the state actor's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the state actor acted recklessly in conscious disregard of the risk, and (6) such conduct, when viewed in total, was conscience shocking.

11

*Matthews*, 889 F.3d at 1150.

### a. Affirmative Conduct

As noted, a plaintiff must first show a state actor affirmatively acted to create or increase a plaintiff's vulnerability to danger from private violence. *Patton*, 868 F.3d at 1222.

Defendants, relying on *DeShaney*, argue they did not act affirmatively because they returned the Children to their Father and merely restored the status quo. In *DeShaney*, Joshua DeShaney was a young boy whose father continually beat him. *DeShaney*, 489 U.S. at 191. After multiple visits to Joshua's home, county caseworkers observed signs of abuse and Joshua was temporarily removed him from his father's custody. *Id.* at 192. However, he was returned home to his violent father a short while later. *Id.* After his return, a caseworker made monthly visits to the home and observed signs of abuse, but the caseworker did nothing more than take notes. *Id.* at 192–93. Joshua's father finally beat him so badly that he fell into a coma and suffered permanent brain damage. *Id.* at 193. Joshua and his mother filed an action under 42 U.S.C. § 1983, alleging that the county officials violated the Substantive Due Process of the Fourteenth Amendment by failing to protect him from the father's violence. *Id.* at 193, 195.

The Supreme Court rejected their claims. Even though the Court described the case as "undeniably tragic" and called the officials' actions "calamitous," the Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," so "the State had no constitutional duty to protect Joshua against his father's violence." *Id.* at 191, 197, 202. The Court explained:

> [Joshua and his mother] concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once

12

took temporary custody of Joshua does not alter the analysis, for when it returned
him to his father's custody, it placed him in no worse position than that in which he
would have been had it not acted at all; the State does not become the permanent
guarantor of an individual's safety by having once offered him shelter.

*Id.*

However, while *DeShaney* establishes that state actors have no general affirmative duty to

protect private citizens from each other, even if an official knows abuse is occurring, Plaintiff's

complaint is distinguishable because the Defendants here took affirmative action to place them in

a position of danger rather than merely failing to act on their behalf. In *DeShaney*, the plaintiffs

never alleged that state workers violated his due process rights by returning him to his father.

Rather, they alleged the officials "fail[ed] to intervene to protect [Joshua] against a risk of violence

at his father's hands of which they knew or should have known." 489 U.S. at 193. And the

*DeShaney* plaintiffs conceded the state played no part in creating the danger that Joshua faced. *See*

*id.* at 197. In contrast, Plaintiff here alleges Defendants created a dangerous situation because the

Children "were in a good foster home and their essential needs were being met" but "Defendants

modified this status quo by removing the Plaintiffs from a place of safety, foster care, and starting

a trial home visit with a person they knew was dangerous." Compl. ¶¶ 160, 161. In other words,

Plaintiff does not allege that Defendants failed to act as in *DeShaney*, but that Defendants acted in

a harmful manner by exposing the Children to known dangers.

*DeShaney* does not foreclose claims against social workers who fail to alert the court of

facts undermining the father's fitness as a caretaker. *See Currier v. Doran*, 242 F.3d 905 (10th Cir.

2001); *see also K.H. Through Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990)

(distinguishing *DeShaney* from situations where the "state removed a child from the custody of

her parents; and having done so, it could no more place her in a position of danger, deliberately

and without justification, without thereby violating her rights under the due process clause of the

Fourteenth Amendment"). Defendants acted affirmatively. They made the status-quo changing decision to take the Children into custody, initiate custody proceedings, and then recommend Children be placed with Father on a trial home visit, despite evidence of potential harm. These affirmative acts then either created or increased the Children's vulnerability to danger from private violence because CYFD employees knew that Father posed a danger to Children and yet they placed them with him anyway. *See Patton*, 868 F.3d at 1222. The Court next evaluates the remaining six elements of Plaintiff's claim.

> b. Elements One through Six of Plaintiff's State-Created Danger Claim
>> *i. Whether Defendants Created Danger or Increased the Children's Vulnerability to Danger*

Plaintiff must next prove that Defendants "created the danger or increased the [Children's] vulnerability to the danger in some way." *Matthews*, 889 F.3d at 1150. As explained below, the Tenth Circuit's decision in *Patton*—a case about a child service worker's withholding of facts about a custodial father's pattern of abuse—shows that Plaintiff's evidence raises a sufficient jury question on the issue.

In *Patton*, T.D., a 14-year-old male, was living with his mother. *Patton*, 868 F.3d at 1214. T.D.'s father, Tiercel Duerson, did not live in the home. *Id.* In 2009 through 2010, T.D. was removed from his mother's custody and placed in temporary residential centers. *Id.* at 1214–15. The Denver Department of Human Services ("DDHS") filed a "Petition in Dependency of Neglect," and assigned Defendant Kelcey Patton as the caseworker to explore options for T.D.'s placement into housing. *Id.* at 1214.

One option was to place T.D. with his father, Mr. Duerson. But Ms. Patton knew that Mr. Duerson was a registered sex offender stemming from a 2005 conviction of attempted sexual assault of a minor for attempting to sodomize his minor stepdaughter, P.G. *Id.* at 1215. Ms. Patton

14

also knew that Mr. Duerson had violated a restraining order by attempting to contact P.G., and that Mr. Duerson's probation was revoked because he had failed to complete his sex offender registration and was unwilling to comply with probation conditions. *Id.* Apart from the 2005 conviction, there had been "multiple other incidents" involving Mr. Duerson sexual abuse of P.G. that did not result in a conviction. *Id.*

Before an approaching court hearing on T.D.'s placement options, Ms. Patton submitted a report to the court that mentioned only the bare fact of Mr. Duerson's 2005 conviction, but otherwise omitted several facts, including Mr. Duerson's complete criminal history, the details of the 2005 conviction, his failure to fulfill his sex offender treatment and his violation of the restraining order, and the other multiple incidents of sexual abuse involving P.G. *Id.* at 1216. At the hearing, Ms. Patton again failed to bring these issues up, and instead recommended T.D.'s transfer to Mr. Duerson's custody, which the juvenile court did. *Id.* at 1216–17.

A few months into T.D.'s placement in Mr. Duerson's home, Ms. Patton had concerns regarding T.D.'s safety in the home after T.D. disclosed that his father hit him with a mop handle. *Id.* at 1217. School officials had told her that in the last few months, T.D. had spent a lot of time at the nurse's office complaining of sickness and body aches, appeared to be afraid of his father, and at times did not want to go home. *Id.* at 1218. Yet in her report to the juvenile court, Ms. Patton did not mention these issues, even though she personally "wanted to remove T.D. from [his father's] home because she was afraid for T.D.'s safety." *Id.* (alternation in original). She did not divulge the information because she feared she would be fired. *Id.* The court ordered T.D. to remain with his father. *Id.*

DDHS eventually received a report of sexual contact between T.D. and his minor half-brother, prompting T.D.'s removal from his father's home. *Id.* After an investigation DHS

15

ultimately found that Mr. Duerson had repeatedly sexually assaulted T.D. both alone and with T.D.'s minor half-brother. *Id.* at 1218–19.

The Tenth Circuit held that Ms. Patton "violated T.D.'s substantive due process right to be free from state-created danger." *Id.* at 1225. Addressing the first element, the court found Ms. Patton liable in three ways. First, she failed to inform the juvenile court that she knew of Mr. Duerson's troubling criminal history and therefore made "incomplete and therefore misleading statements," that "influenced the juvenile court's placement decision, making Ms. Patton responsible for T.D.s placement in Mr. Duerson's home—a place of danger." *Id.* at 1227.

Second, over multiple hearings she continued to recommend that T.D. remain in Mr. Duerson's custody, "despite having evidence that he was physically abusing T.D." *Id.* She knew that T.D. claimed his father hit him with a mop handle, that school officials reported about T.D. being sick and afraid of his father, and she had her own concerns for T.D.'s safety in his father's home. *Id.* at 1228. Yet she continually recommended T.D. remain with his father. "Her decision to withhold her safety concerns, coupled with her recommendations to keep T.D. in his father's home in the face of evidence of potential abuse, made her one of those responsible for the juvenile court's decision to keep T.D. in Mr. Duerson's temporary custody. *Id.* at 1228.

Third, even though she received T.D.'s allegation that father had hit him with a wooden mop and the school officials' troubling information, she failed to follow up on these allegations, thereby "help[ing] create or increase T.D.'s vulnerability to the danger posed by Mr. Duerson." *Id.* at 1229.

Here, this case is factually and legally similar to *Patton*.[4] Like Ms. Patton who "withheld certain facts undermining Mr. Duerson's fitness as a caretaker" from the juvenile court, a jury

---

[4] In oral argument, Defendants maintained that CYFD did not create a danger to the Children because CYFD simply returned the Children to their parents, thereby restoring the status quo. *See* July 16, 2024 Motion Hearing Transcript

could find that Garza and Saldana's March 13, 2020 Report omitted material facts that undermined Father's fitness as a caretaker. *Id.* at 1227. The Report contained no mention of A.D. and R.B.'s numerous disclosures made throughout February 2020 to a therapist that Father yelled at and hit R.B., that he hit Mother, hurt animals, and that Father scared A.D and R.B. The Report also did not mention that Evans, a therapist with professional training, had submitted a child abuse referral based on these disclosures. In the face of evidence of potential abuse, the Report instead affirmatively represented to the court that "[supervised] visits [between Father and Children] [went] well", "there are no risks to the [C]hildren if they are returned home" and that CYFD "did not have any safety concerns." Report at 3. Significantly, based on the current record, there is no evidence that A.D. and R.B.'s disclosures reached the state court.

The Report also claimed that "[Father] ha[d] been compliant with his treatment plan and has done everything the Department ha[d] asked of him," *id.*, even though Plaintiff submitted evidence that Father "never complied with his treatment plan" and refused to attend required therapy sessions. Woodward Decl. ¶ 44. Just as Ms. Patton failed "to inform the juvenile court of her knowledge and concerns" a reasonable jury could find that Garza and Saldana's Report contributed to the Children being placed in "a place of danger" with their Father. *Patton*, 868 F.3d at 1227.

Beyond the Report, a reasonable jury could also conclude Saldana's testimony at the March 16, 2020, initial permanency hearing influenced the court's placement decision. Although Saldana had informed the court that CYFD had "addressed" and investigated the "concerns by the therapist and [R.B.'s] foster mother as to whether the kids are afraid of their father" and allegations of

---

("Mot. Hr'g Tr.") at 14:10-15:15 (this Memorandum Opinion and Order cites to the court reporter's unofficial transcript. All page citations are subject to change on the official, edited version of the transcript.) *See also id.* at 18:17-22. For all of the reasons explained herein, the Court rejects Defendants' argument and finds that the principles applied in *Patton* apply here.

App. Vol. 1: 196

domestic violence, this was essentially the extent of her testimony. Mar. 16, 2020 Hr'g. Tr. 33:1-8, Doc. 19-20. She did not include her particular knowledge that roughly a month earlier A.D. and R.B. had made several disclosures of abuse by Father that cast doubt on his fitness as a caretaker. Therefore, a fact question exists whether Saldana's testimony at the March 16, 2020, hearing influenced the court's placement decision.

Turning to De Los Santos and Liggett, a reasonable jury could likewise conclude that they also played a role in the Children being placed in danger. Viewing the evidence in the light most favorable to Plaintiff, Mazy, the investigator believed that A.D. and R.B.'s disclosures should have been substantiated. But De Los Santos worked with Garza to coerce Mazy to unsubstantiate the disclosures to portray Father in a false light. As for Defendant Liggett, she and Garza feared that Woodward would testify unfavorably about Father, so they allegedly thwarted Woodard's professional opinion from reaching the court. This apparently had an effect because the judge remarked that "[Father] ha[d] made great progress … in his treatment plan," even though Plaintiff has submitted evidence to the contrary. Mar. 16, 2020 Hr'g. Tr. 27:17-19. Plaintiff has therefore submitted sufficient evidence on whether De Los Santos and Liggett played a role in exposing the Children to danger.

In summary, Plaintiff's evidence raises a sufficient fact question on the first element of her state-created danger claim.

### ii. Whether the Children Are Part of a Limited and Specifically Definable Group

The second element requires Plaintiff to show that Children are members of a "limited and specifically definable group." *Matthews*, 889 F.3d at 1150. Plaintiff argues the Children meet this element because they are "four children the state took into custody at the Walmart parking lot in Hobbs on June 3, 2019." Doc. 97 at 35. *See Patton*, 868 F.3d at 1229 ("T.D. was a member of a

18

limited and specifically definable group" specifically "children the state has removed from their natural parent and taken into state custody"); *Armijo*, 159 F.3d at 1264 ("Armijo was a member of a limited and specifically definable group—special education students who have expressed threats of suicide"). The Court agrees, and notes that Defendants do not appear to dispute this element. Plaintiff's evidence satisfies the second element.

### iii. Whether the Defendants Put the Children at Substantial Risk of Serious, Immediate, and Proximate Harm

The third element of Plaintiff's state-created danger claim requires her to show that "the state actor's conduct put [the Children] at substantial risk of serious, immediate, and proximate harm." *Matthews*, 889 F.3d at 1150. Defendants argue that this element is not met because other events cut off the chain of liability, including the Mother's participation in the kidnapping and the six-month gap between the kidnapping and M.B.'s injury in North Carolina. Doc. 91 at 21-22.

However, Defendants' argument focuses too much on the parents' role in the ordeal when the real focus of this element is on government actions that create "a high probability of a serious and substantial harm." *Uhlrig*, 64 F.3d at 575. In *Patton*, the court held this element was met because the father's prior pattern of sexual offenses showed a probability of reoffending, so the fact that the social worker withheld this information "contributed to putting T.D. at risk of serious, immediate, and proximate harm." *Patton*, 868 F.3d at 1229. Here, too, Plaintiff's evidence raises a jury question whether Defendants' alleged withholding of relevant information about Father and placing the Children in his home put them at risk of serious, immediate, and proximate harm. Plaintiff's evidence therefore satisfies the third element.

App. Vol. 1: 198

*iv-v. Whether Defendants Acted Recklessly and In Conscious Disregard of an Obvious or Known Risk*

The fourth and fifth elements of Plaintiff's claim, which the Court analyzes together, require Plaintiff to show that Defendants acted recklessly and in conscious disregard of an obvious or known risk. *Matthews*, 889 F.3d at 1150. In *Patton*, the Tenth Circuit held that these elements were met because "Ms. Patton's intentional exclusion of her knowledge and concerns from her hearing reports showed she acted recklessly and in conscious disregard of an obvious or known risk that Mr. Duerson posed to T.D." *Patton*, 868 F.3d at 1230. Here, too, Plaintiff's evidence raises a triable issue of fact whether the Defendants intentionally omitted key information about Father's fitness as a caretaker from the Report and the initial permanency hearing. Plaintiff's evidence also raises a fact issue about whether Mazy, the CYFD investigator, was coerced to unsubstantiate disclosures of abuse and whether Ivy Woodward's damaging testimony about Father was intentionally blocked by De Los Santos and Liggett. Plaintiff's evidence therefore satisfies this element.

*vi. Whether Defendants' Conduct, When Viewed in Total, was Conscience Shocking*

Finally, Plaintiff must demonstrate that Defendants' conduct, when viewed in total, was conscience shocking. *Matthews*, 889 F.3d at 1150. Conscious-shocking conduct means "deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). "[M]ere negligence does not shock the conscience." *DeAnzona v. City & Cnty. of Denver*, 222 F.3d 1229, 1236 (10th Cir. 2000). "Rather, a plaintiff must demonstrate a degree of outrageousness

and a magnitude of potential or actual harm that is truly conscience shocking." *Ruiz v. McDonnell*, 299 F.3d 1173, 1184 (10th Cir. 2002).

In *Patton*, the Tenth Circuit held that the social worker's conduct—withholding information from the court about the father's fitness as a caretaker, her awareness of and failure to investigate evidence of abuse, and her responsibility in placing the child with his father—was conscious shocking and exceeded mere negligence. *Patton*, 868 F.3d at 1230; *see also Currier*, 242 F.3d at 920 (holding that caseworker's failure to investigate bruises and continued allegations of abuse and responsibility for court order granting custody to caretaker could be conscience-shocking behavior sufficient to survive dismissal).

