Case No. 24-2134

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**ENDICOTT-QUINONES ET AL.,**

        Plaintiffs-Appellees,

v.

**GARZA, et al.**

        Defendants-Appellants.

On Appeal from the United States District Court
for the District of New Mexico
The Honorable David H. Urias
United States District Judge
Case No. 21-cv-00368 DHU/JMR

**APPELLEES' BRIEF**

Benjamin Gubernick
WGLA, LLP
717 Texas Ave, Suite 1200
Houston, TX 77002
346-277-0287
ben@wglawllp.com

Todd J. Bullion
LAW OFFICE OF TODD BULLION
4801 Lang Ave NE, Suite 110
Albuquerque, NM 87109
505-494-4656
todd@bullionlaw.com

*Attorneys for Plaintiffs-Appellees*

**ORAL ARGUMENT NOT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................iii

GLOSSERY……………………………………………………………………..vii

PRIOR OR RELATED APPEALS...................................................................... 1

INTRODUCTION ............................................................................................. 2

JURISDICTIONAL STATEMENT .................................................................... 4

STATEMENT OF THE ISSUES......................................................................... 5

STATEMENT OF THE CASE............................................................................ 6

SUMMARY OF THE ARGUMENT ................................................................. 12

STANDARD OF REVIEW .............................................................................. 15

ARGUMENT ................................................................................................... 16

   I.   <u>Special Relationship</u> ............................................................................. 16

        A. A Special Relationship Exists If The State Retains Ultimate Responsibility For A Child's Safety And Wellbeing...................... 17

        B. The State Of New Mexico Maintains A Special Relationship With Children As Long As They Are In Its Legal Custody. ................... 20

        C. A Trial Home Visit Does Not End The Special Relationship. ...... 22

        D. The District Court Correctly Applied The Law .............................. 24

        E. Defendants' Proposed "Physical Control" Test Does Not And Should Not Exist. ....................................................................................... 25

i. Defendants' Physical Control Test Would Gut the Special Relationship Doctrine And Endanger Children ..................26

ii. Defendants' Physical Control Test Is Woven From Whole Cloth ....................................................................................27

II. State-Created Danger ................................................................31

A. Defendants Misunderstand and Misapply the State-Created Danger Doctrine ......................................................................32

B. The *Status Quo Ante* Was Not Restored .......................................34

C. Defendants Increased The Danger To The Children ....................36

III. Clearly Established Law ................................................................37

A. Special Relationship ....................................................................37

B. State-Created Danger ....................................................................39

C. This Is An Obvious Case ..............................................................40

IV. Defendants' Remaining Arguments .......................................41

A. Causation ....................................................................................42

B. Conscience Shocking Conduct ....................................................43

CONCLUSION ..................................................................................45

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..............46

CERTIFICATE OF SERVICE ..............................................................47

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS ..................................................................................48

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*A.M. ex rel. Youngers v. New Mexico Dep't of Health*,
    65 F. Supp. 3d 1206 (D.N.M. 2014). ........................................... 18, 29

*Anderson v. Liberty Lobby, Inc,*,
    477 U.S. 242 (1986). ..........................................................................15

*Armijo v. Wagon Mound Pub. Schs.*,
    159 F.3d 1253 (10th Cir. 1998)............................................. 16, 28, 29

*A.S. By & Through Blalock v. Tellus*,
    22 F. Supp. 2d 1217 (D. Kan. 1998) ..................................................22

*Bank of Ill. v. Over*,
    5 F.3d 76 (7th Cir.1995) .....................................................................33

*Camp v. Gregory*,
    67 F.3d 1286 (7th Cir. 1995) ..............................................................19

*Cox v. Glanz*,
    413 F.3d 86 (D.C. Cir. 2005). .............................................................15

*Dahn v. Amedei*,
    867 F.3d 1178 (10th Cir. 2017)...........................................................18

*Crowson v. Washington Cnty. Utah*,
    983 F.3d 1166 (10th Cir. 2020)...........................................................15

*Currier v. Doran,*,
    242 F.3d 905, 919 (10th Cir. 2001)........................... 13, 16, 33, 36, 39

*D.C. v. Wesby*,
    583 U.S. 48 (2018) ............................................................................ 40

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989...................................................... 2, 19, 32, 33, 34

*DeShaney by First v. Winnebago Cnty. Dep't of Soc. Servs*,
    812 F.2d 298 (7th Cir. 1987 aff'd sub nom *DeShaney v. Winnebago*
    *Cnty. Dep't of Soc. Servs* 489 U.S. 189 (1989) ..................................32

*Est. of Booker v. Gomez,,*
    745 F.3d 405 (10th Cir. 2001)...........................................................15

*Est. of Johnson v. La Causa Inc.,*
    No. 10-C-953, 2011 WL 5319909 (E.D. Wis. June 24, 2011).
    ................................................................. ...........21, 23, 36

*Fancher v. Barrientos,*
    23 F.3d 1191 (10th Cir. 2013)..........................................................15

*Fogarty v. Gallegos,*
    523 F.3d 1147 (10th Cir. 2008)..........................................................6

*Garrett v. Stratman,*
    254 F.3d 946 (10th Cir. 2001)..........................................................15

*Gutteridge v. Oklahoma,*
    878 F.3d 1233 (10th Cir. 2018).........................................................37

*Henderson v. Glanz,*
    813 F.3d 938, 948 (10th Cir. 2015)....................................................43

*Henry v. City of Erie,*
    728 F.3d 275 (3d Cir. 2013)............................................................42

*Horton v. Flenory,*
    889 F.2d 454 (3d Cir. 1989)............................................................24

*Hubbard v. Oklahoma ex rel. Oklahoma Dep't of Hum. Servs,*
    759 F. App'x 693 (10th Cir. 2018). ............................................ 24, 42

*Johnson v. Jones,*
    515 U.S. 304 (1995) ....................................................................4

*Johnson ex rel. Est. of Cano v. Holmes,*
    455 F.3d 1133 (10th Cir. 2006)............................................ 18, 21, 27

*Johnson ex rel. Cano v. Holmes,*
    377 F. Supp. 2d 1039 (D.N.M. 2004). ........................................ 18, 21

*K.H. Through Murphy v. Morgan,*
    914 F.2d 846 (7th Cir. 1990).......................................... 12, 25, 32, 39

*L.R. v. Sch. Dist. of Philadelphia,*
    836 F.3d 235 (3d Cir. 2016)...........................................................34

*Liebson v. New Mexico Corr. Dep't,*
    73 F.3d 274 (10th Cir. 1996)...........................................................30

*Maldonado v. Josey,*
    975 F.2d 727 (10th Cir. 1992)................................................. 17, 25, 28,

*Mascorro v. Billings,*
    656 F.3d 1198 (10th Cir. 2011) ..........................................................38

*Matthews v. Bergdorf,*
    889 F.3d 1136 (10th Cir. 2018)...................................... 18, 21, 25, 41,

*Milburn v. Anne Arundel County Dept. of Social Services,*
    871 F.2d 474 (4th Cir.1989)...............................................................30

*Morrow v. Balaski,*
    719 F.3d 160 (3d Cir. 2013), *as amended* (June 14, 2013)................33

*Ortiz v. New Mexico,*
    550 F. Supp. 3d 1020 (D.N.M. 2021). .................................................41

*R. F. J. v. Fla. Dep't of Child. & Fams.,*
    398 F. Supp. 3d 1268 (M.D. Fla. 2019). .............................................19

*Rosales v. Bradshaw,*
    72 F.4th 1145 (10th Cir. 2023)................................................... 40, 41

*Ross v. United States,*
    10 F.2d 1422 (7th Cir. 1990) ..............................................................37

*Ruiz v. McDonnell,*
    299 F.3d 1173 (10th Cir. 2002).................................................. 26, 42

*S.S. v. McMullen,*
    225 F.3d 960 (8th Cir. 2000) ..............................................................33

*Smith v. D.C.,*
    800 F.3d 1231 (10th Cir. 2015)...................................... 18, 19, 21, 39

*State ex rel. Hum. Servs. Dep't,,*
    988-NMCA-100. ..................................................................................20

*State ex rel. Child., Youth & Fams. Dep't v. Jerry K.,*
    015-NMCA-047. ..................................................................................20

*State ex rel. Child., Youth & Fams. Dep't v. Senaida C.,*
    2008-NMCA-007. ................................................................................20

*State of N.M. ex rel. CYFD v. Lisa A.,*
    2008-NMCA-087 .................................................... 22, 24, 40

*Wooten v. Campbell,*
    49 F.3d 696 (11th Cir. 1995)................................. 21, 24, 29, 30, 31, 38

*Wright v. Lovin,*
    32 F.3d 538 (11th Cir.1994) ................................................31

*T.D. v. Patton,*
    868 F.3d 1209 (10th Cir. 2017) ..........................................37

*Taylor v. Rojas,*
    592 U.S. (7th Cir. 2020) ....................................................39

*Uhlrig v. Harder,*
    64 F.3d 567, 574 (10th Cir. 1995).......................................41

*Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs.,*
    959 F.2d 883 (10th Cir. 1992)......................... 13, 17, 19, 28

**Statutes**

42 U.S.C. § 1983.................................................................11

K.S.A. § 38—1543(i)). .......................................................23

NMSA 1978, § 32A–1–4N ..................................................18

NMSA 1978, § 32A-1-4(T). ................................................20

NMSA 1978, § 32A-3B-9 ...................................................20

Okla. Stat. Ann. tit. 10A, § 1-4-806. ...................................23

Wis. Stat. § 48.207.............................................................24

**Regulations**

N.M. Admin. Code 8.10.7.7(KK)..........................................22

# GLOSSARY

The Children………………………………...Minor children A.D., R.B., E.B., and M.B.