Plaintiff's evidence similarly meets this standard. Before the trial home visit De Los Santos and Garza allegedly ordered an investigator to unsubstantiate credible disclosures of physical abuse. Garza and Liggett allegedly prevented Woodward from providing the children's court with her professional opinion, and Garza allegedly prevented Woodward from communicating with the Guardian ad Litem. Garza and Saldana allegedly submit a report to the court that was incomplete, and Saldana provided incomplete testimony about Father's fitness as a caretaker. After the trial home visit started, Saldana allegedly staged Father's apartment and provided him with advance notice of unannounced visits so that it would appear the Children were not in a place of danger.

Plaintiff's evidence is sufficient on the sixth element to withstand Defendants' summary judgment motion.

### 2) Clearly Established Law

Having raised a triable issue on the constitutionality of Defendants' conduct, the Plaintiff must next demonstrate that "the right was clearly established at the time of the defendant's unlawful conduct." *Gutierrez*, 841 F.3d at 900. "A right is clearly established when a Supreme

App. Vol. 1: 200

Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (citation omitted).

Two cases—*T.D. v. Patton* and *Currier v. Doran*—are sufficiently analogous to this case. In both cases, social workers failed to alert the court of relevant facts undermining the fathers' fitness as caretakers and recommended placing the children in the fathers' homes.

In *Currier*, CYFD investigated a report of neglect regarding two minors, Latasha and Anthony, who were in their mother's custody. *Id.* at 909. A CYFD worker found the minors in the care of a cousin who was also a minor. *Id.* Their mother had left the state. *Id.*

CYFD petitioned the court to transfer legal custody of Latasha and Anthony to CYFD. *Id.* A hearing on the petition was held. *Id.* One of the defendants, CYFD social worker Tom Doran, had learned that the children's father had a "history of financial irresponsibility" and had made only a few child support payments over the years. *Id.* Doran attended the court hearing, but he did not alert the court to the father's failure to pay child support. *Id.* The court granted legal custody of the children to CYFD, but physical custody to the children's father. *Id.*

Doran visited the father's home and noticed a small bruise on Anthony's cheek. *Id.* A few months later, Anthony had another bruise when he arrived at CYFD for an office visit. *Id.* The children's mother eventually returned. *Id.* She reported that the father and his fiancée were physically abusing the children. *Id.* Doran was aware of at least one of these reports but did not investigate. *Id.* The mother also alleged that the father's fiancée punished the children by dunking them in a bathtub full of water. *Id.* Doran again did not investigate. *Id.*

During this period, the father gained legal custody of the children in addition to physical custody. *Id.* About a month after legal custody was transferred, the children came to CYFD for an

App. Vol. 1: 201

office visit. *Id.* at 910. Bruises were visible on Anthony's face and Latasha had two visible bruises on her back. *Id.* When asked who gave them to her, she replied, "Da Da." *Id.*

At this point, CYFD temporarily removed the children from their father's home and placed them with relatives. *Id.* Doran met with a CYFD supervisor and told her that the children would be abused if they returned to their father. *Id.* But in the meeting Doran "failed to strongly advocate" against the return, so the CYFD supervisor concluded the children had to be placed with the father. *Id.*

About five months later, the father poured boiling water on Anthony. *Id.* Anthony later died from his injuries. *Id.* The Tenth Circuit affirmed the denial of qualified immunity to Doran under a state-created danger theory. *Id.* at 919. According to the Tenth Circuit, Doran "created the danger or increased the plaintiff[s'] vulnerability to the danger through his failure to investigate the numerous bruises and allegations of abuse and his responsibility for the court order granting legal custody" to the father. *Id.* at 919–20 (alteration in original). And "[b]y failing to investigate the allegations of child abuse and by recommending that [the father] assume legal custody, Doran's conduct put Anthony and Latasha at obvious risk of serious, immediate, and proximate harm, a harm that Doran recklessly and consciously disregarded." *Id.*

Based on *Currier* and *Patton*, Defendants were on notice they placed the Children in danger by minimizing or concealing facts touching on Father's fitness as a caretaker. In *Currier*, the social worker withheld the father's history of not paying child support, which the Tenth Circuit determined influenced the children court's placement of the children with the father. *Currier*, 242 F.3d 919. And in *Patton*, the Circuit determined the social worker placed a child in danger by not informing the court of the father's criminal history. *Patton*, 868 F.3d at 1227–29. These cases put Defendants on notice that allegedly withholding information from the court—A.D. and R.D.'s

23

App. Vol. 1: 202

disclosures, the therapist's child abuse referral, and Woodward's testimony, among other things—that undermined Father's fitness as a caretaker would violate the Children's "clearly established substantive due process constitutional right to be free of a state official's creation of danger from a private actor." *Id*. at 1212.

In summary, Plaintiff has satisfied the second prong of the qualified immunity defense to show that Defendants violated a right that "was clearly established at the time of the defendant's unlawful conduct." *Gutierrez*, 841 F.3d at 900. Defendants' motion for summary judgment on Plaintiff's state-created danger claim is denied. The Court next turns the special relationship exception.

### B. Special Relationship Analysis

#### 1) Constitutional Violation

Under this exception, state officials "can be held liable for harm done by third parties if the state has a special relationship with the harmed individual," that is, "when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1142–43 (10th Cir. 2006) (quotation marks omitted). "[F]oster care is recognized as one of the custodial relationships that creates a special relationship." *Schwartz v. Booker*, 702 F.3d 573, 580 (10th Cir. 2012). "This special relationship triggers a continuing duty that is subsequently violated if a state official knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, ... and if an affirmative link to the injuries [the child] suffered can be shown." *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238–39 (10th Cir. 2018) (alterations in original; quotation marks omitted) (quoting *Schwartz*, 702 F.3d at 580).

24

"Due-process claims built on the special-relationship doctrine have four elements." *Dahn v. Amedei*, 867 F.3d 1178, 1185 (10th Cir. 2017). The plaintiff must demonstrate: (1) "the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs" (2) "the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger; (3) "the defendant's conduct caused the plaintiff's injuries" and (4) "the defendant's actions must shock the conscience." *Est. of Angel Place v. Anderson*, No. 19-1269, 2022 WL 1467645, at *5 (10th Cir. May 10, 2022), *cert. denied sub nom. Place v. Anderson*, 143 S. Ct. 373, 214 L. Ed. 2d 182 (2022) (quoting *Dahn v.* 867 F.3d at 1185–86).

### a.   Whether a Special Relationship Existed

"The existence of the special relationship is the pivotal issue: if none exists, a state cannot be held liable for a person's injuries at the hands of a private third party as opposed to a state actor." *Dahn*, 867 F.3d at 1186.

Defendants concede that a special relationship existed when the Children were taken into custody in June 2019. But "[o]nce the children were placed in the home of their parents, the special relationship ended as a matter of law," according to Defendants. Doc. 103, 15. Analogizing to *DeShaney,* Defendants argue that the exception does not apply because the Children were in the custody of their biological parents when the harm occurred. *See Yvonne L.*, 959 F.2d at 891 ("[T]here is no affirmative duty of the state to protect a child who is in his *parents'* custody.") (emphasis in original).

Plaintiff focuses her arguments on legal custody. She argues that the Children were in CYFD's legal custody—not the parents'—when the harm occurred, so "a special relationship was created on June 3, 2019, when Defendants took custody of [the Children]," and "has continued,

uninterrupted … to the present." Doc. 97 at 15, 18. According to Plaintiff, "a trial home visit is exactly what it sounds like: visitation"—not a transfer of custody from the parents to CYFD. *Id.* at 18.

Defendants' argument that "there is no special relationship when children in the legal custody of the state are placed in the physical custody of the biological parents" is without merit. Their argument assumes the foster care relationship ended during the trial home visit even though the record does not support this conclusion. After the Walmart episode, the Children were removed from their biological parents' legal and physical custody and placed in the legal and physical custody of the CYFD, which in turn placed them in foster care homes to provide for the Children's physical needs on the State's behalf. As the Children's legal custodian CYFD had certain statutory rights and duties concerning the Children. It retained "the right to determine where and with whom" the Children would live. N.M. Stat. Ann. § 32A–1–4(T) (Children's Code definition of "legal custody"). And it had "the right and duty to protect, train and discipline the [Children] and to provide the [Children] with food, shelter, personal care, education and ordinary and emergency medical care[.]" *Id.* As the custodial official responsible for overseeing the Children, CYFD "owed [the Children] the affirmative duty of protection while they were in foster care." *J.W. v. Utah*, 647 F.3d 1006, 1011 (10th Cir. 2011).

The Children were "in foster care" during the trial home visit at their father's home. A "trial home visit" is a period "in which a child with a plan of reunification resides with the parent or guardian while services are provided to the child and family to address risk factors and ensure safety of the child." N.M. Admin. Code 8.10.7.7(KK). CYFD maintained legal custody of the Children and had a certain amount of discretion when it came to the trial home visit. *See State of N.M. ex rel. CYFD v. Lisa A.*, 144 N.M. 324, 327, 187 P.3d 189, 192 (N.M. Ct. App. 2008) (holding

that CYFD could remove a child in its legal custody from a trial home visit because "despite the trial home visit, there was no guarantee that Child would remain in Mother's care or that Mother would ultimately receive custody of Child at the conclusion of the proceedings"). And, as Plaintiff correctly points out, the state court's March 2020 order never mentioned a transfer of physical custody to the parents.

Therefore, the Children remained in the legal custody of CYFD, not the biological parents' custody. Tenth Circuit law "makes clear" that when a special relationship exists between the State and foster child, that relationship "triggers an accompanying, continuing duty imposed on state custodial officials thereafter," to protect foster children from known dangers. *Schwartz*, 702 F.3d at 581. As discussed previously, Plaintiff's evidence raises a triable issue of fact whether officials were aware of known dangers by placing Children with their father, necessitating resolution by the factfinder.

Defendants mistakenly compare this case to *Wooten v. Campbell,* 49 F.3d 696, 699–700 (11th Cir. 1995), which held that no special relationship existed when state had legal custody over a child for the sole purpose of arranging visitation for the noncustodial father, but where the mother retained physical custody. However, *Wooten* is inapplicable because the child was never in foster care to begin with; the state agency simply arranged visitation schedules. *Id.* at 699. Here, in contrast, the Children undoubtedly were in foster care and therefore in the custody of the State when the trial home visit occurred, triggering CYFD's affirmative duty to protect them from known dangers. *See J.W.*, 647 F.3d at 1011; *Schwartz*, 702 F.3d at 581.

In summary, Plaintiff has satisfied the first element of her special relationship claim.

App. Vol. 1: 206

b. Whether Defendants Knew the Children Were in Danger or
Failed to Exercise Professional Judgment

Plaintiff must next show "the defendant knew that the plaintiff was in danger or failed to

exercise professional judgment regarding that danger." *Est. of Angel Place,* 2022 WL 1467645, at

*5. To show a state official failed to exercise professional judgment, a plaintiff must show "more

than mere negligence; the official must have abdicated her professional duty sufficient to shock

the conscience." *Schwartz,* 702 F.3d at 585–86. The Court concludes that Plaintiff's evidence

raises a fact issue on this element. As explained previously, there is a fact issue whether Garza and

Saldana withheld A.D. and R.B.'s disclosures of abuse from reaching the court. There are further

fact questions about whether Garza and De Los Santos were responsible for painting Father in a

false light, and whether Liggett aided in preventing Woodward's damaging testimony about Father

from reaching the court. At this stage, Plaintiff's evidence raises a fact issue whether Defendants

abdicated their "duty to act professionally in making the placement[]" of Children with their father.

*Yvonne L.,* 959 F.2d at 894. Plaintiff has therefore met the second element of her special

relationship claim.

c. Whether the Defendants Caused the Children's Injuries

Plaintiff must next establish that the Defendants' conduct caused the plaintiff's injuries.

*Est. of Angel Place*, 2022 WL 1467645, at *5. There must be "an 'affirmative link' between the

state actor's conduct and 'the injuries ... suffered' to impose special relationship liability." *Hunt v.

Montano,* 39 F.4th 1270, 1281 (10th Cir. 2022) (quoting *Yvonne L.*, 959 F.2d at 890). This standard

"calls for something more than mere but-for causation or coincidence …." *Id.* The Court concludes

that Plaintiff's evidence raises a triable issue of fact on this element. As the Court has previously

explained, Plaintiff has put forward evidence that each Defendant was allegedly involved in

minimizing or downplaying Father's fitness as a caretaker, which is sufficient to survive summary

28

judgment at this stage. *See id.* (holding that the plaintiffs met this element where they alleged "a host of risk factors ignored [by CFYD officials]").

d. Whether Defendants' Actions Shocked the Conscious

Lastly, Plaintiff must demonstrate that Defendants' actions "shock the conscience." *Est. of Angel Place*, 2022 WL 1467645, at *5. The same "shocks the conscience" test applies to both state-created danger claims and special relationship claims. *See Johnson*, 455 F.3d at 1142; *Radecki v. Barela*, 146 F.3d 1227, 1230 (10th Cir. 1998). As the Court previously explained when analyzing this element as part of Plaintiff's danger-creation claim, Plaintiff's evidence, accepted as true, shows that each Defendant had a role in knowingly placing the Children in a potentially dangerous environment and ignoring, minimizing, or downplaying problems with Father's fitness as a caretaker. Plaintiff has met the final element of her special relationship claim.

**2) Clearly Established Law**

It is clearly established that foster care creates a special relationship. *See Schwartz*, 702 F.3d at 580. Since 1985, caselaw has further established "that state officials could violate foster children's substantive due process rights if they knew of an asserted danger to a foster child." *Id.* at 588; *J.W.*, 647 F.3d at 1011 ("the constitutional right of foster children to be kept reasonably safe from harm has been clearly established since at least 1985"). And, it is clearly established that the special relationship between the State and foster child "triggers a continuing duty that is subsequently violated if a state official knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, ... and if an affirmative link to the injuries [the child] suffered can be shown." *Gutteridge*, 878 F.3d at 1238–39 (quoting *Schwartz*, 702 F.3d at 580).

App. Vol. 1: 208

Reasonable officials in Defendants' shoes would have known that undermining or downplaying information on the Father's fitness as a caretaker would violate the Children's substantive due process rights to be reasonably safe from harm. Defendants owed the Children an affirmative duty of protection. *See J.W.*, 647 F.3d at 1011. Given Plaintiff's evidence that each individual Defendant played an alleged role in painting the Children's father in a false light, caselaw establishes ignoring an asserted danger or failing to exercise professional judgment with respect thereto would violate the Children's substantive due process rights. *See Schwartz*, 702 F.3d at 588. The Court concludes that the individual Defendants are therefore not entitled to qualified immunity on Plaintiff's special relationship claim.

### New Mexico Tort Claims Act (Count 3)

Lastly, Defendants move for summary judgment on Count 3 of Plaintiff's operative complaint, which pleads a claim under the NMTCA against CYFD and Saldana and Garza in their individual and official capacities. *See* Pl.'s Compl. ¶¶ 172–78. The essence of Plaintiff's NMCTA claim is that these Defendants breached their duty to provide the Children "a reasonably safe living space … while the [C]hildren were in CYFD's legal custody." *Id.* ¶¶ 173, 176.

The NMTCA provides a mechanism to "compensate those injured by the negligence of public employees and to impose duties of reasonable care[,] while at the same time limiting governmental liability so that government should not have the duty to do everything that might be done." *Rayos v. State ex rel. New Mexico Dep't of Corr.*, 336 P.3d 428, 430 (N.M. Ct. App. 2014) (quoting *Cobos v. Doña Ana Cnty. Hous. Auth.,* 126 N.M. 418, 970 P.2d 1143 (N.M. 1998)) (quotation marks omitted; alteration in original). The NMTCA achieves this by creating a general immunity from tort liability for the State and State employees with certain, limited exceptions. *Id.*

One exception is the "building waiver" exception, which provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

N.M. Stat. Ann. § 41–4–6(A).

Defendants argue this waiver does not apply because they did not "operate" the biological parents' private home. The Court recounts some general principals regarding the builder waiver before addressing the parties' specific arguments. The New Mexico Supreme Court has interpreted the building waiver broadly. *See Upton v. Clovis Mun. Sch. Dist.*, 140 N.M. 205, 207, 141 P.3d 1259, 1261 (N.M. 2006). It is not limited to injuries occurring only on government-owned property. *Cobos,* 970 P.2d at 1146–47. Nor is it limited to injuries resulting from a physical defect on the premises. *Encinias v. Whitener L. Firm, P.A.*, 310 P.3d 611, 616 (N.M. 2013). Instead, Section 41–4–6(A) applies "where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." *Id.* at 616–17. Courts must examine the "scope of the duties" performed by public employees to operate or maintain the building in question. *Cobos*, 970 P.2d at 1146–47. "Scope of duty" means "performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, *regardless of the time and place of performance*." N.M. Stat. Ann. § 41–4–3(G) (emphasis added).