CYFD………………………………………… New Mexico Children, Youth & Family Department

Defendants………………………………… Patricia Garza, Brenda Saldana, Jennifer De Los Santos, Rebecca Liggett

Evans………………………………………… Selena Evans, former therapist to A.D., R.B., and E.B.

Father………………………………………… A.D., R.B., E.B., and M.B.'s biological father

February Disclosures……………………….. Therapy disclosures made by A.D. and R.B. during February, 2020

GAL…………………………………………….. Laura Castillo, guardian ad litem to A.D., R.B., E.B., and M.B. from 2019 to 2020

Garza…………………………………………. Patricia Garza, manager of CYFD's Hobbs office

HPD………………………………………………. Hobbs Police Department

Initial Permanency Order………………….. The "Initial Permanency Order" issued by the State Civil Court on March 23, 2020

January Disclosures……………………….. Therapy disclosures made by A.D. and R.B. during January, 2020

Rebecca Liggett…………………………… CYFD's chief children's court attorney Hobbs office

Mazy…………………………………………….. Kelly Mazy, investigator at CYFD's Hobbs office

Mother……………………………………A.D., R.B., E.B., and M.B.'s biological mother

The Parents………………………………… A.D., R.B., E.B., and M.B.'s biological parents

Plaintiff…………………………………….. Alison Endicott-Quinones, current guardian ad litem to A.D., R.B., E.B., and M.B.

The Report………………………………… Collectively, the "Judicial Review And/Or Permanency Hearing Report" and "Family Treatment Plan" submitted to the State Civil Court On March 13, 2020

Saldana…………………………………….. Brenda Saldana, case worker at CYFD's Hobbs office

State Civil Court…………………………… Abuse & Neglect Court overseeing the Children's civil case from 2019 to 2020

Woodward………………………………… Ivy Woodward, permanency planner at CYFD's Hobbs office

## PRIOR OR RELATED APPEALS

There are no related cases or appeals.

# INTRODUCTION

Consider two scenarios:

1. An abused girl is taken from her biological father and placed in foster care. The father calls the state's child protective services office. He asks a social worker to bring his daughter to his house, so that he can beat her to death. The social worker—seeing an opportunity to reduce her case load—drives the girl to the father's house, where she is killed.

2. A police officer hears crying coming from an alley on a cold winter night. He finds a newborn baby, abandoned in a dumpster. He takes the baby out of the dumpster and starts walking towards his patrol car. After a few steps, the police officer decides he does not want to deal with the paperwork that rescuing the baby will entail. So, he tosses the baby back in the dumpster and leaves. The baby then dies of exposure.

Most people would agree the social worker and police officer in these scenarios committed murder. Most people would also agree that these scenarios have little in common with the facts in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), where "[t]he most that [could] be said of the state functionaries … [was] that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Id.* at 203.

But according to Defendants' proposed version of the law, neither the social worker nor the police officer violated the Constitution's Due Process Clause. As to Scenario 1, Defendants contend the special relationship doctrine permits a social worker to serve a child up to a murderer—an action Defendants describe as merely placing the child "under the physical control of [the child's] parents." Def. Br. at 45.

And as to Scenario 2, Defendants contend the state-created danger doctrine allows a police officer to toss a baby in a dumpster to freeze. As Defendants spin it,

"the *status quo ante* [is] restored by return of the [baby] to the [dumpster] from [which the baby was] taken." Def. Br. at 7.

But Defendants' whitewashing cannot conceal the basic flaws in their position. For sure, the United States Constitution imposes no obligation on the state to provide aid. But just as certainly, the Constitution does not permit what Defendants ask for here: a modification of the law that would grant state actors a license to kill. The district court reject Defendants' motion for summary judgment, and this Court should affirm.

## JURISDICTIONAL STATEMENT

Plaintiff agrees the standard for review is *de novo*. However, on interlocutory appeal from a qualified immunity motion, this Court's jurisdiction is limited to "neat abstract issues of law[.]" *Johnson v. Jones*, 515 U.S. 304, 317 (1995).

## STATEMENT OF THE ISSUES

I.      Is the existence of a special relationship determined by custodial power, as this Court and others have held, or physical control, as Defendants' brief contends?

II.      Does the state-created danger doctrine permit state actors to knowingly expose people to pre-existing dangers?

III.      If children in New Mexico are rescued from their biological parents by the police, and then taken into state custody, and then placed on a trial home visit, has the *status quo ante* been restored?

IV.      In April of 2020, was there a clearly established exception to the special relationship or state-created danger doctrines that permitted social workers to assist biological parents in harming their children?

## STATEMENT OF THE CASE

The following facts are derived from findings made by the district court. They are considered conclusively established. *See e.g., Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008) ("Those facts explicitly found by the district court, combined with those that it likely assumed, … form the universe of facts upon which we base our legal review.").

### a. CYFD Belatedly Takes The Children Into Custody

On June 3, 2019, the Parents were arrested for felony child abuse by HPD in a Walmart parking lot while panhandling. App. Vol. I at 181. The Children were with them. *Id*. The Children were in extremely poor health. *Id*. CYFD employees had encountered the Parents and Children at the Walmart several months earlier, but refused to provide aid. *Id*. Garza had applauded her subordinates for ignoring the Children's plight. *Id*.

Even after the Parents' arrest, CYFD—through its high-ranking administrator Liggett—refused to take custody of the Children for several hours. *Id*. CYFD only took the Children into custody after prodding by a state court judge. App. Vol. I at 181. The Children were taken into custody in June 2019. App. Vol. I at 182. Once the Children came into state custody onwards, they were placed in safe foster homes.

### b. Defendants Conspire To Jettison The Children's Case

Defendants' priority was to rush the case through the reunification process, so that the Children would no longer be Defendants' problem. App. Vol. I: 182. Garza was specifically worried about the matter turning into "another Everhart case," referring to a case were where children had remained in CYFD custody over 10 years. *Id*. As part of their scheme to dispose of the Children's case as quickly as they could, Defendants decided to start a trial home visit with Parents. *Id*. Defendants' goal was to convince the State Court to sign off on reunification and dismiss the case. *Id*.

Defendants were undeterred by numerous red flags about Father, including: (1) he attempted, twice, to bribe CYFD employees into looking the other way while he ran off with the Children; (2) he would become angry while visiting the Children; (3) the Children were afraid of him; and (4) he made no progress on his court-ordered treatment plan. *Id*. During one supervised visit at CYFD's office, the Parents barricaded themselves in a room with the Children, requiring HPD officers to break down the door. *Id*.

The Children's initial permanency planner, Woodward, objected to Garza's trial home visit plan, which she viewed as reckless. *Id*. In Woodward's professional opinion, Father was a "ticking time bomb," and if given the chance would abscond with and harm the Children. *Id*. Garza responded to Woodward's concerns by saying, "maybe we'll luck out and they will disappear." App. Vol. I:182-83.

### c. Defendants Suppress Evidence Of Father's Unfitness

Throughout January of 2020, A.D. and R.B. began to make disturbing disclosures about Father to their therapist, Evans. App. Vol. I: 246. The January Disclosures included allegations that Father had murdered a dog and had engaged in inappropriate sexual behavior. *Id*.

On January 28, 2020, the Children's GAL filed a motion to suspend all visitation with Father based on the therapy disclosures. App. Vol. I: 183. The GAL intended to call Woodward as a witness. *Id*. Woodward would have provided the State Court with her professional opinion that Father was unfit and likely to neglect and abuse the Children if he were allowed unsupervised access. App. Vol. I: 183-184. Garza and Liggett, however, ordered Woodward to lie at the hearing, so their plan to quickly reunify the Children and Parents would not be derailed. *Id*. Woodward believed she would likely be terminated if she did not commit perjury. App. Vol. I at 184. The GAL withdrew the motion so that Woodward's job would

not be jeopardized. *Id*. Woodward was then barred by Garza from communicating with the GAL, even though that was supposed to be part of Woodward's job.

On February 3, 2020, Evans sent a letter to CYFD outlining her concerns about Father based on the January Disclosures. *Id*. CYFD responded to the letter threatening to refer fewer cases to Evans. App. Vol. I at 185.

On February 4, 2020, R.B. disclosed to Evans that Father "yells and hits" him "alot [sic]." App. Vol. I: 184. This was the first of the February Disclosures. It was corroborated by further disclosures from R.B., and by A.D. on February 24, 2024, when she disclosed that Father hits R.B. "in the head a lot," hurts animals, and scares her. *Id*. On February 24, 2020, Evans submitted a child abuse referral to CYFD's central intake based on the February Disclosures. *Id*.

Garza and Saldana were aware of R.D. and A.D.'s disclosures to Evans. App. Vol. I: 184-185. CYFD opened an investigation into Evans' February 24, 2020 referral. App. Vol. I at 185. The investigation was assigned to Mazy. *Id*. Once the investigation was concluded, Mazy determined that the abuse allegations should be substantiated. *Id*. However, she was coerced by De Los Santos and Garza into unsubstantiating the allegations not supported by "credible evidence." *Id*. Pursuant to CYFD's policy manual, the February Disclosures were per se credible evidence. App. Vol. I: 100 at paragraph EE and 249. Fabrication was also implausible because R.B. and A.D.'s disclosures matched, even though they were living in separate foster homes. App. Vol. 1: 248-249.

The District Court made the following specific finding, "Significantly, based on the current record, there is no evidence that A.D. and R.B.'s disclosures reached the state court." App. Vol. 1: 196.

### d. Safeguards Are Removed; Aid Is Cut Off; Defendants Place The Children On A Trial Home Visit

In March 2020, a motion was filed in Father's felony child abuse case to remove the no-contact order from his conditions of release. App. Vol. 1: 183. The motion was based on Saldana's false claim to Father's defense attorney that Father was compliant with CYFD's treatment plan. *Id*. Saldana provided false information to Father's defense attorney so that a trial home visit could take place. *Id*.