New Mexico courts have considered the building waiver in the context of foster care on at least three occasions. In *M.D.R. v. State ex rel. Hum. Servs. Dep't*, 114 N.M. 187, 188, 836 P.2d 106, 107 (N.M. Ct. App. 1992), the Court of Appeals held that CYFD did not "operate" the plaintiffs' private foster home by placing a child in their home knowing that the child had a history of sexual abuse with other children. Judge Minzner wrote a concurrence. She agreed CYFD did

App. Vol. 1: 210

not operate the foster home by making the placement decision. But her concurrence suggested that CYFD might operate a foster home if it engages in "supervision of actual day-to-day operation." *Id.* at 111 (Minzner, J., specially concurring).

Then in *Young v. Van Duyne*, 135 N.M. 695, 696, 92 P.3d 1269, 1270 (N.M. Ct. App. 2004), the Court of Appeals held that the building waiver exception applied when CYFD placed a child with violent tendencies into a foster home and the child killed the foster mother. Highlighting Judge Minzner's *M.D.R.* concurrence, the court found that the waiver could apply because the plaintiff asserted that CYFD exercised "detailed control" over the foster parents' home and that this control constituted CYFD's "operation" of the foster home. *Id.* at 1271. The court remanded to allow the plaintiff to "prove a regulatory scheme or conduct from which a fact finder" could conclude that "CYFD's regulatory duties and conduct in regard to [the foster parents'] home during foster placement constituted operation of the home as contemplated under Section 41–4–6." *Id.* at 1280.

Finally, in *Quevedo v. New Mexico Child. Youth & Fams. Dep't*, 385 P.3d 657, 659, 662 (N.M. Ct. App. 2016), the Court of Appeals held that the building waiver applied when CYFD knowingly placed adolescents in a private, non-profit treatment facility that abused them, and that CYFD failed to properly license and regulate the facility. Once again citing Judge Minzner's *M.D.R.* concurrence, the holding in *Quevedo* rested heavily on the State's extensive role in regulating and operating foster homes. *See id.* at 662–63. Because of this extensive regulation, the court explained that "CYFD has an obligation to house children in its care in homes or facilities that meet certain minimum health and safety standards" and "[t]his obligation may create a relationship between CYFD, the homes or facilities in which children are placed, and the children." *Id.* at 663.

App. Vol. 1: 211

Here, the parties have barely discussed the State's alleged role in regulating and operating the biological parents' home. But even if the parties had more fully discussed what duty of care, if any, CYFD owed the Children, there would still be questions of material fact to be answered, such as the individual Defendants' alleged actions in minimizing Father's fitness as a caretaker and questions about the Defendants' knowledge of the circumstances. The Court therefore concludes that questions of material fact preclude summary judgment on the builder waiver issue. *See id.* at 664 (holding that genuine issues of material fact about the building waiver's application existed where the plaintiffs alleged that "CYFD failed to exercise ordinary care 'to provide for the care, protection, and wholesome mental and physical development of children' under statutory or regulatory circumstances requiring CYFD to do so"); *Young*, 135 N.M. at 696 (remanding to allow the plaintiff to "prove a regulatory scheme or conduct from which a fact finder" could conclude that "CYFD's regulatory duties and conduct in regard to [the foster parents'] home during foster placement constituted operation of the home as contemplated under Section 41–4–6"). Defendants' motion for summary judgment on Plaintiff's NMTCA claim, Count 3, is denied.

## IV. CONCLUSION

For the reasons explained here, it is therefore **ORDERED** that Defendants' Renewed Motion for Summary Judgment **(Doc. 91)** is **DENIED**.

**IT IS SO ORDERED.**

DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE

App. Vol. 1: 212

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ALISON ENDICOTT-QUIÑONES,**
**Guardian ad Litem, on behalf of**
**A. D., R. B., E. B., and M. B.,**
**minor children,**

        **Plaintiffs,**

**vs.**                                    **No: 21-cv-00368 DHU/JMR**

**PATRICIA GARZA, in her individual**
**and official capacity; REBECCA LIGGETT,**
**in her individual and official capacity; BRENDA**
**SALDANA, in her individual and official capacity;**
**JENNIFER DE LOS SANTOS in her individual and**
**official capacity; NEW MEXICO CHILDREN YOUTH**
**& FAMILIES DEPARTMENT; and DOES 1-50,**

        **Defendants.**

**NOTICE OF APPEAL**

Defendants, the New Mexico Children, Youth and Families Department ("CYFD"), Patricia Garza, Rebecca Liggett, Jennifer De Los Santos, and Brenda Saldana (collectively "Defendants"), by and through their attorneys, Park & Associates, LLC (Alfred A. Park and James J. Grubel), hereby gives notice pursuant to Rule 4(a)(1), Fed. R. App. P. that they are appealing to the United States Court of Appeals for the Tenth Circuit  from that portion of the Court's Memorandum Opinion and Order of August 15, 2025 (Doc. 115), which denied their motion for summary judgment based upon the doctrine of qualified immunity.

i

Respectfully Submitted:

PARK & ASSOCIATES, LLC

By_ */s/ James J. Grubel*
Alfred A. Park
James J. Grubel
3840 Masthead Street, N.E.
Albuquerque, NM 87109
505-246-2805 ext. 104
jgrubel@parklawnm.com
*Counsel for Defendants*

I hereby certify that a true and correct
copy of the foregoing was served via
CM/ECF filing system to all counsel
of record on this 11th day of September, 2024.

*/s/ James J. Grubel*
James J Grubel

App. Vol. 1: 214

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3    _____
                                 )
 4    ALISON ENDICOTT-QUINONES,   )   Case No. 21-cv-00368-DHU/JMR
      Guardian ad Litem on behalf of)
 5    A.D., R.B., E.B., and M.B.,  )
      minor children,             )
 6             Plaintiffs,        )
                                  )
 7         vs.                    )   Mimbres Courtroom
                                  )   Albuquerque, New Mexico
 8    PATRICIA GARZA, in her      )
      individual and official     )
 9    capacity; REBECCA LIGGETT,   )
      in her individual and official)
10    capacity; BRENDA SALDANA, in )
      her individual and official  )
11    capacity; JENNIFER DE LOS    )
      SANTOS, in her individual and )
12    official capacity; NEW MEXICO )  July 16, 2024
      CHILDREN YOUTH & FAMILIES    )   1:07 p.m.
13    DEPARTMENT; and DOES 1-50,    )
             Defendants.          )
14    _____)

15
                    TRANSCRIPT OF PROCEEDINGS
16           RENEWED MOTION FOR SUMMARY JUDGMENT
           BEFORE THE HONORABLE DAVID HERRERA URIAS
17              UNITED STATES DISTRICT COURT JUDGE

18    APPEARANCES:

19    For the Plaintiff:   TODD J. BULLION, ESQ.
                           Law Office of Todd J. Bullion
20                         4801 Lan Avenue, NE, Suite 110
                           Albuquerque, NM  87109
21
                           BENJAMIN GUBERNICK, ESQ.
22                         Gubernick Waldo Law Advocates, LLP
                           717 Texas Avenue, Suite 1200
23                         Houston, TX  77002

24    For the Defendants: JAMES J. GRUBEL, ESQ.
                          Park & Associates, LLC
25                        3840 Masthead Street, N.E.
                          Albuquerque, NM  87109
```

```
1   REPORTED BY:        CARMELA V. McALISTER, CRR, RPR, NM CCR 308
                        United States Court Reporter
2                       333 Lomas Blvd., NW
                        Albuquerque, New Mexico  87102
3                       Phone:  505-248-2094
                        Email:  Carmela_McAlister@nmd.uscourts.gov
4
         Proceedings recorded by mechanical stenography; transcript
5   produced by computer.
6
7
8
9
10
11
```

## TABLE OF CONTENTS

Court in Session                                         3

Argument by Mr. Grubel                                   3

Response by Mr. Gubernick                               28

Reply by Mr. Grubel                                     61

Certificate of Official Court Reporter                  72

```
 1              THE COURT:  Good afternoon, everybody.  We are going to
 2    go on the record in the case of Endicott-Quinones v. Garza, et al.
 3    This is No. 21-CV-00368-DHU.
 4              Let's have counsel state their appearances.
 5              MR. GUBERNICK:  Afternoon, Your Honor.  Ben Gubernick
 6    appearing for Plaintiff, joined by Todd Bullion and Alison
 7    Endicott-Quinones is also present.
 8              THE COURT:  Thank you all for being here.
 9              MR. GRUBEL:  And good afternoon, Your Honor.  James
10    Grubel on behalf of the Defendants.
11              THE COURT:  Good afternoon to you as well.
12         All right.  We're here on the Defendants' renewed motion for
13    summary judgment.  I have reviewed the briefs and the exhibits
14    that were attached to those.  I've also reviewed the corrected
15    second amended complaint.  Because this case involves the
16    assertion of qualified immunity, I thought hearing from the
17    parties on sort of the most pertinent points of their positions
18    would be helpful to the Court.  So let's hear some argument on
19    that motion.
20         Since this is the defense motion, let's start off with you.
21    If you want to come up to the podium.
22              MR. GRUBEL:  Thank you, Your Honor.  Good afternoon.
23         We're here today on Defendants' renewed motion for summary
24    judgment.  I represent the Children, Youth and Family Department,
25    CYFD; as well as Rebecca Liggett, who is an attorney with CYFD;
```

1   Patricia Garza, who was the lead county office manager; Brenda

2   Saldana was the permanency planning worker; and Jennifer de los

3   Santos was her supervisor.

4           THE COURT:  Are these all former employees or --

5           MR. GRUBEL:  Let's see, Rebecca Liggett is retired.

6   Patricia Garza is its current attorney, Your Honor.  Brenda

7   Saldana, I believe, is retired, and Jennifer de los Santos is

8   still there.

9           THE COURT:  Okay.  All right.

10          MR. GRUBEL:  Defendants seek summary judgment because

11  the undisputed facts demonstrate that in April of 2020, the

12  Plaintiffs, who were all minors, were placed -- and who had been

13  previously placed in the custody of CYFD, were returned to the

14  physical custody of their parents from whom they were initially

15  taken.  Of note, Plaintiffs allege that their substantive due

16  process rights were violated when they were placed back in their

17  parents' physical custody because the parents, soon thereafter,

18  fled with their children and left New Mexico.

19      Plaintiffs assert that the Defendants are liable under the

20  Fourteenth Amendment due process under two theories:  One is the

21  danger creation theory, and the second is the special relationship

22  theory.  However, Your Honor, the return of the biological

23  children -- the children to their biological parents renders both

24  theories of liability non-viable as a matter of law under the

25  presiding case authority in the Tenth Circuit.

1   THE COURT:  Well, I think -- I think that a lot of the

2 issues that I've seen in the briefs or the issues that have been

3 raised by the parties sort of turn on exactly how we characterize

4 what happened with how the children ended up back in the -- at

5 least with their parents or at least one parent.  So I want to

6 make sure that we kind of bear down on that because there seems to

7 be some disagreement about what happened here.  So when you say

8 returned to the physical custody of their parents, was it both

9 parents or was it the father who they were allowed to have that

10 visit with?

11   MR. GRUBEL:  So, Your Honor, it was technically both

12 parents.  At the initial -- so there were three older children.

13 They were returned -- there was an order entered on March 31st,

14 2020.  They were returned around about that time to the father,

15 because the mother was still in ICE custody at that very moment.

16 The youngest child was still with her foster mother.  She was with

17 a separate foster mother named Jill Jones, and Ms. Jones relayed

18 that the youngest child was ill.  So she was able to stay with

19 Ms. Jones for a little longer, about two weeks.  At some point

20 during that period, the mother was also released from ICE custody

21 and was returned and she returned to the home as well.

22   THE COURT:  Okay.  And you made a point to say returned

23 to the physical custody of their parents, and I know there's been

24 some talk about this.  You don't agree that they were still in the

25 legal custody of CYFD?

1     MR. GRUBEL:  I do believe they were in the legal custody

2 of CYFD, Your Honor, yes.

3     THE COURT:  And so with regard to -- when you say

4 "returned to," really what we're talking about is this was a --

5 from what I've read, including the information, materials related

6 to the state court proceedings, this was a trial home visit.

7     MR. GRUBEL:  Correct, Your Honor.

8     THE COURT:  So it's not the situation where CYFD makes a

9 determination that parents are fit, makes them kind of -- and a

10 state court agrees and they are returned to the custody of their

11 parents full-time.  Just by the nature of the way that this is

12 characterized by the court, which is a trial home visit -- and I

13 think there's a definition of what that means in the statutes --

14 that's not the same as saying the children were returned to their

15 parents permanently.

16     MR. GRUBEL:  That distinction is correct, Your Honor.

17 But the only quibble I would have is that the children -- there is

18 an assessment that was done of the children, so the -- the state

19 is mandated and required by federal authority, constitutional law,

20 to return the children to the parents because the parents have a

21 constitutional right and have the freedom to raise the children as

22 they see fit so long as that doesn't violate the law.  And so the

23 state is put in --

24     THE COURT:  Even when there's allegations of child

25 abuse?  I think at the time that this was going on -- and correct

1  me if I'm wrong -- but the father was facing state felony charges

2  for abuse.  So even in situations like that, you're claiming that

3  the CYFD has a constitutional obligation to return children to

4  their biological parents?

5  MR. GRUBEL:  Your Honor, they have a constitutional

6  obligation to ensure that the parents -- that the balance --

7  there's a balance and that it is fully vetted and that there's a

8  balance between the rights of the parents and the rights of the

9  children.

10  THE COURT:  And it's the state court in this case that

11  would have done the vetting?

12  MR. GRUBEL:  Correct.

13  THE COURT:  And I know there's an allegation from the

14  Plaintiffs that there was information that was withheld from the

15  state court.  I've looked at some of the information, some of

16  the -- I think it was testimony provided by Ms. Saldana.  It

17  doesn't seem to me like there was a lot provided to the state

18  court regarding the specifics of the therapy that the children had

19  undergone and some of the things that the therapist was concerned

20  about.  Was the state court advised of the concerns that were

21  expressed by the therapists?

22  MR. GRUBEL:  Your Honor, the children in that case had

23  their own guardian ad litem, and that guardian -- there was a --

24  Plaintiffs have made much ado in this case about a motion that the

25  guardian ad litem had filed to stop visitation.  The guardian ad

1  litem then consulted with CYFD, and it's on one of the exhibits,

2  where Judge Kirksey in Lea County said that the guardian ad litem

3  had withdrawn her motion because her concerns had been alleviated

4  because an investigation was undertaken.

5       THE COURT:  Well, but my question was whether CYFD

6  informed the court of the concerns of the therapists, at least as

7  they were expressed by the therapist, on the reports the children

8  were giving her.

9       MR. GRUBEL:  So, Your Honor, I think we need to be

10 precise in terms of what reports and when and to whom.  So there

11 were allegations of -- there was a story relayed to the therapists

12 that the father allegedly killed the family dog.  That was raised.

13 That was addressed by the GAL.  There were subsequent

14 allegations --

15      THE COURT:  Addressed by the GAL?  What do you mean by

16 that?

17      MR. GRUBEL:  Known by the GAL.  Maybe that's a better

18 way to say it.  Known by the GAL.

19      THE COURT:  Was it known by the state court?

20      MR. GRUBEL:  I can't -- I wasn't there, Your Honor.  And

21 I've read the transcript, but I don't recall that and I'm not

22 going to misrepresent to the Court what I recall.  I do not recall

23 that.

24      THE COURT:  Okay.  And do you believe or would you agree

25 that CYFD -- even setting aside what the GAL's obligations were in

1  this case, that CYFD had an independent obligation to inform the

2  state court of all the pertinent information that might relate to

3  whether it was a risk to put those children back into the custody

4  of -- even the physical custody of their father?

5        MR. GRUBEL:  Your Honor, that's a tough question,

6  because on the one hand -- yes, do I think as decent human beings

7  they need to do whatever they can to protect children?  Of course

8  I do, and I believe these individuals tried to do that.  However,

9  the state did not -- was not obligated to take these children into

10  custody and returning -- this is not a situation like, for

11  example, the Currier where the state took the child from the

12  non-custodial parent and then returned it -- and then provided

13  physical custody of that child to -- I think I messed it up.  Let

14  me restart, Your Honor.

15     This is not a case where the state took the custody of a

16  child from a custodial parent and then transferred that custody to

17  a non-custodial parent.  That's what happened in Currier.  That's

18  what happened in T.D. v. Patton.  In that example, Your Honor, the

19  Tenth Circuit has said, You, CYFD, have changed the status quo.

20  You have thereby created a danger because you've put that child in

21  a position that that child wouldn't be in but for state

22  interaction, so --

23        THE COURT:  Is that even the -- well, that whole

24  argument about the status quo is sort of circular in some ways for

25  me, because it seems like the status quo wouldn't be the --

1  whether -- well, I guess your argument is the status quo would be
2  the children were with their parents because that's originally
3  where they were found.  But the difference here, though, is there
4  were some intervening things that occurred, things that CYFD
5  learned about in the meantime.  Maybe they didn't know about it at
6  the time that they had first taken custody of the children and put
7  them in foster care, but they learned about them through the
8  therapists' reports, through other things.  Doesn't that, then,
9  impose an obligation on CYFD, and doesn't that mean, then, that
10 the status quo would not be necessarily the situation the kids
11 were in to begin with, but the status quo would be the safe place
12 that the children were in, which was in foster care?
13         MR. GRUBEL:  No, Your Honor.  And I know that's
14 emotionally unappealing, I understand that.  It's not an argument
15 I want to make but the answer is no.  And DeShaney addresses that,
16 and more, I think, relevant for today's purpose, the Hubbard case
17 addresses this.  Hubbard is a Tenth Circuit case.  It's 2018.  I
18 didn't spend -- I addressed it in the briefing, Your Honor, but I
19 was trying to cover everything.  Hubbard -- if I can sort of give
20 you some background on Hubbard.
21         THE COURT:  Sure.
22         MR. GRUBEL:  So Hubbard involved the State of Oklahoma.
23 Children were alleged to be abused by their parents.  And so the
24 State of Oklahoma went in and found that the circumstances of the
25 home were horrible.  There were cockroaches everywhere.  There was

1  feces in the bathroom.  There was no electricity.  There was no

2  running water.  The father was -- apparently had mental illness,

3  was schizo-bipolar.  There was drug use, including -- they make a

4  lot of emphasis on marijuana but there's also methamphetamine that

5  was apparently being used.

6      So the State of Oklahoma came in and took the children out.

7  It then went through a process, evaluated them, set up a parenting

8  plan for the parents; and then before the parenting plan was even

9  implemented, returned the children to the parents on -- they don't

10  use these words but effectively, Your Honor, it is a trial home

11  visit.  And so they're on a trial home visit for awhile, and then

12  there's more allegations that these children are still in a bad

13  condition.  State employees go to the home, realize that it is

14  equally bad or worse, and they then take the children into state

15  custody again.

16      They then place the children with foster parents, and

17  unfortunately for these children, the foster parents are just as

18  bad, if not worse.  And the foster -- I believe there's three

19  children, but the youngest child, Your Honor -- there are signs

20  that the children aren't going to therapy.  There are signs

21  that -- there are other indications, perhaps, that the foster

22  parents aren't doing their job.  And ultimately and unfortunately,

23  the youngest child suffers a skull fracture and dies.  And the --

24  so then the grandaunt and uncle of the children sue and they sue

25  the State of Oklahoma, and they allege that both the sort of

1    failure to interact with the biological parents and with the

2    foster parents violated both -- violated due process rights

3    because it violated the special relationship and it violated the

4    danger creation.

5         And the Tenth Circuit, as to the -- and so what the Tenth

6    Circuit did is it divided the two groups of abusers into two

7    groups.  It was the biological parents versus the foster parents.

8    And so the foster parents, no one disputed it and it's clear --

9    the law is clear, the foster parents -- the state had a special

10   relationship with the children because of the foster parents.  But

11   as to the biological parents, Your Honor -- and this is a case

12   where they didn't even try to implement the parenting plan.  The

13   Tenth Circuit -- the district court dismissed the claims and said

14   the complaint has failed to state a claim because, Your Honor, the

15   key was -- and the Tenth Circuit said -- so -- and, actually, let

16   me turn to the page so I read it directly.  It's a paragraph this

17   big, literally, in Hubbard, Your Honor.

18        The special relationship applies when a child is placed in

19   foster care, quoting Schwartz.  It does not apply when the

20   children are in the custody of their biological parents, quoting

21   Yvonne L., and that's 959 F.2d 891.  If there's no affirmative

22   duty to the state to protect the child who is in his parents'

23   custody, citing DeShaney, accordingly, the Hubbards do not state a

24   claim.

25        So then they go to state-created danger, and importantly, I