On March 13, 2020, Garza and Saldana filed the Report with the State Court. App. Vol. 1: 185. The Report recommended reunification as the Children's permanency plan. *Id*. The Report contained numerous misleading omissions and affirmative misrepresentations related to Father's fitness, including claims that the disastrous supervised visits had gone well, that Father had made progress on his treatment plan, and that CYFD did not have any safety concerns, and that the Parents posed "no risk" to the Children. App. Vol. 1: 185-186. The Report also omitted any mention of the February Disclosures and the February 24, 2020 child abuse referral. *Id*. The Report also announced CYFD's intention to move the Children from foster homes to Father's apartment for a trial home visit. *Id*. The Children were in foster care and remained in CYFD's custody during the trial home visit. App. Vol. 1: 205-206.

The State Court held a hearing on March 16, 2020 to discuss the Report. Saldana testified at the hearing that reunification was an appropriate and safe permanency plan for the Children. Saldana told the State Court that the concerns raised in Evans' February 3, 2020 letter (which were based on the January Disclosures) had been addressed. Saldana did not notify the Court that the Children had made further disclosures, or Evans' February 24, 2020 abuse referral. The State Court stated that it "soun[ed] like" Father "ha[d] made great progress[.]"

On March 23, 2020, the State Court signed the Initial Permanency Order, which approved Defendants' proposed permanency plan. The Initial Permanency Order states that a permanency review hearing would be held within three months, and that "Visitation shall be as set forth in the case plan." The Initial Permanency Order makes no mention of any custodial rights or responsibilities being transferred or assigned to the Parents. App. Vol. 1: 206. The District Court made the specific finding that, "the Children were in foster care and therefore in the custody of the State when the trial home visit occurred, triggering CYFD's affirmative duty to protect them from known dangers". *Id.*

Defendants made status-quo changing decisions knowing that Father posed a danger to Children yet placed them with him anyway. App. Vol. 1: 193. During the trial home visit, Saldana provided household services to the Children, gave Father advanced warning of 'unannounced' visits, and assisted him in 'staging' the apartment to make him look like a fit parent. App. Vol. 1: 200.

### e. The Parents Flee With The Children; Defendants Aid Their Escape; M.B. Suffers Catastrophic Injuries

In late April or early May 2020, the Parents kidnapped the Children and left New Mexico. App. Vol. 1: 187. HPD tried to issue an Amber Alert and bring custodial interference charges, but Liggett and Saldana blocked them.[1] *Id.* Garza ordered her subordinates not to talk to the police. *Id.* HPD obtained a search warrant for CYFD's Hobbs office, in an effort to bypass Defendants' stonewalling. *Id.* However, Garza, De Los Santos intentionally withheld responsive documents that could have helped HPD locate the Children. *Id.*

In October 2020, M.B. was dumped at a hospital in North Carolina by Mother. *Id.* She had catastrophic injuries including skull fractures, healing skull fractures, an

---

[1] The District Court found there was a genuine fact dispute on this issue and resolved it in Plaintiff's favor.

orbital fracture, intercranial hemorrhaging, subdural hematomas, and burns on her legs. App. Vol. 1: 187.

Following the Children's abduction in April or May 2020, CYFD issued change of placement notices, switching the Children's placement from "trial home visit" to "unknown." *Id*. When M.B. was abandoned by Mother in October 2020, CYFD filed another change of placement notification with the State Court, switching M.B.'s placement from "unknown" to the North Carolina hospital. *Id*. These changes of placement were filed because CYFD believed it retained custodial responsibility for the Children. *Id*.

### f. Plaintiff Files Suit; Defendants Move For Summary Judgment; The District Court Denies The Motion

On March 14, 2023, Plaintiff filed this action in New Mexico state court. Plaintiffs sued under 42 U.S.C. § 1983 for violation of the Children's substantive due process rights. Plaintiff asserted that Defendants were liable under special relationship and state-created danger theories. Plaintiffs also brought a state law claim that is not part of this appeal. Defendants moved for summary judgment on the basis of qualified immunity. The motion was extensively briefed and then argued for two hours before the district court. On August 15, 2025, the district court denied Defendants' motion in its entirety. This appeal followed.

# SUMMARY OF THE ARGUMENT

"If the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department." *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990) (Posner, J.). That brightline rule forms the core of the special relationship and state-created danger doctrines. It is also the rule Defendants ask this Court to subvert.

*First*, the district court correctly held that a special relationship existed between Defendants and the Children at all relevant times. CYFD's legal custody gave Defendants exclusive authority to determine where and with whom the Children would reside. Defendants were also required by statute to attend to the Children's needs and ensure their safety. The Parents, by contrast, had no custodial rights or responsibilities during the trial home visit. Accordingly, under this Circuit's ultimate responsibly test, neither the trial home visit nor any other event extinguished the special relationship.

The district court was also correct in rejecting Defendants' argument that a special relationship is determined by who has "physical control" of a child. Defendants' version of the law is unworkable, inconsistent with precedent, and would effectively repeal the doctrine.

*Second*, Defendants' conduct meets all the requirements for a state-created danger claim. A jury could find that Defendants misled the state court overseeing the Children's case and prevented third parties from aiding the Children. A jury could also find that Defendants' misconduct endangered the Children.

There is no merit to Defendants' contention that the state-created danger doctrine permits social workers to knowingly re-expose children to threats posed by their biological parents.

**Third**, the trial home visit did not restore the *status quo ante*. Immediately before CYFD took the Children into custody, the Parents had custodial power, but no physical access (due to their being under arrest). During the trial home visit, the Parents had no custodial power but full physical access. Defendants' claim that "the Children were returned to their biological parents," Def. Br. at 4, is pure equivocation.

**Fourth**, the rights Defendants violated were clearly established. As to Plaintiff's special relationship claim, "children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm[.]" *Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs.*, 959 F.2d 883, 893 (10th Cir. 1992). No clearly established exception to that bedrock Constitutional principle exists for harm caused by a child's biological parents.

Likewise, the state-created danger doctrine does not permit social workers to knowingly re-expose children to threats posed by their parents. This Court has rejected Defendants' proposed doctrinal loophole as "arbitrary." *Currier v. Doran*, 242 F.3d 905, 919 (10th Cir. 2001). No reasonable social worker would interpret the law the way Defendants do in their brief.

**Fifth and finally**, the Court lacks jurisdiction to hear Defendants' other grievances. And even if the Court did have jurisdiction, Defendants' arguments lack merit. The district court accurately held that Defendants placed the Children at immediate and serious risk of harm by leaving them alone with Father, a person they knew to be a "time bomb." That it took six months for the full extent of that risk of harm to manifest is a red herring.

The district court was also right that Defendants' actions shocked the conscience. Defendants do not even try to reduce their request for a do-over on this issue to a neat, abstract question of law. Instead, Defendants invite the Court to re-

weigh the evidence, draw inferences against Plaintiff, and ignore the district court's factual findings.

## STANDARD OF REVIEW

When a state actor moves for summary judgment based on qualified immunity, the court must "view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor[.]" *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

A district court's denial of qualified immunity is reviewed *de novo*, but only to "the extent it involves abstract issues of law." *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013). The Court lacks jurisdiction "to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Fogarty*, 523 F.3d at 1154. Where, as here, the district court made extensive factual findings, the Court must "scrupulously avoid" second-guessing those findings. *Garrett v. Stratman*, 254 F.3d 946, 952 (10th Cir. 2001).[2] Rather, the scope of this Court's review is limited to "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, [and] (2) whether that law was clearly established at the time of the alleged violation." *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015).

---

[2] A "very difficult to satisfy" exception exists for factual findings that are "blatantly contradicted by the record[.]" *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1177 (10th Cir. 2020). Defendants do not argue that any of the district court's findings reach that high threshold.

## ARGUMENT

The Due Process Clause protects people from the state, and in two circumstances obligates the state to protect people from each other. First, "if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." *Armijo v. Wagon Mound Pub. Schs.*,159 F.3d 1253, 1261 (10th Cir. 1998). Second, under the state-created danger doctrine, "a state [can] be liable when it affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence." *Currier*, 242 F.3d at 923.

The district court found that Plaintiff'' claims survived Defendants' qualified immunity challenge under either theory. Now, Defendants say both holdings were wrong for essentially one reason: "[T]he District Court failed to recognize that the undisputed fact that the Children were returned to their biological parents was dispositive[.]" Def. Br. at 4. But that argument falls apart under close inspection, legally and factually.

## I. Special Relationship.

The district court held that a special relationship was created when CYFD took the Children into custody, and that the trial home visit did not end the special relationship. Two points were central to the district court's reasoning: (1) CYFD remained the "custodial official responsible for overseeing the Children"; and (2) no custodial rights were transferred to the Parents.

Defendants concede a special relationship was formed. However, they claim it ended when the trial home visit started. Defendants' logic goes like this:

- A special relationship requires "involuntary restraint" (Def. Br. at 13);
- Defendants "had no control over the location of the Plaintiffs after April 2020" (Def. Br. at 15);

- Therefore, "after April 2020 … no special relationship could exist." Def. Br. at 14.

But that syllogism relies on equivocation and begs the question. In the context of the special relationship doctrine, words like "restraint," "custody," and "control" simply do not mean what Defendants say they do.

The Children were placed in Father's apartment by Defendants, through Defendants' custodial power, and remained subject to removal at Defendants' discretion. Thus, the special relationship continued uninterrupted, and the district court should be affirmed.

### A. A Special Relationship Exists If The State Retains Ultimate Responsibility For A Child's Safety And Wellbeing.

The district court's holding was consistent with the test this Circuit uses to determine if a special relationship exists: there is a special relationship as long as the state "retains *ultimate responsibility* for [a] child's food, shelter, clothing, medical care, and reasonable safety." *Maldonado v. Josey*, 975 F.2d 727, 733 (10th Cir. 1992) (emphasis added).