```
 1    think, for this case, Your Honor, the Tenth Circuit finds --
 2              THE COURT:  Let me go back to your argument now.  In
 3    this case, weren't the children placed into foster care pretty
 4    early on after they were taken in by CYFD?
 5              MR. GRUBEL:  Yes.
 6              THE COURT:  There was a special relationship that was
 7    created, at least as far as the law that I've read?
 8              MR. GRUBEL:  There was a special relationship while they
 9    were in foster care.
10              THE COURT:  So you're saying that somewhere along the
11    line, that special relationship ended?
12              MR. GRUBEL:  Correct.
13              THE COURT:  When did it end?
14              MR. GRUBEL:  It ended in Document 69.5, Your Honor, with
15    the notice of placement.  So I'm just looking at documents dated
16    April 16th, pursuant to -- and this is advanced notice of
17    placement.  Pursuant to Section 32A-4-14 NMSA 1978, you are
18    notified of the placement of M.B. be changed from non-relative
19    foster care to trial home visit.  So they were taken out of foster
20    care at that point.  And there's another one for the three older
21    children, too, on the same date, Your Honor.
22              THE COURT:  Okay.  All right.
23              MR. GRUBEL:  Your Honor, as to danger creation, Hubbard
24    also addresses that, and in relevant part it says, Even if the
25    pre-foster care defendants, which would be the defendants related
```

to the biological parents, put the children in danger by restoring them to their biological parents' home, they did not create the danger.  It also goes on to say, The amended complaint fails to allege that the living conditions worsened for the children following unification with their biological parents.  And so here, Your Honor, what would need to be demonstrated is that somehow CYFD made the biological parents in this instance worse.  So I don't know exactly what that would be.  I'm not saying it's impossible.  But it's not raised here.

Did, for example, a parenting plan go awry and make one of the parents or both of them worse?  But there's no evidence of that.  What happened here is that the parents got their children back and they fled, and that is not -- and that's, frankly, the status they were.  If you look at the first -- at 69-1, Your Honor, it's the affidavit of the social worker that was attached to the initial pleading to get custody of the children.  That -- the social worker spoke to the dad because he was more communicative.  He spoke Spanish, Your Honor, where I believe the mother only spoke Romanian Gypsy.  And it was relayed that they had -- the parents had no ties to New Mexico.  They were apparently here traveling through, trying to get to San Francisco to get to a -- an immigration hearing for the mother.  So they had relayed early on we have no idea -- we didn't intend to stay.  And so the status quo is the children in the -- in the physical control of their parents in June -- on June 3rd, 2019, in the

1    parking lot of Walmart.

2        So, Your Honor, my core argument here is because you --

3    because the children were restored to the status quo ante, that's

4    all the analysis that's necessary.  You can -- we can look -- and

5    in the briefing, I've addressed the other issues.  I've raised

6    other cases.  For example, there's the Wooten case out of the

7    Eleventh Circuit, Your Honor, which specifically addresses the

8    difference and whether there is a difference between physical and

9    legal custody.  In Wooten -- let me make sure I don't conflate my

10   cases -- the child was in the physical custody of her mother or

11   his mother, and the state monitored visits with the father.  At

12   some point, the father came to visit.  He shot himself and he shot

13   the child.  Well, he shot the child first, obviously, and,

14   unfortunately, the child died.  The mother sued the state and in

15   that case, the Eleventh Circuit said, look, this is tragic but at

16   the end of the day, the mother was in the best position to stop

17   the father.  There weren't social workers there.  She had the

18   control.

19       And that ties into the Armijo case that governs the Tenth

20   Circuit, Your Honor.  It's Armijo v. Wagon Mound.  And that case

21   for special relationship at least -- and I think the language of

22   the Yvonne L. deals with it, but just so that the Court gets the

23   full picture -- at least I present the full picture.  I don't mean

24   to disrespect and say that the Court understands or does not

25   understand, Your Honor.  There's multiple case authority that

1  differentiate between physical custody and legal custody, and in

2  this circuit, under <u>Armijo v. Wagon Mound</u>, it has to do with the

3  control of daily living.  And <u>Armijo</u> dealt with a student who was

4  up in Wagon Mound and he was sent home from school.  The school

5  district did not provide parental notification and one of the

6  employees took him home and dropped him off at home.

7  Unfortunately, the child committed suicide.

8       The Tenth Circuit looked at this and said as to control -- I

9  mean, control of -- to create a special relationship is of the

10  level of institutionalization of developmentally disabled people,

11  which is uncommon at this point in time, incarceration, Your

12  Honor, and often these cases will arrive in -- arise in foster

13  care because the foster parents are deemed to be employees,

14  essentially, of the state.  And that's the simplest -- there's

15  other reasons but that's the simplest.  So it has to be level of

16  your controlling the coming and going.  And in <u>Armijo</u>, the Tenth

17  Circuit looked and said, you know, arguably, the child was in the

18  control of the school while he was in the vehicle.  But once he

19  left that school administrator's vehicle, he was free to come and

20  go, leave the house when he wanted to do -- when he wanted to.

21  And there was, as a matter of law, no special relationship because

22  the requisite control was not there

23       Now, as to the danger creation, it found differently, and

24  what the Tenth Circuit said is the status quo was the kid in

25  school.  No one told the parents.  And so at least he stated a

1   claim for danger creation in that theory, because the parents, you

2   know, had assumed that the child was at school.

3       And there's others.  Most of the other cases cited, Your

4   Honor, whether it be <u>Schwartz v. Booker</u>, or <u>T.D. v. Patton</u>, they

5   all deal with transferring a child either to foster parents or to

6   a non-custodial parent.  The only case that has been cited in the

7   briefing that dealt with sort of returning a parent to a --

8   returning a child to a biological parent was the <u>Tazioly</u> case, and

9   that's out of the Eastern District of Pennsylvania.  It's 1998.

10  And <u>Currier</u> -- the Tenth Circuit in <u>Currier</u> looked sort of

11  favorably on that.  And in <u>Tazioly</u>, what had happened, Your Honor,

12  is a child was born to a drug-addicted mother and the child was in

13  need of critical medical care.  At some point, the state gave the

14  child to the mother and the mother ended up harming the child.

15      The Tenth Circuit in <u>Currier</u>, which is an older case, looked

16  a little favorably, but more recently in <u>Hubbard</u>, <u>Hubbard</u>

17  distances itself from that saying it's unique to the

18  circumstances.  It's also just a district court case, so it

19  doesn't necessarily -- it doesn't apply and doesn't establish

20  the -- for QI purposes, doesn't establish the law.

21          THE COURT:  What was the distinction that you made with

22  the cases like <u>T.D. v. Patton</u>?

23          MR. GRUBEL:  Your Honor, should I go through them

24  alphabetically?  That might be the easiest.

25          THE COURT:  Well, I'm really curious to hear what you

1  have to say on _Patton_ because, there, it was not the case that
2  they were transferred to foster care or to a non-custodial parent,
3  but actually the children were placed with their biological
4  father.
5         MR. GRUBEL:  But, Your Honor -- yeah, but that was --
6  but they had been taken from the mother.  Originally, my
7  understanding of that case is that they were originally with the
8  biological mother, and then they were placed with the father, so
9  that what -- following up on _Currier_, what the Tenth Circuit said
10  is our precedent is if you take from a custodial parent and
11  transfer it to a non-custodial parent and that non-custodial
12  parent -- whether that parent be biological or not, and that
13  parent harms that child, that is danger creation.
14      Now, I also draw the Court's attention to the -- and it's
15  just concurrence, but Judge Mary Briscoe in _Patton_ has -- she
16  calls it a concurrence because she agrees ultimately based on the
17  precedent, but she seriously questions the rationale of _Currier_,
18  saying that it's in contravention of _DeShaney_.  But nonetheless,
19  we don't have that case here.  _Patton_ is transferring from the
20  mother to the father.  We don't have that here.  We have taking
21  from the parents in June of 2019, and returning them in April of
22  2020.  And regardless of when the mother came home, Your Honor, I
23  think that's a bit of a red herring.  The alleged harm of them
24  fleeing did not occur until the mother -- until the family was
25  reunited.  So that's a splitting of hairs but it's important.

1  It's the who had control of the daily living activities and that
2  was the --

3          THE COURT:  Do you think that the holding in <u>Patton</u>, the
4  finding of a due process violation under those circumstances,
5  really turned on the fact that it was -- that the child was taken
6  from one custodial parent and provided or turned over to the
7  custody of the biological father?

8          MR. GRUBEL:  That's how I read it and, Your Honor,
9  that's how I understood Judge Briscoe to read it.

10          THE COURT:  Well, the majority opinion, at least -- I
11  don't know whether or not they spent a lot of time on that
12  particular issue as being dispositive of their ruling.  It seems
13  to me like <u>T.D. v. Patton</u>, otherwise, is almost on all fours with
14  the case we have now, both on state -- on danger creation and with
15  regard to the special relationship.

16          MR. GRUBEL:  And, Your Honor, I would say that <u>Hubbard</u>,
17  the more recent case, is even closer.

18          THE COURT:  What is the citation to <u>Hubbard</u>?

19          MR. GRUBEL:  <u>Hubbard</u> is -- let me get to the first page.
20  That is 759 F.App'x. 693, and that was issued on December 28th,
21  2018.

22          THE COURT:  So that's an unpublished case?

23          MR. GRUBEL:  Yes, Your Honor.

24          THE COURT:  Which has no precedential value?

25          MR. GRUBEL:  Correct.

1    THE COURT:  So I'm not bound by Hubbard?

2    MR. GRUBEL:  Correct.

3    THE COURT:  So the controlling law still on this issue

4    would be T.D. v. Patton?

5    MR. GRUBEL:  Perhaps, Your Honor, but I don't think it

6    addresses the issues directly.  And I respectfully think the

7    emphasis was -- particularly because I think Judge Briscoe

8    clarifies.  She's taking issue with the fact that they seemed to

9    be relying -- that this is in contravention of DeShaney.  And

10   DeShaney is very clear.  You take the child from the parent and

11   you restore it to the parent.  There's some, perhaps, moral

12   obligation but there's not a legal obligation.  And the reasons

13   for that, Your Honor, are practical because that means that any

14   child -- so just a hypothetical.  Drug abuse, Your Honor.  It's

15   rampant and I think we can all presume that drug abuse is the

16   basis for many of these abuse and neglect proceedings.

17       If a parent participates in his or her parenting plan,

18   becomes clean, and demonstrates, for whatever the Court and CYFD

19   determine is an appropriate period of time, that that individual

20   is clean, there -- CYFD and the court, because of constitutional

21   law, are required, because the causes of the custody with CYFD

22   have been ameliorated, to return to the parents.  Because there --

23   we are fighting two rights:  The rights of the children to be safe

24   and the rights of the parents.  And, Your Honor, they're supposed

25   to be equal.  They're supposed to be.  But when one reads the law,

1  parents a little bit higher, frankly.  And nobody will say that,
2  but that seems to be where we're going.
3      But in that case -- and my point is, Your Honor, assuming the
4  mother -- assuming the mother was on drugs, we can all predict as
5  human beings that that mother is likely to fall off the wagon and
6  start using drugs again.  That -- and if the child is harmed, that
7  is not on CYFD.  That is not on the state.  That is on the mother.
8  And we cannot predict the future with any certainty, and that's
9  the problem.  In this case, what Plaintiffs are alleging is that
10  the -- it was predictable that the children would flee.  Yes, they
11  have it.  But, Your Honor, the harm here took place, allegedly --
12  well, the harm -- but we do not know the cause.  It's not in the
13  record what caused the actual injury to the youngest child six
14  months later, approximately, in Charlotte, North Carolina.
15      So I point that out because, Your Honor, let's assume -- if
16  Plaintiff wants to engage in hypotheticals, we -- there's lots of
17  hypotheticals we can engage in.
18          THE COURT:  Going back to your hypothetical just now,
19  the issue with that, though, is you're saying that it's not on
20  CYFD in such a case, it's not on the state, it's on the mother
21  because you can't predict the future with any certainty.  But
22  where there's some information -- and I would say that Plaintiffs
23  have presented some information or some evidence of information
24  that CYFD had that would be equivalent to knowing that that mother
25  was falling off the wagon before they were returned, that makes

1  the case a little bit different.  That's what we have here.

2      We have, according to the Plaintiff -- I have to take the

3  evidence in the light most favorable to them at this point.

4  They -- CYFD was well aware and even took affirmative actions to

5  hide this from the state court, that there was a risk, a

6  substantial risk to the safety of the children, in allowing them

7  to participate in that trial home visit.  So that seems, to me, to

8  make it distinguishable from those cases that you're citing to now

9  or the hypothetical that you're talking about now.

10      MR. GRUBEL:  So, Your Honor, given that, the case

11  authority -- what I'm hearing is there may be ambiguity in the

12  case authority.  If there's ambiguity in the case authority -- I

13  mean, I'm fervent, Your Honor, I believe that this -- based on the

14  cases I cited -- particularly Hubbard.  I understand the Court's

15  saying it's not precedential.  But given that, I believe there's

16  no constitutional violation, given DeShaney, given the weight of

17  authority.

18      THE COURT:  But DeShaney also -- every time I look at

19  the cases that you cited to, I almost immediately see a

20  distinction.  DeShaney, for instance, was certainly about -- I

21  think they even used the language -- the failure of the government

22  to intervene and how they had no obligation to do that.  That's

23  not the same thing here.  What the Plaintiffs are alleging is not

24  that the government failed to intervene to protect these children,

25  but the government actually affirmatively took actions and steps

1  to ensure that these children would end up back with their parents

2  who were facing serious charges of child abuse and other issues,

3  where there was information that a therapist had reported her

4  concerns about the children being placed back.

5      It just seems like there's so many facts here that

6  distinguish this case from the cases that you're talking about.

7  While, certainly, I understand some of the reasons why these cases

8  end up where they do, again, when I go back to look at them and

9  actually read them, it's almost immediately on its face that

10  they're distinguishable in some way based on what the Plaintiffs

11  are alleging here.

12          MR. GRUBEL:  Well, given the Court's position --

13          THE COURT:  Except for Patton.  That's the one that I

14  see that is very, very, very similar to these circumstances, and

15  I'm reading it now as we're sitting here, and I just don't see the

16  Court placing a lot of weight on the fact that this was taken --

17  it was a child that was taken from the mother's custody and placed

18  into the father's -- the biological father's custody.  What the

19  Court is concerned about and seems to really focus on is just that

20  the -- in that case, the government is placing the children into a

21  dangerous position.

22      It's right here in a quote.  "We agree with the district

23  court that Ms. Patton violated T.D.'s substantive due process

24  right by knowingly placing T.D. in a position of danger and

25  knowingly increasing T.D.'s vulnerability to danger.  She

recommended to the juvenile court that T.D. be placed and remain
in Mr. Duerson's temporary custody despite her admitted concerns
about T.D.'s safety in the home, her knowledge of Mr. Duerson's
criminal history that included a conviction for attempted sexual
assault against a minor in his care, and notice of evidence that
Mr. Duerson was potentially abusing T.D.  She failed to inform the
juvenile court about her concerns and knowledge of Mr. Duerson's
criminal history and made her affirmative recommendations out of
fear of being fired."

The only difference I see there is that the person that
they're talking about, the defendant in that case, apparently was
concerned -- had concerns about the children.  We don't have that
here because it doesn't -- actually, the Plaintiffs' allegation is
that Garza wasn't concerned at all.

So where is -- I'm still looking for that distinction with
the one case that I see that is binding on this Court, that does
seem to address both the state danger creation and the