More than 30 years ago, this Court held that "children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm[.]" *Yvonne L.,* 959 F.2d at 893. "Custody" in this context is different from, for example, a bank's custody of a customer's valuables. Rather, it refers to the right and duty to exercise control over a child's life. Thus, "[a]lthough a child may well be in the 'custody' of … school authorities during school hours, this custody does not amount to a restraint that prohibits the child and his parents from caring for the basic needs of the child." *Maldonado*, 975 F.2d at 732–33. There is no special relationship between schools and students because "parents decide where their children will be educated[.]" *Id*. at 732.

17

Conversely, once some other party becomes ultimately responsible for a child's welfare, the special relationship ends as a matter of law. This is analogous to a relay runner passing a baton. As soon as the baton leaves the state's hands, the special relationship ends. *Smith v. D.C.*, 413 F.3d 86, 96 (D.C. Cir. 2005) ("Courts have typically … treat[ed] the custody analysis as an all-or-nothing inquiry."). As this Court explained in *Dahn v. Amedei*, 867 F.3d 1178 (10th Cir. 2017):

> We note the importance of Dahn's adoption date. On December 11, 2008, Oklahoma, Colorado, and Adoption Alliance finalized Lovato's adoption of Dahn. This meant that after December 11, no state—neither Colorado nor Oklahoma—had custody of Dahn. This, in turn, affects the special-relationship claim, because after his adoption, Dahn was not completely dependent on any state to satisfy his basic human needs

*Id*. at 1186 fn. 7. And in *Matthews v. Bergdorf*, 889 F.3d 1136 (10th Cir. 2018):

> [A] child alleged to be adopted … [or] living with an adult pursuant to a guardianship … is not in the custody of the State and, unlike a foster child, does not have a special relationship with the State. An adopted child is in the custody of his or her adoptive parents. Similarly, a child living in Oklahoma pursuant to a court-ordered guardianship is in the custody of his or her guardian."

*Id*. at 1146. *See also, Johnson ex rel. Cano v. Homes*, 377 F. Supp. 2d 1039, 1046 (D.N.M. 2004) ("*Cano I*"), *aff'd sub nom. Johnson ex rel. Est. of Cano v. Holmes*, 455 F.3d 1133 (10th Cir. 2006) ("*Cano II*") ("Until the adoption was finalized on July 31, 2000 … state law charged CYFD with the duties to 'determine where and with whom [Grace] shall live;' and to 'provide [Grace] with food, shelter, education, and ordinary and emergency medical care.'" (Quoting NMSA 1978, § 32A–1–4N) (Modifications original)).

The above cases illustrate that a special relationship "neither turns on physical presence nor day-to-day control." *A.M. ex rel. Youngers v. New Mexico Dep't of Health*, 65 F. Supp. 3d 1206, 1259 (D.N.M. 2014) (collecting cases). Rather, courts "focus on which individual or agency society deems most responsible for a child or

individual's well-being." *Id.* In other words, where a child lives is less important than who gets to *decide* where the child lives. *DeShaney,* 489 U.S. at 196 ("the Due Process Clause of the Fourteenth Amendment was intended to prevent government from *abusing its power*[.]") (Quotations omitted) (emphasis added). Thus, "if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs." *Yvonne L.,* 959 F.2d at 893.

Cases from other circuits illustrate these principles. For example, in *Smith*, a teenager named Tron was murdered while in the District of Columbia's legal custody. 413 F.3d at 94. The murder occurred at an apartment provided to Tron by a third-party contractor, as part of an "independent living program[.]" *Id.* at 89. The court found that a special relationship existed even though Tron "live[d] on [his] own", (*id.* at 89), and "could come and go[.]" *Id.* at 94. Central to the court's reasoning, "Tron was legally bound to participate in [the program] and live at the site it provided. He could not have gone elsewhere even if, for example, he felt threatened by his roommate or his neighbors." *Id.* 95 (D.C. Cir. 2005). So, even though Tron was not physically controlled on a moment-to-moment basis, "the District's control over Tron *restrained his liberty against his will*. … Tron had to live at Queenstown Apartments. He had no choice." *Id.* at 94 (emphasis added). *See also*, *Camp v. Gregory*, 67 F.3d 1286, 1295 (7th Cir. 1995) ("to the extent Gregory and the DCFS bore a duty for Anthony's safety when it was appointed guardian, that duty did not terminate when Anthony was placed again with Camp."); *R. F. J. v. Fla. Dep't of Child. & Fams*., 398 F. Supp. 3d 1268, 1276 (M.D. Fla. 2019) ("a closer look at the cases reveals that the decisive factor is not who has custody of the children, but the state's action (or lack thereof) in placing them there.").

## B. The State Of New Mexico Maintains A Special Relationship With Children As Long As They Are In Its Legal Custody

New Mexico law vests CYFD with sweeping authority over the lives of children in its legal custody. CYFD's powers are codified in the Children's Code:

> "[L]egal custody" means a legal status created by order of the court or other court of competent jurisdiction or by operation of statute that vests in a person, department or agency the right to determine where and with whom a child shall live; the right and duty to protect, train and discipline the child and to provide the child with food, shelter, personal care, education and ordinary and emergency medical care; the right to consent to major medical, psychiatric, psychological and surgical treatment and to the administration of legally prescribed psychotropic medications[.]

NMSA 1978, § 32A-1-4(T). And New Mexico courts have consistently held that this "right to determine where and with whom a child shall live" is exclusive to CYFD:

> Additionally, legal custody is a legal status created by court order that vests in a person or agency the right to determine where and with whom a child will live. ... Thus, we conclude that, once legal custody was in the Department, the children's court had no authority to prohibit the Department from placing physical custody of the child with any particular person. Although granting such authority to the children's court might serve a useful purpose, the present statute does not do so.

*State ex rel. Hum. Servs. Dep't*, 1988-NMCA-100, ¶ 9, 107 N.M. 769, 771. *See also, State ex rel. Child., Youth & Fams. Dep't v. Jerry K.*, 2015-NMCA-047, ¶ 31 ("Absent an abuse of its discretion, the Department's 'legal custody' of Children permitted it, alone, to determine where and with whom Children would be placed."); *State ex rel. Child., Youth & Fams. Dep't v. Senaida C.*, 2008-NMCA-007, ¶ 11 ("CYFD has the discretion to place children within the foster system, and the district court [can] only overrule a CYFD decision 'if the court determines that [CYFD] has ... abused its discretion in the placement or proposed placement of the child.'" (citing NMSA 1978, § 32A–4–25(H)(6)) (modifications original)).

It bears emphasis: New Mexico's definition of "legal custody" is extremely broad. So much so that it subsumes the set of custodial powers that some states describe as "physical custody." As explained in CYFD's employee handbook, which has been in place since 2018 and lists Liggett as a contributor:

> The term "legal custody" is defined in the Children's Code. It should be read in harmony with the definitions of "guardian" and "parent." Whoever has legal custody of a child is empowered to make decisions regarding, among other things, where and with whom the child shall live, that is, the physical placement of that child. If legal custody is given to CYFD, placement is in the discretion of CYFD and not the court; CYFD's placement decisions are reviewable by the courts under the abuse of discretion standard. *The term "physical custody" can confuse the two concepts and is no longer used.*

App. Vol. 2 at 187. *Cf. Wooten v. Campbell*, 49 F.3d 696, 699 (11th Cir. 1995) (no special relationship in a case applying Georgia law, where the "public agency [was] awarded legal custody of a child, but [did] not control that child's physical custody."). *See also*, *Est. of Johnson v. La Causa Inc*., No. 10-C-953, 2011 WL 5319909, at *7 (E.D. Wis. June 24, 2011) (unpublished) (distinguishing *Wooton* because "although using the same words, it appears that definitions of physical and legal custody at issue in *Wooten* are very different from those used in the Wisconsin Children's Code.")

Indeed, in *Cano I* the district court found that the duties mandated by Section 32A–1–4(T) triggered a special relationship. 377 F. Supp. 2d at 1047. That holding was affirmed by this Court in *Cano II*: "the state has a special relationship with children in state custody." 455 F.3d at 1143. *See also*, *Smith*, 413 F.3d at 94 ("the District's legal custody over Tron is a good indicator that it had a duty to look after him. Because the District, rather than Tron's family, had primary legal control over him, the District had legal responsibility for his daily care."); *Matthews*, 889 F.3d at 1146 (special relationship where an Oklahoma state statute "impos[es] on [child

protective services] the duty to provide for the care and treatment of a child placed in [child protective services] custody").

## C. A Trial Home Visit Does Not End The Special Relationship.

Under New Mexico law, a trial home visit does not change the legal relationship between CYFD and a child in state custody. During a trial home visit the child "resides with the parent or guardian while services are provided to the child and family [by CYFD] *to ensure safety of the child*." N.M. Admin. Code 8.10.7.7(KK) (emphasis added).

A trial home visit neither grants custodial power to a child's parents nor functions as a relinquishment of CYFD's custodial power. In keeping with CYFD's exclusive authority under Section 32A–1–4(T) to decide where and with whom the child resides, a trial home visit begins and ends at the state's discretion. A parent simply has no right to a trial home visit. *State of N.M. ex rel. CYFD v. Lisa A.*, 2008-NMCA-087, ¶ 9, 144 N.M. 324, 327 ("Despite the trial home visit, there was no guarantee that Child would remain in Mother's care or that Mother would ultimately receive custody of Child at the conclusion of the proceedings."). To drive the point home, the Children's Code does not even include the child's parents in the list of people who are statutorily authorized to challenge a CYFD placement decision. N.M. Stat. Ann. § 32A-3B-9 (C) (stating that a change of placement can be paused if a "child's guardian ad litem or attorney requests a court hearing to contest the proposed placement change"). As the New Mexico Court of Appeals explained in *Jerry K.*, "while Father could and did express his preferences in regard to Children's placement, once Children were legal custodians of the Department, Father was not in a position to decide where or with whom Children would be placed." 2015-NMCA-047 at ¶ 31.