substantial -- or the special relationship.  What more do you have
that distinguishes Patton from this case other than what you said
about it going from one parent and the custody being transferred
into a biological --

MR. GRUBEL:  That is the main distinction, Your Honor.
That is the main distinction.  And I understand the Court thinks
they're on all fours, but I think the fact patterns are still
different because it is one parent -- it is taking from the two

1  biological parents and restoring it to the two biological parents.

2  We've got _Yvonne L._ which case is binding.  _Yvonne L._ --

3       THE COURT:  Well, in some ways, this case is about

4  taking them from foster parents and back into the biological

5  parents.

6       MR. GRUBEL:  Yes.

7       THE COURT:  Okay.

8       MR. GRUBEL:  Your Honor, at the end of the day, then, if

9  there's ambiguity, _Patton_ is not on all fours, and to the extent

10  there's ambiguity, it has to be precise.

11       THE COURT:  There's no ambiguity.  I mean, I don't see

12  any ambiguity.  I'm not saying there's any ambiguity.  There's a

13  difference in the factual -- there's always going to be difference

14  in the facts.

15       MR. GRUBEL:  Yes.

16       THE COURT:  What I'm concerned about is it a distinction

17  that makes a difference legally?  And right now, just sitting here

18  now, I don't see it.  But I understand your argument that there

19  is, and I'll go back to look at that case a little bit more

20  carefully, as well as some of the other cases you cited to today.

21  But for purposes of this hearing, I just wanted to get your sort

22  of off-the-top-of-your-head description of what the distinguishing

23  facts were here.  And I think I have that.

24       MR. GRUBEL:  Okay.  Do you have any further questions,

25  Your Honor?

1    THE COURT:  No.  And I didn't mean to interrupt you, if
2  you have any further argument, that's --

3    MR. GRUBEL:  Well, Your Honor, just briefly as to sort
4  of -- I think it is important because, for the danger creation, it
5  has to be immediate and proximate.  That is one of the issues
6  here.

7    Now, Plaintiffs are arguing the absconding is the danger.  I
8  don't really see how that's the danger.  Frankly, I think that's
9  being advanced because the three older children were not
10  physically injured at any point.  There's no allegation of that.
11  And, again, I do emphasize, Your Honor, we do not know what
12  happened to the youngest child in North Carolina.  I don't know.
13  I've looked.  It's -- I don't have access to that.  I don't know
14  what happens, Your Honor.  I looked online.  There's nothing
15  available.  So that's a jump in assumption.  And it is literally
16  at the other end of I-40 about six months later.  I don't think
17  that can qualify as immediate harm.

18    Now, Plaintiffs cite to the one case up in Colorado.  It's a
19  2023 case, it's a district court case, where an individual was
20  in -- was in a group home, from what I gather.  He was having a
21  psychotic episode.  He wanted to go the hospital.  And he -- a
22  police officer discouraged that individual from going to the
23  hospital.  And that individual later on wandered out -- it was
24  winter, wandered out on a lake, it was ice covered but it wasn't
25  sufficient.  He fell through and he drowned.  And that stated a

claim in that district court. But, again, that's not six months later, Your Honor. That was relatively proximate and I think there can be a causal link. Where, here, we're saying we don't know what the ultimate injury -- we know what the ultimate injury to this child was but we don't know the mechanism of injury. We don't know who did it. We don't know what the circumstances are. And that is Plaintiff needing to come forward and say, look, this is what happened. And that's not been presented. So on that element, you know, if the Court doesn't buy that the status quo ante doesn't preclude this, we've got an issue with the issue of proximate cause.

Also, Your Honor, you know, the conscious shocking is an extremely high standard. It's that the state not only has to be reckless or frankly, I think, deliberately indifferent. It's intentional. The case law is oppressive. And so the allegations here is CYFD people just sort of threw their hands up and just did it. But nobody -- there's no allegations that people -- any worker, any of the Defendants, intended for the children to be physically harmed. And if you look at -- again, I understand the Court's not putting much weight to the Hubbard case, but, Your Honor, if you look at Hubbard, you know, the circumstances were awful. I mean, the toilets weren't working. The -- well, actually, no, as to the -- it said the Court -- the Tenth Circuit found that as to the allegations of -- the social workers ignored the fact that the children weren't attending therapy, ignored all

1  these other signs.  They were bad.  They were probably a

2  dereliction of their job duties.  But it wasn't so bad that it

3  rose to the level of being conscious shocking.

4      And I don't want to make this argument, Your Honor, but the

5  reality is all these child abuse cases are awful.  The

6  circumstances are tragic.  And we are put in the position of

7  saying which one is less awful than the next.  It's an

8  uncomfortable position, admittedly, but conscious shocking is very

9  high.  And so, ultimately, even in <u>Hubbard</u>, even against --

10 because of the -- even against the defendants who were involved

11 with the decision as to the foster parents, the Tenth Circuit said

12 there's no conscious shocking.

13         THE COURT:  All right.  Thank you.  I appreciate your

14 argument.

15         MR. GRUBEL:  Thank you, Your Honor.

16         THE COURT:  For the Plaintiffs?

17         MR. GUBERNICK:  Thank you, Your Honor.  With the Court's

18 permission, I would like to use a PowerPoint presentation.

19         THE COURT:  Sure.

20         MR. GUBERNICK:  We have copies of it as well for defense

21 counsel and one for the Court.

22         THE COURT:  You're going to be putting it up on the --

23         MR. GUBERNICK:  Yes, also hand out copies.

24         THE COURT:  You'll be able to see that as well, and then

25 he'll also provide you a copy of that.  Thank you.

1          MR. GUBERNICK:  Please the Court.

2          THE COURT:  You may proceed.

3          MR. GUBERNICK:  So, Your Honor, I'd like to -- I'm going

4    to talk about the order we're going to be presenting information

5    in here.  There is a good deal of stuff I want to cover.  As the

6    defense correctly notes, the Plaintiff does have the burden once

7    the motion -- once the issue of qualified immunity is raised.

8    It's a burden that we embrace and so I want to be thorough in our

9    discussion of this.

10         So I'm actually going to start with some factual issues, one

11   of which the Court already asked some questions about, and then

12   turn to the law covering special relationship, then state-created

13   danger, and then end on conscience-shocking behavior.

14         Let's start with this question about what the state court

15   knew when they signed off on this permanency plan that CYFD had

16   put forward.  The crux of Defendants' arguments in their reply

17   brief -- and, again, here was, well, hey, they had -- they had

18   access to these disclosures that the kids were making during

19   therapy, so what's the issue?  And I just want to interrogate the

20   evidence a little bit on that and show that I'm not quite sure

21   that's entirely accurate.

22         There were two batches of disclosures, and this is the

23   timeline on this.  In January of 2020, A.D. makes two disclosures

24   that do make it to the Court.  The first is this claim that

25   Ducila, the biological father, killed a dog at one point.  And

1  then this second claim where she seems to describe herself as

2  being treated like currency and talks about how other people show

3  up sometimes to take care of them instead.

4       Now, Celina Evans, the kids' therapist, she finds these

5  disclosures disturbing and disturbing enough that she sends a

6  letter, which is in the record, to the guardian ad litem and CYFD,

7  and that letter, which is on February 3rd, 2020, details the

8  January disclosures and say -- says I'm worried about these.

9  Okay.  And, again, the court did know about these.  But there were

10 other disclosures.

11      The day after Celina Evans sends that letter -- so this is

12 February 4th, 2020 -- R.B. discloses to Evans that Ducila,

13 biological father again, beats him a lot.  2/11/20, again, Ducila

14 beats me a lot.  2/16, I'm afraid of him.  2/24/2020, A.D. says

15 Ducila beats their mother and hits R.B. in the head a lot.

16 Defense counsel mentioned in their presentation that you don't

17 specify what the danger was that the -- that the Defendants

18 exposed these kids to.  This was the danger here.

19      And then on February 24th of 2020, Celina Evans is so

20 disturbed by these that she submits a SCI report that goes to CYFD

21 central intake for child abuse allegations.  The contention that

22 we've put forward in our opposition to their summary judgment

23 motion, and the one I'd advance again here, is that none of these

24 disclosures on this slide ever made to it the guardian ad litem or

25 the state district court.  All right.

1    Now, the Defendants disagree with that.  These are the

2 Defendants -- this is from the Defendants' reply.  All of these

3 are in response to material facts we've put forward saying that

4 the court didn't know this stuff.  You guys hid it.  How does

5 the -- what does the defense say?  Well, the crux of it is

6 their -- they point to Document 98-20 at page 3.  Let's look at

7 98-20 at page 3.  And the Court already mentioned this earlier.

8 This is the discussion between Brenda Saldana and the guardian ad

9 litem Laura Castillo.  Laura Castillo is questioning Brenda

10 Saldana.  Look at the disclosures she asks about.  She asks about

11 the dog.  She asks about the currency thing.  But that's it.

12    Now, Brenda Saldana volunteers this statement, second page

13 there, line 13, Yes, and also regarding domestic violence.  That's

14 unprompted.  And defense puts a lot of weight on the words

15 "domestic violence."  Laura Castillo didn't ask anything about

16 domestic violence, and then after Brenda Saldana asks that, goes

17 right back to talking about the dog that Ducila supposedly may

18 have killed.

19    What's going on here?  Well, drawing all reasonable

20 inferences in the Plaintiffs' favor, as the Court must, I would

21 submit this is Brenda Saldana knowing she is talking to someone

22 who has no idea that there have been these subsequent disclosures.

23 She knows that Laura Castillo is not aware.  She knows that she's

24 providing misleading testimony.  All right.

25    So I would suggest, Your Honor, that when she just tacks on

1  these words "domestic violence," which are vague, it's not clear

2  what they're referring to.  It doesn't say, yes, and also dad

3  beating his kids in the head.  She just says domestic violence.

4  Again, vague enough that it obviously -- that it could even

5  conceivably just be interpreted as referring to these disclosures

6  that Laura Castillo is already aware of.  She tacks this on as

7  CYA, again, reasonable inference supported by the evidence drawn

8  in Plaintiffs' favor, knows she's being misleading, so wants to

9  try and mitigate that a little bit, but without giving enough

10  information to invite follow-up questions.

11      What's some other reason to believe, some other evidence?

12  And, of course, we cannot prove a negative, right?  But there is

13  ample support in the record that these disclosures, again, about

14  dad beating his kids, never made it to the court.  They're not in

15  the transcript.  We've already talked about that.  They're not in

16  the permanency report.  And I would encourage the Court to read

17  the March 16th, 2020 permanency report in its entirety.  It's hard

18  to find anything in there that's not contradicted by other

19  information that CYFD knows.  It says, Oh, the kids aren't afraid

20  of dad.  The visits go well.  Right?  There are no concerns.  It

21  is false statement after false statement after false statement.

22  And nowhere in that report does this stream of disclosures that

23  keep coming, nowhere is it mentioned.

24      There is also, at the March 16th hearing, CASA submits a

25  report to the court as well.  This is notable because that report

contains extensive discussion of the January disclosures, talks
about the dog, talks about the currency, talks about the letter
that Celina Evans, the therapist, sent. Not one word in that
report mentions the February disclosures of dad beating his kids
in the head. Not there. It strains credulity. Why would CASA
spend all this time detailing these other allegations and then be
completely silent on the other disclosures? Well, again,
reasonable inference supported by the evidence, they didn't know
because they weren't told.

I would also, Your Honor, if this is really an issue that
needs to be further expanded on, Ms. Endicott-Quinones is here
today, and she can testify about what -- how, procedurally, these
SCI reports work. These things go to CYFD, and in certain
circumstances, they go to the police. They do not automatically
go to the guardian ad litem. They don't automatically go to the
court. And, in fact, she would -- and I'll just put this as a
proffer, were she to testify, she would also say that guardian ad
litems frequently have to fight with CYFD to get these SCI
reports. So, again, reasonable inference supported by the
evidence, that report never left -- sorry, not that report. Those
disclosures never left CYFD.

One other point on this. The defense tries to downplay these
by saying they were unsubstantiated. I'm not sure if -- I know
some districts, Your Honor, have a Chutzpah Doctrine. I'm not
sure if New Mexico does, but if this district does, this certainly

1    violates it. These weren't substantiated because Jennifer de los

2    Santos and Patricia Garza bullied Kelly Mazy into not

3    substantiating them, says you have to unsubstantiate these. I

4    know you think they're credible. I know you think they should be

5    substantiated. But guess what, you work for us. You're going to

6    do what we tell you to do.

7            THE COURT: And where is that information coming from?

8    What's the evidence to show that de los Santos and Garza ordered

9    Mazy to do that?

10           MR. GUBERNICK: Ms. Mazy testified to that, Your Honor,

11   in deposition, except she's actually -- Ms. Mazy's actually since

12   passed away. But this was -- she testified to this in the state

13   court whistleblower case that was filed contemporaneously with

14   this one, and it was -- the same defense attorneys did

15   cross-examine her on it. So I think this would be pretty clearly

16   admissible in this trial if it gets to that point as an

17   unavailable witness. And additionally, at the time, she was an

18   agent of CYFD. She was an investigator working there. So the

19   testimony would come in through multiple ways, so...

20           And the other thing I want to add on that, Your Honor, is

21   just a matter of a bit of common sense here. This was not just

22   some wild story that these kids were telling. If my

23   recollection's correct, at the time, A.D. and R.B. lived with

24   separate people. They weren't -- they didn't have an opportunity

25   to, like, consult with each other, these two little kids, and come

1   up with these allegations against their dad and they're describing

2   the same thing. Dad beats R.B. a lot. Same thing. So common

3   sense, what's going on here?

4       And I would also add, Your Honor, under CYFD's own

5   regulations, disclosures that abused children make are credible

6   evidence. When they say, oh, there's no credible evidence of

7   this, we're just going to unsubstantiate this, that's contrary to

8   their own regulations. So, again, the Chutzpah Doctrine. They're

9   saying, hey, we're allowed to rely on the fact that these were

10  unsubstantiated. Well, you unsubstantiated them. It's like

11  something out of Soviet Russia. It's completely backwards, so...

12      Just a couple other quick factual corrections in the record.

13  So the defense says, hey, this is just argument of counsel that --

14  when we allege that Brenda Saldana was giving Ducila advanced

15  notice of the unannounced visits during the trial home visit, and

16  that Woodward was barred from speaking with the guardian ad litem

17  after that aborted hearing where Liggett and Garza prevent her

18  from testifying and getting her concerns to the court. This isn't

19  argument of counsel. This is first-hand testimony. Woodward was

20  deposed, testified to this.

21      Rebecca Gascon, for this issue with the advanced notice to

22  Ducila by Saldana, Rebecca Gascon was a coworker of Saldana's who

23  basically spent every waking moment with her because they were

24  living together and working together and observed basically

25  everything that Saldana was doing on this case. She was standing

1   right next to him -- right next to her, I mean, when she's calling

2   Ducila to give him a warning, hey, we're about to be over there.

3   You know, don't -- make sure the place is clean and like -- so we

4   can maintain this narrative for the court.  She hears her say it.

5   She's standing right there.  She was deposed.  This is not

6   arguments of counsel.  These are just facts.

7       Okay.  And, likewise, the second point they make, that she

8   has no direct knowledge of the parents' compliance with the

9   parenting plan because she had been removed from the case, look,

10  they're welcome at trial to try to impeach a witness and say, oh,

11  you don't know what you're talking about, or your recollection is

12  bad, or whatever.  Again, she testified to it.  She was working at

13  CYFD.  Yeah, they were trying to keep her from getting

14  information, all right, but that was unsuccessful.  I mean Ivy

15  Woodward's one of the people who goes to the police after the kids

16  disappear, right?  She was still, even after being removed from