Two cases Defendants cite support the finding that a special relationship continues during a trial home visit. In *A.S. By & Through Blalock v. Tellus*, 22 F.

Supp. 2d 1217 (D. Kan. 1998), Kansas' Social and Rehabilitation Services ("SRS") was granted "temporary custody" of a child. 22 F. Supp. 2d. at 1219. The child resided at her mother's home, where she was later abused. *Id*. SRS had "legal custody" under Kansas law, but the child's mother had "physical custody." *Id*. at 1222. In holding that no special relationship existed, the court pointed to SRS's lack of custodial power over the child:

> the temporary custody statute provides that the children are not to be removed from parental custody absent a finding by the court that "reasonable efforts have been made to prevent or eliminate the need for removal of the child or that an emergency exists which threatens the safety of the child and requires the immediate removal of the child."

*Id*. (quoting K.S.A. § 38—1543(i)). As "[n]o such finding was made in … conjunction with the award of temporary custody[,]" the court doubted that SRS even had "the authority to remove A.S. from her mother's home without further proceedings." *Id*.

Likewise, in *Hubbard v. Oklahoma ex rel. Oklahoma Dep't of Hum. Servs*., 759 F. App'x 693, 696 (10th Cir. 2018) (unpublished), this Court held that a special relationship did not exist during a "trial reunification" that occurred in Oklahoma. The Court reasoned that the special relationship doctrine did not apply because "the children are in the custody of their biological parents." *Id*. at 709. That result was required by Oklahoma law. During a trial reunification, the "legal custody" retained by Oklahoma's Department of Human Services ("DHS") merely "permit[ed] the Department to visit the child in the home of the parent, at school, in a child care facility, or any other setting the Department deems necessary and appropriate." Okla. Stat. Ann. tit. 10A, § 1-4-806(A). Indeed, DHS could not even end the trial reunification without overcoming a rebuttal presumption at an adversarial hearing. *Id*.

A New Mexico trial home visit stands in stark contrast to temporary custody in Kansas and trial reunification in Oklahoma. CYFD's legal custody comes with exclusive authority to decide where and with whom a child will reside. *Johnson*'s discussion of a similar Wisconsin statute is instructive:

> Wis. Stat. § 48.207(1) states that' "[a] child held in physical custody" by the state may be held in "the home of a parent or guardian." This provision seems to suggest that a child could still be in the "physical custody" of the state while living fulltime in a parent's home, which is notably distinct from the conclusion that formed the basis for the holding in Wooten

2011 WL 5319909, at *7. Under New Mexico law, a trial home visit does not limit or modify the state's custodial power. Thus, the special relationship continues regardless of where CYFD decides the child will live.

### D. The District Court Correctly Applied The Law.

The district court correctly held the Children's trial home visit did not terminate the special relationship. That is because during the trial home visit, "the Children remained in the legal custody of CYFD, *not the biological parents' custody*." (Emphasis added). That finding was supported by the record. The Report called for the Children to remain in state custody during the visit. Similarly, the Initial Permanency Order did not mention any rights or responsibilities being transferred to the biological parents. Indeed, the Initial Permanency Order says only that "legal custody would remain with CYFD."

Nonetheless, Defendants assert "[i]t was the parents' responsibility to provide food, shelter, healthcare, and other necessities of life, notwithstanding any support offered by CYFD." Def. Br. at 7. But they cite nothing to support that claim; it is pure *ipse dixit* and contradicts the plain language of Section 32A–1–4(T) and CYFD's own policy manual.

Whether the Children's trial home visit started, continued, or ended, was at Defendants' sole discretion. The Parents had no say. *Lisa A*., 2008-NMCA-087 at ¶ 9. "It should have been obvious [to Defendants] that [they] could not avoid the responsibilities which that decision had placed on [them] merely by delegating custodial responsibility to irresponsible private persons[.]" *K.H.*, 914 F.2d at 851.[3]

Defendants were ultimately responsible for the Children's wellbeing. Until that baton was handed off—such as through reunification—Defendants were obligated to protect the Children from third parties. But reunification was never achieved. Defendants could no more shirk their duties through the contrivance of a trial home visit than they could by dropping the Children off on the side of the road and driving away.

Along the same lines, Defendants may not gaslight their responsibilities away by arguing that "[t]he District Court's failure to identify a specific order by the state court transferring physical custody [to the Parents] is irrelevant and not based on the undisputed facts." Def. Br. at 15. The district court "failed" because no such order exists. The State Court never transferred physical custody (or any custody) to the Parents. This Court should affirm.

### E. Defendants' Proposed "Physical Control" Test Does Not And Should Not Exist.

Defendants do not discuss the ultimate responsibility test. Their brief also omits any mention of *Maldonado*, *Matthews*, and most other relevant Tenth Circuit cases. And despite state law's importance in determining who society deems ultimately responsible for a child's wellbeing, Defendants do not cite a single New Mexico state court case. Nonetheless, Defendants insist that the special relationship

---

[3] This also defeats Defendants' out-of-left-field assertion that "Plaintiffs were not involuntarily placed in the home of their parents." Def. Br. At 21.

inquiry turns on who has physical control of a child at any given moment. Def. Br. at 12. But that position is untenable and lacks support in precedent.

### i. Defendants' physical control test would gut the special relationship doctrine and endanger children.

As a starting point, it is circular to use "physical control," in the abstract, as the measure of a special relationship. People physically control each other whenever they apply force—the whole point of the doctrine is that, in some circumstances, the state has a duty to provide *protection from* that application of force. If failing to protect terminates the special relationship, then the doctrine would be meaningless; it would only apply to harm directly inflicted by state actors.

Yet according to their brief, that is what Defendants believe: "the District Court failed to identify how the Defendants exercised the requisite level of control when it is undisputed that the parents were able to flee New Mexico with the Children." Def. Br. at 24. And as if to eliminate any doubt, Defendants drop this footnote: "***If children were taken by foster parents, that would theoretically support a breach in the duties imposed by a special relationship. That is because the foster parents are agents of the state***. ***The same analysis does not apply to biological parents***." Def. Br. at 24, fn. 4. (Emphasis added). Defendants' argument is breathtaking in its implications. Were this Court to accept it, child protective services workers *would only be obligated to protect foster children from state actors*. The special relationship doctrine would be effectively repealed.

This is not an overstatement. CYFD could, for example, let a kidnapper snatch a foster child off the street. Assuming the kidnapper is not a state actor, the state would be under no obligation to intervene. Defendants take this position even though it is well-established that "liability may attach to a state actor for the violence of a third party if the state restrained the plaintiff's personal liberty and that restraint

hindered the plaintiff's freedom to act to protect himself from the third party." *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002).

And to return to the kidnapping analogy, if Defendants are correct then the special relationship terminates as soon as the kidnapper's van drives off. At that point, the child is "no longer … within the control of the Defendants." Def. Br. at 8. Defendants even acknowledge some of the appalling consequences this sea change in the law would have for this Circuit's children:

> For example, if there had been a fire in the home in which the Children resided with their parents, ***it would not have been the role of Defendants to remove the children from the burning home***. Rather, it would be the responsibility of the parents to immediately act. The parents had the same responsibility to provide food and other immediate needs to Plaintiffs during the trial home visit.

Def. Mot. at 18.

Defendants' position is manifestly unacceptable, and at odds with precedent. Courts have held that a state cannot wash its hands of foster children by sending them off to live with dangerous private actors. *See Cano II*, 455 F.3d at 1140 (duty to investigate remains until adoption is finalized, even though prospective adoptive parents "are not considered public employees nor is their day-to-day conduct as parents regulated and controlled by the State."). Yet, Defendants contend it is constitutionally permissible to stand idly by and watch while children on a trial home visit—who are only there because CYFD wants them to be there—*die in a fire*.

### ii. Defendants' Physical Control Test Is Woven From Whole Cloth

According to Defendants, the district court "ignored or misapprehended" cases that "refute[] the conclusion that a special relationship [can] exist when the state does not maintain physical control over a child." Def. Br. at 16. But the "weight

of authority" Defendants say they have behind their "physical control" test, *id.*, does not exist.

### a. Defendants Misread *Armijo*

To start with, Defendants attach great importance to one paragraph in *Armijo*. There, this Court found that the state did not have a special relationship with a student who committed suicide after a school employee drove him home:

> At most, Armijo was a student in a public school confined in Herrera's car during the drive home from school. Even if such circumstances constituted a custodial relationship, that relationship ended once Armijo exited the car and ran to his house because at that point he was no longer under any involuntary restraint by a school official. "The only 'restraint' imposed upon Armijo after his removal from school was Schutz' directive that he not return to school that day. Otherwise, Armijo was free to do whatever he wanted, including voluntarily leaving his house. Banning a student from the school grounds does not rise to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual. The fact that Armijo ended his life after he was "released" by Herrera bars any liability under the special relationship doctrine.

*Id.* at 1262-63. Defendants contend this paragraph of *arguendo* dicta entitles them to qualified immunity: "as articulated in *Armijo*, a special relationship is determined by the level of control by the state during the time of restraint." Def. Mot. at 16.

But *Armijo* did not say that a special relationship existed while Armijo was in Herrera's car. Nor could it. As *Maldonado* held, a school official like Herrera does not have a special relationship with the school's students. Rather, *Armijo* pointed out that *even if* confinement in the car could create a legal duty, the plaintiff's theory of liability would still not be viable.