17  the case, trying to get CYFD to do the right thing and take this

18  seriously and keep from happening what happened here.

19      And then they also say at the end here that -- one other

20  correction.  They say Plaintiffs were not involuntarily placed in

21  the home of their parents.  I don't know what this means.  It was

22  entirely up to CYFD to do a trial home visit.  They are in that

23  apartment for one reason:  CYFD has decided that's where they're

24  going to be.  This wasn't some sort of group decision between the

25  parents.  This isn't something where the court made them do it or

something.  No.  CYFD decides this is going to happen, so it
happens.  New Mexico law is crystal clear on that.  It is up to
CYFD to decide when a trial home visit starts and stops.

Actually and on that point, Your Honor, I want to say that
there was testimony on this point in deposition.  I believe it was
Patricia Garza, said that, hey, at any time during a trial home
visit, we can just take the kid out, right?  It's not like -- and
we'll talk about this a bit later in A.S., which is a case
Defendants rely heavily on in their reply brief, where they need
to get permission from the Court to get the kids out of that
situation.  No.  They are there because they want them to be
there.  They can take them out anytime they feel like it.  In
fact, Garza and everyone else, they say they're obligated to.
They just didn't do it.

THE COURT:  So that goes to your argument that they were
still in the custody of CYFD?

MR. GUBERNICK:  Correct, and I'll have more to say about
that in a second, Your Honor.

Okay.  So, actually, let's get to that right now, special
relationship.  So what we really see, Your Honor, in the pleadings
on this motion, there's a fundamental disagreement about what the
special relationship is.  Plaintiffs' position is the one
supported by published Tenth Circuit precedent, which is that it
boils down to who is the party who is ultimately responsible for
providing for a child's basic needs, reasonable safety, right?

1  This is in <u>Maldonado v. Josey</u>.  The key to understanding a special

2  relationship as it is -- as it's used in the Supreme Court and in

3  the Tenth Circuit, is that it's an all-or-nothing proposition.  A

4  number of cases use that term, all-or-nothing proposition.  You

5  don't have a partial special relationship or a limited special

6  relationship.  You either have it or you don't.  And that makes

7  sense because, again, the inquiry is who does society deem

8  ultimately responsible for the kids' safety?  That's this second

9  quote from <u>A.M.</u>, says that.  And then this third case says the

10 same thing.  This is the key issue in this.  That's Plaintiffs'

11 position.  And the --

12         THE COURT:  Well, outline that for me.  What is the

13 Plaintiffs' position based on <u>Maldonado</u> and the other cases of how

14 we determine whether a special relationship exists between CYFD

15 and the children in this case?

16         MR. GUBERNICK:  So, again, it goes to the question of

17 who does society deem ultimately responsible at a given time?  And

18 it's essentially a baton that gets transferred, is the way that

19 the Courts have viewed this.

20     Here, it's -- our position is actually very simple.  CYFD

21 started a special relationship or entered into a special

22 relationship with the Plaintiffs here when they took them into

23 custody after -- begrudgingly after several hours in that Walmart

24 parking lot.  Actually, I think that's undisputed here.  Everyone

25 agrees that there was a special relationship at that point.

And our contention, Your Honor, is that it never ended.
During the trial -- again, they're in the department because they
plan -- because the Defendants want them in the department. They
maintain complete control over those children's lives. And the
word -- the word "control" is used in a few different ways in the
pleadings here, Judge, and that's one of the sources of possible
confusion. Right? "Control" means something very specific when
we're talking about -- when we're talking about the special
relationship. It does not mean -- and this is also physical
custody, the same thing. It does not mean, okay, who is in the
room right now? Look, anytime someone inflicts violence on
somebody, they're exercising control over them, right? That's
obviously correct.

Now, the Defendants' position at bottom in their pleadings,
and especially in their reply brief because this is flushed out a
lot more there, is that, well, if someone has access to someone,
if someone can do something to them, if someone's physically
present with them, they have control over them. That doesn't make
any sense. The whole point of the special relationship doctrine
is the circumstances where the state is obligated to keep somebody
from doing something to somebody else, to keep a third party from
exercising control over them. That's the whole idea of protecting
somebody from a third party. Right? The fact that someone can
inflict harm -- a third party can inflict harm on someone in your
care, it means you're doing your job badly. It doesn't mean

1 | you're unemployed.

2 | So I think the key case here, also, or a useful case for this

3 | was the D.C. Circuit's opinion in Smith v. D.C., because this is

4 | actually the debate we're having here --

5 | THE COURT: What about the case, the Armijo case?

6 | MR. GUBERNICK: I'll talk about Armijo in just one

7 | second, Judge.

8 | THE COURT: Well, you're talking about special

9 | relationship right now, and it seems to me like that discusses

10 | restraint as a factor.

11 | MR. GUBERNICK: Let me get to Armijo. Okay, so here's

12 | Armijo.

13 | THE COURT: Armijo states that a plaintiff must show

14 | involuntary restraint by a government official in order to

15 | establish a duty to protect under the special relationship theory.

16 | How does that fit into your case?

17 | MR. GUBERNICK: Well, correct. So it fits into our case

18 | because we're saying that, again, who put the kids in that

19 | apartment? It's these Defendants. It's not -- who keeps the kids

20 | in that apartment? It's these Defendants. Who has custodial

21 | power over those kids? It's these Defendants.

22 | Now, Defendants in their reply here, they try to twist Armijo

23 | a little bit and I think this is worth some discussion. The

24 | Defendants contend, well, Armijo held that there's a special

25 | relationship while the kid is in the car with that school

1  employee.  Did <u>Armijo</u> actually hold that?  I have the whole quote
2  here.  I know it's a lot of text.  That ain't what <u>Armijo</u> is
3  saying.  <u>Armijo</u> is saying even if we assume there was some sort of
4  legal duty to help that kid or protect that kid while he's in the
5  car, well, he killed himself after he got out of the car.  You
6  would still lose.  This is an arguendo argument and assuming
7  arguendo that <u>Armijo</u> is making.

8      <u>Armijo</u> is not saying that the school employee has a special
9  relationship with the kid while the kid is in the car.  And
10 actually, it's not just we're saying it.  <u>A.M.</u> says that.  <u>A.M.</u>
11 points this out, because another defendant in another case tries
12 to use this argument.  They say, well, you know, the special
13 relationship, it turns on who's in the room.  Again, who is in a
14 position to physically control somebody or make them do something
15 or inflict harm on them.  That's not true.  Because if that was
16 the law, that would overrule <u>Maldonado</u>.  <u>Maldonado</u> says that there
17 is no custodial -- there's no special relationship.  It is, again,
18 black letter law.  There is no special relationship between a
19 school and a student.

20     And <u>Maldonado</u> acknowledges.  They say, well, sure it's the
21 case that while a student is in school, school employees
22 exercise -- can exercise control over those people.  But
23 ultimately -- and this is the key to this case, Your Honor -- it
24 is the parents who decide that that kid is going to go to that
25 school.  This is not involuntary commitment.  The person who

1    still -- and, again, <u>Maldonado</u> uses the term, ultimate

2    responsibility is with the parents.  The parents can't say, oh,

3    hey, we're not -- we're not obligated to protect the kid while

4    he's in the school because we're not in school with him.  No.

5    Because society would still deem the parents ultimately

6    responsible for the children's safety.

7         Ultimately, Judge, we're just taking the position here that

8    actually lines up exactly with New Mexico State law, which is that

9    while those kids are in the custody of CYFD, there's a special

10   relationship.  And the key here -- and this is a point I made in

11   the opposition brief, Your Honor.  I don't believe it was rebutted

12   in the slightest in the reply or here today, no responsibilities

13   of any kind were transferred to the biological parents.  This is

14   not a case where the state -- where the state -- where the state

15   court judge overseeing the abuse and neglect case said, okay,

16   parents, you're going to be responsible for this, this and this.

17   CYFD, you're still going to be responsible for these three things

18   over here.  No.  The only thing that changed is where they

19   physically were.  That is indistinguishable from <u>Maldonado</u>.  The

20   kids are in the school because the parents want them there --

21   sorry to belabor the point, Your Honor.

22         THE COURT:  How about <u>Hubbard</u>?  I know the case is

23   reported in the Appendix, Federal Appendix, but it is a case where

24   I can see it or view it as persuasive authority.  It seems, at

25   least -- and I'll be honest with you, I haven't read the entire

1    case yet, but the defense is saying that in that case, while the

2    Tenth Circuit agreed that the children who were in foster care,

3    there was a special relationship there, those children who were

4    taken out -- I guess those children who were ultimately returned

5    to their parents in a home visit, a home trial visit like this

6    case, did not have a special relationship with the State of

7    Oklahoma.  So how does that -- if that's -- and I assume that's

8    true and the case.  Why isn't Hubbard a case that goes against

9    your argument?

10        MR. GUBERNICK:  Again, this is something where you have

11   words or phrases that overlap but the law doesn't.  A trial home

12   visit in the state of New Mexico, again, it transfers nothing.

13   That's not the arrangement that we have in Hubbard.  And so

14   Hubbard, I would say, Your Honor, is better evaluated as a pretty

15   garden variety application of the special relationship.  It's not

16   a special relationship case.  The Court says, hey, once that baton

17   has transferred over to the parents, special relationship is

18   extinguished.  That is exactly correct.  The problem is that

19   didn't happen here.

20        Actually, this is the same issue you see in A.S. and Wooten

21   and the other cases that the Defendant is citing here.  Those are

22   different -- and, actually, talk about Wooten here for a second.

23   So this is from Wooten here.  The child protective services, yes,

24   they retained legal custody -- and the Defendants are saying,

25   well, that's the same thing that happened here.  Yeah, but they

did not control where that child would be except to arrange

court-ordered visitation. Again, think of the bundle of sticks.

Most of the sticks are already back with the parents. So I would

say that's the way to understand Hubbard, Your Honor, is that,

yeah, it uses the words "trial visit" but there's nothing in the

record here to indicate that we're dealing with a setup that's

remotely analogous to a trial home visit in New Mexico which

explicitly transfers nothing to the biological parents.

And, actually, I want to talk about that for one second. The

Defendants, a number of times here in their argument, they

suggested this idea that there's some sort of parental right to

have a trial home visit, that this is like that interest balancing

that has to take place. Not true at all. New Mexico state court,

I believe it's Lisa -- I forget what the end of the case cite is,

but it's in the pleadings. Actually, I think I even have it in

here. It is entirely up to CYFD whether a trial home visit starts

or continues. The case says, expressly, there is no guarantee

that this trial -- that a trial home visit will continue, and

there's no guarantee you're getting the kids at the end of it. It

shoots down this idea that there's some sort of due process

interest in continuing this thing. It says no. This is like you

send your kids to have a sleepover at someone's house, right?

This does not grant those people some sort of due process interest

in keeping your kids. It's the same -- it's no different. And so

that's, I think, the key distinction here, Your Honor, is this was

1  just a visit.

2      The only difference between this visit and the one that took

3  place at the CYFD office where dad tried to leave with the kids

4  and they had to call the SWAT team, the only difference between

5  that visit and the trial home visit, one happened at CYFD's

6  building and the other happened at dad's house, right?  And

7  that's -- again, we have a fundamental disagreement about what a

8  special relationship is.  The Defendants' saying, well, house

9  makes it different, right?  It's the location.  It's who's in the

10  whom.  It's what room you're in.  What if there was a visit at the

11  mall?  What then?

12          THE COURT:  You do have a difference -- there is a

13  difference, a fundamental disagreement, about what special

14  relationship is and what it means.  I'll have to decide that

15  because that's not a factual dispute.  It's a legal dispute.

16          MR. GUBERNICK:  Correct.

17          THE COURT:  But with regard to the -- going back to

18  the -- I guess let's move on, is what I'm saying.  I think I have

19  enough on the special relationship, both from your briefs and what

20  you've argued today.  What I want to get to -- well, let me ask

21  you one question:  How about the Defendants' argument that the

22  special relationship ended when they were taken out of foster

23  care?  And I think there was some citations to some documents in

24  the docket.  I think the day was April 16th.

25          MR. GUBERNICK:  Actually, so I would actually like to

1    talk about that.  So they point to this change of placement notice
2    that's filed in the JR case, the abuse and neglect case.  That
3    doesn't mean what the Defendants are suggesting it means.  That's
4    telling the Court where the kids happen to be living, right?  They
5    moved them from -- what we're really talking about -- and,
6    actually, the proof for this is after the kids are found, fast
7    forward to November, the CYFD files another change of placement --
8    I actually have it here -- switching the kid's placement from
9    unknown to a hospital in North Carolina, right?  Is anyone saying
10   that -- wait, what does this mean here?  Does this mean now the
11   hospital in North Carolina's the one with special relationship?
12   No.  This is CYFD saying this is where these kids happen to be
13   living.  It doesn't have any legal effect because, again, it
14   transfers nothing to the parents, just the same way this document
15   does not transfer anything to the hospital in North Carolina.
16   It's just a notice of here's where they're going to be living
17   because -- that is literally all this document -- all these
18   documents do.
19               THE COURT:  All right.  Let's get to the danger
20   creation --
21               MR. GUBERNICK:  Sure.
22               THE COURT:  -- part of the argument.  And you heard the
23   defense talk a little bit about that.
24               MR. GUBERNICK:  Okay.  So I want to talk about --
25               THE COURT:  First of all, I want to get to the status

1  quo, the status quo issue that we have here in this case, and tell
2  me what your position is on that.

3      MR. GUBERNICK:  Okay.  So the status quo issue, so if we
4  assume -- again, this assumes a special relationship was
5  extinguished at some point.  This doesn't work because, again, the
6  Defendants are conflating -- here's what they're saying.  They're
7  saying, okay, well, before the state got involved at all, the
8  parents had access to the children.  So once they have access
9  again, that means that that's the status quo.  That is not the
10  same thing as giving somebody access.  Again, they have this --
11  this is the example they use in the opposition of the fire
12  department pulls you out of a fire.  Everyone agrees they're not
13  allowed to throw you back in the fire, right, because this is them
14  affirmatively doing something to harm you.  Right?  This would be
15  resurrecting a danger that they've saved you from.  The fact
16  that -- and Judge Posner in K.H. is exactly right about this.
17  Just because you save someone's life, you're not allowed to kill
18  them.  You're no less a murderer if you kill them just because,
19  well, they owe you their life or something.  Right?  And that's
20  the same thing that happens here.

21      So the core of the Defendants' argument is like, well, the
22  fire department is not allowed to shoot you in the head, but as
23  long as they throw you into the exact same fire with no
24  differences at all, that's constitutionally permissible.  That, at
25  bottom, is the Defendants' position here.  There's no case law for

1   that anywhere.

2        The status quo ante is -- and also a few other points, Your

3   Honor.  The status quo ante for those kids was not -- and this is

4   mischaracterized, I believe, in the reply brief where it says,

5   well, hey, the parents had control of them and then CYFD took

6   them.  No.  No.  The parents had control of them and then HPD

7   comes along to arrest the parents and charge them with child

8   abuse.  The kids, at that point, are protected from their parents.

9   That is the status quo.  And, actually, conditions of release are

10  then put in place on the parents preventing them from having any

11  contact with those kids.

12       If CYFD does nothing, if CYFD sticks to its guns and says we