And more importantly, Defendants misunderstand *Armijo*. Consider the relationship between Herrera and Armijo immediately after Armijo leaves the car. "Armijo [is] free to do whatever he want[s.]" *Armijo*, 159 F.3d at 1161. Herrera *has no right to make him do anything*. If Herrera forces Armijo to get back in the car, it

would be kidnapping or false imprisonment. Herrera's authority to restrain Armijo is limited to "[b]anning [him] from the school grounds[.]" *Id*. There is no special relationship because—unlike Armijo's parents—Herrera has no custodial power over Armijo. *See also, A.M. ex rel. Youngers v. New Mexico Dep't of Health*, 65 F. Supp. 3d 1206, 1259 (D.N.M. 2014) (rejecting Defendants' reading of *Armijo* because "Armijo was never involuntarily committed to state custody. The school officials, therefore, had no substantive due-process obligations to provide for his safety and security.").

Additionally, if Defendants are right and "a special relationship is determined by the level of control by the state during the time of restraint[,]" Def. Mot. at 16, when exactly did a special relationship exist in *Armijo*? Did Herrera have a special relationship with Armijo while the car was moving, and Armijo could not safely jump out? What if the car was moving slowly? Is the special relationship paused while they are stopped at a red light? Does the existence of a special relationship turn on whether the doors are locked? Defendants do not even attempt to answer these questions.[4]

### b.  Defendants Also Misread *Wooten*

Defendants next mangle the reasoning in *Wooten v. Campbell*, 49 F.3d 696 (11th Cir. 1995). That case arose from the murder of a child by her father. The murder occurred while the child was subject to a custody arrangement that "[b]oth of [the child's] parents consented to[.]" *Id*. at 698. The child's mother, Wooten, "had

---

[4] Defendants' interpretation of *Armijo* has gone through several iterations. First, in their district court reply brief, Defendants asserted that Herrera *did* have a special relationship with Armijo: "In *Armijo*, the special relationship terminated the moment the child left the automobile of the school official driving him home[.]" App. Vol. 1 at 153. Then at oral arguments defendants reversed themselves, saying they "never claimed" that "*Armijo* says that the keeping the child in the car was a special relationship." App. Vol. 1 at 277.

physical custody of [the child] and had consented to visits by [the child's father]." *Id*. at 700. Although the "public agency [was] awarded legal custody of [the] child, [it] d[id] not control that child's physical custody except to arrange court-ordered visitation with the non-custodial parent." *Id*. at 699 (emphasis added).

The court held that no special relationship existed because the state "[did] not control th[e] child's physical custody except to arrange court-ordered visitation with the non-custodial parent." *Id*. The child's mother had also consented to the court-ordered visitation *Id*. at 700 ("Wooten had physical custody of Daniel and had consented to visits by Michael."). Thus, the state had not "impose[d] any limitation on Daniel's personal liberty or freedom to act." *Id*. at 701.

As with this Circuit's special relationship cases, *Wooten* turned on custodial power. "In a foster care situation, the state places the child … into the care of persons *the state has chosen*." *Id.* at 699 (emphasis added). As the child was living with Wooten as part of a consensual custody arrangement, such a placement had not occurred. *See also*, *Milburn v. Anne Arundel County Dept. of Social Services*, 871 F.2d 474, 476 (4th Cir.1989) (state not responsible for the welfare of a child who was *voluntarily* placed in a foster home); *Liebson v. New Mexico Corr. Dep't*, 73 F.3d 274, 276 (10th Cir. 1996) (no special relationship because an inmate's "presence in the prison library … was completely voluntary. … [S]he was free to come and go each day of her employment. Through this employment relationship, she was not taken into state custody and held against her will.").

Moreover, "Wooten maintained the control and dominion of Daniel" because she "*could have petitioned the court* for a change in the custody and visitation arrangements if she felt Michael posed a risk to Daniel's well-being." *Wooten*, 49 F.3d at 700 (emphasis added). In other words, a special relationship was precluded because Wooten retained custodial power over the child.

Still, Defendants claim "the reasoning of the Eleventh Circuit was based on the requisite level of control of the child, or lack thereof, while in the physical custody of the biological mother." Def. Br. at 26. Not so. The court held that a special relationship exists where the state has "primary responsibility" for the child. *Wooten*, 49 F.3d at 701. That is a separate inquiry from who has physical access—indeed, the court found the custody arrangement at issue analogous to a student attending a public school. *Id*. at fn. 5 (citing *Wright v. Lovin*, 32 F.3d 538 (11th Cir.1994), for the proposition that "a child's voluntary school attendance did not create a custodial relationship between himself and the school sufficient to give rise to a constitutional duty of protection.").

## II.   State Created Danger

The district court found the requirements for a state-created danger claim were met, but Defendants insist the holding was "flawed[.]" Def. Br. at 25. Defendants reason that although they worked in concert to subject the Children to a known danger, they "did not create the danger." *Id*. To frame Defendants' position in terms of the Introduction's hypotheticals, the police officer may toss the baby in the dumpster because "returning a child to the *status quo ante* places a child in no greater danger than if the state actors had never intervened." Def. Mot. at 8.

But Defendants are wrong legally and factually. The Constitution does not permit social workers to affirmatively and knowingly act to place children in the path of danger, be it by tossing a baby in a dumpster, or by leaving foster children alone with their abusive father.

And *even if* an exception exists for pre-existing dangers, it would not apply to this case's facts. Placing the Children on a trial home visit did not restore the *status quo ante*, regardless of how the term is defined. Moreover, Defendants ignore numerous actions taken by Defendants after the trial home visit started that enhanced the danger the Parents posed to the Children.

### A. Defendants Misunderstand And Misapply The State-Created Danger Doctrine

Defendants claim the present matter presents "precisely the situation that *DeShaney* held would not support liability pursuant to a danger creation theory." Def. Br. At 26. But that misreads *DeShaney*.

In *DeShaney*, a child (Joshua) was taken into a hospital's temporary custody due to suspected child abuse. 489 U.S. at 192. Three days later, Joshua was returned to his father's custody after a "Child Protection Team" determined "there was insufficient evidence of child abuse to retain Joshua in the custody of the court." *Id*. Over the next six months, a child protective services worker observed obvious signs of child abuse, but no action was taken until after Joshua was beaten into a coma by his father. *Id*. at 193.

The *DeShaney* plaintiff did not challenge the Child Protection Team's decision to return Joshua to his father's custody. Rather, the plaintiff argued that the state was obligated to intervene during the six months that followed. The Supreme Court rejected that theory: "the State does not become the permanent guarantor of an individual' safety by having once offered him shelter." *Id*. at 201.

In *K.H.*, Judge Posner described *DeShaney* as "a 'positive liberties' case, … where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or by other private persons not acting under the direction of the state." *K.H.,* 914 F.2d at 848–49.[5] However, *DeShaney* had no application to a case premised on affirmative state action: "the absence of a duty to rescue does not entitle a rescuer to harm the person whom he has rescued." *K.H.*, 914 F.2d at 849. Thus, although saving someone from lynching

---

[5] Judge Posner also wrote the Court of Appeals opinion *DeShaney* affirmed. *See DeShaney by First v. Winnebago Cnty. Dep't of Soc. Servs*., 812 F.2d 298, 304 (7th Cir. 1987) (Posner, J.), *aff'd sub nom. DeShaney*, 489 U.S. 189.

does not obligate the state to save that person again in the future, "[t]he state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he will be no worse off than if he had not been saved." *Id. See also, Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013), *as amended* (June 14, 2013) (courts "distinguish cases where officials might have done more from cases where officials created or increased the risk itself." (Cleaned up)); *Bank of Ill. v. Over*, 65 F.3d 76, 78 (7th Cir.1995) ("[i]f the [social workers] knowingly placed [plaintiff] in a position of danger, they would not be shielded from liability by the decision in *DeShaney*.")

But Defendants say they have found a loophole. They say a state actor must have "made [a pre-existing danger] more dangerous." *Id*. at 26. So, for example, the Constitution allows the state to rescue a person from lynching and then lynch them, provided the state uses the exact same rope and tree. Or, to use the hypothetical in the Introduction, the Constitution prohibits the police officer from tossing the baby into a *different* dumpster, but the dumpster the baby was removed from is fine.

No cases in this Circuit agree with Defendants. To the contrary, this Court has condemned the notion as "arbitrary." *Currier*, 242 F.3d at 920 (agreeing with the dissent in *S.S. v. McMullen*, 225 F.3d 960, 968 (8th Cir. 2000) that "distinctions ... between foster parents and natural parents … are arbitrary").

Tellingly, Defendants' argument that the district court "failed to distinguish *DeShaney*" is premised on a blatant misquote. According to Defendants' brief, "The District Court reasoned that the Plaintiffs in *DeShaney* never alleged that state officials 'fail[ed] to intervene to protect [Joshua] against the risk of violence at his father's hands of which they knew of [sic] should have known.'" Def. Br. at 25. But the district court's order said the opposite:

> In *DeShaney*, the plaintiffs never alleged that state workers violated his due process rights by returning him to his father. Rather, they alleged the officials "fail[ed] to intervene to protect [Joshua] against a risk of

violence at his father's hands of which they knew or should have known."

(citing *DeShaney* at 193).

The district court found that unlike in DeShaney, Defendants were not passive observers. Had Defendants "stood by and [done] nothing when suspicious circumstances dictated a more active role for them," *DeShaney* at 203, the trial home visit would not have occurred. The no-contact order would have remained in place and the Children would have remained at safe foster homes. As the Third Circuit has explained:

> The Supreme Court's focus in *DeShaney* was on the State's failure to remove Joshua a second time from a situation it had reason to believe was dangerous, meaning the State's decision to leave Joshua with his father was a maintenance of the status quo. … The setting here, by contrast, was a kindergarten classroom where students presumably were safe from outside dangers. When Littlejohn allowed Jane to leave the classroom with an adult who failed to produce proper identification or verification, he exposed Jane to a danger she would not have otherwise encountered.