13  are not taking custody of these children, they're still protected

14  from their parents by HPD.  Now, the defense tries to say, well,

15  there's no constitutional difference between -- or they suggest

16  that HPD and CYFD are the same thing.  They're not.  Actually, we

17  know this even for qualified immunity purposes because you can get

18  a Monell claim against a police department.  You can't get that

19  against the state.  HPD is not CYFD, right?  But CYFD doesn't do

20  that.  Instead, from that point on, they're like, okay, how can we

21  resurrect this danger, right, that you were protected from?  And

22  they just knock things out, just like systematically.  Okay, these

23  conditions of release are protecting you from your parents.  Let's

24  trick the state criminal court into getting rid of those

25  conditions of release.  Let's mislead them into doing that.  And

1  they just keep doing this again and again.

2      It's actually an interesting pattern in this record, Your

3  Honor, that the HPD keeps trying to help these kids, and CYFD

4  keeps stopping them from doing that.  They want to issue an Amber

5  Alert.  CYFD's like, oh, no, no, no, they're fine.  There's no

6  problem.  We don't really want them found anyway.  We're good.

7  They even served a search warrant on CYFD to try to figure out

8  where those kids are so they can protect them from their parents.

9  And CYFD is like, no, we're going to withhold documents.  We're

10 going to obstruct justice here to keep you from finding them.

11 Like who does that?

12     But, I guess, just more generally, just on the status quo

13 ante position, Your Honor, that was the status quo ante.  And

14 regardless even if it wasn't, even if we ignore HPD completely --

15         THE COURT:  You're saying the status quo ante, really to

16 make it simple, is how the children -- well, how CYFD found them.

17 In other words, when they first encountered them, which was after

18 they were safe because their parents had been arrested by HPD, in

19 your position, that's the status quo ante right there?

20         MR. GUBERNICK:  I think that would be, yeah.  That is

21 the point.  It's immediately preceding CYFD taking the children

22 into custody.

23     Additionally, things are different between that moment and

24 the moment this trial home visit starts as well.  And this is one

25 of the cases we cite in our response here.  The parents, back then

1   when CYFD took them into custody, you know, they weren't faced --

2   they weren't being faced with having custody of their children

3   removed from them.  Right?  And this is the point that case makes,

4   is that look at the position the parents are in when the trial

5   home visit starts.  At this point, and especially when they decide

6   to leave, I mean, at this point, they're fugitives from justice.

7   They're facing this possibility of not seeing their kids again.

8   You know, this is not -- there's going to be warrants on them,

9   which there were.  There were eventually even custodial

10  interference felony charges filed against them, even though CYFD

11  tried to keep that from happening, tried to keep the DA from

12  filing charges.  That's a materially different position.

13          Now, the Defendants try to whitewash that by saying, oh,

14  well, they were transient before, so being on the run from the law

15  is kind of a version of being transient, too.  And the people who

16  have access to them -- again, these dangerous parents -- they're

17  the same people that had access to them before.  These things are

18  not the same.  The only similarity is that the parents were in a

19  position to hurt them before and the parents were in a position to

20  help them afterwards, although even though that assumes that

21  custody went straight from parents to CYFD, which it didn't.  It

22  went parents, HPD, CYFD.  So that's really the point here, is that

23  any way you look at this, this was not a return to the status quo.

24          And I think -- and this is really something, Your Honor, that

25  really permeates a lot of the Defendants' arguments here, is this

1  idea sitting out there -- I mean, this goes to the
2  clearly-established law points that the Defendant's making.  Like
3  any way you cut this, for the Defendants to be right here, either
4  on a special relationship or danger-creation theory, you have to
5  accept the idea that there are exceptions to this doctrine for
6  parents who want to hurt their kids, right?  That's the issue.
7  What are they actually saying about the special relationship,
8  right?  They're saying, well, okay, it protects you from
9  everybody, but these were the people who you were at risk from
10 before.  So you're no worse off if we let or even help these
11 people hurt you.
12      And this is an important point here.  Because this actually
13 traces back to K.H.  Judge Posner, in fairness to him, suggests
14 this in K.H.  He's like, well, maybe it's different if it's
15 parents.  Maybe there is some sort of larger right that's
16 implicated here or something.  And this is where Currier really
17 matters a lot.  They zero in on that dicta, that idea, and they
18 gun it down.  They are like, no, it doesn't.  And they -- like
19 they are warning social workers, if you think you can rely on
20 these non-binding musings from Judge Posner to do this or anything
21 like this, you're wrong.  This is where the Tenth Circuit, in a
22 published opinion, gets off the boat.  And not only are the
23 Defendants arguing for an exception that's not clearly
24 established, they're arguing for an exception the Tenth Circuit
25 has said doesn't exist.

1     Now, the defense tries to -- tries to work around this by
2  saying, well, Currier just applies to if you take it from one
3  parent and put them with another parent.  Those were -- that was
4  the specific facts in Currier, sure.  But the larger principle
5  that Currier is built on is you can't just go intentionally
6  harming people in your custody.  There's no -- it doesn't -- look,
7  consider Currier like this.  Right?  Let's say, you know, the
8  state takes possession of -- takes kids into custody.  And at some
9  point along the line, the parents -- the exact same parent they
10 took custody from shows up outside a building carrying a lead pipe
11 and says, hey, could you please bring my kids out here so I can
12 beat them to death with this pipe?  According to the defense, it
13 is constitutionally permissible, I guess under special
14 relationship and danger-creation theory, for Child Protective
15 Services to march the kids out into the parking lot, walk back in
16 the door, and let the dad beat them to death with a pipe.  That,
17 at core, is what they are arguing for.  And that is an extreme --
18 and, actually, don't take my word for it.  They make that
19 argument.  Here, let me show you.
20     Yeah, look at -- this is on page 14 of the reply brief.
21 Defendants say that.  Once you're on a trial home visit, you don't
22 have -- CYFD is no longer responsible for pulling them out of the
23 burning building.  It's the parents who are responsible, even
24 though the parents never had any custodial rights transferred to
25 them at all.  It's absurd and it's an absurdity that, look, if

1  this is true, if -- and, again, this goes back to the defense

2  points of <u>Armijo</u>.  If the Tenth Circuit -- this sliver of dicta in

3  <u>Armijo</u> that is their lead argument in their brief and is really

4  the underlying philosophical idea upon which this whole building

5  is created, if the Tenth Circuit wants to overrule <u>Maldonado</u> and

6  this slew of other cases that really stand for a pretty simple

7  proposition:  If you are in the state's custody, the state's not

8  allowed to affirmatively hurt you or put you in known jeopardy,

9  you know, put you in front of -- they're not allowed to put you in

10  a room with a time bomb like Ducila and just leave you alone.

11      If the Tenth Circuit wants that to be the law, if the Supreme

12  Court wants that to be the law, that's got to come from them.

13  That doesn't come from a smattering of dicta here and there that

14  gets twisted around.  That is not what clearly-established law

15  means.  This goes to the whole clearly-established exception

16  requirement.  The defense accuses us of shifting the burden.  We

17  are not shifting the burden.  We are saying we have an ironclad

18  constitutional rule, and the Defendants are saying yes-but.  Yes,

19  we have a special relationship, but that special relationship, it

20  obligates us to protect them from everybody except the parent we

21  took them from.  Or, again, the fire department, we can't throw

22  you in a different burning car.  We can throw you in the same

23  burning car.  That's what they're saying, that there's an

24  exception.

25      For them to defeat -- for them to get qualified immunity,

1  that exception would have to be clearly established.  It is not

2  clearly established or even endorsed anywhere, and, if anything,

3  <u>Currier</u> says it doesn't exist.

4           THE COURT:  Okay.  I do need to move on this afternoon

5  because we have other things going on at 3:00.  But I wanted to

6  ask you, before you end, to comment on the Defendants' arguments

7  regarding the immediate and proximate harm.

8           MR. GUBERNICK:  Okay.  So a couple -- just very quickly

9  on that, Judge.  So for the -- all we need to -- and this is

10 actually an issue we were trying to figure out how to address in

11 the pleadings.  So I guess to start with, this really isn't

12 properly before the Court, this proximate causation issue.  That's

13 not a requirement for qualified immunity.

14          THE COURT:  Well, when I'm looking at the elements of

15 the -- I think it's the creation of danger.  Isn't that one of the

16 things I'm looking at, is the immediate and proximate harm?

17          MR. GUBERNICK:  Not exactly.  Again, it's a nuance but

18 it's a very important nuance for purposes of the danger creation

19 analysis.  It's immediate risk of harm.  Right?  Which actually

20 makes a lot of sense.  Because we're talking about qualified

21 immunity.  This ultimately is:  What did the social worker know?

22 What was going on in their brain?  If you know you are placing

23 someone in an immediate risk of harm, then that's it.  The social

24 worker has no control over when that harm will manifest, will turn

25 into what happened here.  Right?  It could be immediately after

1   they drop the kids off at Ducila's house and close the door.  It

2   could be six months later.  Right?  From the social worker's

3   perspective, it's the same.

4        Now, and this is what I mean about this issue not -- this

5   issue of proximate causation.  This is -- immediate risk of harm

6   is before the Court.  That is something we have to show to defeat

7   qualified immunity.  We do not have to show proximate causation of

8   the harm itself at this stage.  We will have to show that at

9   trial.  If they want to file a summary judgment motion saying

10  we're not going to be able to meet our burden for whatever reason,

11  we'll respond to that.  We scrutinized -- after we saw this

12  argument in their reply brief, we've scrutinized their motion.  I

13  can't find anywhere in there, them making this argument that,

14  well, hey, you're not going to be able, at trial, to show that

15  this breach of the special relationship or this creation of danger

16  is what proximately led to, for example, the injuries to Mona

17  Lisa.  It's not in there

18            THE COURT:  It's only in their reply brief?

19            MR. GUBERNICK:  Correct.  I can't find it anywhere else,

20  Judge, and that's not -- which actually makes a lot of sense

21  because that's not an element of qualified immunity.  I mean, we

22  have to show immediate risk of harm, and as we've already talked

23  about, we did.  I guess I would also just say on this causation

24  issue, if the Court is going to consider this -- and, I mean, it

25  shouldn't, but if it wants to, we can handle this as well.  We'd

1    have to supplement the record a little bit in response to it.

2          But, look, the State of New Mexico -- they have their own --

3    they had a review board that actually looked at this case and

4    arrived at the conclusion that it was Ducila and the biological

5    mother who caused great bodily harm to Mona Lisa.  Again, we're

6    outside the record right now.  These aren't exhibits because we

7    did not know we would have to address this issue at this stage in

8    the case.

9          And then, also, Your Honor, in the second abuse and neglect

10   case that was initiated after the parents were picked up in North

11   Carolina, as part of the resolution to that case, the parents

12   admitted -- so what the parents had initially told the police and

13   CYFD, that Mona Lisa's head injury was caused by Andrea dropping

14   her.  This is what they both said.  That's how this happened, it

15   was an accident.  As part of the disposition agreement for the

16   second child abuse case, they admitted that that was not true,

17   that that was lies that they had fed Mona Lisa -- or, I'm sorry,

18   fed Andrea to try to stay out of trouble.  So, look, again, we're

19   outside the record on this.

20         But if they want to, you know, argue to a jury that this

21   isn't their fault, that this is equivalent to Mona Lisa getting

22   struck by lightning or something, that there's no causal

23   connection between the harm that resulted and CYFD's egregious

24   misconduct, you know, fine, but that's not properly raised on

25   qualified immunity, and it would lose even if the Court does

1 consider it.

2 That's really all I have to say on that. Judge, if you have

3 a minute, maybe, for conscience shocking.

4 THE COURT: Sure.

5 MR. GUBERNICK: I would just say this is not -- I just

6 want to look at -- these are all the arguments that I could find

7 the defense making in their reply brief about why any of this was

8 remotely okay. They say we didn't have the benefit of hindsight.

9 They had the benefit of foresight. Evans, Woodward, all of these

10 people are saying, Do not let this man have access to these kids.

11 And they do it anyway. In fact, they probably commit crimes to

12 achieve that result, to resurrect that danger. Right?

13 And then they have the second point, well, the harm occurred

14 in North Carolina. They didn't know that would happen. Again,

15 this is -- what a technicality. So, wait, it would be their fault

16 if Ducila beat Mona Lisa's head in in New Mexico as opposed to

17 North Carolina. Again, it makes no sense. It doesn't change the

18 egregiousness of what these people did. Right? That the damage

19 took six months to manifest and manifested in a different state.

20 CYFD, their intent, what they knew, what they did, it's unchanged.

21 All right. And then, again, this is the Chutzpah Doctrine

22 here for the reliance on the unsubstantiation of the physical

23 abuse allegations. Well, of course, they're unsubstantiated. You

24 bullied the investigator into unsubstantiating them. You know, if

25 anything, this makes it worse.

1    And then, finally, this next point here, there's no evidence
2    that they were beaten while they were in New Mexico.  This is the
3    same thing as the North Carolina argument.  What difference does
4    it make?  That's not -- no.
5        And then this last point here is -- I want to talk a second
6    about this, that this was a mistake of judgment.  Take a look at
7    this argument the defense makes in their reply.  They say, well,
8    it's meaningless that Liggett didn't want to take these kids into
9    custody.  This was not a mistake of judgment.  And the reason this
10   isn't meaningless is because it wasn't.  The evidence here is
11   crystal clear.  There is a straight line from what happened in
12   that parking lot to what ends up happening to Mona Lisa.  Every
13   step of the way, none of these Defendants are even trying to
14   exercise professional judgment.  They're just trying to get rid of
15   these kids.  Garza said so and she thinks it's funny.  This isn't
16   reasonable minds can disagree.  This isn't an instance where, oh,
17   it's difficult facts.  No, it's not.  Their goal was very simple.
18   How do we get rid of these kids?  We have too much work to do
19   already.  How do we get this case off our plate?  That is not an
20   exercise of professional judgment.  It's not even pretend to be.
21   It's quasi criminal conduct designed to achieve an end that, the
22   defense is right, is morally reprehensible as well.
23       In other words, Your Honor, this is not what qualified
24   immunity was designed to protect.  This is not a good faith
25   mistake or a reasonable disagreement about what the law is or

confusion about what the law is. They told employees after those

kids disappeared, Don't turn over documents to the police. Don't

even talk to the police. Who talks like that? Who says that?

Criminals. Right? How is this an exercise of professional

judgment? Don't talk to the police. We don't want those kids

found. That's aiding and abetting people you know are dangerous

escape from law enforcement. Again, this is criminal conduct and

the case law is clear on this. You do not get qualified immunity

if you're going to engage in conduct like that.

And that goes, I guess, to the last point, Your Honor, as

they say in the response, this is an obvious case. Even if

everything else that we've gone through here doesn't persuade,

there is no way that, when qualified immunity was created, it was

designed to cover this. And I would just -- and I would stop

there unless the Court has any other questions.

THE COURT: I have a quick question here that I had

written down awhile ago, and that is regarding what the state

judge knew. Did the state judge know about Celina Evans' child

abuse referral?

MR. GUBERNICK: So I guess the simple answer on that,

the state judge, as far as we can tell -- and this is the

contention we had -- did not know about any of the February

disclosures. The letter that Celina sent on February 3rd that

lists the dog and the currency, that letter is actually in the JQ

docket. It's there. We know the Court had that. And, actually,