*L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 243 (3d Cir. 2016). And so too here. "[T]his was not just a failure to intervene. Under the facts as [the district court found them], [Defendants] had the authority to release [the Children] from [their foster homes] and used it." *Id*. at 244. The district court's reasoning was sound.

### B. The *Status Quo Ante* Was Not Restored

Even if the state-created danger doctrine has a loophole, Defendants cannot walk through it. That is because Defendants' arguments are built on a false premise. Defendants insist they did nothing more than restore the *status quo ante*, but their brief leaves the term undefined. It merely says the status quo ante was "custody of the Children with their biological parents[.]" Def. Br. At 2. Yet the brief also fails to define "custody." That is the canary in the coalmine, alerting the Court that something is amiss.

The moment before CYFD took the Children into custody, the Parents retained full custodial power over the Children. However, the Parents had no physical control over the Children. HPD had placed the Parents under arrest and physically separated them from the Children. If the Parents wished to physically harm the Children, they could not do so. Defendants concede this point. Def. Br. At 4 ("The parents were arrested by local police, which left the Children without a guardian.").

When the Children were placed in New Mexico's legal custody, the Parents were stripped of their parental rights. All custodial power was transferred to CYFD. The Children were then sent to live with non-relative foster parents, and a state criminal court imposed a no-contact order on the Parents. So, the Parents continued to be denied access to the Children.

Finally, when the trial home visit started, Defendants granted the Parents physical control over the Children by leaving them unsupervised with the Parents. However, the Parents still had no custodial power over the Children. That situation continued for the next six months and ended with the Parents' arrest in December of 2020.

This chart summarizes the above sequence of events:

**Parents' Relationship to the Children**

|  | Custodial Power | Physical Control |
|---|---|---|
| **Morning of 6/3/19 (prior to arrest by HPD)** | **Yes** | **Yes** |
| **Afternoon 6/3/19 (after arrest by HPD)** | **Yes** | **No** |
| **Evening of 6/3/19 to 4/29/20 (CYFD custody)** | **No** | **No** |

| 4/30/20 to 12/20 (trial home visit) | No | Yes |
| --- | --- | --- |

Defendants argue "the *status quo ante* was restored by return of the Children to the biological parents from whom they were taken." Def. Br. At 17. Yet the trial home visit did not "restore" anything. Prior to CYFD taking custody, the Parents had custodial power over the Children, but no physical control. The Children were protected from the Parents by HPD. During the trial home visit, the Parents had physical control but no custodial power. Courts have recognized that the status quo ante is not "restored" in analogous cases. *Horton v. Flenory*, 889 F.2d 454, 458 (3d Cir. 1989) (liability where the defendants' actions "significantly changed the nature of the plaintiffs' custody."); *Est. of Johnson v. La Causa Inc*., No. 10-C-953, 2011 WL 5319909, at *9 (E.D. Wis. June 24, 2011) ("Arkisha was despondent and hopeless because she feared she would never regain custody of Will and expressed the view that if she could not have Will, then no one could. … Placing Will into this danger could plausibly amount to a violation of Will's substantive due process rights[.]").

### C. Defendants Increased The Danger To The Children

Even if Defendants' actions could be characterized as restoring the *status quo ante*, that is not all Defendants did; they also cut off aid from third parties. That precludes summary judgment.

The district court found that—to start the trial home visit—Defendants took an axe to layers of protection that third parties had erected. That includes Defendants' affirmative misrepresentations to the State Court and GAL, suppression of abuse disclosures, and duping the state court into removing the no-contact order. And after the Children disappeared, Defendants obstructed an HPD search warrant and blocked an Amber Alert. Garza even directed her subordinates not to talk to the police.

These actions were *intended* to prevent other people from assisting the Children, and part of this appeal's factual universe. *Armijo*, 159 F.3d at 1263 (state created danger claim where a state actor "cut[s] off potential sources of private aid."); *Currier*, 242 F.3d at 921 ("Medina can be liable for danger creation because she instructed Juarez to stop making allegations of abuse."); *Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990) ("constitutional wrong" where the state "cut[] off private sources of rescue"). As the district court correctly noted, Defendants' actions paralleled those found unconstitutional in *T.D. v. Patton*, 868 F.3d 1209 (10th Cir. 2017).

## III.  Clearly Established Law

Defendants argue that clearly established law does not prohibit social workers from subjecting a child in state custody to threats posed by the child's biological parents. That argument fails because no reasonable social worker in Defendants' shoes would believe their actions were lawful.

### A. Special Relationship

"[C]ases demonstrate that … substantive due-process obligations to protect children from their biological parents … arise when the state assumes the role of guardian" *A.M.*, 65 F. Supp. 3d at 1259. That was the role the state assumed after "The parents were arrested by local police, which left the Children without a guardian." Def. Br. at 4.

Defendants' actions were of the type found unconstitutional in prior cases. Defendants knowingly misled the State Court. *Schwartz v. Booker*, 702 F.3d 573, 580 (10th Cir. 2012) ("that state officials could violate foster children's substantive due process rights if they knew of an asserted danger to a foster child."). Likewise, Defendants abdicated any semblance of professional judgment. *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018).

Nonetheless, Defendants assert that an *exception* might exist: "no constitutional violation based on a special relationship can be found when a child is placed in the home of a biological parent from whom she was taken." Def. Br. at 23. But a defendant is only entitled to qualified immunity if "an exception to bedrock constitutional principles *clearly exists*." *Mascorro v. Billings*, 656 F.3d 1198, 1209 (10th Cir. 2011) (emphasis added). That threshold is not met here.

First, Defendants mix up the cart and the horse when they say: "the District Court and Plaintiffs failed to identify any case authority that equates placing children on a trial home visit with their biological parents with placing children in foster care." Def. Br. At 23. Children in CYFD's legal custody are not "placed" in foster care. They are already in foster care. And while they are in foster care, CYFD decides where they will live, such as in "non-relative foster care," "relative foster care," or a trial home visit. The Children entered foster care in June 2019 and have remained there to this day—the state has *never* relinquished its custodial power to determine where and with whom the Children will reside. That is the essential characteristic of foster care. *See Wooten*, 49 F.3d at 699 ("In a foster care situation, the state places the child … into the care of persons the state has chosen."). Even Defendants concede the point. *See* Def. Br. At 17 ("In foster care, the state chooses to place a child into the care of someone of the state's choosing.").

Third, do Defendants seriously contend that the special relationship obligates social workers to protect a foster child from everyone on the planet *except* "a biological parent from whom [the child] was taken" (Def. Br. 23)?[6] If so, Defendants cite no on-point authority; as already discussed, *Hubbard* and *A.S.* involve situations where the state's custodial power is insufficient to trigger a special relationship. Those cases do not say—or even suggest—that the special relationship is paused or

---

[6] Defendants are describing the first scenario in the Introduction, where a social worker brings a child to her father so that she can be murdered.

limited depending on who is in the room, or the identity of the person who wishes to harm a child. To the contrary, *Yvonne L.* unequivocally held that "children in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm[.]" 959 F.2d at 893. *See also, Smith*, 413 F.3d at 96 (D.C. Cir. 2005) ("Courts have typically … treat[ed] the custody analysis as an all-or-nothing inquiry.").

### B. State-Created Danger

This Circuit has also never left the door open to the idea that the state-created danger doctrine allows social workers to knowingly place foster children in the path of a dangerous biological parent. On the contrary, that door was slammed long ago.

The closest a court has come to suggesting an exception may exist for biological parents is *K.H.* There, the court noted in dicta:

> [T]here is indeed a difference between placing a child with a member of her family and placing the child with a foster parent. … State employees who withhold a child from her family run the risk of being sued by the family for infringing their liberty of familial association, … and we do not want to place child welfare workers on a razor's edge— damned if they return the child to its family and damned if they retain custody of the child or place him in a foster home or institution.

914 F.2d at 852–53. However, this Court specifically rejected any hypothetical "difference" between biological parents and foster parents:

> Our conclusion that danger creation law was clearly established at the time of the events underlying this suit is not undermined by the Seventh Circuit's dicta in *K.H. v. Morgan* suggesting that placing a child with a family member might insulate the state from all constitutional liability. Never before has this court indicated that state employees would be justified in relying on the isolated dicta of another circuit court to create an exception to a general theory of liability established by Tenth Circuit and Supreme Court cases, and it will not do so now. Such a rule would make state employees immune from constitutional obligations determined to exist by this court or the Supreme Court, based on the non-binding musings of other circuit courts.

*Currier*, 242 F.3d at 924 (citations omitted). As a matter of law, *K.H.*'s dicta is insufficient to clearly establish an exception for biological parents. *Taylor*, 592 U.S. at 13 (Alito, J. concurring) ("Although this Court stated in *Hutto* that holding a

prisoner in a 'filthy' cell for 'a few days' 'might be tolerable,' that equivocal and unspecific dictum does not justify what petitioner alleges." (citations omitted)). That is especially true given *Hubbard*'s acknowledgment that a "[s]tate-created danger claims can apply to placement with a biological parent as well as a foster parent," if the child "experience[s] an immediate increase of vulnerability to private danger when placed with his biological [parent]" and the social worker "ha[s] significant pre-placement warning signs of the [parent's] behavior. 759 F. App'x 693, 709 at fn. 9.

Additionally, the concerns raised in Judge Posner's "damned if you do, damned if you don't" dilemma simply do not exist here. Parents have no right to a trial home visit. *Lisa A*., 2008-NMCA-087 at ¶ 9 ("Despite the trial home visit, there was no guarantee that Child would remain in Mother's care or that Mother would ultimately receive custody of Child at the conclusion of the proceedings."). Unlike the trial reunification in *Hubbard*, whether a trial home visit takes place or continues does not implicate a parent's right to familial association.