1   that was the reason why the -- why Laura Castillo was asking about

2   it at this hearing to decide whether the -- whether to approve

3   this permanency plan.

4       And just one very quick thing on that, Your Honor, because I

5   think there was some confusion on this during your questions to

6   the defense.  This is not a -- that hearing on March 16th, that

7   was not to approve a trial home visit.  That was not to approve a

8   transfer of rights.  Here's what that -- that was designed to

9   approve this overarching six-month or longer plan that CYFD has

10   for achieving reunification.  We agree completely that

11   reunification would have terminated the special relationship the

12   same way that finalization of an adoption terminates the special

13   relationship in A.M.  Obviously, it would have.  And that's the

14   big point here.

15       That was the goal of their scheme.  The goal of their scheme

16   was not a trial home visit because look at this plan.  This is the

17   plan here that the -- that CYFD presented to the Court on March

18   16th.  This is what they wanted the judge to sign off on.  Look at

19   point three.  Remain in custody, complete a trial home visit.

20   Nobody thought that this was a transfer of custody, not legal

21   custody, not physical custody, just custody.  We know this is

22   still our responsibility.  Every witness -- every Defendant we

23   deposed about this said the same thing.  Yeah, they're in our

24   custody during a trial home visit.  Yeah, we're responsible.  We

25   asked Rebecca Liggett at one point, Can you think of any instances

1   where that wouldn't be true?  No.  Everyone agreed they were

2   completely responsible.  They were not asking the court to

3   transfer anything.  They were just saying, This is what we're

4   going to be doing and acknowledging that they're still going to be

5   in their custody.  And that's what the Court approved.

6       But the plan, it didn't work out.  Reunification never

7   occurred, so that special relationship never ended.  So that

8   burden they had of caring for these kids who had -- who were

9   relying on them to keep them safe, that was never transferred.

10          THE COURT:  All right.  Thank you.  I think I've heard

11  enough on the issues, unless you have something burning that you

12  need to finish up with.

13          MR. GUBERNICK:  I'm sorry, Your Honor, I think that's

14  about it.

15          THE COURT:  Thank you.

16          MR. GRUBEL:  Your Honor, do I have time for a --

17          THE COURT:  You do have a quick rebuttal, sure.

18          MR. GRUBEL:  Your Honor, I know we've been here a long

19  time and I know the briefs are dense.  So I'm going to really just

20  focus on the Court's question about T.D. Patton.  And I would draw

21  the Court's attention to page 1223 and 1224, under the sub -- it's

22  under two analysis in Currier and one constitutional violation.

23  And what T.D. Patton says is, Currier first addressed whether

24  DeShaney barred danger creation claim and answered no.  It held

25  DeShaney did not bar the claim relating to the children's

placement in their father's home because the children, quote,
"Would not have been exposed to the dangers of the father but for
the affirmative acts of the state." The Court wrote, "When the
state affirmatively acts to remove a child from the custody of one
parent and then places the child with another parent, DeShaney
does not foreclose constitutional liability." The Court further
addressed whether the facts supported a constitutional violation
under danger creation. That is on page 1223 and 1224.

Your Honor, on page 1231, under the subparagraph A, parallels
to Currier, Currier and this case are factually and legally on
point. Both involved county social workers removing children in
Currier from a mother, and then recommending the child be placed
with the father's home where the child was abused by the father.

So, Your Honor, I respectfully submit that T.D. Patton does
specifically address the issue of whether it's -- whether it's
legally important if the child is removed from one parent into the
other. And under danger creation, I think T.D. Patton does say it
needs to be removed from one parent to the other. It is not a
case, as I read it, respectfully, Your Honor, that the -- that
simply -- I don't think it's analogous to this case where it was
taken from both parents and returned to both parents.

Your Honor, I can sort of address other points that were
raised if the Court has other questions. I do rely, I think -- I
request the Court just rely on the briefing. I think some of the
examples and the way that the briefing was portrayed to the Court,

1   that the reply brief are inaccurate.  The reply brief as to the
2   Armijo in specific -- and I use an example of a fire in a home,
3   that was used, Your Honor, to say CYFD is not in the home at 2:00
4   in the morning.  The parents are responsible.  They're the ones
5   that have to physically get up and move the child.  And that's
6   what Armijo says.  I never claimed -- and it came across in the
7   brief that Armijo says that the keeping the child in the car was a
8   special relationship.  Yeah, the Tenth Circuit's very clear that
9   maybe, potentially, it could be a special relationship while the
10  individual's in the car.  That wasn't the emphasis at all of my
11  briefing, Your Honor.  The emphasis in my briefing is once that
12  kid was released from the car, there's no question there was no
13  special relationship because that child was not in the control of
14  the school district at that time.
15      So -- and one other thing, as to the allegations of HPB, Your
16  Honor, the way it works is HPB -- and timeline's important --
17          THE COURT:  HPB?
18          MR. GRUBEL:  The Hobbs Police Department.
19          THE COURT:  Oh, okay.
20          MR. GRUBEL:  Hobbs Police Department called CYFD.  Hobbs
21  Police detained the parents, and they are allowed, under statute,
22  to place temporary custody with CYFD.  So the custody didn't go
23  from the parents to -- the custody of the Plaintiffs didn't go
24  from the parents to HPD to CYFD.  It went from the parents to
25  CYFD.  And that's how it -- that's generally how it acts.  CYFD

generally cannot go into a situation and take children.  It can

petition a court.  That is statutorily permissible.  But

generally, in the vast majority of cases, a police agency is going

to take custody of the children because they're the first

responders, which make sense.  They see child abuse and then

they're going to notify the child protective services, which is

what happened here.

And of note, Your Honor, the parents weren't initially

charged with child abuse.  They were charged with identity theft

by the Hobbs Police Department after CYFD already had them in

their physical custody at that point.  CYFD then had to petition

the court to get a long-term petition.  Because, frankly, you

know, people were saying -- there's allegations here that the

Hobbs Police Department was trying to save the children.  No, Your

Honor.  I think the Hobbs Police Department pretty clearly was

just trying to prosecute the parents.  Whether that's legitimate

or not, that seems to be the implication here.

Your Honor, I would request that the Court -- I still believe

that all of the extra facts are extrinsic; that they're not

relevant to the main issue; that returning to the status quo ante,

and the Court will make that determination, was dispositive

because of what DeShaney says, of what Patton actually supports,

what Currier supports, what Yvonne L. supports.  Yvonne L. dealt

with foster parents, but it said, as a matter of law, if it's the

bio parents, we wouldn't be dealing with this.  And I would ask

1  the Court to seriously look at the Hubbard case because I would
2  suggest that is stronger and more analogous than Patton, and it's
3  particularly in relation to, in that case, the bio parents were
4  given, effectively, a trial home visit, and it didn't work.  And
5  the children were harmed theoretically -- or I think they were
6  harmed during that period.  And the Circuit's, yeah, that's not
7  danger creation because the child protective services did not
8  create that danger.
9      THE COURT:  All right.  Thank you.
10     MR. GRUBEL:  Thank you, Your Honor.
11     THE COURT:  So am I correct that there is a call of the
12 calendar set in this case for July 26th?
13     MR. GUBERNICK:  Your Honor, I'm not sure about that.  I
14 believe the case is -- well, I know discovery certainly was stayed
15 pending the resolution of this motion.  I think the whole case is
16 stayed.
17     MR. GRUBEL:  Your Honor, to the extent we have
18 collectively failed to vacate it, I think we were just working
19 under the impression that because of these motions -- I think we
20 can request that it be -- the Court vacate the trial.
21     THE COURT:  I wanted to make sure that that wasn't the
22 case, that it was just something that was lingering there and
23 should have been vacated once the case was stayed for discovery.
24 So we will vacate the July 26th, 2024, call of the calendar.
25     You said discovery was stayed.  How much discovery is needed

1  if this case proceeds?  How much more discovery will be needed --

2       MR. GUBERNICK:  Your Honor, there are -- we would

3  probably have another, off the top of my head, maybe five to six

4  depositions to do.  There will, presumably, be expert testimony on

5  our side, and I imagine the defense as well.  None of that

6  happened yet.

7       So the posture on this, Judge, is basically the discovery

8  that's done here was poured over from the whistleblower case.  So

9  the whistleblower case was principally focused on the

10 whistleblower claims.  I mean, obviously, there's a lot of

11 overlap.  But I think a decent amount of discovery would still

12 have be to done here before we're prepared to try the case.

13      THE COURT:  It seems to me what makes sense is, if I

14 grant the motion for summary judgment, there's nothing to be done.

15 If I deny it, then we might have to have a status conference, at

16 that point, to determine how to proceed.

17      Who is the U.S. Magistrate Judge on this case?

18      MR. GRUBEL:  Judge Rozzoni, I believe, Your Honor.

19      THE COURT:  Great.  She's right across the hall.  So we

20 can work together to set up something that makes sense if that's

21 how we're going to proceed.

22      I did have a quick question, because I got a little confused.

23 This is for the defense, I suppose, and it goes to this argument

24 that you made regarding the immediate and proximate harm.  I did

25 read -- I did -- I've always thought of that particular factor as

1    being more relevant to the immediate risk of harm and proximate

2    harm.  If you think that it's an important issue at this stage

3    that there's no evidence of what happened to the child, it seems

4    to me like the record should probably be more complete on that

5    issue.  I know that there was some reference to a report that was

6    filed and maybe some other evidence from which it could be

7    inferred that the child was injured by her parents.  But I'll

8    leave it to you.  If you think that that's an issue that I need to

9    address and I think the record -- I'm going to allow the

10   Plaintiffs to submit additional evidence on that, because it was

11   raised for the first time in your reply.

12        Is that something that you are going to stand by with regard

13   to that factor?

14           MR. GRUBEL:  Your Honor, I just want to clarify.  There

15   was some -- and I don't know if Mr. Gubernick just misspoke.  I

16   wasn't asserting that that's an element of qualified immunity.

17   It's an element of danger creation.

18           THE COURT:  Right.

19           MR. GRUBEL:  Okay.  Your Honor, I -- it's just the point

20   where, you know, the first point is they didn't meet all the

21   elements.  I'm sticking to the main point that there is -- the

22   status quo ante was restored.  It's sort of the condition

23   precedent.  And then in addition, I'm saying, by the way, there's

24   no proximate cause.  So I don't --

25           THE COURT:  Well, it seems to me like if that's

something you want me to consider, even in terms of just looking at whether they've met the elements of -- not of qualified immunity but of the merits of the claims that they're bringing, it seems to me like I need to have the whole picture.  And to the extent that there is evidence in the record that wasn't presented because nobody saw this issue really coming in the way that you've stated it in your reply and then now, it would only be fair to allow for a supplementation of the record, unless I'm reading your argument -- unless I'm taking your argument in the wrong way, unless I'm missing something.

MR. GRUBEL:  No, Your Honor.  And I don't object to supplementation of the record.  Just to clarify, would it be sort of supplementation, and then I get to reply to that, or is it just one supplement from the Plaintiff?

THE COURT:  Supplementation -- of course I'll allow you to reply.

MR. GRUBEL:  And I think it would be a relatively -- we could keep that narrow, Your Honor.

THE COURT:  Right.  And you all are free to talk about this and determine if you want to proceed with that or want to do it some other way.

Go ahead.

MR. GUBERNICK:  Your Honor, one possible issue with that.  I mean, if they're really going to be talking about what caused these injuries, if that's what we have to establish at this

 1  point, that's what we'll be using expert testimony for.  That's

 2  going to require, like, experts to go over medical records, that

 3  sort of thing.  These are the things that haven't happened yet

 4  because discovery's been stayed pending resolution of the

 5  qualified immunity issue, so I'm wondering if --

 6          THE COURT:  The only reason I raise it is because you in

 7  your -- I think it was the PowerPoint, you are referencing some

 8  evidence out there -- and I know that it's not an expert

 9  testifying that this is what caused the injury, but at least

10  something that -- from where I can reasonably infer that there's

11  evidence out there that this might have been caused by the

12  parents.  That would be helpful to me as I'm evaluating these

13  factors.  So did you want to submit that report or the evidence

14  that you have?  I think you stated that there was an admission

15  made by the parents or some contradictory statements made by the

16  parents.

17          MR. GUBERNICK:  Yes, Judge.  We're happy to submit that

18  stuff.  I just want the Court to know that this would not be all

19  the evidence we'd be presenting at trial.

20          THE COURT:  Absolutely, no.  And I still don't have --

21  have not yet agreed that you even have to get there at the stage

22  that we're at right now.  I just wanted to give you the

23  opportunity, if that's something that's being argued by the

24  defense, to present that supplemental record.

25          MR. GUBERNICK:  I'm happy to confer with defense and

1  we'll come up with a plan.

2            THE COURT:  And if you-all decide it's not necessary,

3  that's fine with me.  But I will give you the opportunity if

4  there's still some disagreement about what has to be presented at

5  this stage of the litigation, you're welcome to supplement the

6  record, and they can reply.

7            MR. GUBERNICK:  Thank you, Judge.

8            THE COURT:  Anything further from the parties?

9            MR. GRUBEL:  No.  Thank you, Your Honor.

10           THE COURT:  Any questions at all, even with regard to

11  the litigation or anything else?

12           MR. GUBERNICK:  Not from Plaintiffs, Your Honor.

13           MR. GRUBEL:  No, Your Honor.  Thank you.

14           THE COURT:  All right.  Thank you-all for the arguments.

15  I appreciated the briefs.  They were very thorough.  I will take

16  this under advisement and hopefully get a decision out here soon.

17  I hope to get this out in the next couple of months.  Of course, I

18  say this to all our civil litigants:  Our criminal docket is

19  pretty heavy and that always takes precedent.  I'm -- at the

20  moment, it seems like we have a little bit of a lull, so hopefully

21  I'll get some of this behind me.  And like I said, the hearing was

22  very helpful today, to hear your arguments and kind of get a

23  refined view of what your positions are.  So I appreciate it.

24       Court will be in recess.

25  (Court adjourned at 3:00 p.m.)

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3    _____
                             )
 4    ALISON ENDICOTT-QUINONES,  )      Case No. 21-cv-00368-DHU/JMR
      Guardian ad Litem on behalf of)
 5    A.D., R.B., E.B., and M.B.,  )
      minor children,            )
 6              Plaintiffs,      )
                                 )
 7         vs.                   )
                                 )
 8    PATRICIA GARZA, in her     )
      individual and official    )
 9    capacity; REBECCA LIGGETT,  )
      in her individual and official)
10    capacity; BRENDA SALDANA, in  )
      her individual and official  )
11    capacity; JENNIFER DE LOS   )
      SANTOS, in her individual and )
12    official capacity; NEW MEXICO )
      CHILDREN YOUTH & FAMILIES    )
13    DEPARTMENT; and DOES 1-50,   )
              Defendants.        )
14    _____)

15

16           CERTIFICATE OF OFFICIAL COURT REPORTER

17         I, CARMELA V. McALISTER, CRR, RPR, CMRS, New Mexico CCR #306,

18    Federal Official Realtime Court Reporter, in and for the United

19    States District Court for the District of New Mexico, do hereby

20    certify that pursuant to Section 753, Title 28, United States

21    Code, that the foregoing is a true and correct transcript of the

22    stenographically reported proceedings held in the above-entitled

23    matter on July 16, 2024, and that the transcript page format is in

24    conformance with the regulations of the Judicial Conference of the

25    United States.
```

Dated this 22nd day of October 2024.

_____

CARMELA V. McALISTER, CRR, RPR, CMRS, NM CCR #306
United States Court Reporter
333 Lomas Blvd., NW
Albuquerque, New Mexico  87102
Phone:  505-348-2094
Email: carmela_mcalister@nmd.uscourts.gov