A harder case *might* exist if reunification had occurred prior to the Children's injuries. Then, there would at least be some logic to Defendants' concern about "the State [being] … exposed to constitutional liability every time it returned children to biological parents absent a clear showing that the biological parents were safer than foster care." Def. Br. at 9. But reunification did not happen in this case. The Children were never "returned" to Parents. All the trial home visit did was place the Children in danger's path.

### C. This Is An Obvious Case

Even if Circuit precedent was not analogous, "Qualified immunity exists to protect mistaken but reasonable decisions, not purposeful criminal conduct." *Rosales v. Bradshaw*, 72 F.4th 1145, 1157 (10th Cir. 2023). Thus, this would still be an "obvious case, where the unlawfulness of the officer's conduct is sufficiently

clear" to deny Defendants' qualified immunity claim. *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (quotations omitted). Defendants knowingly misled multiple courts and obstructed HPD's efforts to locate the Children. Garza even told her subordinates not to talk to the police. Any reasonable social worker would understand that "actions allegedly designed to shield and protect [an abuser] … could give rise to constitutional liability under the state-created danger exception." *Matthews*, 889 F.3d at 1152. Defendants "were not asked to make any split-second decisions[.]" *Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1175 (D.N.M. 2021). Rather, they engaged in a monthslong pattern of "conscious wrongdoing[.]" *Rosales*, 72 F.4th 1158. Qualified immunity does not protect Defendants.

## IV. Defendants' Remaining Arguments

Defendants offer several additional arguments that are omitted from their Statement of Issues. Most of these "issues" are not abstract legal questions suitable for review. *See e.g.* Def. Br. at 33 (requesting reversal due to lack of "corroborating evidence").

### A. Causation

Defendants purport to dispute the district court's conclusion that their actions "increased the risk of immediate harm to the Children." Def. Br. At 35. On close inspection, however, Defendants are really arguing about factual findings.

To start with, the district court correctly stated the law when it said the "real focus … in on government actions that create a high probability of serious and substantial harm." *See Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995) ("Plaintiff must demonstrate that … Defendants' conduct put Uhlrig and the other members of that group at substantial *risk* of serious, immediate and proximate harm[.]" (emphasis added)). The emphasis on risk is logical in a qualified immunity motion, as that is the only thing the defendant controlled when the challenged decision was made. By analogy, say a foster child asks a social worker to borrow a

revolver to play Russian Roulette with some friends, and the social worker obliges. Liability would not hinge on how many cylinder spins and trigger pulls it takes for someone to die.

Defendants rely on *Henry v. City of Erie*, 728 F.3d 275 (3d Cir. 2013), which arose from the death of Section 8 housing residents in an apartment fire. The plaintiffs contended that the City of Erie should have terminated the building's Section 8 eligibility prior to the fire, due to the owner's failure to install a fire escape. *Id*. at 279. The court, however, held that the "defendants' approval and subsidization of the apartment did not lead 'fairly directly' to the fire." *Id.* at 285.

This Court reached a similar conclusion in *Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002). There, a plaintiff brought suit based against state officials who issued a license to a daycare facility where a child was later injured. The plaintiff's theory was the license should have been denied because the facility's owner had a history of domestic violence. This Court rejected a state-created danger claim because:

> [I]mproper licensure did not impose an immediate threat of harm. Rather, it presented a threat of an indefinite range and duration. Moreover, the licensure affected the public at large; it was not aimed at J.R. or Ms. Ruiz directly. *Unlike the direct placement of a child into an abusive home*, the mere licensure of Tender Heart was not an act directed at J.R. which, in and of itself, placed J.R. in danger.

*Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002) (emphasis added).

In *Henry* and *Ruiz*, the state's actions did not by themselves create the risk of harm. They were just minor links in the causal chain. That would be true had the harm manifested one day after the state action or one year.

The present matter, on the other hand, *does* "involve the direct placement of a child in the hands of an abuser." *Ruiz v. McDonnell*, 299 F.3d 1173, 1185. And the Parents absconded within two weeks of M.B.'s placement; the Children were

presumably subjected to an itinerant, abusive environment from then on. M.B. was found, she had "healing skull fractures."

Finally, Defendants' request for an arbitrary temporal cutoff is especially uncalled for here, given that *Defendants acted to hinder the efforts of third parties to rescue the Children from their abusers*. The district court was correct that "Plaintiff's evidence raises a jury question whether Defendants' alleged withholding of relevant information about Father and placing the Children in his home put them at risk of serious, immediate, and proximate harm."[7]

### B. Conscience Shocking Conduct

Finally, Defendants say that "the placement of the Children on a trial home visit does not shock the conscience as a matter of law." Def. Mot. at 37. But Defendants spin many of the district court's factual findings and flat-out ignore others. The law is clear that Defendants must "concede the most favorable view of the facts to the plaintiff for purposes of the appeal" and discuss only legal issues. *Henderson v. Glanz*, 813 F.3d 938, 948 (10th Cir. 2015) (quotations omitted).

For example, Defendants describe A.D. and R.B.'s abuse disclosures this way: "At worst, there were indications that a therapist for the Children had concerns that the father often became angry and that the Children were afraid of him." Def. Br. at 40. But that is not the "worst" inference that can be drawn from the disclosures. One

---

[7] Defendants also argue "Plaintiffs have offered no evidence of the cause of the injury to the child, let alone proof that it was an immediate consequence of any identifiable actions by the Defendants." Def. Br. At 10. But as discussed at oral arguments, that was not a basis for summary judgment in their motion. *See* App. Vol. 1: 268-271. The district court was unsure if supplementation was needed but encouraged the parties to confer on possible solutions. App. Vol. 1: 280-284. Before the parties could agree on a solution, the district court denied the motion. If the precise cause of M.B.'s injuries is material to this appeal's resolution, the issue should be developed on remand.

could also infer that A.D. and R.B. meant what they said, and that Father beat his children. In the head. A lot.

Along the same lines, the district court found that Liggett suborned perjury, an action Defendants sugarcoat as "preparing Ivy Woodward to provide testimony[.]" Def. Br. at 42. That is like calling a plane crash an unexpected reduction in speed and altitude.

Defendants' brief is littered with similar inappropriate recastings of the district court opinion:

| District Court Finding | Defendants' Spin |
| --- | --- |
| "Liggett withheld documents responsive to a search warrant served on CYFD by the Hobbs Police Department[.]" App. Vol. 1 at 187. | "Such actions have reasonable explanations rather than being beyond the realm of behavior acceptable in a civilized society." Def. Br. at 42. |
| "Mazy was ultimately coerced by … De Los Santos into unsubstantiating A.D. and R.B.'s abuse disclosures." App. Vol. 1 at 185. | "Ms. De Los Santos … doubt[ed] the claims of physical abuse[.] … At worst, Ms. De Los Santos made a mistake in judgment." Def. Br. at 43. |
| "Saldana filed [the] … Report in state court. … [T]he Report contained misleading statements or omissions." App. Vol. 1 at 185. | "At worst, Ms. Saldana did not include information that Plaintiffs believe relevant. … [S]he had a difference of opinion with Plaintiffs." Def. Br. at 44. |
| "Garza … ordered Woodward to stop communicating with the GAL about the case[.]" App. Vol. 1 at 183. | "[T]he Children had an attorney to advance their position in an adversarial proceeding." Def. Br. at 44. |

The only abstract question of law Defendants even arguably raise is the contention that actions cannot shock the conscience unless they were "intended to cause harm to the Children." Def. Mot. at 11. But this Circuit has never required that. *See e.g.*, *Schwartz*, 702 F.3d at 585 ("Booker and Peagler were aware of Chandler's circumstances and were the custodial officials responsible for overseeing

Chandler's foster care case. To conclude otherwise, … would artificially constrain the doctrine beyond reason.").

## CONCLUSION

For the foregoing reasons, the Court should affirm and remand for trial.

Respectfully submitted,

Date: 1-29-25        _____

Benjamin Gubernick
Attorney for Plaintiff-Appellee
717 Texas Ave. Suite 1200
Houston, TX 77002
ben@wglawllp.com
346-277-0287

-and-

Todd J. Bullion
Attorney for Plaintiff-Appellee
4801 Lang Ave NE, Suite 110
Albuquerque, NM 87109
todd@bullionlaw.com
505-494-4656

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the type-volume limitation of Fed. R. App. P. 32a, the word limit of Fed. R. App. P. 7(b), excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X ] this document contains 12,748 words,

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X] this document has been prepared in a proportionally spaced typeface using <Microsoft Word> in <14 point Times New Roman.

Date: 1-29-25

_____
Benjamin Gubernick
Attorney for Plaintiff-Appellee
717 Texas Ave. Suite 1200
Houston, TX 77002
ben@wglawllp.com
346-277-0287

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was furnished by electronic means and/or served via the CM/ECF certificate of delivery to the following on January 29, 2025:

James Grubel
Attorney for Defendants-Appellants
 jgrubel@parklawnm.com

Date: 1-29-25

_____

Benjamin Gubernick
Attorney for Plaintiff-Appellee
717 Texas Ave. Suite 1200
Houston, TX 77002
ben@wglawllp.com
346-277-0287

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I further certify that all required privacy redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or Scanned PDF format is an exact copy of the written document filed with the Clerk, and that the digital submissions have been scanned for viruses with the most recent version of Windows Defender and according to this program, they are free from viruses.

Date: 1-29-25

_____
Benjamin Gubernick
Attorney for Plaintiff-Appellee
717 Texas Ave. Suite 1200
Houston, TX 77002
ben@wglawllp.com
346-277-0287